No. 25-1654

IN THE UNITED STATES COURT OF APPEALS FOR THE
EIGHTH CIRCUIT

MERCY HEALTH NETWORK, INC. d/b/a MERCYONE,
Appellant,

v.

MERCY HOSPITAL, IOWA CITY, IOWA, *et al.*,
Appellees

DAN CHILDERS, SUCCESSOR LIQUIDATION TRUSTEE OF THE MERCY
HOSPITAL LIQUIDATION TRUST,
Trustee-Appellee

_____

On Appeal from the United States District Court
for the Northern District of Iowa, Cedar Rapids Division

_____

**BRIEF OF APPELLANT**

_____

David B. Goroff
Nora J. McGuffey
**FOLEY & LARDNER LLP**
321 N. Clark Street, Suite 3000
Chicago, IL 60654
(312) 832-4500
dgoroff@foley.com
nora.mcguffey@foley.com

*Counsel for Appellant Mercy Health
Network, Inc. d/b/a MercyOne*

*Oral Argument Requested*

## SUMMARY OF THE CASE AND REQUEST FOR ORAL ARGUMENT

In this appeal, Appellant Mercy Health Network, Inc., d/b/a MercyOne ("MercyOne") challenges the confirmation of a Chapter 11 Bankruptcy Plan ("Plan"), because it contains Debtors' and Third-Party Releases (together, "Releases") that release claims against thousands of parties who provided no consideration, causing the Plan to fail the requirements of *In re Master Mortg. Inv. Fund, Inc.,* 168 B.R. 930 (Bankr. W.D. Mo. 1994) ("*Master Mortgage*"). MercyOne additionally challenges the Third-Party Release because it does not require the affirmative consent held necessary by *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204 (2024) ("*Purdue*"). The District Court, affirming the Bankruptcy Court, rejected MercyOne's arguments and upheld the Releases. The District Court also found that MercyOne lacked standing to appeal, despite being an impaired creditor. If that standing ruling is affirmed, it would create a needless circuit split with the Second and Ninth Circuits. *In re DBSD N. Am., Inc.*, 634 F.3d 79, 89 (2d Cir. 2011); *In re P.R.T.C. Inc.*, 177 F.3d 774, 778 (9th Cir. 1999).

MercyOne respectfully requests oral argument. This appeal concerns novel issues related to a chapter 11 plan's release of claims under *Master Mortgage,* 168 B.R. 930, not previously considered by this Court. This also is the first appeal to raise what constitutes requisite "consent" after *Purdue*. MercyOne respectfully requests that it be given 20 minutes for its oral argument.

i

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.l(a), Appellant Mercy Health Network, Inc., d/b/a MercyOne, states that it is a Delaware nonstock corporation whose sole member is Trinity Health Corporation, an Indiana nonprofit corporation.

4905-5069-0369.8

# TABLE OF CONTENTS

SUMMARY OF THE CASE AND REQUEST FOR ORAL ARGUMENT ............ i

CORPORATE DISCLOSURE STATEMENT ......................................... ii

TABLE OF CONTENTS ............................................................... iii

TABLE OF AUTHORITIES........................................................... v

JURISDICTIONAL STATEMENT ................................................. 1

ISSUES PRESENTED................................................................. 1

STATEMENT OF CASE ............................................................. 3

      A.     Factual Background............................................................ 3

           1.     The Plan Includes Impermissible Wholesale Releases of Remote Released Parties............................................. 4

           2.     The Plan Provides No Mechanism For Opting In To The Third-Party Release.......................................... 6

           3.     The Plan Singles Out MercyOne As Not Released ................... 7

           4.     Debtors' CRO Admits Debtors Did No Investigation Of The Remote Releases ..................................... 8

           5.     The Bankruptcy Court Confirms The Plan And Rejects A Stay........................................................ 10

           6.     The OC Pursues Rule 2004 Discovery From MercyOne ......... 11

SUMMARY OF ARGUMENT.................................................... 12

ARGUMENT ........................................................................ 15

      A.     Standard of Review .......................................................... 15

      B.     The District Court Erred In Holding That MercyOne Lacked Standing To Appeal The Plan's Approval Of The Remote Releases ......................................................... 15

1. MercyOne Has Standing To Challenge The Remote Releases As An Impaired Creditor ............................................. 16

2. The OC Members' Statement That It Will Pay MercyOne's Claim Does Not Deprive MercyOne Of Standing ..................................................................... 28

3. MercyOne Has Standing Because It Faces Pecuniary Harm Responding To Discovery Pursued By The OC, Which Was Appointed Under An Unconfirmable Plan ............ 29

4. Mercy One Has Standing To Challenge The Third-Party Release ................................................................... 30

C. The Courts Below Erred In Upholding The Releases On The Merits ................................................................... 35

1. The Remote Releases Caused The Plan To Fail §1129(a)(1) ..................................................... 35

2. The Remote Releases Fail *Master Mortgage* ........................... 36

3. An Opt-Out Right Cannot Save The Third-Party Release ........ 48

4. The District Court's Attempts To Distinguish *Purdue* Failed ................................................................... 50

5. The Business Judgment Rule Cannot Save The Releases ........ 56

CONCLUSION ................................................................... 57

CERTIFICATION OF COMPLIANCE ................................................................... 58

CERTIFICATE OF SERVICE ................................................................... 58

4905-5069-0369.8

# TABLE OF AUTHORITIES

Page(s)

Cases

*General Intermodal Logistics Corp. v. Mainstream Shipyards & Supply, Inc.*,
   748 F.2d 1071 (5th Cir. 1984)..................................................................44

*Harrington v. Purdue Pharma L.P.*,
   603 U.S. 204 (2024) ..................................................................... passim

*Hayton Farms, Inc. v. Pro-Fac Co-op, Inc.*,
   2011 WL 4344549 (W.D. Wash. Sept. 14, 2011) ..................................44

*In re Affiliated Foods, Inc.*,
   249 B.R. 770 (Bankr. W.D. Mo. 2000)..................................................20

*In re AFY*,
   734 F.3d 810 (8th Cir. 2013).................................................................27

*In re Amos*,
   624 B.R. 657 (B.A.P. 8th Cir. 2021).......................................................15

*In re Avianca Holdings S.A.*,
   632 B.R. 124 (Bankr. S.D.N.Y. 2021) ........................................... 55, 56

*In re Bennett*,
   154 B.R. 157 (N.D.N.Y. 1993) ..............................................................44

*In re Boston Harbor Marina Co.*,
   157 B.R. 726 (Bankr. D. Mass. 1993) ...................................................33

*In re Canal Street Ltd P'ship*,
   269 B.R. 375 (B.A.P. 8th Cir. 2001).......................................................20

*In re Chassix Holdings, Inc.*,
   533 B.R. 64 (Bankr. S.D.N.Y. 2015) ............................................. 32, 49

*In re Citation Corp.*,
   371 B.R. 518 (N.D. Ala. 2007)..............................................................27

*In re City Homes III, LLC*,
   564 B.R. 827 (Bankr. D. Md. 2017) .......................................................36

*In re Civic Partners Sioux City, LLC*,
   2013 WL 5534743 (Bankr. N.D. Iowa Oct. 7, 2013) ...........................36

*In re Combustion Eng'g*,
   391 F.3d 190 (3d Cir. 2004)..................................................................27

*In re Comm. W. Fin. Corp.*,
   761 F.2d 1329 (9th Cir. 1985)...............................................................18

*In re Conseco, Inc.*,
   301 B.R. 525 (Bankr. N.D. Ill. 2003) ....................................................33

*In re DBSD N. Am., Inc.*,
  634 F.3d 79 (2d Cir. 2011) .......................................................................... passim

*In re Dean Hardwoods, Inc.*,
  431 B.R. 387 (Bankr. E.D.N.C. 2010) ................................................................52

*In re Dig. Impact, Inc.*,
  223 B.R. 1 (Bankr. N.D. Okla. 1998) ......................................................... 31, 49

*In re Dunes Hotel Assocs.*,
  1997 WL 33344253 (Bankr. D.S.C. 1997) ..........................................................20

*In re Elec. & Metals Indus., Inc.*,
  153 B.R. 36 (Bankr. W.D. Tex. 1992) .................................................................32

*In re Emerge Energy Servs. LP*,
  2019 WL 7634308 (Bankr. D. Del. Dec. 5, 2019) ........................................ 32, 49

*In re Gilbertson Restaurants, LLC*,
  2005 WL 783063 (Bankr. N.D. Iowa 2005) ........................................................35

*In re Hampton Corp., Inc.*,
  1992 WL 1482466 (D.N.D. July 7, 1992) ...........................................................29

*In re Hecker*,
  496 B.R. 541 (B.A.P. 8th Cir. 2013) ...................................................................27

*In re Hoffinger Indus., Inc.*,
  321 B.R. 498 (Bankr. E.D. Ark. 2005) ................................................................36

*In re Indianapolis Downs, LLC*,
  486 B.R. 286 (Bankr. D. Del. 2013) ....................................................................49

*In re Internet Navigator, Inc.*,
  289 B.R. 128 (Bankr. N.D. Iowa 2003) ...............................................................36

*In re LATAM Airlines Grp. S.A.*,
  2022 WL 2206829 (Bankr. S.D.N.Y. June 18, 2022) ..........................................50

*In re LTV Steel Co.*,
  560 F.3d 449 (6th Cir. 2009) ...............................................................................17

*In re Machne Menachem, Inc.*,
  233 F. App'x 119 (3d Cir. 2007) .........................................................................28

*In re Mallinckrodt PLC*,
  639 B.R. 837 (Bankr. D. Del. 2022) ....................................................................49

*In re Marble Cliff Crossing Apartments, LLC*,
  486 B.R. 887 (Bankr. S.D. Ohio 2013) ...............................................................35

*In re Master Mortg. Inv. Fund, Inc.*,
  168 B.R. 930 (Bankr. W.D. Mo. 1994) ......................................................... passim

*In re Mesaba Aviation, Inc.*,
  418 B.R. 756 (B.A.P. 8th Cir 2009) ....................................................................28

*In re Midway Gold, US, Inc.*,
  575 B.R. 475 (Bankr. D. Colo. 2017) .......................................................... 31, 49

4905-5069-0369.8

*In re Neogenix Oncology, Inc.*,
2015 WL 5786345 (Bankr. D. Md. Oct. 1, 2015) .................................. 1, 2, 31, 49

*In re NESV Ice, LLC*,
661 B.R. 427 (Bankr. D. Mass. 2024) ..................................................35

*In re P.R.T.C. Inc.*,
177 F.3d 774 (9th Cir. 1999)....................................................... i, 2, 18

*In re Peabody Energy Corp.*,
933 F.3d 918 (8th Cir. 2019)................................................................28

*In re Produce Hawaii, Inc.*,
41 B.R. 301 (Bankr. D. Haw. 1984) ....................................................32

*In re Riverbend Leasing*, *LLC*,
458 B.R. 520 (Bankr. S.D. Iowa 2011)........................................ passim

*In re Rohnert Auto Parts, Inc.*,
113 B.R. 610 (B.A.P. 9th Cir. 1990)....................................................35

*In re Roman Catholic Diocese of Syracuse, New York*,
667 B.R. 628 (Bankr. N.D.N.Y. 2024) ........................................... 34, 50

*In re Seaside Eng'g & Surveying, Inc.*,
780 F.3d 1070 (11th Cir. 2015)...........................................................40

*In re Simply Essentials, LLC*,
78 F.4th 1006 (8th Cir. 2023) ....................................................... 17, 25

*In re Smallhold, Inc.*,
665 B.R. 704 (Bankr. D. Del. 2024)........................................... passim

*In re SunEdison, Inc.*,
576 B.R. 453 (Bankr. S.D.N.Y. 2017) ........................................... 32, 49

*In re Sunnyland Farms, Inc.*,
2016 WL 1212723 (Bankr. D.N.M. Mar. 28, 2016)...........................28

*In re Tonopah Solar Energy*,
657 B.R. 393 (D. Del. 2022) ...............................................................21

*In re Tribune Co.*,
464 B.R. 126 (Bankr. D. Del. 2011) ............................................. 40, 43

*In re U.S. Fidelis, Inc.*,
481 B.R. 503 (Bankr. E.D. Mo. 2012)........................................... 39, 40

*In re Wigley*,
886 F.3d 681 (8th Cir. 2018).................................................. 21, 22, 23

*In re Wood*,
647 B.R. 165 (B.A.P. 6th Cir. 2022)....................................................29

*In re Wool Growers Cent. Storage Co.*,
371 B.R. 768 (Bankr. N.D. Tex. 2007)........................................... 33, 48

*In re WR Grace & Co.*,
729 F.3d 332 (3d Cir. 2013)................................................................28

*In the Matter of Fansteel Foundry Corp.*,
　2018 WL 5472928 (Bankr. S.D. Iowa, Oct. 26, 2018)........................................39
*Kane v. Johns-Manville Corp.* (*In re Johns-Manville Corp.*),
　843 F.2d 636 (2d Cir. 1988)........................................................ passim
*Katebian v. Ogier*,
　654 B.R. 402 (N.D. Ga. 2023)........................................................17
*Opportunity Fin. LLC v. Kelley*,
　822 F.3d 451 (8th Cir. 2016)....................................................... passim
*Patterson v. Mahwah Bergen Retail Group, Inc.*,
　636 B.R. 641 (E.D. Va. 2022)..................................................... 32, 49
*Phoenix Premier Properties, LLC v. Fed. Nat'l Mortg. Ass'n*,
　2012 WL 2389955 (D. Ariz. June 25, 2012) ....................................20
*Privacy Info. Ctr. v. U.S. Dep't of Com.*,
　928 F.3d 95 (D.C. Cir. 2019) ........................................................16
*Stutzka v. McCarville*,
　420 F.3d 757 (8th Cir. 2005)........................................................11
*Truck Ins. Exch. v. Kaiser Gypsum Co.*,
　602 U.S. 268 (2024) ....................................................................30
*U.S. v. Love*,
　20 F.4th 407 (8th Cir. 2021) .........................................................26
*United States Aid Funds, Inc. v. Espinosa*,
　559 U.S. 260 (2010) .....................................................................35
*United States v. Ashbritt, Inc.,*
　2009 WL 10668426 (S.D. Fla. July 21, 2009) .................................44
*United States v. Molak,*
　276 F.3d 45 (1st Cir. 2002)...........................................................29
*Wegner v. Grunewaldt,*
　821 F.2d 1317 (8th Cir. 1987)........................................................15

4905-5069-0369.8

## Statutes

11 U.S.C. §363 ...................................................................................................3

11 U.S.C. §547 .................................................................................................24

11 U.S.C. §1123(a)(4) ................................................................................. passim

11 U.S.C. §1129(a) ..................................................................................... 35, 36

11 U.S.C. §1129(b) ...........................................................................................35

11 U.S.C. §1129(a)(1) .........................................................................................1

28 U.S.C. §157(b)(2)(L) .....................................................................................1

28 U.S.C. §158(a) ...............................................................................................1

28 U.S.C. §158(d) ...............................................................................................1

28 U.S.C. §1291 ..................................................................................................1

28 U.S.C. §1334(b) .............................................................................................1

28 U.S.C. §1927 ................................................................................................19

## Rules

Fed. R. App. P. 27(d)(2) ...................................................................................58

Fed. R. App. P. 32(a)(5) ...................................................................................58

Fed. R. App. P. 32(a)(6) ...................................................................................58

Fed. R. Bankr. P. 2004 ........................................................................11, 14, 16

Fed. R. Bankr. P. 9011 .....................................................................................19

Fed. R. Civ. P. 12(b)(6) ...................................................................................19

4905-5069-0369.8

## JURISDICTIONAL STATEMENT

The U.S. Bankruptcy Court for the Northern District of Iowa ("<u>Bankruptcy Court</u>") had jurisdiction under 28 U.S.C. §1334(b). The matter was a core proceeding under 28 U.S.C. §§157(b)(2)(L) and 1334(b). The U.S. District Court for the Northern District of Iowa ("<u>District Court</u>") had jurisdiction under 28 U.S.C. §158(a). The District Court entered its final order and judgment on March 3, 2025. (App.1556-1614, Dist.R._Doc._47; App.1644, Dist.R._Doc._48), and MercyOne filed a notice of appeal on March 31, 2025. (App.1645, Dist.R._Doc._ 49).[1] This Court has jurisdiction under 28 U.S.C. §§158(d)(1) and 1291.

## ISSUES PRESENTED

A.      Did the District Court, affirming the Bankruptcy Court, err in finding that MercyOne lacked standing as an impaired creditor to challenge the Plan's Third-Party Releases, where these caused the Plan to violate 11 U.S.C. §1129(a)(1), because all affected claimants did not affirmatively consent to these, as required by *Purdue*, and MercyOne's opting out of these releases could not be deemed consent?

<u>Relevant authority</u>: *In re Smallhold, Inc.*, 665 B.R. 704 (Bankr. D. Del. 2024); *In re Neogenix Oncology, Inc.*, 2015 WL 5786345, at *5 (Bankr. D. Md. Oct. 1, 2015).

---

[1]Citations to the record in the Bankruptcy Court are cited herein as "Bankr.R._Doc._" and the record in the District Court are cited herein as "Dist.R._Doc._".

4905-5069-0369.8

B.    Did the District Court err in finding that MercyOne, despite being an impaired creditor and despite being burdened with discovery pursued by a Liquidation Trustee and Oversight Committee ("<u>OC</u>") appointed pursuant to an unconfirmable plan, was not an "aggrieved party" with standing to appeal the confirmation of the Plan's Remote Releases, which released claims against thousands of persons and entities who contributed nothing (the "<u>Remote Released Parties</u>") on the ground that it was too speculative to conclude that any actual claim existed against any of these Parties or that the releases in favor of these parties (the "<u>Remote Releases</u>") forfeited potential recoveries for the estate? <u>Relevant authority</u>: *In re DBSD N. Am., Inc.*, 634 F.3d 79, 89 (2d Cir. 2011); *Kane v. Johns-Manville Corp.* (*In re Johns-Manville Corp.*), 843 F.2d 636 (2d Cir. 1988); *In re P.R.T.C. Inc.*, 177 F.3d 774, 778 (9th Cir. 1999).

C.    Did the District Court, in affirming the Bankruptcy Court, err that the release of the Remote Released Parties by the Plan's Debtors' Release satisfied *Master Mortgage*? <u>Relevant authority</u>: *Master Mortgage*, 168 B.R. 930; *In re Riverbend Leasing*, *LLC*, 458 B.R. 520 (Bankr. S.D. Iowa 2011).

D.    Did the District Court, in affirming the Bankruptcy Court, err in finding that the Plan's Third-Party Releases were consensual and are consistent with *Purdue* by treating an "opt out" as an affirmative consent?  <u>Relevant authority</u>: *Purdue*, 603 U.S. 204 (2024); *Smallhold,* 665 B.R. 704; *Neogenix*, 2015 WL 5786345.

2

## STATEMENT OF CASE

### A.    Factual Background

Debtor Mercy Hospital Iowa City ("MIC") is a Catholic-based Iowa non-profit that operates an acute care community hospital and clinics in Iowa City, Iowa. (App.0007, Bankr.R._Doc._27, at 7).[2] MIC had a history of financial problems and in 2017 contracted with MercyOne to provide management services as an independent contractor pursuant to a non-exclusive Management Services And Affiliation Agreement. MercyOne terminated this agreement and ceased performing services in April 2023.

Thereafter, on August 7, 2023, MIC and its affiliates filed a petition for relief under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court. (Bankr.R._Doc._1).

Debtors implemented a sale process under 11 U.S.C. §363 to sell substantially all their assets to another entity that would continue to provide medical care out of the Debtors' facilities. (Bankr.R._Doc._476). The University of Iowa purchased substantially all such assets and continues to provide medical care out of those facilities. (Bankr.R._Doc._476, at 2-3). MIC has no ongoing operations. (Bankr.R._Doc._1043, at 3)

---

[2]MIC and certain of its affiliates and subsidiaries that filed chapter 11 bankruptcy are collectively "Debtors."

4905-5069-0369.8

On February 23, 2024, the Debtors filed their first version of the Plan,[3] which was confirmed by the Bankruptcy Court on June 7, 2024 ("Confirmation Order") (App.1267-1321, Bankr.R._Doc._ 1114).

1. **The Plan Includes Impermissible Wholesale Releases of Remote Released Parties**

The Plan includes two categories of releases: (1) the Debtors' Release—releasing claims that Debtors would have been able to pursue against the six "Key Parties,"[4] who indisputably made substantial contributions to Debtors' bankruptcy and Remote Released Parties; and (2) the Third-Party Release—a release of claims that third parties otherwise could have pursued against Key Parties and Remote Released Parties.[5] The Remote Released Parties include 18 categories of persons and entities connected in some way to each of the Key Parties, *totaling 108 additional categories of "released parties.*" These include each Key Party's:

> current and former directors, managers, officers, predecessors, successors, affiliates, principals, members, management companies, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, and other professionals and advisors[.]

---

[3] The final Plan that was later confirmed was filed on May 14, 2024. (App.0720, Bankr.R._Doc._1050).

[4] The Key Parties are: Debtors; the Unsecured Creditors Committee ("UCC") and its members; the Pension Committee and its members; the Bondholder Representatives, the Mercy Hospital Foundation ("Foundation") and the Sisters of Mercy. MercyOne does not object to the release of the Key Parties.

[5] The Debtors' Releases and Third-Party Releases are together the "Releases."

4905-5069-0369.8

(App.0755, Bankr.R._Doc._1050, at Art.II.A.1.189(g)).

Accepting the Plan required accepting the Remote Releases and forfeiting any potential claim and chance of recovery for the estates. Indeed, the Remote Releases of each Remote Released Party is indisputably broad as they include anything about Debtors, including, *inter alia*, business dealings with Debtors, courses of dealing with Debtors, and implementation of any contracts or releases relating to Debtors (so a release regarding releases). (App.0847-48, Bankr.R._Doc._1050, at Art.XIV.D.1-2).

Specifically, the Releases, *inter alia*, each release these parties:

> **from any claim, Claim, Cause of Action, obligation, suit, judgment, damages, debt, right, remedy, liability, action, proceeding, suit, account, controversy, agreement, promise, right to legal remedies, right to equitable remedies, or right to payment, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising in law, equity, or otherwise, for any act or omission in connection with, relating to, or in any manner arising from, in whole or in part, the Debtors the Debtors' operations, the Chapter 11 Cases, the Sale, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan, the business or contractual arrangements between any Debtor and any Released Party . . . .**

(App.0847-48, Bankr.R._Doc._1050, at Art.XIV.D.1-2) (emphasis original).[6]

---

[6] The Debtors' Release, (App.0847-48, Bankr.R._Doc._1050, at Art.XIV.D.1), is substantially similar to the Third-Party Release, (App.0847-48,

4905-5069-0369.8

## 2. The Plan Provides No Mechanism For Opting In To The Third-Party Release

The definition of "Releasing Parties" expressly includes nondebtor entities (including claimants) who remain silent—*i.e.,* who do not consent. (App.0756, Bankr.R._Doc._1050, at Art.II.A.1.190). For instance, "Releasing Parties" includes those who are not entitled to vote (either by being deemed to "accept" or "reject" the Plan), and do not return a non-voting notice form with the opt-out box checked. Specifically, the Releases extend to:

> (b) each Holder of a Claim that [was] deemed to accept the Plan or is otherwise Unimpaired under the Plan and who [did] not opt out of the voluntary release by checking the opt out box on the applicable non-voting status notice form, and [having] return[ed] [as instructed], indicating that they are not willing to grant the releases provided in the Plan; and (c) each Holder of a Claim that [was] deemed to reject the Plan or [was] otherwise Impaired under the Plan and who [did] not opt out of the voluntary release by checking the opt-out box on the applicable non-voting status notice form, and [having] return[ed] it [as instructed], indicating that they are not willing to grant the releases provided in the Plan."

(App.0756, Bankr.R._Doc._1050, at Art.II.A.1.190(b)).

---

Bankr.R._Doc._1050, at Art.XIV.D.2). The Plan contains an injunction against bringing Claims and Causes of Action from which the Plan's "Released Parties" were released. (App.0849-50, Bankr.R._Doc._1050, at Art.XI.F).

4905-5069-0369.8

The Releases also include not just those who accepted the Plan (even if such claimant were to opt out), but those who rejected the Plan and did not opt out, and those who abstained from voting:

> (a) each Holder of a Claim that (i) vote[d] to accept the Plan or (ii) either (1) abstain[ed] from voting or (2) vote[d] to reject the Plan ***and, in the case of either (1) or (2), [did] not opt out of the voluntary release by checking the opt-out box on the applicable Ballot***, and returning it [as instructed] indicating that they [were] electing to opt out of granting the releases provided in the Plan."

(App.0756, Bankr.R._Doc._1050, at Art.II.A.1.190(a)) (emphasis added). Thus, claimants who failed to return anything (*i.e.*, remained silent) or who did not both affirmatively vote to accept ***and*** properly opt out of the Third-Party Release were deemed to have released their claims, including against the Remote Released Parties.

The Plan posited, solely on information and belief, that the Bondholders would insist on the Releases extending to the Remote Released Parties or would otherwise not support the Plan. (App.0847-48, Bankr.R._Doc._1050, at Art.XIV.D.2). In his First Day Declaration, Mark Toney, Debtors' Chief Restructuring Officer ("CRO"), had identified Bondholders' actions as one of four causes of Debtors' failure. (App.0022-26, Bankr.R._Doc._27, at 22-26).

### 3. The Plan Singles Out MercyOne As Not Released

The Plan acknowledged that MercyOne objected to the Releases and accordingly objected to confirmation. (App.0794, Bankr.R._Doc._1050, at

7

Art.III.D.2). The Plan singled out MercyOne as the one entity not being released. (App.0756, Bankr.R._Doc._1050, at Art.II.1189).[7]

Debtors acknowledged that the Releases might fail, which might cause the Plan to not be confirmed or modified:

> There can be no assurance that the releases, exculpation, and injunction provisions, as provided in Article XIV.D, Article XIV.E, and Article XIV.F hereof, will be granted. Failure of the Court to grant such relief may result in a plan of liquidation that differs from the Plan or the Plan not being confirmed.

(App.0814, Bankr.R._Doc._1050, at Art. VII.A.8). Debtors careered ahead anyway.

### 4. Debtors' CRO Admits Debtors Did No Investigation Of The Remote Releases

At the confirmation hearing on May 16, 2024, Toney was Debtors' only witness in support of Plan confirmation. On cross-examination, Toney admitted that neither he nor Debtors did any investigation into possible claims against the Remote Released Parties. (App.1139-41, 11144-46, 1150-51, Bankr.R._Doc._1145, at 31:23-32:10, 32:24-33:4, 36:24-37:3, 38:25-39:2, 42:18-43:1). He testified that he believed such an investigation would not have been cost-effective, but admitted he could not know what claims were being released or their value. (App.1137-38, 1150 & 1177-78, Bankr.R._Doc._1145, at 29:24-30:1, 42:10-22, 69:20-70:6). He agreed that there were potentially thousands of employees of Debtors alone who would be released

---

[7]Debtors' officers and directors also were excepted from the Releases.

and could not estimate how many Remote Released Parties there were. (App.1151-52 & 1156-57, Bankr.R._Doc._1145, at 43:17-44:16, 48:19-49:9). He agreed that the Release would eliminate possible avoidance actions, including for preferences and fraudulent transfers. (App.1138, Bankr.R._Doc._1145, at 30:15-22). He agreed that if avoidance actions were brought, this could generate more revenue to pay claims that otherwise would not be paid in full. (App.1149-50, Bankr.R._Doc._ 1145, at 41:15-42:9). He admitted that the Plan created a Liquidation Trust, and set aside approximately $1 million to fund that Liquidation Trustee's pursuit of claims, but agreed the Liquidation Trustee could not pursue released claims. (App.1135-37, 1149, 1154-56, & 1183, Bankr.R._Doc._1145, at 27:23-29:5, 41:1-4, 46:13-19, 47:7-48:3, 75:16-20).

Counsel for the Pension Committee also "represented" that she had reviewed potential claims against the Remote Released Parties and concluded none existed. (App.1165, Bankr.R._Doc._1145, at 57:18-23). However, this attorney did not testify under oath and was not listed or called as a witness or subject to cross-examination. Moreover, the Pension Committee did not have Debtors' records. She described no basis for her conclusion and submitted no supporting evidence.

Toney testified that he believed that Bondholders' Representatives would not have supported the Plan without the Releases, (App.1169, Bankr.R._Doc._1145, at 61:7-16), but identified no basis for this belief and Debtors submitted no supporting

evidence. The Bondholders Representatives participated in the Hearing but presented no witness or evidence.

MercyOne solely objected to the Plan because of the Remote Releases. (App.0670, Bankr.R._Doc._1016). The five voting classes voted to approve the Plan. (App.0697, Bankr.R._Doc._1037, at 7).

### 5. The Bankruptcy Court Confirms The Plan And Rejects A Stay

On June 7, 2024, the Bankruptcy Court overruled MercyOne's objections and confirmed the Plan. (App.1248-66, Bankr.R._Doc._1113). MercyOne then moved to stay that order because the Supreme Court would soon decide *Purdue*, which could impact the enforceability of the Third-Party Release. (App.1403-17, Bankr.R._Doc._1124). The Bankruptcy Court denied this. (App.1431, Bankr.R._Doc._1137)

MercyOne appealed and the Liquidation Trust (App.1322, Bankr.R._Doc._1123), as successor to Debtors, elected to have the District Court hear the appeal.

MercyOne renewed its request for a stay in the District Court (Dist.R._Doc._5), which the Magistrate Judge denied. (App.1543-55, Dist.R._.Doc._32).

4905-5069-0369.8

### 6. The OC Pursues Rule 2004 Discovery From MercyOne

The OC has since moved for and received documents from MercyOne and taken three depositions under Fed.R.Bankr.P. 2004 (Bankr.R._Doc._1545), pursuant to Bankruptcy Court order. (Bankr.R._Doc._1854).[8]

After this appeal was filed, in an attempt to moot MercyOne's standing, a member of the OC stated it would pay MercyOne's claim in full, while the OC still reserved all rights to pursue its claims against MercyOne in the bankruptcy case. This effort failed, however, because it violated the Bankruptcy Code's requirement that members of a class be treated equally. *See* 11 U.S.C. §1123(a)(4). Accordingly, MercyOne did not accept such payment. But even were such payment accepted, it would be subject to clawback and other challenges. Such circumstances do not create mootness. Notably, while on May 16, 2025, the Liquidation Trustee filed a motion to dismiss on standing—which this Court ordered taken with the merits of this appeal on June 5, 2025—he did not raise this ploy as a basis, showing his recognition this was a feckless gesture.

On June 16, 2025, the Liquidation Trustee asked the Bankruptcy Court to compel MercyOne to accept this payment, while reserving all rights *vis-à-vis* that payment were this to happen. (Bankr.R._Doc._1928). This is being briefed.

---

[8]This Court may judicially notice Court filings and orders. *See Stutzka v. McCarville*, 420 F.3d 757, 760 n.2 (8th Cir. 2005).

4905-5069-0369.8

## SUMMARY OF ARGUMENT

Releases of nondebtors in bankruptcy are supposed to be rare and approved only in exceptional circumstances. The plan proponent bears the burden of proof for such a release. Here, however, Debtors, as Plan proponents, demonstrated no circumstance justifying the release of thousands of Remote Released Parties. Yet the Bankruptcy Court confirmed the Plan and upheld the Remote Releases, and the District Court confirmed. Both decisions constituted error, requiring this Appeal.

The Remote Releases are unprecedented. For each of the six Key Parties, 18 categories of persons and entities are also released from all claims. That adds 108 categories of released parties. Each category, in turn, may have tens, hundreds or thousands of persons or entities for each Key Party. Indeed, Debtors alone had thousands of employees. The categories include amorphous and open-ended terms, including "consultants," "advisors," and "professionals," which easily could lead to unintended parties claiming a release. The Remote Releases date back forever, compounding their overbreadth.

The Remote Releases have no legitimate purpose. No Remote Released Party provided any consideration in exchange. None paid anything to the Debtors. None provided sweat equity or concessions.

None testified in Bankruptcy Court. Next to none participated at all in the bankruptcy. Debtors' CRO admitted he did not even know the identities of all

Remote Released Parties. Even more astonishingly, Debtors' CRO did no investigation into any possible claim against any Remote Released Party.

That is not how "rare" releases are supposed to happen. Rather, *Master Mortgage* establishes a five-part test, none of which Debtors satisfied.

- Debtors and Remote Released Parties do not share an identity of interest. While Debtors' CRO speculated that certain of Debtors' consultants might have indemnification agreements with Debtors, that is one category of released parties among 108. And there was no proof even of this.

- No Remote Released Party made a "substantial contribution" to the Plan's success. Authority says this requires a monetary contribution. None made either that or any other kind of contribution.

- The Remote Releases are not essential to reorganization. Debtors' CRO speculated that the Bondholders Representatives might walk away absent these, but the Bondholders Representatives sat in Bankruptcy Court and never corroborated this.

- While all classes voted in favor of the Plan, after *Purdue*, consent is required for a third-party release. The better-reasoned authority holds that this is actual consent, which would require an opt-in provision that is absent here. *See Smallhold*, 665 B.R. 704.

- Finally, few creditors have received anything, including in MercyOne's impaired class.

As to third-party releases, *Smallhold* holds that *Purdue* requires an opt-in provision to establish actual consent that is absent here. *See Smallhold*, 665 B.R. 704.

And while the District Court found MercyOne lacked standing, this is an outlier decision that, if accepted, would create a circuit split with the Second and Ninth Circuits. Despite the law of these Circuits and district courts going the other way, the District Court held, that MercyOne' status as an impaired creditor did not suffice to make it an aggrieved person. It speculated that there was no possible claim against any Remote Released Party that would change that impaired status, which ignores the likelihood of at least preference claims against those who dealt with Debtors. It also flips the burden from Debtors (and Liquidation Trustee as successor)—who must demonstrate the need for a release—onto MercyOne. And it is inconsistent with the District Court's reasoning on the merits that the Remote Releases avoided "immense and complex" litigation.

MercyOne is independently a "person aggrieved" because it is suffering pecuniary harm having to respond to the OC's Rule 2004 discovery, when, had the Plan not been confirmed, the OC would not have this power.

While an OC member stated it would pay MercyOne's claim in full, this was improper under 11 U.S.C. §1123(a)(4), as it would have treated MercyOne unequally relative to others in its class and been subject to attack and clawback. The Liquidation Trustee's current motion to compel MercyOne to accept such payment would equally permit attack and clawback of any payment.

In short, this Court should find MercyOne has standing to challenge the Remote Releases and that they fail on the merits.

## ARGUMENT

### A. Standard of Review

Whether MercyOne has standing to appeal and whether the Remote Releases caused the Plan to be unconfirmable are each questions of law subject to *de novo* review, in that the facts related to standing are undisputed. *Opportunity Fin. LLC v. Kelley*, 822 F.3d 451 (8th Cir. 2016). Plan confirmation issues concerning the application of law to undisputed facts are reviewed *de novo*. *In re Amos*, 624 B.R. 657, 660 (B.A.P. 8th Cir. 2021). As the second tier of appellate review, this Court reviews the District Court's legal and factual findings *de novo*. *Wegner v. Grunewaldt*, 821 F.2d 1317, 1320 (8th Cir. 1987).

### B. The District Court Erred In Holding That MercyOne Lacked Standing To Appeal The Plan's Approval Of The Remote Releases

MercyOne has appellate standing to challenge the Remote Releases and to accept the District Court's contrary position would create a circuit split. *First*,

MercyOne has standing as an impaired creditor. MercyOne's claim remains outstanding, and no payments have been made to its class. As noted above, the OC's statement that its member would pay MercyOne's claim in full violates §1123(a)(4) and, if accepted, would expose MercyOne to possible clawback and claims. *Second*, MercyOne has standing to challenge the Plan because it creates the OC, which is presently causing it pecuniary harm by pursuing expensive, burdensome Rule 2004 discovery against it. *Third*, contrary to the District Court, MercyOne has standing to challenge the Third-Party Release even though, by objecting to the Plan, it opted out of these Releases, because opting-out does not constitute consent and does not destroy standing. *Fourth*, if MercyOne has standing to challenge one Remote Release on appeal it does not need separate standing to challenge the other because they are based on the same failure of overbreadth. *See Elec. Privacy Info. Ctr. v. U.S. Dep't of Com.*, 928 F.3d 95, 100 (D.C. Cir. 2019).

## 1. MercyOne Has Standing To Challenge The Remote Releases As An Impaired Creditor

Other than the District Court, courts uniformly hold that impaired creditors have standing to appeal plan confirmation orders, because they are "aggrieved parties" with the necessary pecuniary interest.

The primary goal of bankruptcy is to minimize injury to creditors and maximize the value of a bankruptcy estate. *See Opportunity Fin.*, 822 F.3d at 459

(quoting *In re LTV Steel Co.*, 560 F.3d 449, 454 (6th Cir. 2009));[9] *In re Simply Essentials, LLC*, 78 F.4th 1006 (8th Cir. 2023). Appellate standing in bankruptcy serves this goal. *See Katebian v. Ogier*, 654 B.R. 402 (N.D. Ga. 2023) (guarantor of loan, as creditor, had standing to appeal bankruptcy court order valuing claim and permitting trustee to sell property because it affected what surplus remained for the estate to apportion among debtors' creditors, directly affecting its pecuniary interest).[10]

Therefore, "as a general rule, creditors have standing to appeal orders of the bankruptcy court disposing of property of the estate because such orders directly affect the creditors' ability to receive payment of their claims." *P.R.T.C.*, 177 F.3d at 788 (quoting *Kane*, 843 F.2d at 642); *DBSD*, 634 F.3d 79, 89; *Kanebian*, 654 B.R. at 410 (citations omitted).

---

[9] The District Court, misapprehended *LTV*, stating that it shows the Sixth Circuit does not allow absolute standing for impaired creditors. (App.1627, Dist.R._Doc._47, at 13). However, *LTV* did not involve claims of impaired unsecured creditors who were challenging plan provisions that diminished recovery prospects. There, the court found first that a CEO who had an *administrative claim* lacked standing to challenge an order which would not impact that administrative claim and, second, that officers and directors—noncreditors—were not aggrieved by a denial of their motion to dissolve the creditors committee simply because it was suing them.

[10] *Katebian* is being appealed.

In *DBSD*, the Second Circuit, surveying cases, held that the standing inquiry *"[has] never demanded more to accord a creditor standing than that it has a valid and impaired claim."* 634 F.3d at 90 (emphasis added).

*Kane* holds similarly. There, the Second Circuit held that an appellant-creditor was a "person aggrieved" by a bankruptcy court order confirming a reorganization plan because that order "determine[d] the extent to which each creditor [was] to be paid," his recovery was "subject to the [estate] being sufficiently funded" and his "economic interests . . . *were directly impaired*." 843 F.2d at 642. The Second Circuit explained, "[s]ince the . . . [p]lan gives Kane less than what he might have received, he is directly and adversely affected pecuniarily by it, and he therefore has standing to challenge it on appeal." *Id.*

The Ninth Circuit holds similarly. *See P.R.T.C.*, 177 F.3d at 778 ("A creditor does, however, have a direct pecuniary interest in a bankruptcy court's order transferring assets of the estate."); *In re Comm. W. Fin. Corp.*, 761 F.2d 1329, 1334 (9th Cir. 1985) ("a claimant has standing to appeal an order disposing of assets from which the claimant seeks to be paid.")

Here, the Debtors' Releases indisputably dispose of estate property. By releasing all claims against thousands of Remote Released Parties, they unquestionably diminish possible estate recoveries. Indeed, the fact that Debtors went to the trouble of releasing the Remote Released Parties demonstrates their

belief that such claims existed, otherwise this effort would have been futile. The District Court "disagree[d]," positing that the Releases may have been intended to protect Remote Released Parties from frivolous claims. (App.1626-27, Dist.R._Doc._47, at 12-13). Debtors, of course, never argued this in Bankruptcy Court and provided no evidence supporting this. Importantly, the District Court did not explain why protecting the Remote Released Parties—who were not creditors— was a proper concern of Debtors, where it would make repaying the claims of creditors—who, by law, *were* Debtors' primary concern—more difficult. This is especially true where no Remote Released Party contributed *anything* in exchange for a release.

Such logic also ignores the Liquidation Trustee's discretion to decide what claims to bring. If a claim seems frivolous, he can just not bring it.[11] Instead, the Remote Releases merely tie the Liquidating Trustee's hands if he concluded the opposite—that meritorious claims exist against a Remote Released Party.[12]

Absent the Remote Releases, the Liquidation Trustee could have litigated claims against the Remote Released Parties or negotiated settlements which would

---

[11]This makes it especially strange that the Liquidation Trustee has so vigorously argued for the Remote Releases because reversal would merely increase the number of potential claims that he could pursue to maximize creditor recoveries.

[12]The law protects parties from frivolous litigation in other ways, including through potential fee recoveries under Fed.R.Bankr.P. 9011 and 28 U.S.C. §1927 and dismissal under Fed.R.Civ.P. 12(b)(6).

4905-5069-0369.8

have brought the estate additional funds, enabling greater distributions to impaired creditors like MercyOne. For example, Debtors almost certainly had preference or fraudulent transfer claims as to at least some of Debtors' employees, officers, consultants and advisors. MercyOne thus has a "financial stake" in challenging the Confirmation Order's approval of the Plan's Release provisions. *See Opportunity Fin.*, 822 F.3d at 458; *In re Canal Street Ltd P'ship*, 269 B.R. 375 (B.A.P. 8th Cir. 2001) (because of financial stake in litigation, bondholder had standing to appeal order refusing to reopen case).

Many other courts have held similarly. *Phoenix Premier Properties, LLC v. Fed. Nat'l Mortg. Ass'n*, 2012 WL 2389955, at *2 (D. Ariz. June 25, 2012) (impaired creditors have a financial stake in a plan); *In re Dunes Hotel Assocs.*, 1997 WL 33344253, at *13 (Bankr. D.S.C. 1997) (creditor had standing to challenge confirmation of a plan which would impair its contractual rights).

This Circuit's courts, specifically, have recognized that an impaired creditor has standing in the bankruptcy court to challenge whether a plan satisfies §1129, and this would be of little value if they could not appeal an erroneous determination. In *In re Affiliated Foods, Inc.*, 249 B.R. 770 (Bankr. W.D. Mo. 2000), the bankruptcy court found that the holder of an impaired claim had standing to object to a plan, and specifically to whether it satisfied the best interests of creditors test of §1129(a)(7). *Id.* at 787.

Indeed, a case the District Court cited to find lack of standing instead supports the standing of an impaired creditor to appeal confirmation based on a plan's releases. *In re Tonopah Solar Energy*, 657 B.R. 393, 407 (D. Del. 2022) (App.1624, Dist.R_.Doc._47, at 10), distinguished between impaired creditors (like MercyOne), which have such appellate standing and unimpaired creditors, who must show other grounds. The *Tonopah* court noted that "[c]ourts have limited *unimpaired* creditors' standing to those issues directly affecting their interests and barred such creditors from challenging confirmation on other grounds." *Id.* at 406 (emphasis added) (collecting authority). There, the plan provided that the claims of all general unsecured creditors would "ride through" to the reorganized entity, *id.*, and therefore were unimpaired. Here, claims against the Remote Released Parties were sacrificed.[13]

While the District Court relied on *Opportunity Finance*, 822 F.3d 451 and *In re Wigley*, 886 F.3d 681 (8th Cir. 2018), to support its denial of standing, (App.1622, 1626, Dist.R._Doc._47, at 8,12), neither involved an impaired creditor and both are distinguishable. *Opportunity Finance* involved debtors' *lenders*, which had benefitted from a pre-bankruptcy Ponzi scheme led by the individual who controlled

---

[13]The District Court cited *Tonopah* as holding that a party that opts out of a third-party release loses standing, (App.1624, Dist.R._Doc._47, at 10), yet *Smallhold* holds that, after *Purdue*, consent instead requires opting in and rejects prior Delaware authority. 665 B.R. at 722-23.

the debtors at that time. 822 F.3d at 455. Unlike MercyOne, they had not filed proofs of claim. *Id*. This Court therefore concluded they lacked standing to challenge an order substantively consolidating the debtors' estates, which they contended deprived them of affirmative defenses in litigation against the estate.

*Wigley* too, did not concern an impaired creditor. Rather, it involved whether *debtor's wife* could challenge the bankruptcy court's denial of plan confirmation, where the plan had proposed to settle claims against her for $350,000, which the bankruptcy court rejected as unfair. 886 F.3d at 685. This Court found that the denial of confirmation merely restored the status quo ante regarding claims against her and did not increase her burdens or diminish her rights. *Id.* at 685. Here, by contrast, the Confirmation Order released claims against the Remote Released Parties that previously existed, thereby causing detriment to impaired creditors.

Citing nothing, the District Court faulted MercyOne, a claimant, for not identifying "a claim against a Remote Released Party," (App.1625, Dist.R._Doc._47, at 11), and then listed a series of steps that purportedly would have to occur before MercyOne could receive claim payment, including that the Liquidating Trustee would have to identify that claim, litigate it, prevail, survive appeal, collect on the judgment, funnel the collection to the Liquidating Trust and then disburse it to creditors. (*Id.*). From this, the District Court concluded that the possibility additional funds could have been recovered absent the releases of

thousands of Remote Released Parties was "too remote to confer standing." (*Id.*).

Again, *DBSD* only requires that a creditor be impaired, not that it establish with

scientific precision that it will recover on a particular claim. 634 F.3d at 90-91. *Kane*,

too, emphasizes that a creditor need only show that a plan gives it less than "*what*

*he might have received*." 843 F.2d at 642 (emphasis added).

The District Court held it would be "pure speculation" to believe such a claim

existed against any Remote Released Party. (App.1625, Dist.R._Doc._47, at 11). But

were this true, the Remote Releases would have been wholly unnecessary and

unjustifiable. It was Debtors' burden to identify why they were necessary. The

District Court's conclusion demonstrates Debtors failed this burden, providing

additional reason why this appeal should be allowed.

Similarly, the District Court partially quoted MercyOne's counsel's

acknowledgement at oral argument in the Bankruptcy Court that he did not know of

a specific claim that was released. (*Id.*). This ignored MercyOne's counsel's point

(and applicable case law) that it was *Debtors' burden* to demonstrate why the Remote

Released Parties were essential to the Plan. (App.1565, Dist.R._Doc._52, at 10:12-

17). In the District Court, MercyOne's counsel nevertheless explained that it is near

certain that avoidance actions existed against some Remote Released Parties. For

instance, §547 allows a trustee to avoid preferential payments made to creditors 90

days before the petition date if, *inter alia*, such payment caused that creditor to

receive a disproportionate percentage of payment on its debt. 11 U.S.C. §547. It

seemed likely if not certain that such claims otherwise would exist against certain of

Debtors' thousands of employees, professionals, advisors, consultants and others

absent the Remote Releases. (App.1565-67, Dist.R._Doc._52, at 10:18-12:10).[14]

The District Court ignored this.

The District Court noted that MercyOne could not identify such a claim "eight

months following the Plan confirmation," (App.1625-26, Dist.R._Doc._47, at 11-

12). Again, *DBSD* and *Kane* hold this is not necessary for standing, and for good

reason. It is not a creditor's burden to investigate the claims that might be brought

to fund payments to itself and other creditors and accepting otherwise would set a

terrible precedent. That is a debtor's burden; yet, here, Debtors abdicated that burden

by not even investigating possible claims against Remote Released Parties. After

confirmation, it became the Liquidation Trustee's burden to investigate claims, but

the Plan tied his hands by already forfeiting them.

Notably, while faulting MercyOne for arguing that it was likely that avoidance

actions existed against some of the Remote Released Parties, the District Court

reasoned similarly, concluding that there likely remain unpled claims against the

---

[14]Because MercyOne was clear in noting the likelihood of such avoidance actions, the District Court erred in stating that MercyOne had not identified "a single claim." (App.1625, Dist.R._Doc._47, at 11).

4905-5069-0369.8

Sackler family arising from their participation in the opioid epidemic. (App.1632, Dist.R._Doc._47, at 18).

This was not the only place where the District Court allowed the Liquidating Trustee to have it both ways. For purposes of MercyOne's standing, the District Court found that it was "pure speculation" that even one claim existed against these thousands of Remote Released Parties. (App.1625, Dist.R._Doc._47, at 11). Yet for purposes of *Master Mortgage*'s "substantial contribution" and "essential to reorganization" tests, the District Court determined the Remote Releases were necessary to avoid "immense and complex" litigation. (App.1637, Dist.R._Doc._47, at 23). That Debtors believed such litigation exists, and needed to be released, supports MercyOne's standing to challenge their forfeiture, while Debtors' failure to submit evidence substantiating such "immense" litigation should have caused the Remote Releases to fail on the merits. The District Court's acknowledgement that immense litigation existed absent the Remote Releases shows Debtors jeopardized potentially significant recoveries and must be subject to challenge on appeal.

The District Court suggested that the Remote Releases would advance goals of efficiency and finality, (App.1627, Dist.R._Doc._47, at 13), but this is at the expense of maximizing the value of the estate, which is the primary goal of a chapter 11 bankruptcy. *See Simply Essentials, LLC.*, 78 F.4th 1006. Rather than being

"efficient" to forfeit potential recoveries against thousands of parties while doing no investigation, it is negligent.

The District Court also relied upon the conclusory, unsworn assertion (discussed above) made by counsel for the Pensioners Committee that she had investigated possible claims against third parties and determined none would increase recoveries. (App.1626. Dist.R._Doc._47, at 12). Again, this had no evidentiary value. The District Court ignored that because the Pension Committee did not have Debtors' millions, of documents and records, its counsel could not have conducted any credible investigation.[15] This was yet another example where the District Court let the Liquidation Trust have it both ways. If Pension Committee counsel *had* determined there were no possible claims against the Remote Released Parties and this were accepted as evidence, it would have demonstrated that the Remote Releases <u>were not</u> essential to reorganization and that these parties made no substantial contribution, causing them to fail. Instead, the District Court accepted this as a basis to deny MercyOne standing but disregarded this in its "essential to reorganization" analysis.

---

[15]The Pension Committee filed eight fee applications during the bankruptcy. (Bankr.R._Docs._958, 960, 1081, 1201, 1203, 1214, 1216, 1218). Only one contains an entry—for 1.6 hours—regarding investigation of possible causes of action. (Bankr.R._Doc._958, at 12). This Court may take judicial notice of these public records. *See U.S. v. Love*, 20 F.4th 407, 412 (8th Cir. 2021).

4905-5069-0369.8

The District Court also relied on a series of inapposite cases to deny standing. *First*, in *In re Citation Corp.*, 371 B.R. 518 (N.D. Ala. 2007), the claimholder, AVCO, was held not to have been aggrieved by the confirmation of debtors' Chapter 11 plan and therefore lacked appellate standing. This was because the plan did not release AVCO's potential allowed unsecured claim, which consisted of a beneficial interest in a creditor trust created in debtors' prior bankruptcy case. The plan left claims of that creditor trust intact and provided for their full payment in cash in the ordinary course of business. Therefore, AVCO's fear that it might not be paid was speculative.

*Second*, the District Court incorrectly cited *In re AFY*, 734 F.3d 810 (8th Cir. 2013), as holding that this Circuit does not offer "per se" standing to impaired creditors to challenge a release of claims. *AFY* did not concern impaired creditors. Rather, it held that a company's *shareholders* lacked standing to challenge an order converting the estate based on the "shareholder standing rule," which prohibits *shareholders*—not impaired creditors—from asserting a derivative claim cannot appeal a bankruptcy decision. Moreover, *AFY* relied upon *In re Combustion Eng'g*, 391 F.3d 190 (3d Cir. 2004), which was abrogated by *Purdue*, 603 U.S. at 204, n.1.

*Third*, in *In re Hecker*, 496 B.R. 541 (B.A.P. 8th Cir. 2013), the court held that a secured creditor lacked standing because its superior liens meant that it could not possibly be harmed by the registration of judgments it wished to challenge. Here,

the forfeiture of recoveries caused by the Remote Releases does cause possible harm to impaired creditors.

*Fourth*, the District Court cited *In re Mesaba Aviation, Inc.*, 418 B.R. 756, 761-62 (B.A.P. 8th Cir 2009), yet it found a creditor lacked standing because its claim had been adjudicated and disallowed. MercyOne's claim was not disallowed.

### 2. The OC Members' Statement That It Will Pay MercyOne's Claim Does Not Deprive MercyOne Of Standing

After this appeal was filed, on May 5, 2025, the OC stated that it would pay MercyOne's claim, *subject to a full reservation of rights*.[16] This amounted to a gratuitous offer which violates the Bankruptcy Code. It is quintessential to confirmation of a plan that claims of creditors in a particular class be treated the same. 11 U.S.C. §1123(a)(4); *see also In re Peabody Energy Corp.*, 933 F.3d 918, 925 (8th Cir. 2019) (noting there must be the same treatment for each claim in a particular class); *In re WR Grace & Co.*, 729 F.3d 332 (3d Cir. 2013) (noting that equality of distribution among creditors is a central policy of bankruptcy code); *In re Sunnyland Farms, Inc.*, 2016 WL 1212723, at *5 (Bankr. D.N.M. Mar. 28, 2016) (§1123(a)(4) requires that allowed claims be treated similarly). To pay 100% of MercyOne's claim while others in the same class are to receive little or none would violate that principle. *In re Machne Menachem, Inc.*, 233 F. App'x 119, 122 (3d Cir.

---

[16]The Liquidation Trustee's current motion to compel MercyOne to accept payment, contains this same reservation. (Bankr.R._Doc._1928).

2007) (determining that payment of creditors outside of plan violated §1123(a)(4) and stating, "We agree with the District Court that the debtor's orchestration of the purchase of claims outside the plan of reorganization undermined the critical confirmation requirements of the bankruptcy code."); *In re Hampton Corp., Inc.*, 1992 WL 1482466, at *3 (D.N.D. July 7, 1992) ("Cole simply cannot receive more than 35% of its unsecured claim since the basic requirement that every claim or interest within a particular class be treated identically would be violated.").

Where a payment to a creditor might be unwound, the creditor retains standing. *In re Wood*, 647 B.R. 165, 170 (B.A.P. 6th Cir. 2022) (possibility "however remote" that trustee might later seek to unwind payment to creditor precluded mootness of appeal); *cf. United States v. Molak*, 276 F.3d 45, 48-49 (1st Cir. 2002) (possibility of having to pay restitution was pecuniary interest precluding mootness of appeal).

3. **MercyOne Has Standing Because It Faces Pecuniary Harm Responding To Discovery Pursued By The OC, Which Was Appointed Under An Unconfirmable Plan**

MercyOne independently has standing because it is already being put to significant pecuniary harm by the OC, the "oversight committee" established by the Plan to pursue estate claims. As noted, MercyOne has already had to produce documents and present witnesses for deposition pursuant to the OC's Rule 2004

requests. Yet if the Plan was unconfirmable, the OC was not properly appointed and acts without rightful authority.

The Supreme Court held last year that where a plan impairs even a non-creditor's interests, the impaired party is a "party in interest" with standing to challenge the plan. *See Truck Ins. Exch. v. Kaiser Gypsum Co.*, 602 U.S. 268, 281-82 (2024) (non-creditor insurer of the debtor had standing to challenge plan that "impair[ed] the insurer's financial interests by inviting fraudulent claims," and exposed the insurer "to millions of dollars in fraudulent tort claims."). MercyOne has such standing.

This is not a case where MercyOne faces a potential *risk of harm* in litigation by a properly appointed trustee, as in *Opportunity Finance*, 822 F.3d at 459. MercyOne already has incurred pecuniary harm by having to has produced thousands of documents and presented three witnesses for deposition pursued by an entity appointed under an unconfirmable Plan.

### 4.    Mercy One Has Standing To Challenge The Third-Party Release

In finding that MercyOne lacked standing to challenge the Third-Party Release, the District Court misstated MercyOne's argument as being that "Third-Party Releases are not permissible after [*Purdue*] so any plan that includes the Third-Party Releases is not confirmable." (App.1624, Bankr.R._Doc._47, at 10). It is not

the inclusion *per se* of the Remote Releases that makes them unconfirmable, but the lack of unanimous consent by affected parties, as *Purdue* mandates.

In *Purdue*, the Supreme Court held that a bankruptcy court's powers "do not endow it with the power to extinguish without their consent claims held by nondebtors (here the opioid victims) against other nondebtors (here, the Sacklers)." *Purdue*, 603 U.S. at 220. Courts after *Purdue* hold that consent should be determined consistent with basic contract principles. *See, e.g., Smallhold*, 665 B.R. 704 (citing *In re Ebix, Inc.*, No. 23-80004 (Bankr. N.D. Tex. Aug. 2, 2024), Hr'g Tr.).

The Plan does not do so. It treats those who were silent on the Plan (*i.e.*, did not vote) as agreeing to the Third-Party Release and those who rejected the Plan and opted out of the Release as effectively having agreed to that Release. It therefore relies on implied and not actual consent. Substantial law rejects that implied consent can support a third-party release. *See e.g., Smallhold*, 665 B.R. 704; *Neogenix*, 2015 WL 5786345, at *5 ("Courts traditionally held that the creditor must individually consent by voting in favor of the plan.") (collecting authority); *In re Midway Gold, US, Inc.*, 575 B.R. 475 (Bankr. D. Colo. 2017); *In re Digit. Impact, Inc.,* 223 B.R. 1, 14-15 (Bankr. N.D. Okla. 1998) (same). Therefore, the Third-Party Release fails both *Purdue*'s mandate and requirements of §1129(a)(1).

This principle is reinforced in cases regarding the failure to opt out of releases. In *Patterson v. Mahwah Bergen Retail Group, Inc*., the court vacated a bankruptcy

court's approval of non-debtor releases, finding that failure to opt out could not be construed as consent. 636 B.R. 641, 686 (E.D. Va. 2022). It found that contract principles did not support finding consent by failing to opt out, because "an offeror has no power to cause the silence of the offeree to operate as an acceptance when the offeree does not intend it to do so." *Id.* at 685 (citations omitted); *see also In re Emerge Energy Servs. LP*, 2019 WL 7634308, at *18 (Bankr. D. Del. Dec. 5, 2019) (consent could not be inferred from failure to return a ballot or "Opt-Out" form); *In re SunEdison, Inc.,* 576 B.R. 453, 460-61 (Bankr. S.D.N.Y. 2017) (non-voting third parties' silence or failure to vote was not consent to a release); *In re Chassix Holdings, Inc.,* 533 B.R. 64, 81 (Bankr. S.D.N.Y. 2015) (same).

Multiple courts hold that appellate standing encompasses the ability to raise a plan's failure to comply with statutory prerequisites, including §1129(a). Thus, in *Kane*, the Second Circuit held that a holder of an asbestos-related personal injury claim had standing to challenge a chapter 11 plan's failure to comply with statutory requirements for confirmation, including §1129(a), and that votes on the plan were obtained by an invalid voting procedure. 843 F.2d at 646; *see also In re Produce Hawaii, Inc.*, 41 B.R. 301, 303 (Bankr. D. Haw. 1984) (creditors who voted against the plan have standing to raise failure to satisfy best interests of creditors test); *In re Elec. & Metals Indus., Inc.,* 153 B.R. 36 (Bankr. W.D. Tex. 1992) (FDIC had

standing to assert plan's failure to satisfy §1129(a) even though it held a disputed secured claim that was neither filed nor allowed).

Moreover, numerous cases allowed creditors or their representatives to challenge third-party releases without questioning standing. *See In re Boston Harbor Marina Co*., 157 B.R. 726, 729-30, 732 (Bankr. D. Mass. 1993) (rejecting plan that treated vote for plan as agreement to release these non-debtors because "[t]he parties who would benefit by the release and injunction are contributing nothing to the Plan"); *In re Wool Growers Cent. Storage Co*., 371 B.R. 768, 777-78 (Bankr. N.D. Tex. 2007) (applying five-factor *Master Mortgage* test to find that non-consensual non-debtor releases made plan unconfirmable); *In re Conseco, Inc.*, 301 B.R. 525, 527-28 (Bankr. N.D. Ill. 2003) (rejecting merits of lead plaintiffs' challenge to revised consensual non-debtor release, but not questioning standing; and noting that prior version of plan violated §1129 by requiring all creditors who accepted a distribution to release certain non-debtors).

If MercyOne lost the ability to challenge the defective Third-Party Release because it objected to the Plan, and those who voted for the Plan lost their right to challenge the defective Third-Party Release because they accepted the plan, and those who failed to vote also lost that right, then the only party who would have standing to challenge the Third-Party Release would be the U.S. Trustee, who, not knowing how *Purdue* would turn out, did not oppose the Third-Party Releases. The

result would be that a Third-Party Release that violates *Purdue* and *Master Mortgage* would remain in force, thereby undermining the integrity of the federal bankruptcy process. Since then, the U.S. Trustee's office has objected consistently and nationally that plan releases fail where they rely on implied consent.[17]

Citing nothing, the District Court, held that the "person aggrieved" standard requires something more than that a plan is not confirmable. (App.1624, Dist.R._Doc._47, at 10). *Kane* suggests otherwise. 843 F.2d at 644-46. This also misstates MercyOne's argument, which is that a party impacted by a plan that violates governing law—here §1129(a)(1) and *Purdue*—has standing to appeal.

Also, if the Supreme Court has held that a third-party release fails where all affected claimants do not consent, and a claimant does not consent, that claimant must be able to challenge that failure or *Purdue*'s mandate would be meaningless. Yet, under the District Court's reasoning, if a bankruptcy court disregards *Purdue*'s mandate, that release stands anyway if creditors who objected to the plan still may sue third parties.

---

[17]In *In re Container Store Group Litig.*, 4:25-CV-00618 (S.D. Tex.), pending before the Southern District of Texas, the U.S. Trustee is presently appealing another bankruptcy court's finding that an opt-out provision from a third-party release could be deemed to be implied consent to that release. The U.S. Trustee has regularly objected to releases on this basis since *Purdue*. *See also In re Roman Catholic Diocese of Syracuse, New York*, 667 B.R. 628 (Bankr. N.D.N.Y. 2024).

4905-5069-0369.8

**C.** **The Courts Below Erred In Upholding The Releases On The Merits**

**1.** **The Remote Releases Caused The Plan To Fail §1129(a)(1)**

Section 1129 of the Bankruptcy Code articulates the legal standards for Chapter 11 plan confirmation, and a court may not confirm a plan unless each of its requirements is met. *In re Riverbend Leasing, LLC*, 458 B.R. 520, 525-56 (Bankr. S.D. Iowa 2011); *In re Gilbertson Restaurants, LLC*, 2005 WL 783063, *4 (Bankr. N.D. Iowa 2005). Bankruptcy courts have an independent obligation under §1129 to determine whether plan proponent(s) have satisfied all relevant Chapter 11 plan confirmation requirements. *See In re NESV Ice, LLC*, 661 B.R. 427, 435 (Bankr. D. Mass. 2024) ("[t]he Court has an independent obligation to ensure that the plan satisfies the § 1129 requirements"); *In re Marble Cliff Crossing Apartments, LLC*, 486 B.R. 887 (Bankr. S.D. Ohio 2013) (same); *In re Rohnert Auto Parts, Inc.*, 113 B.R. 610, 616 (B.A.P. 9th Cir. 1990) ("We hold that under Section 1129(a) of the Code, the court had an independent obligation to determine that the Plan complied with the provisions of Title 11."). It follows that bankruptcy courts have an obligation to reject a plan containing provisions contrary to the Code, even if no party objects. *United States Aid Funds, Inc. v. Espinosa*, 559 U.S. 260 (2010).

A bankruptcy court must hold a debtor to its proof. As the Bankruptcy Court acknowledged, "the proponent of a plan [here Debtors] bears the burden of proof with respect to each element of §§ 1129(a) and 1129(b) under a preponderance of

evidence standard." (App.1253, Bankr.R._Doc._1113, at 6) (citing *In re Internet Navigator, Inc*., 289 B.R. 128, 131 (Bankr. N.D. Iowa 2003)); *see also In re Civic Partners Sioux City, LLC*, 2013 WL 5534743, *15 (Bankr. N.D. Iowa Oct. 7, 2013).

Here, the Remote Releases, by unjustifiably releasing untold claims against thousands of Remote Released Parties, cause the Plan to fail §1129(a), yet the Courts below upheld them anyway. Because the Remote Releases cause the Plan to violate the Bankruptcy Code and governing precedent, they must be excised on remand.

## 2. The Remote Releases Fail *Master Mortgage*

The burden is on a party that would include a release of a non-debtor in a plan to demonstrate that such release satisfies the legal standard. *In re City Homes III, LLC*, 564 B.R. 827, 828 (Bankr. D. Md. 2017) ("The burden is squarely upon the Plan Proponents to justify the Releases . . . ."); *In re Hoffinger Indus., Inc*., 321 B.R. 498, 502 (Bankr. E.D. Ark. 2005) ("The plan proponent carries the burden of proof by a preponderance of the evidence"; finding that releases that were ambiguous and used broad, inclusive language were inappropriate under the Bankruptcy Code).

While this Court has yet to pass on it, for more than 30 years, courts in this Circuit and throughout the country have relied on *Master Mortgage*'s five-part test to determine whether a plan provision releasing third parties is permissible. *See*

*Riverbend Leasing,* 458 B.R. at 527. *Master Mortgage* stressed that such releases are rarely justifiable:

> The Court cautions the Gentle Reader that a permanent injunction is a rare thing, indeed, and only upon a showing of exceptional circumstances in which the factors outlined above are present will this Court even entertain the possibility of a permanent injunction.

168 B.R. at 937. *Master Mortgage* further identified five factors to weigh in making this determination:

> (1) There is an identity of interest between the debtor and the third party, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete assets of the estate.
>
> (2) The non-debtor has contributed substantial assets to the reorganization.
>
> (3) The injunction is essential to reorganization. Without it, there is little likelihood of success.
>
> (4) A substantial majority of the creditors agree to such injunction, specifically, the impacted class, or classes, has "overwhelmingly" voted to accept the proposed plan treatment.
>
> (5) The plan provides a mechanism for the payment of all, or substantially all, of the claims of the class or classes affected by the injunction.[18]

---

[18]*Master Mortgage* held these factors are not exclusive or conjunctive. 168 B.R. at 935.

4905-5069-0369.8

*Id.* at 935; *see also Riverbend Leasing*, 458 B.R. at 527 (citing factors in the context of third-party releases).[19]

*Master Mortgage* upheld a non-debtor release based on these factors. It found an identity of interest between the debtor and released parties because a settlement between the debtor and Skopbank (a released party) created a right of indemnity against the parties. 168 B.R. at 937. Thus, an action against it would result in a right of contribution against Master Mortgage. *Id.*

It also found that Skopbank contributed substantial assets to the reorganization. *Id.* In settling claims, it assigned participation interests and released collateral interests which enabled a distribution to plan classes that was otherwise not feasible. *Id.* at 938.

*Master Mortgage* further found that the release was "necessary," because "[t]here is little debate among the creditors that without the Skopbank settlement, Master Mortgage could not have reorganized," emphasizing it was the largest creditor and had contributed assets that formed the foundation of the plan. *Id.*

---

[19]While the District Court cited *Riverbend* as applying the *Master Mortgage* factors, (App.1634, Dist.R._Doc._47, at 20), it ignored that the Bankruptcy Court there *denied confirmation* because, like here, the plan contained an unenforceable injunction in favor of nondebtors which lumped those who were not important to a plan with those who were, and the record did not substantiate released parties' "involvement in *Riverbend*." 458 B.R. at 527. It rejected "generalizations" made about released parties. *Id.*

*Master Mortgage* found that the creditors—particularly those most affected by releases—overwhelmingly voted for the plan. *Id*.

Finally, *Master Mortgage* found factor five satisfied because at least three classes were to receive payment of their claims, and even impaired classes were only impaired by the releases yet voted for the plan. *Id*.

Other courts in this Circuit have emphasized similar factors in upholding a non-debtor release. In *In the Matter of Fansteel Foundry Corp.*, the court emphasized that the plan tailored the release to debtor's contingent claims involving fraud, willful misconduct or gross negligence regarding a single asset. 2018 WL 5472928, at **11-12 (Bankr. S.D. Iowa, Oct. 26, 2018). The released party was providing "the only funding available to propose a viable plan," thereby realizing recovery for creditors who otherwise would receive none. *Id.*at *10. Similarly, *In re U.S. Fidelis, Inc.*, the third-party release enabled a substantial distribution to consumers that was otherwise unavailable, avoided years of costly litigation and no impacted party objected. 481 B.R. 503 (Bankr. E.D. Mo. 2012).

These bear no resemblance to the release of thousands of Remote Released Parties who contributed nothing. The Remote Releases fail each *Master Mortgage* test.

4905-5069-0369.8

### a. There Is No Identity Of Interest Between Debtors And The Remote Released Parties

The District Court acknowledged that MercyOne did not dispute that there was an identity of interest between Debtors and the Key Parties. (App.1636, Dist.R._Doc._47, at 22). Regarding the Remote Released Parties, the District Court found "[t]he identity of interest is less clear[.]" (*Id*.).[20] That is a gross understatement.

The District Court erroneously found the Bankruptcy Court's analysis was "sound" that Debtors "and all Released Parties" under the Plan had an identity of interest "because they shared a common goal of confirming the plan and avoiding "immense and complex litigation." (App.1637, Dist.R._Doc._47, at 23).[21] This is legally and factually wrong. Regarding the law, the Liquidation Trustee has no legitimate interest in avoiding litigation against thousands of parties who might contribute assets to the estate to enable greater recoveries to impaired creditors. To the contrary, that is his core mission. (App.0836, Bankr.R._Doc._1050, at Art.X.I.1).

---

[20]The District Court agreed that the Bankruptcy Court erred in finding that Toney's testimony applied to all released parties when he admitted he did not know who all of the Remote Released Parties were. (App.1637, Dist.R._Doc._47, at 23).

[21] The District Court noted that the Bankruptcy Court relied on *In re Seaside Eng'g & Surveying, Inc.,* 780 F.3d 1070 (11th Cir. 2015), yet *Purdue* also abrogates this case. 603 U.S. 204, n.1. The District Court also noted that the Bankruptcy Court relied on *In re Tribune Co.*, 464 B.R. 126, 187 (Bankr. D. Del. 2011), yet it supports MercyOne, as it limited a plan's release, finding it could not fairly apply to debtors' professionals, advisors and others, while the Remote Releases do.

Again, to the extent the Liquidation Trustee believes a suit against a Remote Released Party would be ineffective or counterproductive, he can elect not to bring it and does not need a release for this purpose. The Remote Releases merely tie his hands where he determines that viable claims exist to pursue. Had avoiding complex litigation been Debtors' paramount interest, they would not have created and funded the Liquidation Trust to begin with.

Regarding factual errors, the District Court erroneously believed that Debtors' sole witness provided "unrefuted testimony that "many of the Remote Released Parties had indemnification agreements with [K]ey [P]arties who, in turn had indemnification agreements with the debtors." (App.1636, Dist.R._Doc._47, at 22). Toney identified no actual indemnification agreement between any Key Party and anyone else, including the Debtors. He stated that Debtor's agreements with consultants and advisors would typically have indemnification provisions, (App.1140-41, Bankr.R._Doc._1145, at 32:24-33:17), but did not describe any actual indemnification provision in any specific party's agreement. To the contrary, he admitted he did not know of any. (App.1141 & 1151, Bankr.R._Doc.1145, at 33:21-34:3, 43:13-16). He admitted that were hundreds of consultants alone being released and did not know their identities. (App.1143, Bankr.R._Doc._1145, at 34:25-35:16). He admitted that any indemnification agreement with a Remote Released Party might not have covered avoidance actions and could have been unenforceable if the

indemnitee engaged in tortious conduct. (App.1142, Bankr.R._Doc._1145, at 34:4-7).

The District Court's focus on Debtors' consultants and advisors ignored that the Remote Releases covered 16 other categories of persons/entities for each Key Party—108 categories of released parties—with no proof that the other 16 categories had similar indemnification agreements for debtors or that those in any category did for the other Key Parties. Thus, indemnification cannot support such sweeping Releases.

Tony admitted he did not investigate potential claims against Remote Released Parties. (App.1139-40, 1144-46, 1150-51, Bankr.R._Doc.1145, at 31:23-32:10, 32:24-33:4, 36:24-37:3, 38:25-39:2, 42:18-43:1). He admitted he knew of no allegations against any employee. (App.1151-52 & 1156-57, Bankr.R._Doc._1145, at 43:17-44:16, 48:19-49:9). While any putative defendant would rather not be sued, it simply defies logic to assume, like the District Court, that the Liquidation Trustee, as Debtors' successor, shared the same interest in *not suing* them.

Again, this is another place where the District Court was internally inconsistent. In addressing standing, the District Court concluded there was no evidence that any claim existed against any Remote Released Party, but in adjudicating the merits of the Remote Releases, the Court determined they were necessary because Debtors/Liquidating Trustee faced "immense and complex

litigation." (App.1637, Dist.R._Doc._47, at 23). The District Court cannot have it both ways.

### b. No Remote Released Party Made Any Contribution

The District Court agreed that the Bankruptcy Court erred when it found that "most Remote Released Parties" contributed to the Plan "when in fact we do not know who or how many released parties there are." (App.1638, Dist.R._Doc._47, at 24). Nonetheless, the District Court erroneously found this factor weighs in favor of upholding the non-debtor releases "because there is evidence that at least some of the Remote Released Parties contributed to the Plan, albeit in nonmonetary ways." (*Id.*). The finding tacitly admits there is no evidence that any Remote Released Party made any financial contribution, as is required. *See Riverbend*, 458 B.R. at 527 (releases failed where released party did not commit personal financial resources to reorganization efforts). It also suggests that thousands should be released because an undefined subset provided unidentified non-monetary consideration, but no case permits releasing say 10 people because one contributed. Irrespective, that finding is mistaken, as no evidence shows even a nonmonetary contribution by any Remote Released Party.

The District Court agreed that Toney's Declaration was the only record evidence concerning this factor, acknowledging that "Toney does not . . . provide

any testimony that the Remote Released Parties also contributed to the Plan." (App.1637, Dist.R._Doc._47, at 23). That should have ended the inquiry.

However, the District Court then noted that some of the *Released Parties* "kept the Debtors' operations running during the University's acquisition." (App.1638, Dist.R._Doc._47, at 24). The Released Parties included the Key Parties. Toney said nothing about any Remote Released Party. The District Court nevertheless speculated that Toney's testimony "was likely referring to at least some of the Remote Released Parties, who were on ground keeping operations during the acquisition." (*Id*.). Yet, even assuming this, such groundskeepers merely performed work they were employed and paid to do, which cannot justify a release. *See General Intermodal Logistics Corp. v. Mainstream Shipyards & Supply, Inc.,* 748 F.2d 1071, 1075 (5th Cir. 1984) ("It is a well-established principle of federal law that a promise to perform a preexisting duty is not sufficient consideration and is grounds for setting aside a release."); *United States v. Ashbritt, Inc.,* 2009 WL 10668426, *3 (S.D. Fla. July 21, 2009) ("the payment of an admitted liability does not provide sufficient consideration" for a release); *In re Bennett*, 154 B.R. 157, 159-60 (N.D.N.Y. 1993) (release failed where plaintiff owed pre-existing duty and provided no additional consideration); *Hayton Farms, Inc. v. Pro-Fac Co-op, Inc.*, 2011 WL 4344549, at *2 (W.D. Wash. Sept. 14, 2011) ("There is no consideration when one party is to

perform some additional obligation while the other party is simply to perform that which he promised in the original contract.")(citation omitted).

Again, Debtors identified no Remote Released Party who was involved at all in reorganization efforts or actually committed a penny. Likewise, Toney identified no Remote Released Party who provided any sweat equity or concession. Also, this ignores that solely considering the Debtors, the Remote Releases released thousands of employees and hundreds or thousands more in 17 other categories. They also released the 18 categories of Remote Released Parties for the five other Key Parties, who were not the subject of Toney's testimony and did nothing even to arguably merit a Release.

Thus, the Remote Releases are indisputably overbroad because thousands who unquestionably contributed nothing are released.

### c. The Remote Releases Were Not Essential To Reorganization

The District Court held the Remote Releases were essential based on the Bankruptcy Court's finding that they "were critical to achieving the near-unanimous consent (other than MercyOne) to the Plan and its confirmation." (App.1638, Dist.R._Doc._47, at 24). The District Court concluded that *the Released Parties* considered the Release as essential to confirmation." (App.1639, Dist.R._Doc._47, at 25). But this lumped the Key Parties together with the Remote Released Parties. MercyOne does not challenge the release of the Key Parties. But Debtors presented

no evidence that the Remote Releases were necessary to secure Plan approval from any Key Party. The assumption otherwise is illogical. For example, it defies logic to assume that the Bondholders would have walked away from their own release and face suits unless the Foundation's consultants were also released, especially given that Toney identified Bondholders as a cause of Debtors' bankruptcy. (App.0022-26. Bankr.R._Doc._27, at 22-26). The Bondholders, who were present at the Confirmation Hearing, called no witness and submitted no evidence.

The District Court stated that if a claim were brought against a Remote Released Party, that party might have sought indemnification from a Key Party pursuant to certain engagement letters with Key Parties that included indemnification. Yet Toney identified none. (App.1173-74, Bankr.R._Doc._1145, at 65:23-66:3). Toney testified he knew about general practices between professionals *and clients* but identified no specific indemnification even as to the Debtors, whose documents he possessed. (App.1173-74, Bankr.R._Doc._1145, at 65:19-66:3). Moreover, the employees, directors, officers, predecessors, successors and affiliates of a Key Party are not its "clients." And of the Key Parties, Debtors had no client relationship with the Pension Committee, Foundation, Unsecured Creditors Committee or Sisters of Mercy. While the Bondholders and Pension Committee participated in the confirmation hearing, neither confirmed they any indemnification with the Debtors. No engagement letter was in evidence.

While the District Court also found that Debtors had "worked with MercyOne" to narrow the Remote Releases, (App.1639, Dist.R._Doc._47, at 25), and Toney so testified, (App.1174, Bankr.R._Doc._1145, at 66:4-10); this is inaccurate, but immaterial. After MercyOne objected to the Remote Releases in connection with the Disclosure Statement, Debtors reduced the Remote Releases to the 18 categories now challenged. That cured none of the defects MercyOne identified.

### d. The Plan Lacked Consent And Support

The District Court held this factor was satisfied because of those who voted, 88-100% of classes voted in favor. However, after *Purdue*, mere "support for the plan" is insufficient for a nondebtor release. Affirmative consent is required. As shown herein, the Remote Releases apply to those who did not actually consent.

The District Court emphasized that the U.S. Trustee did not object to the Plan. (App.1640-41, Dist.R._Doc._47. at 26-27). (Nor did the U.S. Trustee submit any brief or testimony in support.) Again, this forgets that the hearing occurred before *Purdue* and the U.S. Trustee's Office now does object to releases lacking affirmative consent.

### e. MercyOne And Its Class Have Not Been Paid

Toney admitted that there is no certainty that claims of MercyOne and others in its impaired class will be paid. Thus, while the District Court believed that

creditors in this class would not be paid anything in a Chapter 7 liquidation, there was no evidence they would fare better in the Chapter 11. Debtors' failure to satisfy this factor should have led to rejection of the Plan due to the Remote Releases. *See Wool Growers.,* 371 B.R. at 778 (applying *Master Mortgage* factors and finding failure to satisfy factor 5 alone precluded confirmation).

### 3. An Opt-Out Right Cannot Save The Third-Party Release

*Purdue* holds unequivocally that third-party releases in bankruptcy plans are unenforceable absent consent. 603 U.S. at 227. It held that the catchall provision in §1123(a)(6) "cannot be fairly read to endow a bankruptcy court with the 'radically different' power to discharge the debts of a nondebtor without the consent of the affected nondebtor claimants." *Id.* at 218. MercyOne is an affected non-debtor claimant which did not consent. And while *Purdue* left open what would constitute consent, subsequent decisions demonstrate that implied consent does not.

While aware that the *Purdue* decision was imminent, the Bankruptcy Court refused to stay its ruling on MercyOne's objection to confirmation and, as noted, held that MercyOne lacked standing to challenge the Third-Party Release because its ability to opt out of that Release by rejecting the Plan was construed as consent. (App.1332, Bankr.R._Doc._1113, at 5). Forgetting MercyOne's right to a Code-compliant plan, the Bankruptcy Court determined that MercyOne suffered no harm

due to the Third-Party Release. Again, *Purdue* finds "harm" in the imposition of a nondebtor release on parties that have not consented, as here.

Although not explicit, *Purdue* seemingly re-aligned the law concerning third-party releases with traditional contract principles, which requires actual consent. *See, e.g., Neogenix*, 2015 WL 5786345, at *5; *Midway Gold*, 575 B.R. 475; *Digital Impact,* 223 B.R. at 14-15; *Patterson*, 636 B.R. at 685; *Emerge Energy*, 2019 WL 7634308, at *18; *SunEdison, Inc.,* 576 B.R. at 460-61; *Chassix Holdings,* 533 B.R. at 81.

Most relevant here as post-*Purdue* authority is *Smallhold*, which held that an opt out provision does not, alone, create consent or satisfy *Purdue*. 665 B.R. at 722-23. *Smallhold* holds that a contract model should apply. *Id.* at 720-21. In *Smallhold*, the Delaware bankruptcy court held there "does not appear to be a principled basis for authorizing 'opt out' third-party releases in cases like this one, even if such releases might be supported by strong policy arguments" and that a "creditor cannot be deemed to consent to a third-party release without some affirmative expression of the creditor's consent." *Id.* at 710-711.[22] Judge Goldblatt explained that:

> [W]hile the undersigned had previously been comfortable . . . concluding that creditors that failed to opt out may be deemed to consent to a plan's third-party

---

[22]*Smallhold* held that *Purdue* overruled prior Delaware cases, including *In re Indianapolis Downs, LLC*, 486 B.R. 286 (Bankr. D. Del. 2013) and *In re Mallinckrodt PLC*, 639 B.R. 837 (Bankr. D. Del. 2022) that the Bankruptcy Court relied upon to find consent. *Id.* at 718-19.

release, the Court no longer believes it is appropriate to do
so.

*Id.* at 721.

The District Court disregarded these cases. Instead, it relied on two cases—*In re Roman Catholic Diocese of Syracuse, New York*, 667 B.R. 628 (Bankr. N.D.N.Y. 2024), and *In re LATAM Airlines Grp. S.A*., 2022 WL 2206829 (Bankr. S.D.N.Y. June 18, 2022)—yet neither applies. For instance, *Diocese of Syracuse* involved a mass tort, which, as Judge Goldblatt posited, may justify opt-out release because of uniform injury. *Smallhold*, 665 B.R. at 725. This is not a mass tort case. *Diocese of Syracuse* acknowledged that many Second Circuit courts rejected treating opting out as consent and recommended considering such releases on a case-by-case basis. 667 B.R. at 632.

*LATAM*, preceded *Purdue* and, like the bankruptcy court that *Purdue* reversed, relied on the fact that Second Circuit courts "routinely" approved opt out provisions. 2022 WL 2206829, at *47. Moreover, the released parties had provided billions of dollars of debtor-in-possession financing and waived claims, while here, no Remote Released Party has provided a penny. *Id*. at *48. Notably, the U.S. Trustee there objected to the release on that basis. *Id*. at *46.

## 4. The District Court's Attempts To Distinguish *Purdue* Failed.

The District Court acknowledged that in *Purdue*, "[t]he Supreme Court held that the Bankruptcy Code did not endow a bankruptcy court the power to discharge

the debts of a non-debtor (Sackler family) without the consent of the affected non-debtor claimants (the opioid victims with lawsuits against the Sacklers)." (App.1630, Dist.R._Doc._47, at 16). This ignored the like circumstances here, where the Bankruptcy Court discharged all debts of (or claims against) thousands of non-debtors (*i.e.*, Remote Released Parties) without the consent of MercyOne and like non-debtor claimants.

The District Court emphasized that the Supreme Court in *Purdue* "went to great lengths to state that it was narrowly deciding the case based on the circumstances before it." (*Id.*) (citing 603 U.S. at 226). But the District Court overlooked that the relevant "circumstance" was whether affected parties consented. The Supreme Court made clear that it was not ruling upon "consensual third-party releases offered in connection with a bankruptcy reorganization plan," nor as to what qualified as a "consensual release." *Purdue*, 603 U.S. at 226. But it was unequivocal that consent was essential. *See Smallhold,* 665 B.R. at 721.

The District Court stated that MercyOne argued that the "spirit" of *Purdue* should control, (App.1630-31, Dist.R._Doc._47, at 16-17), suggesting, perhaps, that the letter of the case would not. This misstates MercyOne's argument. MercyOne did not use the word "spirit" in either of its briefs to the District Court. Its argument is that *Purdue* requires consent and while facts demonstrating actual consent can vary by case, nothing permits implied consent to substitute for actual consent. Here,

the ballot structure did not provide an opportunity for actual consent through opting into the Remote Releases.

The District Court attempted to distinguish *Purdue* on three specious grounds: (1) that the *Purdue* bankruptcy court had stayed the matter; (2) that there already was pending litigation; and (3) that all affected parties "consented" based on the opt out provision. Each fails.

### a. The Lack Of A Stay Does Not Insulate The Third-Party Release

Regarding the lack of a stay, a bankruptcy court cannot insulate review of its confirmation of a plan that contains an unenforceable nondebtor release by denying the motion for a stay filed by an impacted party. Were it otherwise, *Purdue*'s requirement of consent would quickly become a nullity.

The District Court noted that in the absence of a stay, the Plan had been "at least partially consummated." (App.1631, Dist.R._Doc._47, at 17). That is irrelevant. The Supreme Court left open the question of how releases should be viewed when there is *substantial* consummation. *Purdue*, 603 U.S. at 226. The Plan here has not been substantially consummated because creditors remain unpaid. (App.1540-42, Bankr.R._Doc._1258); *In re Dean Hardwoods, Inc.*, 431 B.R. 387, 391 (Bankr. E.D.N.C. 2010) (no substantial consummation where payment has not commenced to substantially all creditors).

52

Moreover, there is no evidence that any Remote Released Party (or anyone else) has changed their position based on the belief that Remote Releases are valid such that they would be prejudiced by their restoration. (Indeed, no individual Remote Released Party has even been identified and none testified). If the Remote Releases were excised, all that would happen is that the Liquidating Trustee would have the opportunity to pursue additional claims against these non-parties if he chose.

Also, while the District Court discussed the difficulty of unwinding the Plan (App.1631, Dist.R._Doc._47, at 17), this is puzzling in light of the lengthy colloquy the District Court had with MercyOne counsel at oral argument, who made clear that MercyOne is not asking for the entire Plan to be unwound nor for the confirmation process to have to start from scratch. (App.1574, Dist.R._Doc._52, at 19:11-17). Rather, what is required is for the Remote Releases to be excised from the Plan. This will require no unwinding of payments made, which did not concern these parties.

Moreover, even if there were hardship or difficulty associated with the removal of the Remote Releases, as Justice Gorsuch noted in *Purdue*, that policy implications of the decision are not the court's proper concern. Specifically, he wrote, "our only proper task is to interpret and apply the law as we find it; and nothing in present law authorizes the Sackler discharge." *Purdue*, 603 U.S. at 226.

4905-5069-0369.8

### b. Whether Lawsuits Are Already Pending Is Immaterial To The Need For Consent

The District Court noted that in *Purdue* that there were pending lawsuits that the Releases would wipe out. (App.1632, Dist.R._Doc._47, at 18). But that was not *Purdue*'s *ratio decendi*. Rather, it turned on the statutory language of the Bankruptcy Code, which requires consent of all affected parties to discharge claims. *See Purdue*, 603 U.S. at 224.

Here was yet another instance when the District Court appeared to put its thumb on the scale against MercyOne. It stated there was a "virtual certainty that there were more lawsuits coming against the Sacklers," in light of the worldwide opioid crisis. (App.1632, Dist.R._Doc._47, at 18). This may be true, but it is still a prediction of the unknown. Yet when it came to the Remote Releases, the District Court assumed there likely would be no claims against the Remote Released Parties.

### c. The Lack Of Actual Consent Caused The Third-Party Releases To Fail

The District Court held that the ability to opt out of the Third-Party Releases made them pass muster under *Purdue* and relied on this conclusion to rule both on standing and on the merits. The District Court emphasized: "[t]his process provided claim holders and interest holders with a clear and prominent explanation of the opt-out procedure and gave them an opportunity to easily opt out." (App.1632-33,

Dist.R._Doc._47, at 18-19). Again, one that *opts out* does not mean it *consents* to that release. Indeed, it shows the exact opposite.

Here, again, applying the District Court's logic, consent to the Third-Party Releases was the only possible outcome under any scenario. If a party voted for the Plan, it was deemed to actually consent to the Third-Party Release, regardless of whether that party checked the opt-out box. (App.0577, Bankr.R._Doc._926, at 82). If a party did not return its ballot, this was also deemed a consent to the Third-Party Release. The District Court even acknowledged that "[i]f the claim holder did not return the [ballot] form, they were deemed to consent." (App.1633. Dist.R._Doc._47, at 19). If a party, like MercyOne, objected to the Plan, this, too, was deemed to be the equivalent of consent to the Third-Party Release, due to the ability to opt out. Neither MercyOne nor any other claimant had any option to withhold consent.

The District Court observed that "[i]naction is action under appropriate circumstances" and that when someone does not act after being given information about the consequences of inaction, '[t]hat's not a trap.'" (*Id.*) (quoting *In re Avianca Holdings S.A.*, 632 B.R. 124, 137 (Bankr. S.D.N.Y. 2021)). However, that something is "not a trap," also does not transform it into consent.

Moreover, the circumstances that *Avianca* identified where such releases are proper are absent here. These included where:

> the estate received substantial consideration[,] . . . the enjoined claims were channeled to a settlement fund rather than extinguished[,] . . . the enjoined claims would indirectly impact the debtor's reorganization by way of indemnity or contribution[,] . . . the plan otherwise provided for the full payment of the enjoined claims[, and] the affected creditors consent[ed].

632 B.R. at 132-33. None of this was true regarding the Remote Released Parties. Rather, without doing any investigation of claims being sacrificed, Debtors released untold thousands who provided no consideration.

The District Court noted that the UCC did not object to the Third-Party Release, emphasizing that it represented all creditors, including MercyOne. (App.1633, Dist.R._Doc._47, at 19). Yet an individual creditor maintains its right to object to a plan and its terms irrespective of whether the UCC approves. The UCC, too, did not investigate what claims existed against the Remote Released Parties. No UCC representative testified regarding this provision. Moreover, the UCC approved the Plan before *Purdue* was issued.

### 5. The Business Judgment Rule Cannot Save The Releases

The District Court concluded that it did not have occasion to determine whether the Remote Release passed muster under the business judgment rule. (App.1643, Dist.R._Doc._47, at 29). However, because the Bankruptcy Court did, MercyOne reiterates that any such argument failed for two reasons.

56

*First*, where the Remote Releases trespass statutory requirements and Supreme Court mandates, the business judgment rule cannot save them. *Second*, Debtors simply did not exercise any business judgment. Debtors' CRO admitted he did no investigation regarding the Remote Released Parties, including whether the estates had any claims against them, how many persons and entities were encompassed in each of the 18 categories, and who they were.

## CONCLUSION

For the foregoing reasons, this Court should reverse the decision of the District Court upholding the Bankruptcy Court's denial of MercyOne's objection to the Plan based on the Remote Releases and find that the presence of the Remote Releases made the Plan unconfirmable as is and require that on remand the Remote Releases be excised from the Plan.

Dated: June 26, 2025

Respectfully submitted,

/s/ David B. Goroff
David B. Goroff
Nora J. McGuffey
**FOLEY & LARDNER LLP**
321 N. Clark Street, Suite 3000
Chicago, IL 60654
Tel: (312) 832-4500
Fax: (312) 832-4700
dgoroff@foley.com
nora.mcguffey@foley.com

4905-5069-0369.8

## CERTIFICATION OF COMPLIANCE

This Brief complies with the typeface requirements of Fed.R.App.32(a)(5) and the type-style requirements of Fed.R.App.P.32(a)(6) because it has been prepared in Microsoft Word using a proportionally spaced typeface—Times New Roman 14 point. This Brief is within the type-volume limitation of Fed. R. App. P. 27(d)(2) which permits up to 13,000 words. As determined by the Word Count feature of Microsoft Word, the Brief contains 12,874 words, excluding the parts of this Brief exempted under the Federal Appellate Rules and Local Rules.

*/s/ David B. Goroff*
David B. Goroff

## CERTIFICATE OF SERVICE

I hereby certify that on June 26, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

*/s/ David B. Goroff*
David B. Goroff

4905-5069-0369.8