No. 25-01654

IN THE UNITED STATES COURT OF APPEALS FOR THE
EIGHTH CIRCUIT

MERCY HEALTH NETWORK, INC. d/b/a MERCYONE,
Appellant,

v.

MERCY HOSPITAL, IOWA CITY, IOWA, *et al.*,
Appellees

DAN CHILDERS, SUCCESSOR LIQUIDATION TRUSTEE OF THE MERCY
HOSPITAL LIQUIDATION TRUST,
Trustee-Appellee
_____

On Appeal from the United States District Court
for the Northern District of Iowa, Cedar Rapids Division
_____

**ADDENDUM TO APPELLANT'S BRIEF**
_____

David B. Goroff
Nora J. McGuffey
**FOLEY & LARDNER LLP**
321 N. Clark Street, Suite 3000
Chicago, IL 60654
(312) 832-4500
dgoroff@foley.com
nora.mcguffey@foley.com

*Counsel for Appellant Mercy Health
Network, Inc. d/b/a MercyOne*

*Oral Argument Requested*

## Appellant's Addendum – Table of Contents

| No. | Date | Document Title | Docket No. | Appendix Page No. |
|---|---|---|---|---|
| 1 | 6/7/24 | Memorandum Opinion and Order Overruling MercyOne's Objection to Debtors' Plan Confirmation | Bankr. R. Doc. 1113 | App.1248 – App.1266 |
| 2 | 6/7/24 | Findings of Fact, Conclusions of Law, and Order Confirming Debtors' Joint Chapter 11 Plan of Liquidation | Bankr. R. Doc. 1114 | App.1267– App.1321 |
| 3 | 3/3/25 | Order Granting Appellee's Motion to Dismiss for Lack of Standing | Dist. R. Doc. 47 | App.1615 – App.1643 |
| 4 | 3/3/25 | Judgment in a Civil Action | Dist. R. Doc. 48 | App.1644 |
| 5 | 5/14/24 | Notice of Filing of Revisions to Debtors' Combined Disclosure Statement and Joint Chapter 11 Plan of Liquidation (Excerpts) | Bankr. R. Doc. 1050 | App.0755 – App.0756, App.0847 – App.0848 |
| 6 | 5/16/24 | Transcript of Confirmation Hearing (Excerpts) | Bankr. R. Doc. 1145 | App.1137 – App.1141, App.1144 – App.1147, App.1150 – App.1151 |

4937-2345-8641.1

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF IOWA

IN RE:

MERCY HOSPITAL, IOWA CITY,
IOWA, *et al.*,

      Debtors.

Chapter 11

Bankruptcy No. 23-00623

Jointly Administered

## MEMORANDUM OPINION AND ORDER OVERRULING MERCYONE'S OBJECTION TO DEBTORS' PLAN CONFIRMATION

The matter before the Court is Mercy Health Network's (d/b/a "MercyOne") Objection to Confirmation of Plan (Doc. 1016). The Debtors filed their Modified Chapter 11 Plan of Liquidation (Doc. 929) on April 4, 2024, with a Plan Supplement (Doc. 993) filed on April 29, 2024, and a final Modified Chapter 11 Plan of Liquidation (hereinafter "Plan") (Doc. 1050) on May 14, 2024. The Court held the plan confirmation hearing on May 16, 2024. The Court took evidence and heard argument on MercyOne's objection. This is a core proceeding. For the following reasons, MercyOne's objection is overruled.

### I. FINDINGS OF FACT AND CONCLUSIONS OF LAW

MercyOne's objection primarily involves the plan provisions on Released Parties at Article II(A)(1.189)(g) of the Plan. MercyOne asserts the release provisions are improper and make the plan non-confirmable. Debtors contend that MercyOne does not have standing to object because it opted out of the third-party release.

Debtors also contend that, even if MercyOne has standing, the release provisions satisfy all applicable confirmation standards. At the evidentiary hearing, the Debtor offered the declaration of Mark Toney in support of confirmation. He was also called as a witness. In sum, he testified the Article II(A)(1.189)(g) Releases were a product of extensive negotiation between the key parties to get a consensual plan—with all creditors consenting other than MercyOne. He noted the releases were an essential component of the compromise, which likely would not have been reached without their inclusion.

He admitted on cross-examination that no in-depth analysis was done to determine the potential for recovery, or possible amount of recovery, from the Released Parties. He noted that Debtors exercised their fiduciary duties by pursuing a course of action that was best for the estate, without spending unnecessary time and incurring fees to make that full-blown determination. Debtors relied on a basic view that there had been no reason to believe that any released party had clear liability or was likely to provide a source of substantial recovery for the estate. Debtors relied on counsel and on the fact that other parties who would benefit from a potential recovery against the Released Parties were in favor of their inclusion. He stated the releases were a trade-off Debtors and other key parties were willing to make to get a consensual plan. Moreover, most of the released parties provided key concessions or other value to the estate for the release they would receive.

2

## A. Debtors Argument That MercyOne Does Not Have Standing to Object to Article II(A)(1.189)(g) of the Plan.

"A *party in interest* may object to confirmation of a plan." 11 U.S.C. § 1128(b) (emphasis added). Section 1109(b) of the Code notes that a party-in-interest includes "the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee . . . ." Id. There is no dispute that MercyOne is a party in interest here.

The analysis, however, does not end here. "Generally, it is only an aggrieved party, whose own interests are impacted by particular plan provisions, [who] may object to those provisions at confirmation." In re Nevel Properties Corp., No. BR 09-00415, 2012 WL 528179, at *6 (Bankr. N.D. Iowa Feb. 17, 2012), aff'd, 765 F.3d 846 (8th Cir. 2014) (citing In re Applied Safety, Inc., 200 B.R. 576, 587 (Bankr. E.D. Pa. 1996)). "Thus, a party cannot successfully object to plan provisions that have no effect on the party's rights and interests thereunder. A party may therefore not object to a plan raising rights that belong to third parties who are not objecting." Id.[1]

---

[1] In re Indianapolis Downs, LLC, 486 B.R. 286, 304 (Bankr. D. Del. 2013) (holding that parties who objected to the third-party release in the debtors' chapter 11 plan "lack[ed] the requisite standing to object" to such release because, among other things, the parties "voted to reject the Plan and . . . affirmatively opt[ed] out of the release provision"); In re Orlando Investors, L.P., 103 B.R. 593, 569-97 (Bankr. E.D. Pa. 1989) (finding that in the context of a confirmation hearing, creditors "have standing only to challenge those parts of a reorganization plan that affect their direct interests"); In re Mallinckrodt PLC, 639 B.R. 837, 877 (Bankr. D. Del. 2022) (finding "that the Pension Trust does not have standing to object to the Third-Party Releases because it has opted out and is therefore not bound by them"); Matter of Ultra Petroleum Corp., No. 21-20049, 2022 WL 989389, at *5 (5th Cir. Apr. 1, 2022) (finding that despite objecting party's argument that the opt-out process and releases were improper. . . he himself managed to opt-out and thus has no standing to challenge the releases"); In re Akorn, Inc., No. 20-1254 (MN), 2021 WL 4306222, at *16 (D. Del. Sept. 22, 2021) (holding that because appellants did not opt into the releases, they "lacked standing to challenge those releases"); Talarico v. Ultra Petroleum Corp., 2020 WL 8361996, at *3 (S.D. Tex. Dec. 29, 2020) ("[I]t is clear that [the appellant] lacks standing to bring and maintain this appeal based on the 'third-party release' provision[] of the Plan" because he "opted out of the provision."); In re Dynegy Inc., No. 12 Civ. 8908 (JGK), 2013 WL 2413482, at

**App.1250**

Some confusion has arisen in both MercyOne's arguments in briefing and at the confirmation hearing. MercyOne objects at various points to "the Releases" in the Plan—and makes arguments about "the Releases" without distinguishing between the two types of releases at issue. There are "third-party" releases—by which non-debtor third-parties relinquish rights to pursue parties covered by the release. There are also "Debtor releases," which have the Debtor relinquish its rights to prusue specified parties. The distinction between those types of releases is important in this case—and important in the law. In re Midway Gold US. Inc., 575 B.R. 507, 509 (Bankr. D. Colo. 2017); In re Washington Mutual, 442 B.R. 314, 346-47 (Bankr. D. Del. 2011).

The distinction is important under the facts of this case for a very fundamental reason. MercyOne, as allowed by the Plan, has opted-out of the "Third-Party" release. As such MercyOne is not effected by the "Third Party" releases. It retains all rights to pursue its own claims against those otherwise immunized by the third-party release. The "Debtor release" is not a release of any rights of MercyOne. It provides that Debtors relinquish rights to pursue the parties covered by the Debtor release. MercyOne is not the Debtor and is not a released party. As such, MercyOne

---

*5 (S.D.N.Y. June 4, 2013) (affirming bankruptcy court ruling that creditor "lacked standing on his own behalf to object to the [r]elease because he had timely opted out of the [r]elease and therefore a decision on whether the [r]elease was permissible would not affect his rights").

is limited to arguing only about the effect such a release has on any recovery it could

make as a creditor.

To the extent MercyOne is objecting to the negotiated, consensual non-debtor

Third-Party Releases of *other* parties—which did not opt-out—MercyOne has no

standing.  MercyOne voluntarily and unequivocally opted out of the Third-Party

Releases in the plan, meaning MercyOne is not bound by the provisions of the Plan

that prevent a non-Debtor party like MercyOne from pursuing its own claims against

the released parties.  Case law provides that parties that opt-out of the third party

releases—like MercyOne here—have no standing to challenge the releases.  In re

Indianapolis Downs, LLC, 486 B.R. 286, 304 (Bankr. D. Del. 2013); In re

Mallinckrodt PLC, 639 B.R. 837, 877 (Bankr. D. Del. 2022) (finding "that the

Pension Trust does not have standing to object to the Third-Party Releases because

it has opted out and is therefore not bound by them").  MercyOne is a single creditor,

with a small claim in comparision to the other key creditors supporting the plan—

including the Bondholders,[2] the Pensioners,[3] and the Unsecured Creditors.

MercyOne has made no credible argument that its rights are actually effected by the

"Debtor releases."  It has only suggested that the releases give away the right to

pursue recoveries that **might possibily** result in MercyOne and other creditors

---

[2] The Court's references to the "Bondholders" include both Computershare Trust Company, N.A., as Trustee, and
Preston Hollow Community Capital, Inc., as Bondholder Representative.
[3] The Court's references to the Pensioners include the Official Committee of Pensioners and its prior iterations in
the case.

receiving payment on their claim. This suggestion—without any supporting evidence—does not provide MercyOne with adequate standing to object to the Debtor's release of other parties beyond that limited right.

## B. MercyOne's Objections Fail on the Merits.

Even if MercyOne does have standing to object to the Debtor's release, the Court concludes MercyOne failed to sufficiently establish that objection. As a general matter, a proposed plan of reorganization may be confirmed by a bankruptcy court only if the plan meets all of the requirements for confirmation under 11 U.S.C § 1129. If all of the subparts of § 1129(a) except (a)(8) have been met, a plan may still be confirmed under the cramdown provisions of § 1129(b). The proponent of the plan bears the burden of proof with respect to each element of §§ 1129(a) and 1129(b) under a preponderance of the evidence standard. In re Internet Navigator Inc., 289 B.R. 128, 131 (Bankr. N.D. Iowa 2003). The findings of fact and conclusions of law satisfying these statutory requirements are set out in the Confirmation Order, ¶¶ N–EE, which is hereby adopted and incorporated by reference. No party—including MercyOne—has challenged these findings and conclusions.

MercyOne focuses its entire objection on the release of parties listed at Article II(A)(1.189)(g) of the Plan—a discretionary plan provision under §1123(b). MercyOne specifically argues: (i) the releases are overbroad, (ii) Debtors'

6

conclusory assertions cannot support inclusion of the Article II(A)(1.189)(g) Releases, (iii) there is no identity of interest between Debtors and the released parties, (iv) the released parties contributed nothing to the overall reorganization efforts, (v) the released parties are not essential to reorganization, (vi) the releases improperly apply to those who do not affirmatively consent to the plan, and finally that (vii) these releases do not satisfy Debtors' good faith requirement of § 1129(a)(3).

The Court begins this analysis by reiterating that this case is not about third-party releases where non-debtor parties are forced to give up their rights to pursue released parties. That is a contentious issue now before the United States Supreme Court. See Lujan Claimants, et al. v. Boy Scouts of Am., et al., No. 23A741 (Feb. 9, 2024). Again, there is non-Debtor third-party release language in this Plan, but MercyOne has opted-out of the application of that Plan language. Case law is quite clear that a different and less demanding standard applies to challenges to Debtor releases.

The only real issue remaining, and the only one truly argued at the confirmation hearing, is whether the Debtors release of other parties to this case is warranted. MercyOne argues that the releases are not valid because Debtor has failed to show they meet the applicable legal standard. MercyOne also argues the releases should also be disallowed because that **might** result in MercyOne receiving more payment on its claim.

7

1. <u>Debtors have met their burden of proof for the inclusion of the Debtor's Release in II(A)(1.189)(g).</u>

Debtors and MercyOne agree that the factors set forth in <u>In re Master Mortg. Inv. Fund, Inc.</u>, 168 B.R. 930 (Bankr. W.D. Mo. 1994) are applicable here to assist the Court as it considereds the validity of the Debtors releases.  The Factors that support releases include:

> (1) There is an identity of interest between the debtor and the third party, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete assets of the estate.
> (2) The non-debtor has contributed substantial assets to the reorganization.
> (3) The injunction is essential to reorganization. Without the it, there is little likelihood of success.
> (4) A substantial majority of the creditors agree to such injunction, specifically, the impacted class, or classes, has "overwhelmingly" voted to accept the proposed plan treatment.
> (5) The plan provides a mechanism for the payment of all, or substantially all, of the claims of the class or classes affected by the injunction.

<u>Id.</u> at 935.  Debtors, however, do not agree with MercyOne's suggestion that Debtor's releases are extraordinary and should rarely be approved.  That assertion is not supported by case law.  <u>In re Midway Gold US, Inc.</u>, 575 B.R. 475, 507, 609 (Bankr. D. Colo. 2017) ("Ordinarily, debtors are authorized under § 1123 (b)(3)(A) to settle or **release** claim in a Chapter 11 Plan").  In fact, <u>Midway Gold</u> went on to state:

> A plan may provide releases by a debtor of non-debtor third parties after considering the specific facts and equities of each case. Moreover, a debtor may release claims in a plan pursuant to Bankruptcy Code § 1123 (b)(3)(A), if

8

**App.1255**

the release is a valid exercise of the debtor's **business judgment**, is fair and reasonable, and is in the best interest of the estate.

575 B.R. at 509 (citing In re Spansion, 426 B.R. 114, 142-43 n. 48 (Bankr. D. Del 2010) (emphasis added). There is language in the case law that also makes this abundantly clear and specifies that the analysis of the Master Mortgage factors allows for flexibility in the analysis tailored to each case. This is not a 'rigid factor test' to be applied in every circumstance." Id. "These factors are neither exclusive nor conjunctive requirements, but simply provide guidance in the Court's determination of fairness." In re Washington Mutual, Inc., 442 B.R. 314, 346 (Bankr. D. Del. 2011).

With those thoughts in mind, the Court turns to the Master Mortgage factors.

i.      Identity of Interest

Here, the Court finds that there is an identity of interest between Debtors and the Released Parties. Particularly persuasive is the fact that these releases were integral to the consensual nature of the Plan and necessary to avoid the prospect of immense and complex litigation absent the releases. In re Tribune Co., 464 B.R. 126, 187 (Bankr. D. Del. 2011) (finding that debtors and releases "share the common goal" of confirming a plan dependent on settlement of complex multi-party litigation resulted in an "identity of interest" for purposes of the Master Mortgage factors); In re Seaside Engineering & Surveying, Inc., 780 F.3d 1070, 1079-80 (11th Cir. 2015) (finding identity of interest between debtor and released parties, who were debtor's

9

**App.1256**

key employees, where debtor would deplete its assets in defending released parties against litigation).  Debtor also presented unrefuted evidence and argument on the fact that many of the Released Parties under the Debtor's releases had indemnity rights back against the Debtor.  This fact further establishes the identity of interest factor.

ii.    Substantial Contribution

The evidence also showed that most parties receiving the benefit of the Debtor's release agreed to forego some right or possible right of recovery in exchange for the release.  In doing so, these parties provided assurance that the Releases would both eliminate a risk of adverse result for the Debtor and allow the Debtor to avoid any further expense in pursuing those issues on which Debtor received concessions.  Both of these elements provide substantial contribution to the estate.  See In re rue21, Inc., 575 B.R. 314, 326 (Bankr. W.D. Pa. 2017) ("It is within the bankruptcy court's discretion to determine whether the nature and size of the consideration rises to the level of a 'substantial' contribution."); see also Seaside Engineering, 780 F.3d at 1079-80 (finding that labor and services of debtors' professionals constituted substantial contribution); In re Mercedes Homes, Inc., 431 B.R. 869, 881 (Bankr. S.D. Fla. 2009) (finding that debtors' officers' and directors' expertise and knowledge, which would be used to work for reorganized debtors, constituted a substantial contribution).

10

iii.   Essential to the Plan

The evidence and undisputed arguments also show the Releases were critical to achieving the near-unanimous consent (other than MercyOne) to the Plan and its confirmation.  Multiple major constituents, including most notably the Bondholders and the Pensioners, explicitly noted that their support of the Plan was dependent on Debtors' inclusion of the released parties.  See Matter of Fansteel Foundry Corp., No. 16-01825 (ALS), 2018 WL 5472928, at *11-12 (Bankr. S.D. Iowa Oct. 26, 2018) (overruling objection to third-party releases because, among other things, "[t]he plan cannot move forward if the release and exculpation are not permitted"); In re 710 Long Ridge Rd. Operating Co., II, LLC, No. 13-13653 (DHS), 2014 WL 886433, at *15 (Bankr. D.N.J. Mar. 5, 2014) (finding factor satisfied where "contributions by [releasees were] absolutely necessary to a successful reorganization"); In re U.S. Fidelis, Inc., 481 B.R. 503, 520 (Bankr. E.D. Miss. 2012) ("A release of a non-debtor is appropriate only if, without it, there would be little likelihood of the (sic) accomplishing of the goal of the chapter 11: the confirmation of a successful plan of liquidation that benefits creditors, including the unsecured creditors.  Here, there is no chance of a plan of liquidation without the releases, and if there is no confirmed plan, the Case either will be converted to a chapter 7 case or dismissed."); In re MAC Panel Co., No. 98-10952C, 2000 WL 33673757, at *10 (Bankr. M.D.N.C. Feb. 24, 2000) (finding factor satisfied because injunctive relief and release, "which were

11

prerequisites to the availability of the [releasee's] funds, [were] 'essential' to the

confirmation" of debtor's plan); In re Union Fin. Servs. Grp., Inc., 303 B.R. 390,

428 (Bankr. E.D. Mo. 2003) ("Where the success of the reorganization is premised

in substantial part on such releases, and failure to obtain releases means the loss of

a critical financial contribution to the debtor's plan that is necessary to the plan's

feasibility, such releases should be granted.").

iv.     Overwhelming Support for the Plan

All of the Voting Classes voted overwhelmingly in favor of Confirmation of

the Plan after information about the releases was widely distributed through the

Solicitation Process.  See Master Mortgage, 168 B.R. at 938 (stating that creditor

approval of a release is "the single most important factor" to determine whether a

release is appropriate); In re Key3Media Grp., 336 B.R. 87, 97-98 (Bankr. D. Del.

2005), aff'd, 2006 WL 2842462 (D. Del. Oct. 2, 2006) (granting a settlement of

estate causes of action over a creditor's objection because, among other things, a

majority of creditors approved the settlement).  This factor provides strong support

for approval of the release language.

v.      Payment of Claims

Finally, it is undisputed that the Plan here provides for distributions to parties

affected by the releases.  Courts generally find this factor met when a plan provides

for a distribution to impaired creditors affected by releases that is greater than the

12

**App.1259**

distribution such creditors would receive under a chapter 7 liquidation. <u>Matter of</u>

<u>Fansteel Foundry Corp.</u>, 2018 WL 5472928, at *12 (approving thirdparty release

because, among other things, "[t]he plan provides a mechanism that realizes

recovery for creditors who would receive no distribution" otherwise); <u>In re U.S.</u>

<u>Fidelis, Inc.</u>, 481 B.R. at 520 (finding fifth Master Mortgage factor satisfied where

there was a return to creditors).

After weighing all the factors and circumstances of this case, the Court finds

that Debtors have met their burden under <u>Master Mortgage</u> or <u>Midway Gold</u> by a

preponderance of the evidence. MercyOnes's objections that the Releases are

unlawful and should not be included here is overruled.

This conclusion leaves only MercyOne's objection that this result is unfair to

MercyOne and may allow other parties to escape some possible liability that **might**

**possibly** result in more payment of MercyOne's claims. The Court rejects this

argument as well. The formation of this Plan has been the result of extensive

compromise and settlment talks between the key parties in this case, including the

United States Trustee, the Unsecured Creditors Committee, the Pensioners, and the

Bondholders, and various other constituents. Where a compromise is part of a plan

of reorganization, the court has the duty "to determine that a proposed compromise

forming part of a reorganization plan is fair and equitable." <u>In re Coram Healthcare</u>

**App.1260**

Corp., 315 B.R. 321 (Bankr. D. Del. 2004) (citing TMT Trailer Ferry, 390 U.S. 414,

424 (1968)).

> As this Court has previously noted:

> [T]he standard for evaluation is whether the settlement is fair and equitable and in the best interests of the estate. The court need only ensure the settlement does not fall below the lowest point in the range of reasonableness. In assessing the reasonableness of a settlement, the court considers: (A) the probability of success in the litigation; (B) the difficulties, if any to be encountered in the matter of collection; (C) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (D) the paramount interest of the creditors and a proper deference to their reasonable views in the premises.

In re McQuillen Place Co., LLC, No. BR 19-00507, 2021 WL 1234457, at *3 (Bankr.

N.D. Iowa Mar. 30, 2021) (citing Ritchie Cap. Mgmt., L.L.C. v. Kelley, 785 F.3d 273,

278–79 (8th Cir. 2015)).  Debtors argue it is within its reasonable business judgment

to include the Releases as part of the global settlment that culminated in the Plan

currently before this Court.  See, e.g., In re Quincy Med. Ctr., Inc., No. 11-16394-

MSH, 2011 WL 5592907, at *2 (Bankr. D. Mass. Nov. 16, 2011) ("With respect to a

debtor's releases, there is no reason why a debtor in its *reasonable business judgment*

should not be permitted, as part of its own plan, to propose to release whomever it

chooses.  Bankruptcy Code § 1123(b)(3) contemplates such plan provisions which

are analogous to Federal Rule of Bankruptcy Procedure 9019 compromises and

settlements.")(emphasis added); In re Coram Healthcare Corp., 315 B.R. 321, 330

(Bankr. D. Del. 2004) (citing  In re Martin, 91 F.3d 389 (3d Cir. 1996)) (explaining

that "the court should defer to a trustee's judgment so long as there is a *legitimate business justification* for [its] action")(emphasis added).

This Court has in similar situations deferred to the business judgment of fiduciaries offering settlements as part of its "totality of the circumstances" analysis. See, e.g., In re Simply Essentials, LLC, 640 B.R. 922 (Bankr. N.D. Iowa 2022), aff'd, 78 F.4th 1006 (8th Cir. 2023)(noting that "[s]ubstantial deference should be given to the [fiduciary's] opinion" when evaluating a settlement); In re Hildreth, No. BR 09-00293, 2012 WL 4520635 (Bankr. N.D. Iowa Oct. 1, 2012)(explaining that "the Court gives weight to [the fiduciary's] opinion").  Under the business judgment rule, the challenging party must establish that the course of action chosen by the fiduciary was outside the parameters of what a rational and reasonably informed businessperson might select.  See In re Woodberry, 629 B.R. 239, 243 (Bankr. E.D. Mich. 2021)(citing In re Engman, 331 B.R. 277, 289 (Bankr. W.D. Mich. 2005).

Here, MercyOne has offered no such evidence or argument.  It asserted only that the possibility of greater recovery against released parties could have been explored in more detail before Debtor agreed to the releases.  That is not enough. Debtors offered evidence at the Confirmation Hearing that the Releases were a product of good faith, arm's-length negotiations, and were a material and necessary precondition for the key parties in the case to support the Plan.  The key parties, particularly the Bondholders, also reiterated at the Confirmation Hearing that, but

15

for the inclusion of the Releases, they would not have voted in support of the Plan. The Court finds this the most persuasive evidence and supportive of confirmation for this particular case.  See Midway Gold, 575 B.R. at 509-10 (reaching similar conclusion).  On August 8, 2023, when the Court held its "First Day Motions" hearing in this case, the animosity between Debtors and the multiple constituent groups was palpable.  The Court urged the parties to work together toward consent, with an eye to the future and a confirmation plan.  The parties have done just that. The gravity of having a consensual Plan presented to the Court just a short nine months later—with MercyOne's objections being the only remaining outlier—is not lost on this Court.

This is not to say that every consensual plan that results from heavily contested bankruptcy proceedings should be confirmed soley on that basis.  Rather, in reading the applicable statutes and case law, the Court finds that in this particular case with these particular facts, the inclusion of the Releases in the Plan meets the standards set under McQuillen Place.  This Plan is functionally a global settlement based on Debtors' business judgment that is fair, equitable, and in the best interests of the estate.  See Tri-State Fin., LLC v. Lovald, 525 F.3d 649 (8th Cir. 2008) (upholding a settlment approval based on a review of the four factor considerations and the totality of the circumstances); In re Martin, 212 B.R. 316 (B.A.P. 8th Cir. 1997) (same).  MercyOne has offered no evidence beyond conclusory allegations in

**App.1263**

its motion that this settlement falls "outside the parameters of what a rational and reasonably informed businessperson might select." See In re Woodberry, 629 B.R. at 243. The Court finds the evidence actually offered at the hearing to be credible and persuasive here and overrules MercyOne's objections on this point.

2. Debtors satisfy the good faith requirement of § 1129(a)(3).

MercyOne also argues that the Plan was not proposed in good faith. Section 1129(a)(3) requires that plans be proposed in good faith, but the Code does not define good faith. In re Civic Partners Sioux City, LLC, No. BR 11-00829, 2013 WL 5534743, at *31 (Bankr. N.D. Iowa Oct. 7, 2013) (citing Hanson v. First Bank of S.D., N.A., 828 F.2d 1310, 1315 (8th Cir. 1987) (overturned on other grounds)). "[H]owever, a plan is considered proposed in good faith 'if there is a reasonable likelihood that the plan will achieve a result consistent with the standards prescribed under the Code.'" Hanson, 828 F.2d at 1315 (citing In re Toy & Sports Warehouse, Inc., 37 B.R. 141, 149 (Bankr. S.D.N.Y. 1984)). To determine if the Plan will achieve a result consistent with the Code, this Court must judge this case on its own facts after considering the totality of the circumstances surrounding the plan and the bankruptcy filing. See Noreen v. Slattengren, 974 F.2d 75, 76 (8th Cir. 1992); see also In re Riverbend Leasing LLC, 458 B.R. 520, 529 (Bankr. S.D. Iowa 2011); In re Cedar Shore Resort, Inc., 235 F.3d 375, 381 (8th Cir.2000) ("the powerful

App.1264

equitable weapons of the bankruptcy court should be available only to those debtors with clean hands.").

MercyOne's conclusory objections on this point raise the same arguments addressed in full above—that the Releases show lack of good faith. As noted, the Releases meet all tests to be lawfully included here. MercyOne's arguments also do not explain in any additional detail why inclusion of the Releases would constitute bad faith or show any objections to Debtors' bankruptcy filing in the first place. Nothing in the record suggests that Debtors acted with "unclean hands" or any inappropriate purpose in submitting this Plan or in filing this bankruptcy petition. See Matter of Fansteel Foundry Corporation, 2018 WL 5472928 at *12-13 (Bankr. S.D. Iowa 2018). For all the reasons outlined above and in the Court's Confirmation Order, the goal of the Plan is consistent with the objectives of the Code. This objection to confirmation is overruled.

## II. CONCLUSION AND ORDER

**IT IS THEREFORE ORDERED THAT** MercyOne's objections are OVERRULED and Debtors' Plan is CONFIRMED by the separate court order adopted and incorporated by reference here.

**FURTHER IT IS ORDERED THAT**, to the extent necessary for clarity, this opinion is incorporated in and made a part of the separate Confirmation Order.

Ordered:   June 7, 2024

_____

Thad J. Collins
Chief Bankruptcy Judge

**App.1266**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| MERCY HOSPITAL, IOWA CITY, IOWA, *et al.*, | ) Case No. 23-00623 (TJC) |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |
| | ) |

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER**
**CONFIRMING DEBTORS' JOINT CHAPTER 11 PLAN OF LIQUIDATION**

Mercy Hospital, Iowa City, Iowa and certain of its affiliates and subsidiaries, as debtors

and debtors-in-possession (collectively, the "Debtors")[1] in the above-captioned chapter 11 cases,

having:

i.  commenced the Chapter 11 Cases on August 7, 2023 (the "Petition Date") by each filing a voluntary petition in the United States Bankruptcy Court for the Northern District of Iowa (the "Court") for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101-1532 (the "Bankruptcy Code");

ii.  continued to operate and manage their business and properties as debtors-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108;

iii.  filed, on the Petition Date, the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Use of Cash Collateral and Granting Adequate Protection, (II) Scheduling a Final Hearing on the Use of Cash Collateral, and (III) Granting Related Relief* [Docket No. 26];

iv.  filed, on the Petition Date, the *Declaration of Mark E. Toney in Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. 27];

v.  filed, on August 9, 2023, the *Debtors' Motion for Entry of Order (I)(A) Approving Bidding Procedures for the Sale of Substantially All of the Debtors' Assets, (B) Authorizing the Debtors to Provide Stalking Horse Bid Protections, (C) Scheduling an Auction and Approving the Form and Manner of Notice Thereof, (D) Approving the Assumption and Assignment Procedures and (E) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Thereof; (II)(A) Approving the Sale*

---

[1]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan (as defined herein).

of the Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances and (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases; and (III) Granting Related Relief [Docket No. 58];

vi.     filed, on August 16, 2023, the *Notice of Commencement* [Docket No. 113] (the "<u>Notice of Commencement</u>");

vii.    distributed to all creditors, patients, and notice parties, on or about August 16, 2023, the Notice of Commencement;

viii.   filed, on August 18, 2023, the *Certificate of Service* of the Notice of Commencement [Docket No. 127];

ix.     published for three successive and consecutive weeks, on or about September 2, 2023, September 9, 2023, and September 16, 2023, the Notice of Commencement in the *Cedar Rapids Gazette* and published three successive and consecutive weeks, on or about September 1, 2023, September 8, 2023, and September 15, 2023, the Notice of Commencement in the *Iowa City Press-Citizen* [Docket Nos. 273, 280];

x.      filed, on September 1, 2023, supplemental *Certificates of Service* of the Notice of Commencement [Docket Nos. 182, 183];

xi.     filed, on September 15, 2023, supplemental *Certificates of Service* of the Notice of Commencement [Docket Nos. 241, 242];

xii.    filed, on September 19, 2023, the *Debtors' Certificate of Service by Publication* of the Notice of Commencement in the *Cedar Rapids Gazette* [Docket No. 252];

xiii.   filed, on September 26, 2023, the *Debtors' Certificate of Service by Publication* of the Notice of Commencement in the *Iowa City Press-Citizen* [Docket No. 273];

xiv.    filed, on October 9, 2023, the *Debtors' (I) Motion for Entry of Order Approving Settlement By and Among the Debtors, the Bondholder Representatives, the Committee, and Mercy Foundation; and (II) Application of Mercy, as Sole Member of Mercy Foundation, for Section 540A.106 Ruling* [Docket No. 346];

xv.     held, on October 4, 2023 and October 10, 2023, the auction for substantially all of the Debtors' assets;

xvi.    filed, on October 10, 2023, the *Notice of Auction Results* [Docket No. 352];

xvii.   reopened, on October 27, 2023, the auction for substantially all of the Debtors' assets;

*In re Mercy Hospital, Iowa City, Iowa, et al.*
*Case No. 23-00623 (TJC)*

xviii.   filed, on October 27, 2023, the *Amended Notice of Auction Results* [Docket No. 420];

xix.    filed, on January 8, 2024, a supplemental *Certificate of Service* of the Notice of Commencement [Docket No. 619];

xx.    filed, on January 30, 2024, the *Motion of Debtors for Entry of Order (I) Establishing Administrative Claims Bar Date, (II) Approving Form, Manner, and Sufficiency of Notice Thereof, and (III) Approving Proof of Administrative Claim Form* [Docket No. 694];

xxi.    filed, on February 1, 2024, the *Notice of Sale Closing* [Docket No. 699], apprising parties-in-interest of the closing of the Debtors' sale to the University;

xxii.    filed, on February 1, 2024, the *Debtors' Motion for Entry of Order (I) Approving the Sale of the Debtors' Interest in a Joint Venture Free and Clear of Liens, Claims, Interests, and Encumbrances and (II) Granting Related Relief* [Docket No. 703];

xxiii.    filed, on February 23, 2024, the *Debtors' Combined Disclosure Statement and Joint Chapter 11 Plan of Liquidation* [Docket No. 760];

xxiv.    filed, on March 1, 2024, the *Debtors' Motion for Entry of Order (I) Approving Disclosure Statement; (II) Scheduling Hearing on Confirmation of Plan; (III) Establishing Deadlines and Procedures for (A) Filing Objections to Confirmation of Plan, (B) Claim Objections, and (C) Temporary Allowance of Claims for Voting Purposes; (IV) Determining Treatment of Certain Unliquidated, Contingent, or Disputed Claims for Notice, Voting, and Distribution Purposes; (V) Setting Record Date; (VI) Approving (A) Solicitation Packages and Procedures for Distribution, (B) Form of Notice of Hearing on Confirmation and Related Matters, and (C) Forms of Ballots; (VII) Establishing Voting Deadline and Procedures for Tabulation of Votes; and (VIII) Granting Related Relief* [Docket No. 796];

xxv.    participated in extensive settlement negotiations with the UCC, the Pension Committee, and the Bondholder Representatives, including an in-person settlement conference on March 18, 2024;

xxvi.    filed, on April 3, 2024, the *Debtors' First Amended Combined Disclosure Statement and Joint Chapter 11 Plan of Liquidation* [Docket No. 927] (the disclosures contained therein, the "Disclosure Statement" and the plan contained therein, as may be subsequently amended, modified, or supplemented, the "Plan" and collectively, as may be amended, supplemented, or otherwise modified, the "Combined Disclosure Statement and Plan");

xxvii.    filed, on April 4, 2024, the *Notice of (A) Confirmation Hearing with Respect to Debtors' Combined Disclosure Statement and Joint Plan of Liquidation Under*

3

**App.1269**

*In re Mercy Hospital, Iowa City, Iowa, et al.*
*Case No. 23-00623 (TJC)*

Chapter 11 of the Bankruptcy Code; and (B) Related Objection Deadline [Docket No. 930] (the "<u>Confirmation Hearing Notice</u>");

xxviii.    distributed, on or about April 8, 2024, (a) the Disclosure Statement and related exhibits, including the Plan; (b) the Solicitation Procedures Order (without exhibits); (c) the letter from the UCC in support of the Plan; and (d) the applicable ballot for voting on the Plan (each, a "<u>Ballot</u>") to Holders of Claims in Classes 1-A, 1-B, 3, 4, and 5 who were entitled to vote on the Plan in accordance with the terms of the Solicitation Procedures Order, the Bankruptcy Code, the Federal Rules of Bankruptcy Procedures (the "<u>Bankruptcy Rules</u>"), and the Local Rules of the United States Bankruptcy Court for the Northern District of Iowa (the "<u>Local Rules</u>");

xxix.    distributed, on or about April 8, 2024, the Confirmation Hearing Notice to all creditors in the Chapter 11 Cases;

xxx.    published, on or about April 11, 2024, the Confirmation Hearing Notice in the Iowa City Press Citizen and Des Moines Register;

xxxi.    filed, on April 18, 2024, the *Certificate of Service of Solicitation Materials* [Docket No. 967] (the "<u>Solicitation COS</u>");

xxxii.    filed, on April 18, 2024, the *Debtors' Certificate of Service by Publication* of the Confirmation Hearing Notice in the Iowa City Press Citizen and Des Moines Register [Docket Nos. 970, 971];

xxxiii.    distributed, on or about April 25, 2024, a letter in support of the Plan from the Pension Committee;

xxxiv.    filed, on April 29, 2024, the *Notice of Filing of Plan Supplement with Respect to the Debtors' First Amended Combined Disclosure Statement and Joint Chapter 11 Plan of Liquidation* [Docket No. 993], which included (a) the identity of the Liquidation Trustee; (b) the identity of the Pension Plan Administrator; and (c) the form of the Liquidation Trust Agreement (as modified, supplemented, or otherwise amended from time to time, the "<u>Plan Supplement</u>");

xxxv.    filed, on May 9, 2024, the *Declaration of Emily Young, on Behalf of Epiq Corporate Restructuring, LLC, Regarding Solicitation and Tabulation of Ballots Cast on Debtors' First Amended Combined Disclosure Statement and Joint Chapter 11 Plan of Liquidation* [Docket No. 1037] (the "<u>Voting Declaration</u>");

xxxvi.    filed, on May 14, 2024, (a) a modified version of the Plan [Docket No. 1050], reflecting technical modifications; (b) the *Debtors' (I) Memorandum of Law in Support of Confirmation of the Debtors' First Amended Combined Disclosure Statement and Joint Chapter 11 Plan of Liquidation and (II) Omnibus Reply to Objections to Confirmation* [Docket No. 1053] (the "<u>Confirmation Brief</u>"); (c) the

**App.1270**

*In re Mercy Hospital, Iowa City, Iowa, et al.*
*Case No. 23-00623 (TJC)*

*Declaration of Mark E. Toney, Chief Restructuring Officer of Mercy Hospital, Iowa City, Iowa, in Support of Confirmation of Debtors' Joint Chapter 11 Plan of Liquidation* [Docket No. 1052] (the "Toney Declaration"); and (d) the proposed *Findings of Fact, Conclusions of Law, and Order Confirming the Debtors' First Amended Joint Chapter 11 Plan of Liquidation* (this "Confirmation Order").

The Court having:

i.      entered, on August 8, 2023, the *Interim Order Granting Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Use of Cash Collateral and Granting Adequate Protection, (II) Scheduling a Final Hearing on the Use of Cash Collateral, and (III) Granting Related Relief* [Docket No. 38];

ii.     entered, on August 10, 2023, the *Order Approving Appointment of Susan N. Goodman as Patient Care Ombudsman* [Docket No. 59] (the "PCO Order");

iii.    established, on August 14, 2023, the general bar date of October 16, 2023 and the governmental bar date of February 5, 2024 [Docket No. 92];

iv.     entered, on September 13, 2023, the *Order (A) Approving Bidding Procedures for the Sale of the Debtors' Assets, (B) Approving Break-Up Fee, (C) Scheduling an Auction for, and Hearing to Approve, the Sale of the Debtors' Assets, (D) Approving the Form and Manner of Notice Thereof, (E) Approving Contract Assumption and Assignment Procedures, and (F) Granting Related Relief* [Docket No. 222];

v.      entered, on November 7, 2023, the *Order (I) Approving Settlement by and Among the Debtors, the Bondholder Representatives, the Committee, and Mercy Foundation; and (II) Application of Mercy, as Sole Member of Mercy Foundation, for Section 540A.106 Ruling* [Docket No. 477];

vi.     entered, on November 7, 2023, the *Second Interim Order Granting Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Use of Cash Collateral and Granting Adequate Protection, (II) Scheduling a Final Hearing on the Use of Cash Collateral, and (III) Granting Related Relief* [Docket No. 475];

vii.    entered, on November 7, 2023, the *Order (I) Approving the Sale of Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, (II) Authorizing the Assumption and Assignment of Contracts and Leases, and (III) Granting Related Relief* [Docket No. 476];

viii.   entered, on January 23, 2024, the *Stipulated and Agreed Order Regarding Settlement Between the Debtors and Altera Digital Health Inc.* [Docket No. 684] (the "Altera Settlement Order");

**App.1271**

*In re Mercy Hospital, Iowa City, Iowa, et al.*
*Case No. 23-00623 (TJC)*

ix.     entered, on February 12, 2024, the *Order (I) Establishing Administrative Claims Bar Date, (II) Approving Form, Manner, and Sufficiency of Notice Thereof, and (III) Approving Proof of Administrative Claim Form* [Docket No. 740];

x.      entered, on February 27, 2024, the *Order (I) Approving the Sale of the Debtors' Interest in a Joint Venture Free and Clear of Liens, Claims, Interests, and Encumbrances and (II) Granting Related Relief* [Docket No. 770];

xi.     entered, on April 3, 2024, the *Order (I) Approving Disclosure Statement; (II) Scheduling Hearing on Confirmation of Plan; (III) Establishing Deadlines and Procedures for (A) Filing Objections to Confirmation of Plan, (B) Claim Objections, and (C) Temporary Allowance of Claims for Voting Purposes; (IV) Determining Treatment of Certain Unliquidated, Contingent, or Disputed Claims for Notice, Voting, and Distribution Purposes; (V) Setting Record Date; (VI) Approving (A) Solicitation Packages and Procedures for Distribution, (B) Form of Notice of Hearing on Confirmation and Related Matters, and (C) Forms of Ballots; (VII) Establishing Voting Deadline and Procedures for Tabulation of Votes; and (VIII) Granting Related Relief* [Docket No. 926] (the "<u>Solicitation Procedures Order</u>");

xii.    considered the Plan, the Confirmation Brief, the Voting Declaration, the Toney Declaration, and all filed pleadings, exhibits, statements, and comments regarding Confirmation of the Plan, including all objections, statements, and reservation of rights;

xiii.   held a hearing on Confirmation of the Plan (the "<u>Confirmation Hearing</u>") on May 16, 2024 at 10:30 a.m., prevailing Central Time;

xiv.    heard the statements and arguments made by counsel at the Confirmation Hearing in respect of Confirmation of the Plan, as well as any objections related thereto;

xv.     considered all oral representations, affidavits, testimony, documents, filings, and other evidence regarding Confirmation of the Plan, as well as any objections related thereto; and

xvi.    overruled any and all objections to the Plan and to Confirmation and all statements and reservations of rights not consensually resolved or withdrawn unless otherwise indicated herein.

NOW, THEREFORE, it appearing to the Court that notice of the Confirmation Hearing and the opportunity for any party-in-interest to object to Confirmation of the Plan have been adequate and appropriate, and the legal and factual bases set forth in the documents filed in support of Confirmation of the Plan and other evidence presented at the Confirmation Hearing establish

just cause for the relief granted herein, after due deliberation thereon and good cause appearing

therefor, and the Court, having considered statements of counsel at the Confirmation Hearing and

all evidence of record, including the Toney Declaration, and for the reasons stated on the record at

the Confirmation Hearing, the Court hereby FINDS, DETERMINES, AND CONCLUDES as

follows:

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

IT IS DETERMINED, FOUND, ADJUDGED, DECREED, AND ORDERED THAT:

A.      <u>Findings of Fact and Conclusions of Law</u>.  The findings and conclusions set forth

herein and on the record of the Confirmation Hearing constitute this Court's findings of fact and

conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, as made applicable

herein by Bankruptcy Rules 7052 and 9014.  To the extent any of the following findings of fact

constitute conclusions of law, they are adopted as such.

B.      <u>Judicial Notice</u>.  The Court takes judicial notice of (and deems admitted into

evidence for the Confirmation Hearing) the docket of the Chapter 11 Cases maintained by the

Clerk of the Court, including, without limitation, all pleadings and other documents filed, all orders

entered, all hearing transcripts, and all evidence and argument made, proffered, or adduced at the

hearings held before the Court during the pendency of the Chapter 11 Cases, including, but not

limited to, the Confirmation Hearing.

C.      <u>Commencement and Joint Administration of the Chapter 11 Cases</u>.  On the Petition

Date, each of the Debtors commenced a voluntary case under chapter 11 of the Bankruptcy Code

(collectively, the "<u>Chapter 11 Cases</u>").  In accordance with the *Order (I) Authorizing Joint*

*Administration of Related Chapter 11 Cases and (II) Granting Related Relief* [Docket No. 37], the

Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly

**App.1273**

administered pursuant to Bankruptcy Rule 1015.   Since the Petition Date, the Debtors have

operated their business and managed their properties as debtors-in-possession pursuant to

Bankruptcy Code sections 1107(a) and 1108.   No trustee or examiner has been appointed in the

Chapter 11 Cases.   On August 15, 2023, the Office of the United States Trustee for the Northern

District of Iowa (the "U.S. Trustee") appointed the Official Committee of Unsecured Creditors

(the "UCC") [Docket No. 107].   On November 4, 2023, the U.S. Trustee appointed the Official

Committee of Pensioners (the "Pension Committee") [Docket No. 458].

     D.    Eligibility for Relief.   The Debtors were and are entities eligible for relief under

Bankruptcy Code section 109.

## Jurisdiction and Venue

     E.    Jurisdiction, Venue, and Core Proceeding.   The Court has jurisdiction to consider

this matter pursuant to 28 U.S.C. §§ 157 and 1334.   This is a core proceeding pursuant to 28 U.S.C.

§ 157(b) and the Court has jurisdiction to enter a final order with respect thereto.   Venue is proper

in this District and before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.   The Debtors are

proper plan proponents under Bankruptcy Code section 1121(a).

## Notice, Solicitation, and Voting

     F.    Adequacy of the Disclosure Statement.   After notice and a hearing in accordance

with Bankruptcy Rule 3017, the Disclosure Statement was approved on a final basis, as set forth

in the Solicitation Procedures Order, as containing adequate information pursuant to Bankruptcy

Code section 1125.   The Disclosure Statement contained extensive material information regarding

the Debtors so that parties entitled to vote on the Plan could make informed decisions regarding

the Plan.   Additionally, the Disclosure Statement, including the various notices and the Ballots,

contained adequate information as that term is defined in Bankruptcy Code section 1125(a) and

complied with any additional requirements of the Bankruptcy Code, the Bankruptcy Rules, and

applicable non-bankruptcy law.

G.    <u>Adequate Notice of Confirmation Hearing</u>.  As described in the Voting Declaration

and the Solicitation COS, as applicable, the Combined Disclosure Statement and Plan, the letter in

support of the Plan from the UCC, the applicable ballot, the Solicitation Procedures Order (without

exhibits), and the Confirmation Hearing Notice (collectively, the "<u>Solicitation Package</u>") were

transmitted and served on or about April 8, 2024 to all Holders in the Voting Classes that held a

claim against the Debtors as of March 28, 2024 (the "<u>Voting Record Date</u>").  Additionally, on or

about April 25, 2024, the Combined Disclosure Statement and Plan, a letter in support of the Plan

from the Pension Committee, the applicable ballot, the Solicitation Procedures Order (without

exhibits), and the Confirmation Hearing Notice (collectively, the "<u>Provisional Solicitation</u>

<u>Packages</u>") were transmitted and served on all Persons receiving payments under the Pension Plan

who did not file a Proof of Claim in the Chapter 11 Cases (each, a "<u>Provisional Pension Claim</u>

<u>Holder</u>") pursuant to paragraphs 8 through 10 of the Solicitation Procedures Order.  The

establishment and notice of the Voting Record Date were approved by the Solicitation Procedures

Order.  Transmission and service of the Solicitation Packages was timely, adequate, sufficient, and

complies with the Bankruptcy Code, including sections 1125 and 1126 thereof, the Bankruptcy

Rules, including Bankruptcy Rules 3017, 3018, and 3019, and the Solicitation Procedures Order,

and no further notice is required.  Under the circumstances and including any extensions heretofore

provided in connection therewith, the period during which the Debtors solicited acceptances or

rejections to the Plan was a reasonable and sufficient period of time for Holders in the Voting

Classes to make an informed decision to accept or reject the Plan, and solicitation complied with

Bankruptcy Code section 1126(b).  Under Bankruptcy Code sections 1126(f) and 1126(g), the

Debtors were not required to solicit votes from the Holders of Claims in the Non-Voting Classes, each of which is conclusively presumed to have accepted, or deemed to have rejected, the Plan. The Confirmation Hearing Notice was served via first class mail and/or electronic mail to the Debtors' entire creditor matrix on April 8, 2024, as reflected in the Solicitation COS.  Finally, the Publication Notice was also published in the *Iowa City Press Citizen* and the *Des Moines Register* on April 18, 2024, in compliance with the Solicitation Procedures Order and Bankruptcy Rule 2002(*l*), as reflected in the Affidavit of Publication [Docket Nos. 970, 971]. Given the foregoing, all parties required to be given notice of the Confirmation Hearing (including the deadline for filing and serving objections to confirmation of the Plan) have been given due, proper, timely, and adequate notice of, and had a full and fair opportunity to be heard in connection with, confirmation of the Plan in accordance with the Solicitation Procedures Order and in compliance with the Bankruptcy Code, the Bankruptcy Rules, and applicable non-bankruptcy law and such parties have had an opportunity to appear and be heard with respect thereto.  No other and further notice is required.

H.    <u>Good Faith Solicitation</u>.  As described in the Voting Declaration, solicitation of votes on the Plan complied with the solicitation procedures set forth in the Solicitation Procedures Order, was appropriate and satisfactory based upon the circumstances of the Chapter 11 Cases, was conducted in good faith, and was in compliance with the provisions of the Bankruptcy Code, the Bankruptcy Rules, and any other applicable rules, laws, and regulations.  Accordingly, the Plan was solicited in good faith and in compliance with applicable provisions of the Bankruptcy Code, including sections 1125 and 1126, and the Bankruptcy Rules.

I.    <u>Provisional Pension Claim Holders</u>.  Transmission and service of the Provisional Solicitation Packages was adequate, sufficient, and complies with the Bankruptcy Code, including

**App.1276**

sections 1125 and 1126 thereof, the Bankruptcy Rules, including Bankruptcy Rules 3017, 3018, and 3019, and the Solicitation Procedures Order, given the fact that Provisional Pension Claim Holders were not Holders of Class 5 Claims as of the Voting Record Date. No further notice is required. Under the circumstances and including any extensions heretofore provided in connection therewith, the period during which the Debtors solicited acceptances or rejections to the Plan was a reasonable and sufficient period of time for the Provisional Pension Claim Holders to make an informed decision to accept or reject the Plan, and solicitation complied with Bankruptcy Code section 1126(b). Good cause exists to include the votes of the Provisional Pension Claim Holders in the voting tabulation of Class 5 (Pension Claims).

J.      <u>Voting</u>. Only Holders of Claims in Classes 1-A, 1-B, 3, 4, and 5 were eligible to vote on the Plan (collectively, the "<u>Voting Classes</u>"). The Ballots used to solicit votes to accept or reject the Plan from Holders in the Voting Classes adequately addressed the particular needs of the Chapter 11 Cases and were appropriate for Holders in the Voting Classes to vote to accept or reject the Plan. Holders of Claims in Classes 2 and 6 were either (a) Unimpaired and not entitled to vote to accept or reject the Plan or (b) Impaired under the Plan and deemed to reject the Plan (together, the "<u>Non-Voting Classes</u>"). Thus, Holders of Claims in the Non-Voting Classes were conclusively presumed to have accepted or deemed to have rejected the Plan as applicable, and were not entitled to vote on the Plan pursuant to Bankruptcy Code sections 1126(f)-(g). On May 9, 2024, the Debtors filed the Voting Declaration, certifying the method and results of Ballot tabulation for each of the Classes entitled to vote to accept or reject the Plan. In particular, Class 1-A (Bondholder Claims – Series 2018 Bonds), Class 1-B (Bondholder Claims – Series 2011 Bonds), Class 3 (General Unsecured Claims), Class 4 (Bondholder Deficiency Claims), and Class 5 (Pension Claims) voted to overwhelmingly accept the Plan, in accordance with the requirements

of Bankruptcy Code sections 1124, 1126, and 1129. As evidenced by the Voting Declaration, votes to accept or reject the Plan have been solicited by the Debtors and tabulated fairly, in good faith, in compliance with the Solicitation Procedures Order, and in a manner consistent with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and applicable non-bankruptcy law.

K.    <u>Objections</u>. All parties have had a full and fair opportunity to litigate all issues raised, or which might have been raised, in connection with the Confirmation Hearing. All objections with respect to confirmation of the Plan that have not been withdrawn, waived, or settled are hereby overruled on the merits for the reasons stated on the record at the Confirmation Hearing.

L.    <u>Burden of Proof</u>. The Debtors, as proponents of the Plan, have met their burden of proving that the Plan satisfies the elements of Bankruptcy Code sections 1129(a) and 1129(b) by a preponderance of the evidence, which is the applicable evidentiary standard for Confirmation of the Plan. Further, each witness whose testimony was proffered or adduced on behalf of the Debtors at or in connection with the Confirmation Hearing was credible, reliable, and qualified to testify as to the topics addressed in his or her testimony.

M.    <u>Bankruptcy Rules 3016(a)-(b)</u>. In accordance with Bankruptcy Rule 3016(a), the Plan is dated and identifies the Debtors as the proponents of the Plan. The filing of the Disclosure Statement with the Court satisfied Bankruptcy Rule 3016(b).

**Compliance with Bankruptcy Code Section 1129**

N.    <u>Debtors' Compliance with the Bankruptcy Code (11 U.S.C. § 1129(a)(1))</u>. The Plan complies with the applicable provisions of the Bankruptcy Code and, as required by Bankruptcy Rule 3016, the Plan is dated and identifies the Debtors as proponents of the Plan, thereby satisfying Bankruptcy Code section 1129(a)(1), including Bankruptcy Code sections 1122 and 1123.

*In re Mercy Hospital, Iowa City, Iowa, et al.*
*Case No. 23-00623 (TJC)*

i. <u>Proper Classification and Discretionary Content of the Plan (11 U.S.C. §§ 1122, 1123(a)(1))</u>.  The classification of Claims under the Plan is proper under the Bankruptcy Code.  In accordance with Bankruptcy Code section 1122(a), the Claims placed in each Class under the Plan are substantially similar to other Claims in each such Class.  Valid business, factual, and legal reasons exist for separately classifying the various Classes of Claims created under the Plan, and such classification does not unfairly discriminate between Holders of Claims.  The classifications were not promulgated for any improper purpose, and the creation of such Classes does not unfairly discriminate between or among Holders of Claims.  Therefore, the Plan satisfies Bankruptcy Code sections 1122 and 1123(a)(1).

ii. <u>Specified Treatment of Unimpaired Classes (11 U.S.C. § 1123(a)(2))</u>.  Article V of the Plan specifies that Class 2 (Other Secured Claims) is Unimpaired under the Plan within the meaning of Bankruptcy Code section 1124, thereby satisfying Bankruptcy Code section 1123(a)(2).  Additionally, Article IV of the Plan specifies that Administrative Expense Claims, Priority Tax Claims, Priority Non-Tax Claims, and Professional Fee Claims will be paid in accordance with the terms of the Plan, although these Claims are not separately classified under the Plan.

iii. <u>Specified Treatment of Impaired Classes (11 U.S.C. § 1123(a)(3))</u>.  Article V of the Plan designates Class 1-A (Bondholder Claims – Series 2018 Bonds), Class 1-B (Bondholder Claims – Series 2011 Bonds), Class 3 (General Unsecured Claims), Class 4 (Bondholder Deficiency Claims), Class 5 (Pension Claims), and Class 6 (Intercompany Claims) as Impaired within the meaning of Bankruptcy Code section 1124 and specifies the treatment of the Claims in those Classes, thereby satisfying Bankruptcy Code section 1123(a)(3).

iv. <u>No Discrimination (11 U.S.C. § 1123(a)(4))</u>.  Article V of the Plan provides for the same treatment by the Debtors of each Claim in each respective Class unless the Holder of a particular Claim has agreed to or elected a less favorable or different treatment of such Claim.  Therefore, the requirements of Bankruptcy Code section 1123(a)(4) have been satisfied.

v. <u>Adequate Means for Plan Implementation (11 U.S.C. § 1123(a)(5))</u>.  The Plan and the various documents and agreements set forth in the Plan Supplement provide adequate and proper means for the implementation of the Plan, including, among other things, the Liquidation Trust Agreement, thereby satisfying Bankruptcy Code section 1123(a)(5).

vi. <u>Non-Voting Equity Securities (11 U.S.C. § 1123(a)(6))</u>.  No equity securities are being issued pursuant to the Plan.  As of the Effective Date, the Debtors' organizational documents shall be deemed amended to prohibit

**App.1279**

the issuance of non-voting equity securities, thereby satisfying Bankruptcy Code section 1123(a)(6).

vii.    <u>Designation of Directors and Officers (11 U.S.C. § 1123(a)(7))</u>. The Debtors are not reorganizing under the Plan. However, the assets of the Debtors shall vest in the Liquidation Trust, which will be administered by the Liquidation Trustee. The Liquidation Trustee was selected pursuant to the Plan and the Liquidation Trust Agreement. The selection of the Liquidation Trustee is consistent with the interests of creditors and public policy, thereby satisfying Bankruptcy Code section 1123(a)(7).

viii.    <u>Additional Plan Provisions (11 U.S.C. § 1123(b))</u>. The Plan contains certain provisions that may be construed as permissive, but are not required for confirmation under the Bankruptcy Code. These discretionary provisions comply with Bankruptcy Code section 1123(b), are appropriate, in the best interest of the Debtors and their Estates, and are not inconsistent with the applicable provisions of the Bankruptcy Code.

    a)    <u>Impairment/Absence of Impairment of Classes of Claims and Interests (11 U.S.C. § 1123(b)(1))</u>. Pursuant to Article V of the Plan, the following Classes of Claims are Impaired under the Plan, as permitted by Bankruptcy Code section 1123(b)(1): Class 1-A (Bondholder Claims – Series 2018 Bonds), Class 1-B (Bondholder Claims – Series 2011 Bonds), Class 3 (General Unsecured Claims), Class 4 (Bondholder Deficiency Claims), Class 5 (Pension Claims), and Class 6 (Intercompany Claims). Pursuant to Article V of the Plan, Class 2 (Other Secured Claims) is Unimpaired, as contemplated by Bankruptcy Code section 1123(b)(1).

    b)    <u>Assumption and Rejection (11 U.S.C. § 1123(b)(2) and 1123(d))</u>. Article XII of the Plan addresses the assumption and rejection of executory contracts and unexpired leases, and meets the requirements of Bankruptcy Code section 365(b). There have been [no objections] to the Debtors' disposition of executory contracts pursuant to Article XII of the Plan.

    c)    <u>Additional Plan Provisions (11 U.S.C. § 1123(b)(6))</u>. The provisions of the Plan are appropriate and consistent with the applicable provisions of the Bankruptcy Code, thereby satisfying Bankruptcy Code section 1123(b)(6).

O.    <u>The Debtors' Compliance with the Bankruptcy Code (11 U.S.C. § 1129(a)(2))</u>. As proponents of the Plan, the Debtors have complied with the applicable provisions of the Bankruptcy Code, thereby satisfying Bankruptcy Code section 1129(a)(2). Specifically:

    i.          the Debtors are eligible to be debtors under Bankruptcy Code section 109; and

    ii.        the Debtors have complied with the applicable provisions of the Bankruptcy Code, including sections 1125 and 1126(b), the Bankruptcy Rules, applicable non-bankruptcy law, the Solicitation Procedures Order, and all other applicable law, in transmitting the Solicitation Packages and related documents and notices, and in soliciting and tabulating the votes on the Plan.

P.      <u>Plan Proposed in Good Faith (11 U.S.C. § 1129(a)(3))</u>. The Debtors have proposed the Plan in good faith and not by any means forbidden by law, thereby satisfying Bankruptcy Code section 1129(a)(3). The Debtors' good faith is evident from the facts and record of the Chapter 11 Cases, the Disclosure Statement, and the record of the Confirmation Hearing and other proceedings held in these Chapter 11 Cases. The Plan was proposed with the legitimate and honest purposes of maximizing the value of the Debtors' Estates. The Plan and all documents necessary to effectuate the Plan were negotiated at arm's length among representatives of the Debtors, the UCC, the Pension Committee, the Bondholder Representatives, and their respective professionals. Further, the Plan's classification, indemnification, exculpation, and injunction provisions have been negotiated in good faith and at arm's length, are consistent with Bankruptcy Code sections 105, 1122, 1123(b)(3)(A), 1123(b)(6), 1125(e), 1129, and 1142, and are each necessary for the Debtors' successful liquidation.

Q.      <u>Payment for Services or Costs and Expenses (11 U.S.C. § 1129(a)(4))</u>. The procedures set forth in the Plan for the Court's review and ultimate determination of the fees and expenses to be paid by the Debtors in connection with the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, satisfy the objectives of, and are in compliance with, Bankruptcy Code section 1129(a)(4). Payments to the Estates' retained professionals for services

*In re Mercy Hospital, Iowa City, Iowa, et al.*
*Case No. 23-00623 (TJC)*

rendered after the commencement of the Chapter 11 Cases are subject to the approval of this Court

pursuant to the terms of the orders authorizing the retention of the Estates' professionals.

R.     <u>Directors, Officers, and Insiders (11 U.S.C. § 1129(a)(5))</u>.   The Debtors have

complied with Bankruptcy Code section 1129(a)(5).   In accordance with the provisions of the Plan,

on the Effective Date, the Liquidation Trust shall be established.   As provided in the Liquidation

Trust Agreement, the form of which was included in the Plan Supplement, William H. Henrich of

Getzler Henrich & Associates, LLC will be the Liquidation Trustee.   The appointment of the

Liquidation Trustee is consistent with the interests of the Debtors' creditors and with public policy.

S.     <u>No Rate Changes (11 U.S.C. § 1129(a)(6))</u>.   The Plan does not provide for rate

changes by the Debtors that would require governmental regulatory approval.   Thus, Bankruptcy

Code section 1129(a)(6) is not applicable in these Chapter 11 Cases.

T.     <u>Best Interest of Creditors (11 U.S.C. § 1129(a)(7))</u>.   The Plan meets the "best

interest of creditors" test because each Holder of a Claim in an Impaired Class will receive or

retain under the Plan, on account of such Claim, property of a value, as of the Effective Date of

the Plan, that is not less than the amount that such Holder would so receive or retain if the Chapter

11 Cases were converted to cases under chapter 7 of the Bankruptcy Code.   The liquidation

analysis attached to the Disclosure Statement, the analysis provided in the Confirmation Brief, and

other evidence proffered or adduced at the Confirmation Hearing, including the Toney

Declaration, (i) is reasonable, persuasive, credible, and accurate as of the dates such analysis or

evidence was prepared, presented, or proffered, (ii) utilizes reasonable and appropriate

methodologies and assumptions, (iii) has not been controverted by other evidence, and (iv)

establishes that each Holder of an Allowed Claim or Interest, as of the Effective Date, will recover

at least as much under the Plan on account of such Claim or Interest as such Holder would receive

**App.1282**

if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on the Effective Date. Therefore, the Plan satisfies the requirements of Bankruptcy Code section 1129(a)(7).

U.      Acceptance by Certain Classes (11 U.S.C. § 1129(a)(8)).  Holders of Claims in Class 2 (Other Secured Claims) are Unimpaired within the meaning of Bankruptcy Code section 1124 and are conclusively presumed to have accepted the Plan under Bankruptcy Code section 1126(f).  As set forth in the Voting Declaration, Holders of Claims in Class 1-A (Bondholder Claims – Series 2018 Bonds), Class 1-B (Bondholder Claims – Series 2011 Bonds), Class 3 (General Unsecured Claims), Class 4 (Bondholder Deficiency Claims), and Class 5 (Pension Claims) are Impaired and voted overwhelmingly accept the Plan.  Class 6 (Intercompany Claims) is Impaired and deemed to have rejected the Plan.  Notwithstanding the foregoing, the Plan is confirmable because it satisfies Bankruptcy Code sections 1129(a)(10) and 1129(b).

V.      Treatment of Administrative Claims, Priority Tax Claims, Priority Non-Tax Claims, and Other Priority Claims (11 U.S.C. § 1129(a)(9)).  The treatment of Administrative Claims, Priority Tax Claims, Priority Non-Tax Claims, and Professional Fee Claims pursuant to Article IV of the Plan satisfied the requirements of, and complies in all respects with, Bankruptcy Code section 1129(a)(9).

W.      Acceptance by At Least One Impaired Class (11 U.S.C. § 1129(a)(10)).  As evidenced by the Voting Declaration, Class 1-A (Bondholder Claims – Series 2018 Bonds), Class 1-B (Bondholder Claims – Series 2011 Bonds), Class 3 (General Unsecured Claims), Class 4 (Bondholder Deficiency Claims), and Class 5 (Pension Claims), which are five of six Impaired Classes under the Plan, affirmatively and overwhelmingly voted to accept the Plan by the requisite number and amount of Claims, without including the acceptance of the Plan by any insider (as that

term is defined in Bankruptcy Code section 101(31)).  Therefore, the Plan satisfies Bankruptcy Code section 1129(a)(10).

X.     Feasibility (11 U.S.C. § 1129(a)(11)).    The Debtors have established by a preponderance of the evidence that confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors, as the Plan itself effectuates the liquidation and dissolution of the Debtors through the Plan and the Liquidation Trust, followed by payment of Distributions to creditors by the Liquidation Trustee.  Moreover, the Debtors anticipate having sufficient Cash on hand as of the Effective Date to fund the payments to Holders of all Allowed Claims on the Effective Date (or when they are otherwise required to be paid under the Plan), pursuant to the terms of the Plan, and to satisfy all other obligations under the Plan.  The Plan, therefore, satisfies the requirements of Bankruptcy Code section 1129(a)(11).

Y.     Payment of Fees (11 U.S.C. § 1129(a)(12)).  Article XVII.C of the Plan provides that all fees currently payable under section 1930 of title 28, United States Code, as determined by the Bankruptcy Code, have been or will be paid on or as soon as reasonably practicable after the Effective Date pursuant to the Plan, thereby satisfying the requirements of Bankruptcy Code section 1129(a)(12).

Z.     Continuation of Retiree Benefits; Domestic Support Obligations; Debtor as Individual; Applicable Non-Bankruptcy Law Regarding Transfers (11 U.S.C. §§ 1129(a)(13)-(16)).  Bankruptcy Code sections 1129(a)(13) through (16) are not applicable to the Debtors in these Chapter 11 Cases.

AA.    No Unfair Discrimination; Fair and Equitable (11 U.S.C. § 1129(b)).  The Plan satisfies the requirements of Bankruptcy Code section 1129(b).  Holders of Claims in Class 2 (Other Secured Claims) are deemed to have accepted the Plan and are not entitled to vote on the

**App.1284**

*In re Mercy Hospital, Iowa City, Iowa, et al.*
*Case No. 23-00623 (TJC)*

Plan. Holders of Claims in Class 1-A (Bondholder Claims – Series 2018 Bonds), Class 1-B

(Bondholder Claims – Series 2011 Bonds), Class 3 (General Unsecured Claims), Class 4

(Bondholder Deficiency Claims), and Class 5 (Pension Claims), which are five of six Impaired

Classes under the Plan, affirmatively and overwhelmingly voted to accept the Plan. Holders of

Claims in Class 6 (Intercompany Claims) are deemed to have rejected the Plan and are not entitled

to vote on the Plan (the "Rejecting Class"). Nevertheless, the Plan does not discriminate unfairly

and is fair and equitable with respect to the Rejecting Class, as required by Bankruptcy Code

sections 1129(b)(1)-(2), because (i) no Holder of any Claim or Interest that is junior to the

Rejecting Class will receive or retain any property under the Plan on account of such junior Claim

or Interest and (ii) no Holder of a Claim in a Class senior to the Rejecting Class is receiving more

than 100% recovery on account of its Claim. Accordingly, the Plan does not discriminate unfairly

among the different classes of creditors and interest holders, satisfies the fair and equitable

standard of the Bankruptcy Code, and may be confirmed notwithstanding the rejection of the Plan

by the Rejecting Class.

BB. <u>Only One Plan (11 U.S.C. § 1129(c))</u>. The Plan is the only plan filed in these

Chapter 11 Cases, and accordingly, Bankruptcy Code section 1129(c) is inapplicable in these

Chapter 11 Cases.

CC. <u>Principal Purpose of the Plan (11 U.S.C. § 1129(d))</u>. The principal purpose of the

Plan is neither the avoidance of taxes nor the avoidance of the application of section 5 of the

Securities Act of 1933. The Plan, therefore, satisfies the requirements of Bankruptcy Code section

1129(d).

**App.1285**

DD.    <u>Small Business Case (11 U.S.C. § 1129(e))</u>.  None of the Chapter 11 Cases are a "small business case" as that term is defined in the Bankruptcy Code, meaning that Bankruptcy Code section 1129(e) is inapplicable.

EE.    <u>Satisfaction of Confirmation Requirements</u>.  Based on the foregoing, all other pleadings, documents, exhibits, statements, declarations, and affidavits filed in connection with Confirmation of the Plan, and all evidence and arguments made, proffered, or adduced at the Confirmation Hearing, the Plan satisfies the requirements for Confirmation thereof set forth in Bankruptcy Code section 1129.

## **Miscellaneous**

FF.    <u>Substantive Consolidation</u>.  Article IX.A of the Plan provides for the substantive consolidation of the Debtors and their Estates for all purposes associated with confirmation and substantial consummation of the Plan.  Therefore, the Plan serves as, and is deemed to be, a motion for entry of an order substantively consolidating the Chapter 11 Cases for the limited purposes set forth in the Plan.  Based on, among other things, the Confirmation Brief, the Toney Declaration, and the record made at the Confirmation Hearing, (i) no class of creditors is disadvantaged by the substantive consolidation of the Debtors and their Estates and (ii) substantive consolidation of the Debtors and their Estates is justified, appropriate, and in the best interests of the Debtors, their Estates, creditors, and all other parties-in-interest.

GG.    <u>Tax Status of Liquidation Trust</u>.  The Liquidation Trust is intended to qualify as a "liquidating trust" within the meaning of Treasury Regulation Section 301.7701-4(d) and as described in U.S. Internal Revenue Service Revenue Procedure 94-45, 1994-2 I.R.B. 124, and, thus, as a "grantor trust" within the meaning of Sections 671 through 679 of the U.S. Internal

Revenue Code of 1986, as amended, of which the beneficiaries are the grantors and the deemed owners of the underlying assets.

HH.   <u>Plan Supplement</u>.  The Plan Supplement complies with the Bankruptcy Code and the terms of the Plan, and the filing and notice of the documents included therein are good and proper in accordance with the Solicitation Procedures Order, the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, and no other or further notice is required.  The documents included in the Plan Supplement are an integral part of this Confirmation Order and are incorporated herein by reference.  Subject to the terms of the Plan, the Debtors' right to alter, amend, update, or modify, in each case in whole or in part, the Plan Supplement before the Effective Date is hereby reserved. To the extent that any modifications to the Plan Supplement are determined to be modifications to the Plan, in accordance with Bankruptcy Rule 3019, any such modifications do not (i) constitute material modifications of the Plan under Bankruptcy Code section 1127, (ii) require additional disclosure under Bankruptcy Code section 1125, (iii) cause the Plan to fail to meet the requirements of Bankruptcy Code sections 1122 and 1123, (iv) materially and adversely change the treatment of any Claims, (v) require resolicitation of any Holders of Claims, or (vi) require that any such Holders be afforded an opportunity to change previously cast acceptances or rejections of the Plan.

II.   <u>Plan Provisions and Plan Documents Valid and Binding</u>.  Upon entry of this Confirmation Order, each term and provision of the Plan is valid, binding, and enforceable pursuant to its terms.  Any and all documents necessary to implement the Plan, including those contained in the Plan Supplement (subject to any consent rights under the Plan), have been negotiated in good faith and at arm's length, and shall be, upon completion of documentation and execution and delivery, valid, binding, and enforceable agreements and not be in conflict with any federal or state law.

**App.1287**

*In re Mercy Hospital, Iowa City, Iowa, et al.*
*Case No. 23-00623 (TJC)*

JJ.    Executory Contracts and Unexpired Leases.  Article XII of the Plan provides that, on the Effective Date, except as otherwise provided in the Plan or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, all Executory Contracts and Unexpired Leases shall be deemed rejected as of the Effective Date, unless such Executory Contract or Unexpired Lease (i) previously has been assumed or rejected by the applicable Debtor; (ii) expired or terminated pursuant to its own terms; (iii) is the subject of a motion to assume or reject pending before the Court as of the Confirmation Date; (iv) is identified in the Plan Supplement as an Executory Contract or Unexpired Lease to be assumed; or (v) is an insurance policy.  The Debtors provided sufficient notice to each non-Debtor counterparty to an Executory Contract or Unexpired Lease assumed, assumed and assigned, or rejected by the Debtors during the Chapter 11 Cases.  Each assumption, assumption and assignment, and rejection of an executory contract or unexpired lease pursuant to Article XII of the Plan shall be legal, valid, and binding to the same extent as if such assumption, assumption and assignment, or rejection, as applicable, had been effectuated pursuant to an order of the Court under Bankruptcy Code section 365 entered before entry of this Confirmation Order.

KK.    Plan Settlement.  The Plan constitutes a motion for approval of the settlement with the Debtors, the UCC, the Pension Committee, and the Bondholder Representatives, under Bankruptcy Rule 9019.  The evidence adduced at the Confirmation Hearing and the record in these Chapter 11 Cases establish that the complexity of the Debtors' Chapter 11 Cases necessitated a global resolution among the foregoing parties in order to maximize value for all parties.  The Debtors, along with their advisors, worked extensively, diligently, and in good faith with the UCC, the Pension Committee, and the Bondholder Representatives to formulate, negotiate, and support a plan that was fair and equitable to all parties-in-interest.  To facilitate this process, the Debtors,

the UCC, the Pension Committee, and the Bondholder Representatives engaged in numerous rounds of settlement negotiations, including one in-person mediation conference, which ultimately led to the global settlement embedded in the Plan.  The litigation of any of the contested issues related thereto, including the potential claims and causes of action that were the primary focus of the parties' mediation efforts, would have been costly and time-consuming with uncertain outcomes or likelihood of success, thereby reducing the Debtors' liquidity and value otherwise available for creditor recoveries.  Each component of the settlements contemplated under the Plan is an integral, integrated, and inextricably linked part of the Plan.  The Debtors have met their burden of proving that the foregoing settlements and the treatment of Claims as provided therein, are fair, equitable, reasonable, and in the best interests of the Debtors, the Debtors' Estates, and stakeholders in satisfaction of Bankruptcy Rule 9019.  Therefore, pursuant to Bankruptcy Code sections 105, 363, and 1123(b)(3) and Bankruptcy Rule 9019, and in consideration for, among other things, the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan, including the settlements therein, shall constitute a good-faith compromise and settlement of all Claims, Causes of Action, and controversies resolved pursuant to the Plan and the settlements set forth therein.

LL. <u>The Debtor Release</u>.  The debtor release contained in Article XIV.D.1 (the "<u>Debtor Release</u>") is fair and necessary to the Plan, thereby satisfying the requirements of *In re Master Mortgage Investment Fund, Inc.*, 168 B.R. 930 (Bankr. W.D. Mo. 1994) and other applicable case law.  Based on the record made at the Confirmation Hearing, including the Confirmation Brief and the Toney Declaration, the Debtor Release (i) was given voluntarily and in exchange for the good and valuable consideration provided by the Released Parties; (ii) constitutes a good faith settlement and compromise of the Claims released by Article XIV of the Plan; (iii) is a product of good-faith

**App.1289**

and arm's length negotiations; (iv) represents an integral element to the Plan, the settlements contained therein, and the resolution of these Chapter 11 Cases; (v) is in the best interests of the Debtors and all Holders of Claims; (vi) is fair, equitable, and reasonable; (vii) was given and made after due notice and opportunity for a hearing; (viii) constitutes a sound exercise of the Debtors' business judgment; and (ix) is consistent with the Bankruptcy Code and applicable bankruptcy law. The Debtor Release appropriately offers protection to parties that constructively participated in the Debtors' restructuring efforts. Such protections from liability facilitated the participation of many of the Debtors' stakeholders in the negotiations and compromises that led to the Plan. Further, the failure to implement the Debtor Release would impair the Debtors' ability to confirm and implement the Plan. The scope of the Debtor Release is appropriately tailored under the facts and circumstances of the Chapter 11 Cases. In light of, among other things, the significant contributions made by, or on behalf of, the Released Parties to the Debtors' Estates and the critical nature of the Debtor Release to the Plan, the Debtor Release in Article XIV.D.1 of the Plan is appropriate and hereby approved.

MM. <u>The Third-Party Release</u>. The third-party release contained in Article XIV.D.2 of the Plan (the "<u>Third-Party Release</u>") is fair and necessary to the Plan and is being granted consensually by Holders of Claims who voted to accept the Plan, thereby satisfying the requirements of *In re Master Mortgage Investment Fund, Inc.*, 168 B.R. 930 (Bankr. W.D. Mo. 1994), and other applicable case law. Based on the record made at the Confirmation Hearing, including the Confirmation Brief and the Toney Declaration, the Third-Party Release (i) was given voluntarily and in exchange for the good and valuable consideration by the Released Parties; (ii) constitutes a good faith settlement and compromise of the Claims released by Article XIV of the Plan; (iii) is necessary to confirmation of the Plan and resolution of the Chapter 11 Cases; (iv) is a

product of good-faith and arm's length negotiations; (v) is in the best interests of the Debtors and all Holders of Claims; (vi) is fair, equitable, and reasonable; (vii) was given and made after due notice and opportunity for a hearing; (viii) is consistent with the Bankruptcy Code and applicable bankruptcy law; and (ix) is appropriately tailored to the facts and circumstances of the Chapter 11 Cases, and parties, including Holders of Claims in the Voting Classes and Non-Voting Classes, received due and adequate notice of the Third-Party Release and the opportunity to object to the Third-Party Release.  In light of, among other things, the significant contributions made by, or on behalf of, the Released Parties to the Debtors' Estates and the critical nature of the Third-Party Release to the Plan, the Third-Party Release in Article XIV.D.2 of the Plan is appropriate.

NN.   <u>Exculpation</u>.   The exculpation provision in Article XIV.E of the Plan (the "<u>Exculpation</u>") was proposed in good faith, given for good and valuable consideration, and is essential to the Plan.  Specifically, the Exculpation affords protection to those parties who are estate fiduciaries and constructively participated in and contributed to the Debtors' chapter 11 process consistent with their duties under the Bankruptcy Code, and it is appropriately tailored to protect the Exculpated Parties from inappropriate litigation.  The Exculpation granted under the Plan is reasonable in scope, as it does not relieve any party of liability for an act or omission to the extent such act or omission is determined by final order to constitute fraud, willful misconduct, or gross negligence. The Exculpation, including the carve-out for fraud, willful misconduct, or gross negligence and is consistent with established practice in this jurisdiction and others.  Accordingly, the Exculpation in Article XIV.E of the Plan is appropriate and hereby approved.

OO.   <u>Injunction</u>.  The injunction provisions contained in Article XIV.F of the Plan (the "<u>Injunction</u>") are essential to the Plan and are necessary to implement the Plan and to preserve and enforce the Debtor Release, the Third-Party Release, and the Exculpation.  The Injunction

**App.1291**

*In re Mercy Hospital, Iowa City, Iowa, et al.*
*Case No. 23-00623 (TJC)*

provisions are appropriately tailored to achieve those purposes.  Accordingly, the Injunction

provisions in Article XIV.F of the Plan are appropriate and hereby approved.

PP.    <u>Retention of Jurisdiction</u>.    After the Effective Date, the Court shall retain

jurisdiction over the matters arising in, under, and related to, the Chapter 11 Cases, as set forth in

Article XV of the Plan.  Among others, the Court shall retain exclusive jurisdiction over any suit

brought on any Claim or Cause of Action against a Released Party or an Exculpated Party in

connection with any act taken or omitted to be taken in connection with, or related to, the Chapter

11 Cases, the formulation, negotiation, or implementation of the Plan, the solicitation of

acceptances of the Plan, the pursuit of Confirmation of the Plan, the Confirmation of the Plan, the

Consummation of the Plan, or the administration of the Plan or the property to be distributed under

the Plan.  The protections provided to the Released Parties and the Exculpated Parties shall be in

addition to, and shall not limit, all other releases, indemnities, injunctions, exculpations, and any

other applicable law or rules protecting the Released Parties or the Exculpated Parties from

liabilities.  The Court shall also maintain exclusive jurisdiction to enter and implement orders to

enforce the Injunction as may be necessary or appropriate to restrain interference by any Entity in

connection with actions inconsistent with the Plan and the findings of fact and conclusions of law

in this Confirmation Order.

QQ.    <u>Likelihood of Satisfaction of Conditions Precedent to the Effective Date</u>.  Each of

the conditions precedent to the Effective Date, as set forth in Article XIII.B of the Plan, has been

or is reasonably likely to be satisfied or waived in accordance with Article XIII.D of the Plan.

RR.    <u>Implementation</u>.  All documents necessary to implement the Plan and all other

relevant and necessary documents (including, among others, the Liquidation Trust Agreement) are

essential elements of the Plan and entry into and consummation of the transactions contemplated

**App.1292**

by each such document and agreement is in the best interests of the Debtors and their Estates.  The

Debtors have exercised reasonable business judgment in determining to enter into these documents

and have provided sufficient and adequate notice of the material terms of the documents, including

the identity of the Liquidation Trustee, to all parties-in-interest in the Chapter 11 Cases.  The

documents have been negotiated in good faith and at arm's length and shall, upon completion of

documentation and execution, be valid, binding, and enforceable agreements.

SS.    <u>Disclosure of Facts</u>.  The Debtors have disclosed all material facts regarding the

Plan, the Plan Supplement, and the adoption, execution, and implementation of the other matters

provided for under the Plan involving corporate action to be taken by or required of the Debtors.

TT.    <u>Objections</u>.  All parties have had a full and fair opportunity to litigate all issues

raised, or which might have been raised, in connection with the Confirmation of the Plan and any

and all objections to Confirmation have been fully and fairly litigated.

UU.    <u>Best Interests</u>.  Confirmation of the Plan is in the best interests of the Debtors, their

Estates, Holders of Claims, and all other parties-in-interest.

## <u>ORDER</u>

ACCORDINGLY, IT IS HEREBY ORDERED, ADJUDGED, DECREED, AND

DETERMINED THAT:

1.    <u>Findings of Fact and Conclusions of Law</u>.  The above-referenced findings of fact

and conclusions of law are hereby incorporated by reference as though fully set forth herein and

constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made

applicable herein by Bankruptcy Rule 9014.  To the extent that any finding of fact is determined

to be a conclusion of law, it is deemed so, and vice versa.

2.    <u>Solicitation</u>.  The solicitation of votes on the Plan complied with the Solicitation

Procedures Order, was appropriate and satisfactory based upon the circumstances of the Chapter

11 Cases, was done in good faith based on adequate information, and was in compliance with the

provisions of the Bankruptcy Code, the Bankruptcy Rules, and applicable non-bankruptcy law.

3.    <u>Notice of the Confirmation Hearing</u>.  Notice of the Confirmation Hearing complied

with the terms of the Solicitation Procedures Order, the Bankruptcy Code, the Bankruptcy Rules,

the Local Rules, and was appropriate and satisfactory based upon the circumstances of the Chapter

11 Cases.

4.    <u>Confirmation of the Plan</u>.   The Plan, attached hereto as **<u>Exhibit A</u>**, is hereby

approved in its entirety and **CONFIRMED** under Bankruptcy Code section 1129.  The documents

contained in the Plan Supplement, including the Liquidation Trust Agreement, are hereby

authorized and approved.  The terms of the Plan, including the Plan Supplement, are incorporated

by reference into and are an integral part of this Confirmation Order.  The Debtors and the

Liquidation Trustee are each authorized to enter into and execute all documents and agreements

related to the Plan (including all exhibits and attachments thereto and documents referred to therein

and herein), and the execution, delivery, and performance thereafter by the Liquidating Debtors

and Liquidation Trustee are hereby authorized and approved.

5.    <u>Objections</u>.  All objections, responses to, statements, comments, and reservations

of rights pertaining to Confirmation of the Plan that have not been withdrawn, waived, resolved,

or settled are overruled on the merits and all withdrawn objections are deemed withdrawn with

prejudice.

6.    <u>Deemed Acceptance of Plan as Modified</u>.  The Debtors modified the Plan to address

concerns raised by parties-in-interest and made certain nonmaterial clarifications to the Plan.  The

**App.1294**

*In re Mercy Hospital, Iowa City, Iowa, et al.*
*Case No. 23-00623 (TJC)*

Plan modifications were immaterial and comply with Bankruptcy Code section 1127 and Bankruptcy Rule 3019. Moreover, the Debtors' key constituents affected by such modifications support these changes. Accordingly, no additional solicitation or disclosure was required on account of the modifications and all Holders of Claims who voted to accept the Plan or who are conclusively presumed to accept the Plan (including Provisional Pension Claim Holders) are deemed to have accepted the Plan as modified, revised, supplemented, or otherwise amended (the "Plan Modifications"). No Holder of a Claim or Interest, nor a Provisional Pension Claim Holder, shall be permitted to change its vote because of the Plan Modifications.

7.      <u>Provisions of Plan Non-Severable and Mutually Dependent</u>.  The provisions of the Plan and this Confirmation Order, including the findings of fact and conclusions of law set forth herein, are (a) non-severable and mutually dependent; (b) valid and enforceable pursuant to their terms; and (c) integral to the Plan and this Confirmation Order, respectively, and may not be deleted or modified except in accordance with Article XVI.A of the Plan.

8.      <u>Plan Classifications Controlling</u>.  The terms of the Plan shall solely govern the classification of Claims for purposes of the distributions to be made thereunder. The classifications set forth on the Ballots tendered to or returned by the Holders of Claims and Provisional Pension Claim Holders in connection with voting on the Plan: (a) were set forth thereon solely for purposes of voting to accept or reject the Plan; (b) do not necessarily represent, and in no event shall be deemed to modify or otherwise affect, the actual classification of Claims under the Plan for distribution purposes; (c) may not be relied upon by any Holder of a Claim as representing the actual classification of such Claim under the Plan for distribution purposes; and (d) shall not be binding on the Debtors or the Liquidating Debtors except for voting purposes.

**App.1295**

9.     <u>No Action Required; Corporate Action</u>.   On or before the Effective Date, as applicable, all actions contemplated under the Plan or the Plan Supplement shall be deemed authorized and approved in all respects, including implementation of the transactions contemplated by the Plan (whether to occur before, on, or after the Effective Date).   All matters provided for in the Plan involving the corporate structure of the Debtors or the Liquidating Debtors, as applicable, and any corporate action required by the Debtors or the Liquidating Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, managers, or officers of the Debtors or the Liquidating Debtors, as applicable.

10.     <u>Implementation</u>.   The provisions governing the means for implementation of the Plan set forth in Article IX of the Plan shall be, and hereby are, approved in their entirety and the Debtors are authorized to take all actions reasonably necessary to implement the Plan on the terms set forth in Article IX.

11.     <u>Vesting of Liquidation Trust Assets and Preservation of Litigation Rights</u>.   Pursuant to the Plan, and pursuant to Bankruptcy Code sections 1123(b)(3) and 1141(b)-(c), on the Effective Date, the assets of the Estates which constitute the Liquidation Trust Assets shall be vested in and continue after the Effective Date as assets of the Liquidation Trust.   Except as otherwise provided in the Plan, the Liquidation Trust Agreement, or this Confirmation Order, or in any contract, instrument, release, or other agreement entered into or delivered in connection with the Plan, on the Effective Date, the Liquidation Trust Assets shall vest in the Liquidation Trust, free and clear of all Claims, Interests, liens, encumbrances, and interest.   The Liquidation Trustee is authorized to take any action on behalf of the Debtors in the furtherance of the liquidation of the Liquidation Trust Assets, including executing any corporate action related to the liquidation of the Liquidation

Trust Assets and dissolution and winding up of the Debtors as business entities.  In accordance

with the Plan and Liquidation Trust Agreement, the Liquidation Trustee is authorized to perform

such post-Effective Date acts as are required to wind up the affairs of the Debtors, including, but

not limited to, preparing and filing final tax returns, paying final invoices of the Debtors, and

paying any postpetition fees and expenses of professionals after the allowance of final fee

applications by this Court.

12.    Preservation of Causes of Action.  Any claims, demands, rights, and Causes of

Action of the Debtors and/or the Estates shall be preserved and vest in the Liquidation Trust as

provided in the Plan and shall be prosecuted, managed, controlled, and/or settled on behalf of the

Liquidation Trust by the Liquidation Trustee, as provided in the Plan and the Liquidation Trust

Agreement.

13.    Purpose of Liquidation Trust.  The sole purpose of the Liquidation Trust shall be to

liquidate the Liquidation Trust Assets and to distribute the proceeds of the liquidation, net of all

claims, expenses, charges, liabilities, and obligations of the Liquidation Trust (including any

obligations or liabilities of the Debtors under the Plan or Confirmation Order or Allowed Claims

against the Debtors to which the Liquidation Trust Assets are subject), to the Liquidation Trust

Beneficiaries in accordance with the Plan, the Liquidation Trust Agreement, and Treasury

Regulation Section 301.7701-4(d) and as described in IRS Revenue Procedure 94-45, 1994-2 C.B.

684, with no objective to continue or engage in the conduct of a trade or business except to the

extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidation

Trust.

14.    Appointment of Liquidation Trustee.  In accordance with the Plan and terms of the

Liquidation Trust Agreement, the appointment of William H. Henrich as Liquidation Trustee is

**App.1297**

**APPROVED**.  The Court shall have sole jurisdiction over claims and causes of action against the Liquidation Trustee (solely in his capacity as the Liquidation Trustee) arising out of the performance of the Liquidation Trustee's duties, and the Liquidation Trustee (in such capacity) may not be sued, or have claims asserted against him, in any other forum without leave of the Court.  The Liquidation Trustee and any professionals retained by the Liquidation Trustee may be compensated by the Liquidation Trust in connection with any services provided to or on account of the Liquidation Trust from and after the Effective Date, subject to and in accordance with the terms of the Plan and the Liquidation Trust Agreement.

15.     <u>Appointment of the Trust Oversight Committee</u>.  In accordance with the Plan and terms of the Liquidation Trust Agreement, the Liquidation Trust shall be overseen by a three-member oversight committee (the "<u>Trust Oversight Committee</u>"), consisting of one member designated by the UCC, one member designated by the Bondholder Representatives, and one member designated by the Pension Committee.  On the Effective Date, those parties so designated shall be deemed to have been formally appointed to the Trust Oversight Committee.

16.     <u>Tax Treatment and Reporting of Liquidation Trust</u>.  (A) All parties (including the Liquidation Trustee, the Debtors, and the Liquidation Trust Beneficiaries) shall report for all U.S. federal income tax purposes consistently with the treatment of the Liquidation Trust as a "liquidating trust" in accordance with Treasury Regulation Section 301.7701-4(d) and as described in IRS Revenue Procedure 94-45, 1994-2 C.B. 684, including treating the transfer of the Liquidation Trust Assets to the Liquidation Trust as (i) a deemed transfer of the Liquidation Trust Assets (subject to applicable liabilities and obligations) to the Liquidation Trust Beneficiaries, followed by (ii) a deemed transfer of such assets by the Liquidation Trust Beneficiaries to the Liquidation Trust; (B) accordingly, all parties shall treat the Liquidation Trust as a "grantor trust"

within the meaning of sections 671 through 679 of the Tax Code of which the Liquidation Trust beneficiaries are the grantors and the deemed owners of the Liquidation Trust Assets; (C) all parties shall report consistently with the valuation of the Liquidation Trust Assets transferred to the Liquidation Trust as determined by the Liquidation Trustee (or its designee) for all U.S. federal income tax purposes; (D) the Liquidation Trustee shall be responsible for filing returns for the Liquidation Trust as a grantor trust pursuant to Treasury Regulation Section 1.671-4(a) and any other tax returns that may be required with respect to the Liquidation Trust; and (E) the Liquidation Trustee shall provide to the Liquidation Trust Beneficiaries a separate statement regarding the receipts and expenditures of the Liquidation Trust as relevant for U.S. federal income tax purposes and shall cooperate with reasonable requests from the Liquidation Trust Beneficiaries for additional information for tax purposes.

17.    <u>Fees and Expenses of Liquidation Trustee</u>.  Any reasonable fees and expenses incurred by the Liquidation Trustee arising before the Effective Date shall constitute an Allowed Administrative Claim; *provided* that, upon the occurrence of the Effective Date, all such fees and expenses shall be paid by the Liquidation Trust in accordance with the terms of the Liquidation Trust Agreement.

18.    <u>Plan Settlement</u>.  The settlements contemplated in the Plan satisfy the requirements of Bankruptcy Rule 9019 and are approved.  The compromises and settlements set forth in the Plan, including the global settlement between the Debtors, the UCC, the Pension Committee, and the Bondholder Representatives, as reflected in the relative distributions to and recoveries of Holders of Claims under the Plan, are approved pursuant to Bankruptcy Rule 9019(a) and shall be effective immediately and binding on all parties-in-interest on the Effective Date.  The Debtors and the Liquidation Trustee are authorized to take all actions required under the Plan, the Plan

Supplement, and the Liquidation Trust Agreement to effectuate the Plan and the transactions contemplated therein.  The terms of the Plan (including, without limitation, the settlements set forth therein), the Plan Supplement, and the Liquidation Trust Agreement, are incorporated herein by reference and are an integral part of this Confirmation Order.  The terms of the Plan (including, without limitation, the settlements set forth therein), the Plan Supplement, the Liquidation Trust Agreement, and all other relevant and necessary documents executed or to be executed in connection with the transactions contemplated by the Plan shall be effective and binding as of the Effective Date.  The failure to specifically include or refer to any particular article, section, or provision of the Plan, the Plan Supplement, the Liquidation Trust Agreement, or any related document in this Confirmation Order does not diminish or impair the effectiveness or enforceability of such article, section, or provision and this Confirmation Order shall be interpreted as if such articles, sections, or provisions were included herein in their entirety.

19.    <u>Plan Supplement</u>.  The documents contained in the Plan Supplement, including the Liquidation Trust Agreement, are integral to the Plan and are approved by the Court.  Subject to the terms of the Plan, the Debtors may alter, amend, update, or modify the Plan Supplement and the Liquidation Trust Agreement before the Effective Date.  The parties to the Liquidation Trust Agreement are authorized to enter into the same in substantially the form included in the Plan Supplement.

20.    <u>Treatment of Executory Contracts and Unexpired Leases</u>.  Pursuant to Article XII of the Plan, each executory contract and unexpired lease not previously rejected, assumed, or assumed and assigned shall be deemed automatically rejected pursuant to Bankruptcy Code sections 365 and 1123, unless such executory contract or unexpired lease: (a) previously has been assumed or rejected by the Debtors; (b) expired or terminated pursuant to its own terms; (c) is the

*In re Mercy Hospital, Iowa City, Iowa, et al.*
*Case No. 23-00623 (TJC)*

subject of a pending motion to assume such executory contract or unexpired lease as of the

Confirmation Date; (d) is identified in the Plan Supplement as an Executory Contract or Unexpired

Lease to be assumed; or (e) is an insurance policy.   Entry of this Confirmation Order shall

constitute a Court order approving the rejections, along with the assumptions and assumptions or

assignments, as applicable, of such Executory Contracts or Unexpired Leases, as provided for in

the Plan, pursuant to Bankruptcy Code sections 365(a) and 1123 effective as of the Effective Date.

Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Court order but

not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by

the Liquidating Debtors in accordance with its terms, except as such terms may have been modified

by the provisions of the Plan or any order of the Court authorizing and providing for its assumption

or assumption and assignment under applicable federal law.   Any motions to assume Executory

Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the

Court on or after the Effective Date by a Final Order.   To the maximum extent permitted by law,

to the extent that any provision in any Executory Contract or Unexpired Lease assumed or assumed

and assigned pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is

breached or deemed breached by, the assumption or assumption and assignment by the Liquidating

Debtors of such Executory Contract or Unexpired Lease, then such provision shall be deemed

modified such that the transactions contemplated by the Plan and the Plan Supplement shall not

entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or

to exercise any other default-related rights with respect thereto.

21.    <u>Rejection Bar Date</u>.   Claims created by the rejection of executory contracts or

unexpired leases pursuant to the Plan must be filed with the Claims and Noticing Agent and served

on the Liquidation Trustee and its counsel, no later than 30 days after the Effective Date.   Any

**App.1301**

Claims for rejection of executory contracts or unexpired leases pursuant to the Plan for which a proof of claim is not filed and served within such time will be forever barred and shall not be enforceable against the Debtors or the Estates, their assets, properties, or interests in property, or against the Liquidation Trust.  Unless otherwise Ordered by the Court, all Claims arising from the rejection of Executory Contracts and Unexpired Leases shall be treated as Class 3 (General Unsecured Claims) under the Plan.

22.    <u>Administrative Expense Claim Bar Date</u>.    Requests for payment of an Administrative Expense Claim (other than those that were required to be filed by March 15, 2024 pursuant to Docket No. 740) must be Filed with the Court and served on the Liquidation Trustee and its counsel no later than 30 days after the Effective Date.  Unless the Liquidation Trust or any other party-in-interest objects to an Administrative Expense Claim by the Administrative Expense Claims Objection Deadline, such Administrative Expense Claim shall be deemed Allowed in the amount requested.  In the event that the Liquidation Trust or any other party-in-interest objects to an Administrative Expense Claim, the Court shall determine the Allowed amount of such Administrative Expense Claim.

23.    <u>Professional Fee Reserve</u>.  As soon as practicable after Confirmation and not later than the Effective Date, the Debtors shall transfer to the Liquidation Trust cash in the Amount of the Professional Fee Estimate, which shall be used by the Liquidation Trustee to fund the Professional Fee Reserve. The Professional Fee Reserve shall be maintained in trust for the Professionals and shall be used to pay the Allowed Professional Fee Claims.  Such funds shall not be considered property of the Debtors' Estates or Liquidation Trust Assets.  The amount of Allowed Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals from funds held in the Professional Fee Reserve within two business days after such

Professional Fee Claims are Allowed. Once payments on account of such Allowed Professional Fee Claims have been made in full, any such excess Cash remaining in the Professional Fee Reserve shall be considered Liquidation Trust Assets available for Distribution by the Liquidation Trustee in accordance with the terms of the Plan. For the avoidance of doubt, (a) to the extent that the Professional Fee Reserve is not sufficient to satisfy in full all Allowed Professional Fee Claims, such Allowed Claims shall nevertheless be paid in full in Cash from other available Cash prior to making any Distributions to the Holders of Allowed Claims and (b) any fees and expenses incurred by Professionals in connection with preparing Final Fee Applications shall be paid from the Professional Fee Reserve or, if exhausted, from other available Cash prior to making any Distributions to the Holders of Allowed Claims.

24. <u>Professional Fee Claims Bar Date</u>. Requests for payment of Professional Fee Claims must be Filed with the Court no later than 45 days after the Effective Date and served on counsel for the Liquidation Trustee and counsel for the U.S. Trustee. Objections, if any, to Final Fee Applications of such Professionals must be Filed and served on the Liquidation Trustee, the requesting Professional, and the U.S. Trustee no later than 14 days from the date on which each such Final Fee Application is served and Filed. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior orders of the Court, the Allowed amounts of such Professional Fee Claims shall be determined by the Court. Any Professional Fee Claim that is not asserted in accordance with Article IV.D of the Plan shall be deemed Disallowed under the Plan and shall be forever barred against the Debtors, their Estates, the Liquidation Trust, or any of their assets or property, and the Holder thereof shall be enjoined from commencing or continuing any action, employment of process, or act to collect, offset, recoup, or recover such Claim and shall be subject to the Injunction.

**App.1303**

*In re Mercy Hospital, Iowa City, Iowa, et al.*
*Case No. 23-00623 (TJC)*

25.    <u>Releases, Injunctions, and Exculpations</u>.  The release, exculpation, and injunction

provisions in Article XIV of the Plan shall be, and hereby are, approved and authorized in their

entirety, including, but not limited to, the Debtor Release, the Third-Party Release, the

Exculpation, and the Injunction.

26.    <u>Provisions Governing Distribution</u>.  The distribution provisions of Article XI of the

Plan shall be, and hereby are, approved in their entirety. Except as otherwise set forth in the Plan

or this Confirmation Order, the Disbursing Agent shall make all distributions required under the

Plan.  The timing of distributions required under the Plan or this Confirmation Order shall be made

in accordance with and as set forth in the Plan or this Confirmation Order, as applicable.

27.    <u>Procedures for Resolving Disputed, Contingent, and Unliquidated Claims</u>.  The

procedures for resolving contingent, unliquidated, and disputed Claims contained in Article XI.J

of the Plan shall be, and hereby are, approved in their entirety.  From and after the Effective Date,

the Liquidation Trust shall, subject to the terms of the Plan, have sole responsibility and authority

for disputing, objecting to, compromising and settling, or otherwise resolving and making

distributions with respect to all Claims.

28.    <u>Utility Order</u>.  On or as reasonably practicable after the Effective Date, and only

after all postpetition, but pre-Effective Date, Claims on account of utility services have been paid

and any disputes with respect to such Claims have been resolved, the Liquidating Debtors and/or

Liquidation Trustee are authorized to withdraw the funds held in the segregated escrow account

pursuant to the *Final Order (I) Approving Debtors' Proposed Form of Adequate Assurance of*

*Payment; (II) Establishing Procedures for Resolving Objections by Utility Companies; (III)*

*Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Service; and (IV)*

*Granting Related Relief* [Docket No. 220] (the "<u>Final Utility Order</u>"), and the Liquidating Debtors

**App.1304**

and/or Liquidation Trustee shall have no further obligations to comply with the Final Utility Order. If applicable, all utilities, including any Person or Entity that received a deposit or other form of adequate assurance of performance under Bankruptcy Code section 366 during the Chapter 11 Cases in compliance with the Final Utility Order or otherwise, must return such deposit or other form of adequate assurance of performance to the Debtors or the Liquidating Debtors, as the case may be, on or before the Effective Date, *provided* that any such utility, with the Liquidating Debtors' or Liquidation Trustee's consent, may apply such deposit or other form of adequate assurance of performance to the Liquidating Debtors' account within 30 days of the Effective Date.

29.     <u>Altera</u>.  Effective as of the date hereof, pursuant to the Altera Settlement Order, Altera shall have an Allowed General Unsecured Claim in the amount of $6,000,000.

30.     <u>Restrictions on Foundation Funds</u>.  Effective as of the date hereof, any restrictions on the use of remaining funds held by the Foundation are hereby modified and lifted pursuant to section 540A.106 of the Iowa Code.  Such funds shall be considered Unrestricted Foundation Funds and shall be used to fund distributions as set forth under the Plan.

31.     <u>Eastern JV Interest</u>.  To the extent that the Debtors' JV Interest in Eastern Iowa Rehabilitation Hospital, LLC (the "<u>Eastern JV Interest</u>") is not sold or otherwise monetized by the Debtors prior to the Effective Date, the Debtors are hereby authorized to abandon the Eastern JV Interest, as well as any assets associated therewith.

32.     <u>Other JV Interests</u>.  To the extent that the Debtors' other JV Interests are not sold or otherwise monetized by the Debtors prior to the Effective Date, such JV Interests shall transfer to the Liquidation Trust, subject to all existing liens, claims, and encumbrances, which liens, claims, and encumbrances shall be released concurrently with, and conditioned upon, the applicable Distributions made pursuant to this Plan.

*In re Mercy Hospital, Iowa City, Iowa, et al.*
*Case No. 23-00623 (TJC)*

33.   <u>Pension Plan</u>.  By the Effective Date, the Pension Committee shall (a) identify a church-affiliated sponsor for the Pension Plan, the identity of which shall be reasonably acceptable to the Debtors and the Liquidation Trustee and (b) provide an executed pension plan administrator agreement with Agilis, LLC, the form of which shall be reasonably acceptable to the Debtors and the Liquidation Trustee.  In the event that the Pension Committee fails to satisfy either of the foregoing, the Debtors and/or the Liquidation Trustee shall be authorized and may commence efforts to terminate the Pension Plan.  As of the Effective Date, the Debtors and the Sisters of Mercy are hereby released from and shall not be liable for any claim, Claim, Cause of Action, obligation, suit, judgment, damages, debt, right, remedy, liability, action, proceeding, suit, account, controversy, agreement, promise, right to legal remedies, or right to payment, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising in law, equity, or otherwise, for any act or omission in connection with, relating to, or in any manner arising from, in whole or in part, the Pension Plan.

34.   <u>Dissolution of the UCC and Pension Committee</u>.  The UCC and Pension Committee shall continue in existence until the Effective Date to exercise those powers and perform those duties specified in Bankruptcy Code section 1103 and shall perform such other duties as each may have been assigned by the Court prior to the Effective Date.  Upon the occurrence of the Effective Date, the UCC and the Pension Committee shall dissolve automatically, whereupon their members, professionals, and agents shall be discharged and released from any duties and responsibilities in the Chapter 11 Cases and under the Bankruptcy Code, except with respect to (a) obligations arising under confidentiality agreements, which shall remain in full force and effect, (b) prosecuting applications for payment of fees and reimbursement of expenses of its Professionals or attending to any other issues related to applications for payment of fees and reimbursement of expenses of

**App.1306**

its Professionals, (c) any motions or other actions seeking enforcement of implementation of the

provisions of the Plan, and (d) prosecuting or participating in any appeal of the Confirmation Order

or any request for reconsideration thereof.

35.    <u>Governmental Approvals</u>.  Each federal, state, commonwealth, local, foreign, or

other governmental authority is hereby authorized and directed to accept any and all documents,

mortgages, deeds of trust, security filings, financing statements, and instruments necessary or

appropriate to effectuate, implement, or consummate the transactions contemplated by the Plan

and this Confirmation Order.  This Confirmation Order shall constitute all approvals and consents

required, if any, by the laws, rules, or regulations of any governmental authority with respect to

the implementation or consummation of the Plan and any other acts that may be necessary or

appropriate for the implementation or consummation of the Plan.

36.    <u>Patient Care Ombudsman</u>.  No Person or Entity shall seek or initiate formal or

informal discovery requests, demands, or proceedings upon or from the Patient Care Ombudsman

or Professionals employed by her (collectively, the "<u>Ombudsman Parties</u>") without first seeking

permission, upon sufficient prior notice to the Ombudsman Parties, from the Court.

37.    <u>Termination of the Patient Care Ombudsman's Duties</u>.  On the Effective Date, the

duties, responsibilities, and obligations of the Patient Care Ombudsman in connection with the

Chapter 11 Cases, to the extent not previously terminated under the PCO Order, and the retention

or employment of the Patient Care Ombudsman's attorneys, financial advisors, and other agents,

shall be terminated, except with respect to all Professional Fee Claims related to the Patient Care

Ombudsman and her Professionals.  Nothing herein shall in any way limit or otherwise affect the

Patient Care Ombudsman's obligations of confidentiality under confidentiality agreements, if any,

or under Bankruptcy Code section 333.

38.     <u>Conditions Precedent to Effective Date</u>.  The Plan shall not become effective unless and until the conditions set forth in Article XIII.B of the Plan have been satisfied or waived pursuant to Article XIII.D of the Plan.  Prior to the Effective Date, the Debtors and their officers, directors, agents, affiliates, and advisors are authorized to take any and all actions necessary to cause the satisfaction of all conditions to the Effective Date.

39.     <u>Binding Effect</u>.  Pursuant to Bankruptcy Code section 1141 and the other applicable provisions of the Bankruptcy Code, on or after entry of this Confirmation Order and subject to the occurrence of the Effective Date, the provisions of the Plan (including the exhibits and schedules thereto and all documents and agreements executed pursuant thereto or in connection therewith, including those contained in the Plan Supplement) and this Confirmation Order shall bind the Debtors, the Liquidation Trust, all Holders of Claims against and Interests in the Debtors (irrespective of whether such Claims or Interests are Allowed, Disallowed, or Impaired under the Plan or whether the Holders of such Claims or Interests accepted or are deemed to have accepted the Plan), the Provisional Pension Claim Holders, each Entity receiving, retaining, or otherwise acquiring property under the Plan, any and all non-Debtor parties to executory contracts and unexpired leases with the Debtors, any Entity making an appearance in the Chapter 11 Cases, all parties that filed objections to confirmation of the Plan, any other party-in-interest in the Chapter 11 Cases, and the respective heirs, executors, administrators, successors, or assigns, if any, of any of the foregoing.

40.     <u>Final Cash Collateral Order</u>.  On the Effective Date, the Second Interim Cash Collateral Order shall be deemed a Final Order.

41.     <u>Dismissal of the Board of Directors and Officers of the Debtors</u>.  On the Effective Date, and without the need for further order of this Court or action or formality that otherwise

42

might be required under non-bankruptcy law, the existing boards of directors of the Debtors shall be deemed dissolved and all officers or managers of the Debtors and the current directors shall be deemed resigned and dismissed from their positions (unless previously dismissed or terminated). Thereafter, and notwithstanding any limitation in the constitutional or organizational documents of the Debtors, the Liquidation Trustee shall be the sole director and officer or manager of the Debtors for the limited purpose of effectuating the terms of the Plan and this Confirmation Order.

42.     Cancellation of Existing Stock and Agreements.  On the Effective Date, all notes, stock, membership interests, instruments, certificates, and other documents evidencing any Claims in, or Interests of, the Debtors shall be canceled, of no further force, whether surrendered for cancellation or otherwise, and the obligations of the Debtors thereunder or in any way related thereto shall be discharged.

43.     Payment of Statutory Fees.  The Debtors or the Liquidation Trustee, as applicable, shall pay all U.S. Trustee Fees for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

44.     Exemption from Transfer Taxes.  To the maximum extent provided by Bankruptcy Code section 1146(a), any transfers of property pursuant to the Plan or hereto shall not be subject to any stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, personal property tax, sales tax, use tax, privilege tax, or other similar tax or governmental assessment in the United States, and this Confirmation Order directs and shall be deemed to direct the appropriate federal, state or local government officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment.  Such exemption specifically applies, without limitation, to

*In re Mercy Hospital, Iowa City, Iowa, et al.*
*Case No. 23-00623 (TJC)*

(a) the creation of any mortgage, deed of trust, lien or other security interest; (b) the assuming and

assigning any contract, lease or sublease; (c) any transaction authorized by the Plan; (d) any sale

of an Asset by the Liquidation Trustee in furtherance of the Plan, including but not limited to any

sale of personal or real property; and (e) the making or delivery of any deed or other instrument of

transfer under, in furtherance of or in connection with the Plan.

45.     <u>Recordable Form</u>.  This Confirmation Order shall be, and hereby is, declared to be

in recordable form and shall be accepted by any filing or recording officer or authority of any

applicable Governmental Unit for filing and recording purposes without further or additional

orders, certifications, or other supporting documents.  Further, the Court authorizes the Debtors to

file a memorandum of this Confirmation Order in any appropriate filing or recording office as

evidence of the matters herein contained.

46.     <u>Retention of Jurisdiction</u>.  The Court shall retain exclusive jurisdiction over the

matters arising in, and under, and related to, the Chapter 11 Cases, including any challenges to or

efforts to modify, reverse, withdraw, or amend any provision of the Plan or this Confirmation

Order, as set forth in Article XV of the Plan and Bankruptcy Code sections 105(a) and 1142.

47.     <u>Reversal or Vacatur</u>.  If any or all of the provisions of this Confirmation Order are

hereafter reversed, modified, or vacated by subsequent order of this Court or any other court, such

reversal, modification, or vacatur shall not affect the validity of the acts or obligations incurred or

undertaken under or in connection with the Plan prior to the Debtors' receipt of written notice of

any such order.  Notwithstanding any such reversal, modification, or vacatur of this Confirmation

Order, any such act or obligation incurred or undertaken pursuant to, and in reliance on, this

Confirmation Order prior to the effective date of such reversal, modification, or vacatur shall be

**App.1310**

governed in all respects by the provisions of this Confirmation Order and the Plan or any amendments or modifications thereto.

48.     <u>Severability of Plan Provisions</u>.  This Confirmation Order shall constitute a judicial determination that each term and provision of the Plan, as it may have been altered or interpreted in accordance with Article XVII.B of the Plan, is (a) valid and enforceable pursuant to its terms, (b) integral to the Plan and may not be deleted or modified without the consent of the Debtors, and (c) nonseverable and mutually dependent.  Each term and provision of this Confirmation Order is nonseverable and mutually dependent on each other term and provision of this Confirmation Order and the Plan.

49.     <u>Effect of Reference to the Plan in this Confirmation Order</u>.  The failure to reference or discuss any particular provision of the Plan in this Confirmation Order shall have no effect on the validity, binding effect, and enforceability of such provision, and each provision of the Plan shall have the same validity, binding effect, and enforceability as if fully set forth herein.

50.     <u>Headings</u>.  The headings of the paragraphs in this Confirmation Order have been used for convenience of reference only and shall not limit or otherwise affect the meaning of this Confirmation Order.  Whenever the words "include," "includes," or "including" (or other words of similar import) are used in this Confirmation Order, they shall be deemed to be followed by the words "without limitation."

51.     <u>Conflicts</u>.  The provisions of the Plan and this Confirmation Order shall be construed in a manner consistent with each other so as to effect the purposes of each; *provided, however*, that if there is any inconsistency between the provisions of the Plan and this Confirmation Order, the terms and conditions contained in this Confirmation Order shall govern and shall be deemed a modification to the Plan and shall control and take precedence.

**App.1311**

52.    <u>Governing Law</u>.  Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), the laws of (a) the State of Iowa shall govern the construction and implementation of the Plan and (except as may be provided otherwise in any such agreements, documents, or instruments) any agreements, documents, and instruments executed in connection with the Plan and (b) the laws of the state of incorporation or organization of the Debtors shall govern corporate or organizational governance matters with respect to the Debtors, in each case without giving effect to the principles of conflicts of law thereof.

53.    <u>Applicable Non-Bankruptcy Law</u>.  Pursuant to Bankruptcy Code section 1123(a) and 1142(a), the provisions of this Confirmation Order, the Plan, and related documents or any amendments or modifications thereto shall apply and be enforceable notwithstanding any otherwise applicable non-bankruptcy law.

54.    <u>Notice Parties</u>.  After the Effective Date, the Liquidating Debtors and Liquidation Trustee are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to (a) those Entities who have filed renewed requests to receive documents no later than 30 days after the Effective Date and (b) those Entities whose rights are affected by such documents; *provided, however*, that the U.S. Trustee shall remain on the Bankruptcy Rule 2002 service list.

55.    <u>Immediate Binding Effect</u>.  This Confirmation Order is a Final Order and the period in which an appeal must be filed shall commence immediately upon the entry hereof.  The 14-day stay of this Confirmation Order under Bankruptcy Rule 3020(e) is hereby waived.  The Plan and Plan Supplement shall be immediately effective and enforceable to the fullest extent permitted under the Bankruptcy Code and applicable nonbankruptcy law. Notwithstanding anything to the contrary in the Plan, the Bankruptcy Rules, including Bankruptcy Rule 3020(e), or otherwise, this Confirmation Order shall be effective and enforceable immediately, and the Debtors are hereby

authorized to consummate the Plan and the transactions contemplated thereby immediately upon the entry of this Confirmation Order.  The failure specifically to include or to refer to any particular section or provision of the Plan or any related document in this Confirmation Order shall not diminish or impair the effectiveness of such article, section, or provision, and such section or provision shall have the same validity, binding effect, and enforceability as every other section or provision of the Plan, it being the intent of the Court that the Plan be confirmed in its entirety and that all Plan-related documents be approved.

56.     <u>Substantial Consummation</u>.  On the Effective Date, the Plan shall be deemed to be substantially consummated under Bankruptcy Code sections 1101 and 1127.

57.     <u>Failure of Plan Consummation</u>.  If the Effective Date does not occur, then: (a) the Plan and this Confirmation Order will be null and void in all respects except as expressly set forth in this paragraph; (b) any settlement or compromise embodied in the Plan or this Confirmation Order, assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan will be null and void in all respects; and (c) nothing contained in the Plan or this Confirmation Order shall (i) constitute a waiver or release of any Claims, Interests, or Causes of Action, (ii) prejudice in any manner the rights of any Debtor or any other Entity, or (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by any Debtor or any other Entity, and all parties shall revert to the status quo as if this Confirmation Order had not been entered.

58.     <u>Terms of Injunctions or Stays</u>.  Unless otherwise provided in the Plan or in this Confirmation Order, all injunctions or stays in effect in these Chapter 11 Cases pursuant to Bankruptcy Code sections 105 or 362 or any order of the Court shall remain in full force and effect

**App.1313**

*In re Mercy Hospital, Iowa City, Iowa, et al.*
*Case No. 23-00623 (TJC)*

until the Effective Date.  All injunctions or stays contained in the Plan or this Confirmation Order (including the Injunction) shall remain in full force and effect in accordance with their terms.

59.    Pension Plan Reservation of Rights.  Subject to obtaining the consent of the Bondholder Representatives and the Pension Committee, the Liquidation Trustee, in his sole and absolute discretion, reserves the right to file a motion seeking a modification of this Order and/or the Plan to the extent necessary to allow Mercy Hospital to maintain its corporate existence solely in order to administer the Pension Plan for a period not to exceed 5 years from the date of the Effective Date.

60.    Notice of Confirmation and Effective Date.  The form of the notice of the entry of this Confirmation Order and occurrence of the Effective Date, attached hereto as **Exhibit B** (the "Confirmation Notice") is hereby approved.  Pursuant to Bankruptcy Rules 2002(f)(7) and 3020(c), as soon as reasonably practicable after the Effective Date, the Debtors shall file the Confirmation Notice and serve it by first class mail on each of the following at their respective addresses last known to the Debtors: (a) the Office of the United States Trustee for the Northern District of Iowa; (b) all parties on the master service list in the Chapter 11 Cases; and (c) all known creditors of the Debtors.  The Confirmation Notice need not be mailed to any person if a previous mailing to such person has been returned as undeliverable, unless the Debtors have been informed in writing of a corrected address for such person.  The notice described in this paragraph shall have the effect of an order of the Court and shall constitute good and sufficient notice of the entry of this Confirmation Order, the relief granted herein, and the occurrence of the Effective Date, pursuant to Bankruptcy Rules 2002(f)(7) and 3020(c), and no other or further notice of entry of this Confirmation Order need to be given.

*In re Mercy Hospital, Iowa City, Iowa, et al.*
*Case No. 23-00623 (TJC)*

61.    <u>No Waiver</u>.  The failure to specifically include any particular provision of the Plan in this Confirmation Order will not diminish the effectiveness of such provision nor constitute a waiver thereof, it being the intent of this Court that the Plan is confirmed in its entirety and incorporated herein by this reference.

Dated and entered this <u>7th</u> day of <u>June</u>, 2024.

_____
Honorable Thad J. Collins, Chief Judge

**Prepared and Submitted By:**

**NYEMASTER GOODE, P.C.**
Roy Leaf, AT0014486
625 First Street SE, Suite 400
Cedar Rapids, IA 52401-2030
Telephone:    (319) 286-7002
Facsimile:    (319) 286-7050
Email:        rleaf@nyemaster.com

- and -

Kristina M. Stanger, AT0000255
Matthew A. McGuire, AT0011932
Dana Hempy, AT0014934
700 Walnut, Suite 1600
Des Moines, IA 50309
Telephone:  515-283-3100
Fax:        515-283-8045
Email:      mmcguire@nyemaster.com
            kmstanger@nyemaster.com
            dhempy@nyemaster.com

- and -

**MCDERMOTT WILL & EMERY LLP**
Felicia Gerber Perlman (admitted *pro hac vice*)
Daniel M. Simon (admitted *pro hac vice*)
Emily C. Keil (admitted *pro hac vice*)
444 West Lake Street, Suite 4000
Chicago, Illinois 60606
Telephone:    (312) 372-2000

**App.1315**

Facsimile:      (312) 984-7700
Email:          fperlman@mwe.com
                dsimon@mwe.com
                ekeil@mwe.com

*Counsel for Debtors and Debtors-in-Possession*

## **EXHIBIT A**

**Plan**

[*See* Docket No. 1050]

## **<u>EXHIBIT B</u>**

**Form of Confirmation Notice**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| MERCY HOSPITAL, IOWA CITY, IOWA, *et al.*, | ) | Case No. 23-00623 (TJC) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |
| | ) | **Related to Docket Nos. [__]** |
| | ) | |

## NOTICE OF (I) ENTRY OF ORDER CONFIRMING DEBTORS' FIRST AMENDED JOINT CHAPTER 11 PLAN OF LIQUIDATION AND (II) OCCURRENCE OF EFFECTIVE DATE

**PLEASE TAKE NOTICE** that, on May [__], 2024, the Honorable Thad J. Collins, United States Bankruptcy Chief Judge for the United States Bankruptcy Court for the Northern District of Iowa (the "Court") entered an order [Docket No. [__]] (the "Confirmation Order"), confirming the [*Debtors' First Amended Combined Disclosure Statement and Joint Chapter 11 Plan of Liquidation*] [Docket No. [__]] (as amended, modified, or supplemented, the "Plan")[1] of the above-captioned debtors and debtors-in-possession (collectively, the "Debtors").

**PLEASE TAKE FURTHER NOTICE** that the Effective Date of the Plan occurred on [__], 2024. Each of the conditions precedent to consummation of the Plan enumerated in Article XIII.B of the Plan has been satisfied or waived pursuant to Article XIII.D of the Plan.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the Confirmation Order, the release, injunction, and exculpation provisions in Article XIV of the Plan are now in full force and effect.

**PLEASE TAKE FURTHER NOTICE** that requests for payment of Professional Fee Claims must be filed with the Court and served on the Liquidation Trustee and the U.S. Trustee by [__], 2024, which is the date 45 days after the Effective Date.

**PLEASE TAKE FURTHER NOTICE** that Claims created by the rejection of executory contracts or unexpired leases pursuant to Article XII of the Plan must be filed with the Claims and Noticing Agent and served on the Liquidation Trustee and its counsel no later than 30 days after the Effective Date.

**PLEASE TAKE FURTHER NOTICE** that requests for payment of an Administrative Expense Claim that arose after February 1, 2024 must be filed with the Court and served on the Liquidation Trustee and its counsel no later than 30 days after the Effective Date.

---

[1]   Capitalized terms used not but otherwise defined herein shall have the meanings ascribed to them in the Plan.

*In re Mercy Hospital, Iowa City, Iowa, et al.*
*Case No. 23-00623 (TJC)*

**PLEASE TAKE FURTHER NOTICE** that the Plan, the Plan Supplement, the Confirmation Order, and any other document filed in the above-captioned chapter 11 cases may be examined by any party-in-interest (a) at the Debtors' case website (https://dm.epiq11.com/mercyhospital) or (b) through a link to PACER provided on the Court's website (https://www.ianb.uscourts.gov/) (a PACER account is required). Such documents may also be obtained by written request to Epiq Corporate Restructuring, LLC (the "Voting Agent") at mercyinfo@epiqglobal.com or by telephoning the Voting Agent at (888) 318-5044 (toll-free) or (503) 451-6294 (if calling from outside the U.S. or Canada).

**PLEASE TAKE FURTHER NOTICE** that the Plan and the Confirmation Order contain other provisions that may affect your rights. You are encouraged to review the Plan and the Confirmation Order in their entirety.

Dated: Cedar Rapids, Iowa
      [____], 2024

**NYEMASTER GOODE, P.C.**

*/s/ DRAFT*_____
Roy Leaf, AT0014486
625 First Street SE, Suite 400
Cedar Rapids, IA 52401-2030
Telephone:    (319) 286-7002
Facsimile:    (319) 286-7050
Email:        rleaf@nyemaster.com

- and -

Kristina M. Stanger, AT0000255
Matthew A. McGuire, AT0011932
Dana Hempy, AT0014934
700 Walnut, Suite 1600
Des Moines, IA 50309
Telephone:  515-283-3100
Fax:        515-283-8045
Email:        mmcguire@nyemaster.com
             kmstanger@nyemaster.com
             dhempy@nyemaster.com

- and -

**MCDERMOTT WILL & EMERY LLP**
Felicia Gerber Perlman (admitted *pro hac vice*)
Daniel M. Simon (admitted *pro hac vice*)
Emily C. Keil (admitted *pro hac vice*)
444 West Lake Street, Suite 4000
Chicago, IL 60606
Telephone:    (312) 372-2000
Facsimile:    (312) 984-7700

**App.1320**

*In re Mercy Hospital, Iowa City, Iowa, et al.*
*Case No. 23-00623 (TJC)*

| | | |
|---|---|---|
| Email: | fperlman@mwe.com | |
| | dsimon@mwe.com | |
| | ekeil@mwe.com | |

*Counsel for Debtors and Debtors-in-Possession*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies, under penalty of perjury, that on this [___], 2024, the foregoing document was electronically filed with the Clerk of Court using the Northern District of Iowa CM/ECF and the document was served electronically through the CM/ECF system to the parties of the Chapter 11 Cases.

/s/ DRAFT _____

**App.1321**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION**

MERCY HEALTH NETWORK, INC.,
d/b/a MERCYONE,

          Appellant,

vs.

MERCY HOSPITAL, IOWA CITY,
IOWA; MERCY SERVICES IOWA
CITY, INC.; and MERCY IOWA CITY
ACO, LLC,

          Appellees.

No. 24-CV-68-CJW-MAR

**ORDER**

_____

**TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................ 3

II.    BACKGROUND ................................................................. 3

III.   MOTION TO DISMISS...................................................... 8

      A.    Applicable Law...................................................... 8

      B.    Parties' Arguments................................................. 9

      C.    Analysis.................................................................10

IV.   APPEAL OF CONFIRMATION ORDER.............................................14

      A.    Standard of Review .................................................15

B.      Confirmability in light of *Harrington v. Purdue Pharma* ...................15

C.      *Master Mortgage* Factors ..............................................................20

        1.      Identity of Interest .........................................................21

        2.      Substantial Contribution ..................................................23

        3.      Essential to Plan ............................................................24

        4.      Support for Plan.............................................................26

        5.      Claim Payments ............................................................27

        6.      Conclusion ...................................................................28

D.      Business Judgment Rule...........................................................28

V.      CONCLUSION ...............................................................................29

Case 1:24-cv-00068-CJW-MAR     Document 47     Filed 03/03/25     Page 2 of 29
**App.1616**

## I.    INTRODUCTION

This matter is before the Court on Mercy Health Network, Inc. d/b/a MercyOne's ("appellant" or "MercyOne") appeal from the United States Bankruptcy Court for the Northern District of Iowa's ("Bankruptcy Court") confirmation of the Joint Chapter 11 Plan of Liquidation (the "Plan").  (Docs. 1 & 19).  MercyOne filed an appellant brief (Doc. 19), appellee Trustee of Mercy Hospital Liquidation Trust Dan Childers ("appellee" or "Liquidation Trustee") filed an appellee brief (Doc. 36), and MercyOne filed a reply brief (Doc. 41).

This matter is also before the Court on appellee's Motion to Dismiss Appeal (Doc. 33).  MercyOne filed a resistance (Doc. 40), and appellee filed a reply (Doc. 44).

On January 16, 2025, appellee filed a supplement to its motion to dismiss providing a status update on proceedings in the Bankruptcy Court.  (Doc. 45).

On January 22, 2025, the Court heard oral argument on the appeal and the motion to dismiss.  (Doc. 46).

For the following reasons, the Court **grants** appellee's motion to dismiss the appeal.  (Doc. 33).  Even if the Court did not grant the motion to dismiss, it would still affirm the Bankruptcy Court's decision.

## II.    BACKGROUND

This appeal arises out of the jointly administered bankruptcy proceedings of Mercy Hospital, Iowa City, Iowa and related entities (collectively the "Debtors").  On August 7, 2023, the Debtors filed a petition for relief under Chapter 11 of the United States Bankruptcy Code.  (Bankr. Doc. 1).[1]  The Debtors implemented a sales process under

---

[1] References to "Bankr. Doc." are to docket entries in the underlying matter in the Bankruptcy Court, 23-623-TJC.  References to "Doc." are to docket entries in this appeal, 24-CV-68. References to AA are to Appellant's Appendix filed in support of the appeal and can be found at Doc. 20.

3

Bankruptcy Code Section 363 to sell substantially all their assets to another entity that would continue to provide medical care out of the Debtor's facilities. (Bankr. Doc. 476, at 2–3). The University of Iowa ("University") purchased substantially all the Debtors' assets and continues to provide medical care out of the Debtors' facilities. (*Id.*). As a result of the sale, Mercy Hospital, Iowa City no longer has any active medical operations and will eventually be completely dissolved as part of the Plan. *See* (Bankr. Doc. 1043, at 3).[2]

MercyOne is Mercy Hospital, Iowa City's former manager. As it relates to the Debtors' bankruptcy, MercyOne is a claimant who has filed a claim for approximately $31,500.00. (Doc. 19, at 8). MercyOne's claim is classified in Class 3 as a general unsecured claim. (*Id.*, at 9). According to MercyOne, they are an impaired creditor, meaning they will not be paid the full amount of their claim.

On May 14, 2024, the Debtors filed their Joint Plan of Liquidation (the "Plan") in the United States Bankruptcy Court for the Northern District of Iowa.[3] AA Exh. 5. The Plan was the "result of extensive compromise and settlement talks between the key parties." AA 479. As relevant to MercyOne's appeal here, the Plan includes two categories of releases: Debtor Releases and Third-Party Releases. AA 202–03.

First, the Plan includes "Debtor Releases" in which the Debtors relinquished their right to pursue claims against specified parties. AA 202. Specifically, under the Debtor Releases, the Debtors, their Estates, and their current, former, and successor Affiliates agree to

---

[2] A complete and thorough explanation of the events leading up to the bankruptcy declaration is contained in the Plan at pages 41-45. AA 123–27.

[3] The May 14, 2024 Plan was the final version of the liquidation plan that was first filed on February 23, 2024, and went through several rounds of review and modification. AA 075. The May 14, 2024 Plan was updated to reflect the changes and technical modifications. *Id.*

forever release, waive, and discharge each of the Released Parties from any claim, Claim, Cause of Action, obligation, suit, judgment, damages, debt, right, remedy, liability, action, proceeding, suit [sic], account, controversy, agreement, promise, right to legal remedies, right to equitable remedies, or right to payment . . . for any act or omission in connection with [or] relating to . . . the Debtors.

AA 202.

Second, the Plan includes "Third-Party Releases" in which non-debtor third parties relinquish rights to pursue parties covered by the releases. Specifically, under the "Third-Party Releases,"

[T]he Releasing Parties shall be deemed to . . . release, waive, and discharge the Released Parties from any claim, Claim, Cause of Action, obligation, suit, judgment, damages, debt, right, remedy, liability, action, proceeding, suit [sic], account, controversy, agreement, promise, right to legal remedies, right to equitable remedies, or right to payment . . . for any act or omission in connection with [or] relating to . . . the Debtors.

AA 203.

A Releasing Party is defined, in part, as

the following Entities, each in their respective capacities as such: (a) each Holder of a Claim that (i) votes to accept the Plan or (ii) either (1) abstains from voting or (2) votes to reject the Plan and, in the case of either (1) or (2), does not opt out of the voluntary release by checking the opt-out box on the applicable Ballot, and returning it in accordance with the instructions set forth thereon, indicating that they are electing to opt out of granting the releases provided in the Plan.

AA 111 (Art. II(A)(1.190)). The definition of a "Releasing Party" also provides how a claim holder could either become a Releasing Party or could opt out of being a Releasing Party. A claim holder automatically becomes a Releasing Party if they accept the Plan, or if they either abstain from voting or reject the Plan and, in either of those cases, fail to opt out of the voluntary release by checking the opt-out box on the appropriate form (either ballot or non-voting status notice form) and returning it according to the instructions. A claim holder could opt out of the releases by abstaining from voting or

5

rejecting the Plan and, in either of those cases, checking the opt-out box on the appropriate form and returning it according to the instructions. Put another way, those who either did not vote or voted to reject the plan and who failed to affirmatively opt out of the Releases are deemed to be a Releasing Party.

For both the Debtor Releases and the Third-Party Releases, the "Released Parties" include six key parties and eighteen categories associated with each of those key parties, defined as follows:

> **1.189 "Released Parties"** means, collectively, the following Entities, each in their capacity as such: (a) the Debtors; (b) the UCC and each of its members (only in their capacity as such); (c) the Pension Committee and each of its members (only in their capacity as such); (d) the Bondholder Representatives; (e) the Foundation; (f) the Sisters of Mercy; and (g) with respect to any such Entity, in each case in its capacity as such with respect to such Entity, such Entity's current and former directors, managers, officers, predecessors, successors, affiliates, principals, members, management companies, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, and other professionals and advisors.

AA 110–11 (Art. II(A)(1.189)). Categories (a) through (f) are the "Key Parties." Category (g) makes up the "Remote Released Parties."

The Plan also creates a Liquidation Trust and provides funding to the Liquidation Trustee to investigate and bring claims on behalf of the Bankruptcy Estate. AA 187–92. The Plan funnels all claims not released by the Debtors into the Liquidating Trust, and the Liquidating Trustee has the power to prosecute the claims.

MercyOne objected to the Plan. AA Exhs. 2 & 3. MercyOne challenged the Debtor Releases and the Third-Party Releases insofar as they extend to the Remote Released Parties. MercyOne did not object to the Debtor Releases or the Third-Party Releases as they applied to the Key Parties. (Doc. 40, at 2 n.2). The five voting classes voted to approve the plan resulting in approval which ranged, across the respective

6

classes, from 88.14% to 100% in number of votes and 91.7% to 100% in votes weighted by value of the voters' claims. AA 051. On June 7, 2024, Judge Collins, Chief Bankruptcy Judge for the Bankruptcy Court for the Northern District of Iowa, overruled MercyOne's objections and approved the Plan. AA Exh. 9. There were no other objections to the Plan pending when Judge Collins entered his order.

MercyOne seeks review of Judge Collins' orders confirming the Plan and overruling MercyOne's objections because MercyOne believes the Debtor Releases and Third-Party Releases, insofar as they extend to the Remote Released Parties, are impermissible and therefore cause the Plan to be unconfirmable. MercyOne appealed to the Bankruptcy Appeal Panel, but appellees elected to have the case heard in this Court. MercyOne moved for a stay of Judge Collins' confirmation order pending the appeal in both the Bankruptcy Court and this Court. Both Judge Collins and Magistrate Judge Mark A. Roberts denied the respective motions to stay. (Bankr. Doc. 1137; Doc. 32). Appellee has moved to dismiss the appeal.

Several things have happened toward consummating the Plan since it was confirmed. The Liquidating Trustee relayed in status updates that it has, among other things: sold the Debtors' interest in a senior living facility in exchange for approximately $1,650,000.00 for the Trust; continued collections of accounts receivable before the accounts go stale; made efforts to sell an unoccupied building in downtown Iowa City; made distributions of $20,436.600 to the Bond-Holders and $733,333.33 to the Pensioners; dealt with a large number of Administrative Claims; "made various other payments as required"; reviewed and disposed of approximately $4,000,000.00 in administrative liability claims; has commenced payment of various allowed administrative claims; has sought an extension of the deadline to object to general unsecured claims; and has hired a new realtor relative to a building located in downtown

Iowa City. (Bankr. Doc. 1258); (Doc. 45). The Trustee indicates efforts to consummate the Plan are ongoing. (Doc. 45).

### III.    MOTION TO DISMISS

The Court will first address appellee's motion to dismiss MercyOne's appeal for lack of standing.

#### A.    Applicable Law

Article III standing requires a plaintiff "show that he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (internal quotation marks omitted). "Standing in a bankruptcy appeal is narrower than Article III standing." *In re Wigley*, 886 F.3d 681, 684 (8th Cir. 2018). In the Eighth Circuit, "only a 'person aggrieved' has standing to bring a bankruptcy appeal." *Id.* This is a prudential limitation that applies in the bankruptcy context when litigation almost always involves "the interests of numerous persons who are not formally parties to the litigation." *Id.* The standard allows for efficient judicial administration by limiting appellate review to "those persons whose interests are directly affected." *Id.*

Under this standard, a party is "a 'person aggrieved' with standing to bring a bankruptcy appeal only if she has been 'directly and adversely affected pecuniarily' by an order of a bankruptcy court." *Id.* (quoting *Opportunity Fin., LLC v. Kelley*, 822 F.3d 451, 458 (8th Cir. 2016). "A person has standing under this doctrine if a 'bankruptcy court order diminishes the person's property, increases the person's burdens, or impairs the person's rights.'" *Id.* (quoting *Opportunity Fin.*, 822 F.3d at 458). "Th[e] possibility of harm does not satisfy the persons aggrieved standard." *Opportunity Fin.*, 822 F.3d at 458. "Whether an appellant is a person aggrieved is generally a question of fact for the district court, but where the facts are undisputed" it is a question of law. *Id.* at 457–58.

8

### B.    Parties' Arguments

Appellee moves to dismiss MercyOne's appeal for two main reasons.

First, appellee argues MercyOne does not have standing to appeal the Third-Party Releases because it successfully opted out of the Third-Party Releases.  (Doc. 33, at 3). Thus, even if the Court were to find the Third-Party Releases impermissible and reverse the Bankruptcy Court's confirmation, MercyOne will have the exact same claims available to it because it never released those claims.  (*Id.*).

Second, appellee argues MercyOne does not have standing to challenge either the Debtor Releases or the Third-Party Releases because any potential recovery, or any increased liability, is purely speculative and too attenuated to satisfy the person aggrieved standard.  (*Id.*, at 4).

In response, MercyOne argues it has standing for several reasons.

First, MercyOne argues that its status as an impaired creditor *alone* confers standing because it is not receiving its full recovery under the confirmed Plan.  (Doc. 40, at 6).

Relatedly, MercyOne also argues it has standing because impaired creditors are entitled to a plan that satisfies Title 11, United States Code, Section 1129, but the Third-Party Releases make the Plan unconfirmable under Section 1129.  (*Id.*, at 13).

Last, MercyOne argues it has standing to challenge the Debtor Releases because an increase in what it will recover on their claim if the Debtor Releases are invalidated is not speculative or too far removed.  (*Id.*, at 17).  According to MercyOne, that the parties included releases for the Remote Released Parties shows there must have been claims against them.  (*Id.*, at 6).  MercyOne also argues that because a claim must be litigated and recovered does not indicate a claim is speculative; it is just part of the bankruptcy process.

9

*C.    Analysis*

MercyOne does not have standing to challenge the Third-Party Releases.

MercyOne successfully opted out of the Third-Party Releases. Because it did so, MercyOne never gave up its claims against the Released Parties. *See In re Tenopah Solar Energy, LLC*, 657 B.R. 393, 407 (D. Del. 2022) ("Appellants . . . are not impaired by the Plan's consensual third-party release given that they did not opt into this release."). MercyOne had the ability to pursue the claims it had against the Released Parties before the bankruptcy started, throughout the entirety of the bankruptcy proceedings, and— because it opted out of the releases—it still maintains the right to pursue its claims. Nothing in the Plan has altered or diminished MercyOne's right or ability to pursue those claims. Any decision by this Court about the Third-Party Releases will not alter MercyOne's ability to go after claims that it never lost in the first place.

MercyOne argues that even if its rights are not impaired because it opted out of the Third-Party Releases, it still has standing to challenge the Third-Party Releases because it is entitled to a plan that complies with the Bankruptcy Code under Section 1129(a)(1). (Doc. 40, at 13). According to MercyOne, the Third-Party Releases are not permissible after *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204 (2024), so any plan that includes the Third-Party Releases is not confirmable. The "person aggrieved" standard, however, requires something more than a general objection that a plan is not confirmable. Indeed, the entire purpose of the "person aggrieved" requirement is to efficiently administer bankruptcy proceedings by granting appellate standing only to those parties who have been directly harmed by a bankruptcy court's order. A general objection to a plan as unconfirmable, without showing how the party was harmed, does not meet this standard. As the Court has already discussed, MercyOne opted out of the Third-Party Releases and therefore has not suffered harm by their inclusion in the Plan.

MercyOne also does not have standing to challenge the Debtor Releases.

10

MercyOne argues that the total recovery on claims that could be pursued by the Liquidating Trust is diminished by the Debtors' release of the Remote Released Parties, which impacts MercyOne's distribution of Trust assets. For MercyOne to increase its recovery through the Debtors' claims against the Remote Released Parties, the Liquidating Trustee would have to identify a claim against a Remote Released Party, litigate and prevail on the claim, survive any appeal of the judgment, collect on the judgment, funnel the collection into the Liquidating Trust, and then disburse it to creditors. This is a lengthy process that requires several steps before MercyOne even has a chance of increasing its recovery from the Liquidation Trust. As MercyOne points out, though, this is exactly how bankruptcy proceedings work. The pursuit of such claims is one reason why bankruptcy courts appoint liquidation trustees like the Bankruptcy Court did here. The Court therefore agrees that the lengthy process through which all claims must necessarily go before the proceeds are distributed does not make a creditor's lost recovery on those claims too remote to confer standing under the person aggrieved standard.

The problem here, however, is that it is pure speculation whether there are any claims against the Remote Released Parties at all. MercyOne has not identified a single claim that the Debtors released that would have (or even could have) increased its recovery. "Speculative or hypothetical claims are insufficient to establish standing." *In re Citation Corp.*, 371 B.R. 518, 522 (N.D. Ala. 2007). Even if there is no requirement that MercyOne identify a specific claim to have standing, the record here shows MercyOne is only speculating there may be a claim. When the Bankruptcy Court asked MercyOne whether it had "anything to suggest there's a claim against any of those people you're talking about," MercyOne's counsel responded: "For purposes of today, I don't have anything I could put, concrete, before you. But I believe there are, probably." AA 769. A *belief* that there *probably* are claims is nothing more than speculation. In the

eight months following the Plan confirmation, MercyOne was still unable to point to a concrete example of a claim to convince either Judge Roberts in its request for a stay, or the Court here that there is a released claim that would increase its distribution. In fact, the representative for the Pensioners' Committee indicated during the confirmation hearing, admittedly not under oath, that she investigated possible claims against the released parties, but had not found anything that would increase the funds available for distribution. AA 722. The abstract possibility of a claim that might increase MercyOne's recovery does not satisfy the person aggrieved standard. *Opportunity Fin.*, 822 F.3d at 458.

For similar reasons, it is speculative to conclude that either the Debtor Releases or the Third-Party Releases will increase MercyOne's exposure to liability. Under this theory of harm, MercyOne would be the target of litigation because all the other relevant parties have already been released while MercyOne has not. *See* AA 111 (Art. II(A)(1.189)) (excluding MercyOne from definition of "Released Parties"). There is no indication, however, that there are any claims directed at MercyOne that it would not have otherwise faced had the Remote Released Parties not been released. Appellee merely posited this as one way MercyOne might argue it could be harmed by the Releases (although MercyOne has not raised the argument). The abstract possibility of increased claims against MercyOne does not satisfy the person aggrieved standard.

MercyOne argues it is not speculative to claim that it would receive increased distributions if the Debtors had not released the Remote Released Parties. According to MercyOne, that the Remoted Released Parties were included as an essential part of the Plan necessarily means there must have been some claims available or else the release of the Remote Released Parties would not be necessary. The Court disagrees. There are numerous reasons the relevant parties would want to include the Remote Released Parties in the Releases. For instance, releases can prevent frivolous claims from being lodged

against the Remote Released Parties. Including language that enjoins these claims prevents frivolous claims and advances the goals of finality and efficiency sought in bankruptcy proceedings. It does not necessarily mean there were in fact meritorious claims to be released; and indeed, as explained, MercyOne cannot identify any such claims.

MercyOne makes a final argument that its status as an impaired creditor *alone* confers standing to challenge the Debtor Releases and the Third-Party Releases. (Doc. 40, at 6–13). MercyOne primarily cites to Second Circuit caselaw for the proposition that there is a per se rule that automatically grants impaired creditors appellate standing in bankruptcy cases. *See, e.g.*, *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 642 (2d Cir. 1988) ("As a general rule, creditors have standing to appeal orders of the bankruptcy court disposing of property of the estate because such orders directly affect the creditors' ability to receive payment of their claims."); *In re DBSE N. Am.*, 634 F.3d 79, 89 (2d Cir. 2011) ("We have never demanded more to accord a creditor standing than that it has a valid and impaired claim.").

Other courts, however, have not gone so far as to create an absolute rule conferring standing for impaired creditors. *In re LTV Steel Co., Inc.*, 560 F.3d 449, 454 (6th Cir. 2009) ("[S]imply holding a claim of any type against the estate does not automatically confer appellate standing under the 'person aggrieved' doctrine."). While the Eighth Circuit adheres to the "person aggrieved" doctrine, it does not appear to have adopted a per se rule that grants an impaired creditor standing based on its status as an impaired creditor alone because, unlike the broad right of participation reflected in bankruptcy-level standing, the "person aggrieved" standard is much more restrictive and does not automatically apply to an entire class. *See In re AFY*, 734 F.3d 810, 824 (8th Cir. 2013) (citing *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 214 & n.21 (3d Cir. 2004) ("contrasting the 'restrictive' 'persons aggrieved' standard for 'bankruptcy appellate

standing . . . with the broad right of participation in the early stages of a bankruptcy proceeding' created by [Title 11, United States Code, Section 1109]")).

MercyOne cites a single bankruptcy court case from within the Eighth Circuit to support its claim that the Eighth Circuit follows the per se rule. (Doc. 40, at 8) (citing *In re Affiliated Foods, Inc.*, 249 B.R. 770 (W.D. Mo. 2000)). *In re Affiliated Foods* has a single conclusory line without any substantive discussion that states: "It is undisputed that Central States is the holder of an impaired claim and has standing to object to the plan." 249 B.R. at 787. This single line cannot support MercyOne's conclusion that the Eighth Circuit has a per se rule that all impaired creditors are persons aggrieved. Further, several Eighth Circuit cases have found creditors must show more than just their status as creditors to satisfy the person aggrieved standard. Though these cases do not distinguish between impaired and unimpaired creditors, they strongly suggest there is not a per se rule that confers appellate standing based on a class-wide status alone. *See, e.g.*, *In re Hecker*, 496 B.R. 541, 551 (B.A.P. 8th Cir. 2013) (finding an unsecured creditor did not have appellate standing because it was not specifically harmed by the bankruptcy court's order); *In re Mesaba Aviation, Inc.*, 418 B.R. 756, 761–62 (B.A.P. 8th Cir. 2009) (finding a claimant whose claim was disallowed by the bankruptcy court did not have standing to appeal). The Court finds that MercyOne's status as an impaired creditor is not enough to confer appellate standing on its own.

Thus, MercyOne does not have appellate standing to challenge either the Debtor Releases or the Third-Party Releases. Appellee's motion to dismiss the appeal is **granted** and the appeal is dismissed.

## IV.   *APPEAL OF CONFIRMATION ORDER*

Even if the Court found MercyOne has standing to appeal, the Court would still affirm the Bankruptcy Court's Plan confirmation.

14

To reiterate, MercyOne seeks review of Judge Collins' orders confirming the Plan and overruling MercyOne's objections because it believes the Debtor Releases and Third-Party Releases, insofar as they extend to the Remote Released Parties, are impermissible. MercyOne makes two main arguments in support of its appeal. First, MercyOne argues that the Third-Party Releases are barred by a recent Supreme Court case, *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204 (2024), because the Third-Party Releases apply to parties who did not affirmatively consent to the Releases. Second, MercyOne argues the Bankruptcy Court erred in overruling MercyOne's objection to the Debtor Releases and the Third-Party Releases because the Remote Released Parties cause the Plan to fail under Title 11, United States Code, Section 1129(a)(1).

Taking MercyOne's standing to appeal as given, the Court has jurisdiction over these questions under Title 28, United States Code, Section 158(a).

### A. Standard of Review

"On appeal from a decision of a bankruptcy court, the court sits as an appellate court and reviews the bankruptcy court's findings of fact for clear error and its conclusions of law de novo." *In re Agriprocessors, Inc.*, 547 B.R. 292, 298 (N.D. Iowa 2016). "A factual finding is clearly erroneous if, after examining the entire record, [the court is] . . . left with a definite and firm conviction that the bankruptcy court has made a mistake." *Id.* (alterations in original) (quoting *In re Bruess*, 539 B.R. 560, 564 (8th Cir. BAP 2015)). A bankruptcy court's conclusions involving mixed questions of law and fact are also reviewed de novo. *DeBold v. Case*, 452 F.3d 756, 761 (8th Cir. 2006).

### B. Confirmability in light of Harrington v. Purdue Pharma

MercyOne first argues the Third-Party Releases are barred by a recent Supreme Court case, *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204 (2024), thereby making the Plan unconfirmable.

In *Purdue*, the debtor Purdue Pharma L. P. ("Purdue"), "filed for bankruptcy after facing a wave of litigation for its role in the opioid epidemic." 603 U.S. at 209. Purdue's owners were members of the Sackler family, who "confronted a growing number of suits" related to the opioid epidemic as well. *Id*. The Sacklers were not debtors and did not file for bankruptcy, but agreed to contribute several billion dollars to the Purdue bankruptcy estate in exchange for a release and injunction barring current and future opioid-related claims against them. *Id*. at 209–11. The releases extended to lawsuits brought by opioid victims against the Sacklers. The Supreme Court held that the Bankruptcy Code did not endow a bankruptcy court the power to discharge the debts of a non-debtor (Sackler Family) without the consent of the affected non-debtor claimants (the opioid victims with lawsuits against the Sacklers). *Id*. at 227.

The Court in *Purdue*, however, went to great lengths to state that it was narrowly deciding the case based on the circumstances before it. The Court explicitly stated:

> As important as the question we decide today are the ones we do not. Nothing in what we have said should be construed to call into question *consensual* third-party releases offered in connection with a bankruptcy reorganization plan; those sorts of releases pose different questions and may rest on different legal grounds than the nonconsensual release at issue here. Nor do we have occasion today to express a view on what qualifies as a consensual release or pass upon a plan that provides for the full satisfaction of claims against a third-party nondebtor. Additionally, because this case involves only a stayed reorganization plan, we do not address whether our reading of the bankruptcy code would justify unwinding reorganization plans that have already become effective and been substantially consummated.

*Id*. at 226 (emphasis in original) (citation omitted). MercyOne encourages the Court to look at the holding and the "spirit" of *Purdue* to determine the Third-Party Releases are unenforceable. The "spirit" of *Purdue*, however, was explicitly limited to the facts of that case. The circumstances here are different from *Purdue* and involve the exact

16

circumstances the *Purdue* Court stated it was not addressing. Thus, *Purdue* does not control here.

For starters, *Purdue* involved a stayed reorganization plan. The *Purdue* Court explicitly stated that it was not addressing whether its decision would justify unwinding a reorganization plan that had already become effective and was substantially consummated. Unwinding a plan after it has been consummated poses serious administrative concerns and difficulties because some of the funds have already been disbursed and claims settled. Clawing back those funds and restarting the reorganization process is both impractical and costly. The *Purdue* Court did not need to determine whether the difficulties of unwinding a consummated plan outweighed the rights of the third parties, and it declined to do so.

Here, unlike in *Purdue*, the Plan was never stayed. MercyOne asked the Bankruptcy Court and this Court to stay the Plan. Both the Bankruptcy Court and the Magistrate Judge denied the stay request because they found any possible relief was speculative. Instead, the Plan moved forward. There is little doubt that the Plan here is broadly effective and has been at least partially consummated. The Debtors filed a Notice of Consummation and at least two status reports in which they report that they have, among other things: sold Debtors' interest in a senior living facility in exchange for approximately $1,650,000.00 for the Trust; continued collections of accounts receivable before the accounts go stale; made efforts to sell an unoccupied building in downtown Iowa City; made distributions of $20,436.600 to the Bond-Holders and $733,333.33 to the Pensioners; dealt with a large number of Administrative Claims; and "made various other payments as required." *See* AA 657; (Bankr. Doc. 1258); (Doc. 45). Unwinding even portions of what has already been consummated presents significant problems, and the circumstances here are thus vastly different than what the Supreme Court confronted in *Purdue*. Indeed, the challenges in unwinding a plan are precisely why the *Purdue*

17

Court did not address whether it would have made the same decision in a case in which those challenges were present.

Next, there is no evidence of pending litigation here like there was in *Purdue*. In *Purdue*, there were pending lawsuits by opioid users against the Sacklers that would have been wiped out by the third-party releases. Given the number of opioid users and overdoses in the United States and across the globe, it is also a virtual certainty that there were more lawsuits coming against the Sacklers. In other words, the third-party releases in *Purdue* released pending and real and identifiable potential claims. Here, there are no pending claims forfeited by the Third-Party Releases, nor is there any identifiable claim that could be brought in the future. As discussed, any claim that exists is purely speculative. Unlike in *Purdue*, the releases here are not giving up anything, and to argue otherwise is purely speculative.

Last, even if *Purdue* controls here, the Third-Party Releases are permissible because they are consensual releases. In *Purdue*, the Court stated it was not calling into question *consensual* releases, and post-*Purdue* parties may still be released through consent. Here, the Third-Party Releases are consensual because they contained a valid opt-out provision and because the voting class did not object to it.

When a claim holder has a clear and prominent explanation of the issues and the opt-out procedure and is given the opportunity to opt out, the release is consensual. *See In re Roman Catholic Diocese of Syracuse, N.Y.*, Case No. 20-30663-5-wak, Doc. 2308, at 5 (Bankr. N.D.N.Y. Nov. 14, 2024) (citing *In re LATAM Airlines Grp. S.A.*, No. 20-11254 (JLG), 2022 WL 2206829, at *46 (Bankr. S.D.N.Y. July 7, 2022)). Here, before a claim holder agreed to be bound by the Third-Party Releases, they received a copy of the Third-Party Releases and a Release Opt-Out Election Form explaining the consequences of opting in or opting out of the Third-Party Releases. AA 146–49. Each claim holder also received a pre-addressed envelope to return the Election Form. A claim

18

holder, therefore, only needed to check a box on the form, sign it, and return it in the pre-addressed envelope to successfully opt out of the Third-Party Releases. If the claim holder did not return the form, they were deemed to consent. This process provided claim holders and interest holders with a clear and prominent explanation of the opt-out procedure and gave them an opportunity to easily opt out. As another court aptly explained: "Inaction is action under appropriate circumstances. When someone is clearly and squarely told if you fail to act your right will be affected, that person is then given information that puts them on notice that they need to do something or else. That's not a trap." *In re Avianca Holdings S.A.*, 632 B.R. 124, 137 (Bankr. S.D.N.Y. 2021).

Not only did claim holders have the opportunity to decide whether to consent or opt out of the Third-Party Releases, the Unsecured Creditor Committee ("UCC") did not object to the Third-Party Releases. MercyOne is a member of the unsecured creditor class represented by the UCC. "[T]he creditors appointed to the creditors' committee have a fiduciary obligation to act in the interests of the members whom they represent." *In re Haskell-Dawes, Inc.*, 188 B.R. 515, 522 (Bankr. E.D. Pa. 1995); *see also In re Residential Cap., LLC*, 480 B.R. 550, 559 (Bankr. S.D.N.Y. 2006). In other words, the UCC "as a whole is not just a supporter, but a negotiator and proponent of the Plan and the Solicitation Procedures that include the opt-out mechanism." *In re Roman Catholic Diocese of Syracuse, N.Y.*, Case No. 20-30663-5-wak, Doc. 2308, at 9 (Bankr. N.D.N.Y. Nov. 14, 2024). That the UCC as a representative of an entire class of creditors, including MercyOne, did not object to the opt-out provision or the Third-Party Releases strongly supports a finding that the Plan is consensual and in the best interest of the unsecured creditor class.

Thus, the Court finds *Purdue* does not apply to the facts here, but to the extent *Purdue* applies at all, the Court finds it does not disallow the Third-Party Releases because the opt-out provision and approval by the UCC show the releases were

consensual. The Third-Party Releases do not make the Plan unconfirmable in light of *Purdue*.

### C. Master Mortgage *Factors*

Next, MercyOne argues the release of the Remote Released Parties is impermissible because the Remote Released Parties do not satisfy the *Master Mortgage* factors.

Here, the Bankruptcy Court concluded the releases of the Remote Released Parties were permissible. The Bankruptcy Court relied on the factors set forth in *In re Master Mortgage Investment Fund, Inc.*, 168 B.R. 930 (Bankr. W.D. Mo. 1994), to analyze the permissibility of the releases. The Bankruptcy found all the *Master Mortgage* factors supported the releases. MercyOne agrees that the *Master Mortgage* factors apply. (Doc. 19, at 17).

Courts in the Eighth Circuit apply the standards set forth in *Master Mortgage* to determine whether a non-debtor release (or an injunction preventing claims and suits against a non-debtor) is permissible. *See, e.g.*, *In re Riverbend Leasing LLC*, 458 B.R. 520, 527 (Bankr. S.D. Iowa 2011). *Master Mortgage* identified five factors that courts should consider, including:

(1) There is an identity of interest between the debtor and the third party, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete assets of the estate.

(2) The non-debtor has contributed substantial assets to the reorganization.

(3) The injunction is essential to reorganization. Without . . . it, there is little likelihood of success.

(4) A substantial majority of the creditors agree to such injunction, specifically, the impacted class, or classes, has "overwhelmingly" voted to accept the proposed plan treatment.

(5)     The plan provides a mechanism for the payment of all, or substantially all, of the claims of the class or classes affected by the injunction.

168 B.R. at 934–35 (footnotes omitted). "[T]hese factors do not appear to be an exclusive list of considerations, nor are they a list of conjunctive requirements." *Id.* at 935. Rather, they are the factors courts "seem to have balanced . . . most often" when engaging "in a fact specific review, weighing the equities of each case. *Id.*

The Court will consider each factor in turn.

### 1.     Identity of Interest

MercyOne argues the Bankruptcy Court erred in finding there was an identity of interest between the Debtors and Remote Released Parties. (Doc. 19, at 19–21). According to MercyOne, there is no evidence that the Remote Released Parties shared a "common goal" of affirming the plan. Not only was there no evidence, MercyOne also asserts that the identities of all the Remote Released Parties are not even known, and that "[t]he vast majority had nothing to do with the Bankruptcy, filed no claim, never appeared and did nothing at the confirmation hearing." (Doc. 41, at 10–11).

The Bankruptcy Court found there was an identify of interest between the Debtors and all the Released Parties under the Plan because they shared a common goal of confirming the plan and avoiding "immense and complex litigation." AA 475 (citing *In re Tribune Co.*, 464 B.R. 126, 187 (Bankr. D. Del. 2011), and *In re Seaside Engineering & Surveying, Inc.*, 780 F.3d 1070, 1079-80 (11th Cir. 2015)). The Bankruptcy Court also found the Debtors "presented unrefuted evidence and argument . . . that many of the Released Parties under the Debtors' releases had indemnity rights back against the Debtor." AA 476. The Bankruptcy Court did not explicitly conduct a separate analysis for the Remote Released Parties distinct from a general analysis of all Released Parties.

Identity of interest is a somewhat flexible concept. *See, e.g.*, *In re Tribune Co.*, 464 B.R. at 187 (finding that although the "record [was] unclear as to the extent of any

identity of interest between the Debtors and the Settling Parties based upon indemnification claims," they had a "common goal of confirming the [Plan]" that resulted in an identity of interest); *Master Mortg.*, 168 B.R. at 937 (finding an identity of interest when there was a settlement agreement that created a right of indemnity between the parties).

The Court agrees with the Bankruptcy Court that there was an identify of interest between the Debtors and the Key Parties who were granted releases. MercyOne does not appear to dispute the identify of interest between the Key Parties and the Debtors either. There is no evidence to the contrary, and nothing to suggest the Bankruptcy Court's finding was clearly erroneous as to the Key Parties.

The identity of interest is less clear between the Debtors and the Remote Released Parties. Chief Restructuring Officer Mark Toney ("Toney") gave unrefuted testimony explaining that the Key Parties would not have agreed to the Plan without releases that extend to the Remote Released Parties. AA 199–200; AA 379–81. Toney provided unrefuted testimony that many of the Remote Released Parties had indemnification agreements with the Key Parties, who in turn had indemnification obligations with the Debtors. Thus, any claim against a Remote Released Party could impact the Debtors and thereby establish an identify of interest. AA 698–99; *see also Master Mortg.*, 168 B.R. at 937; *In re Mercedes Homes, Inc.*, 431 B.R. 869, 879–80 (Bankr. S.D. Fla. 2009). Toney also admitted, however, that he had not reviewed each agreement the Key Parties had with the Remote Released Parties. AA 698–99. Toney also admitted he did not know the identity of each Remote Released Party. *See* (Doc. 41, at 11). It is a fair conclusion that based on this uncontradicted evidence there were at least some Remote Released Parties that had an identity of interest with Debtors. It is also fair to conclude, however, that there is no evidence that all did.

On balance, the Court finds this factor weighs slightly in favor of upholding the non-debtor releases, including as to the Remote Released Parties. The Bankruptcy Court's factual findings on this factor were erroneous to the extent the Bankruptcy Court found that Toney's testimony applied to all Released Parties when Toney admitted he did not know who all the Remote Released Parties were. Yet, the Bankruptcy Court's conclusion remains sound that all Released Parties share a common interest with the Debtors of confirming the Plan and avoiding immense and complex litigation—including the Remote Released Parties. *See In re Tribune Co.*, 464 B.R. at 187. And there is evidence that at least some Remote Released Parties have indemnification agreements with the Key Parties. *See Master Mortg.*, 168 B.R. at 937. Thus, this factor weighs slightly in favor of upholding the non-debtor releases.

### 2. *Substantial Contribution*

Next, MercyOne argues the Bankruptcy Court erred in finding that the Remote Released Parties contributed something to the Plan when the Bankruptcy Court found that "most parties receiving the benefit of the Debtors' release agreed to forego some right or possible right of recovery in exchange for the release." AA 476.

The Court agrees there was evidence that the Key Parties substantially contributed to the Plan, and there does not appear to be disagreement on that. Like with the first factor, however, whether the Remote Released Parties substantially contributed to the Plan is a closer call.

The only evidence in the record that the Remote Released Parties contributed to the Plan is, again, Toney's declaration. In his declaration, Toney states that the Key Parties contributed to the Plan in ways other than monetarily. For example, they provided "sweat equity" and helped guide the Debtors through a complex purchase by the University. AA 381–82. Toney does not, however, provide any testimony that the Remote Released Parties also contributed to the Plan. Toney references how some of the

23

Released Parties kept the Debtors' operation running during the University's acquisition. Toney was likely referring to at least some of the Remote Released Parties, who were on the ground keeping operations running during the acquisition. But again, Toney admits he does not even know the identity of all the Remote Released Parties, so there is no way his testimony about contributions to the Plan included all the Remote Released Parties. In other words, there is some thin evidence that some of the Remote Released Parties contributed to the Plan, but no evidence that others did too.

Much like the first factor, the Bankruptcy Court's factual findings and application of the second factor were not entirely erroneous because there was some unrefuted testimony that some Remote Released Parties contributed to the Plan. But the Bankruptcy Court erred to the extent it found that *most* Remote Released Parties contributed to the Plan when, in fact, we do not know who or how many released parties there are. On balance, the Court finds this factor weighs slightly in favor of upholding the non-debtor releases because there is evidence that at least some of the Remote Released Parties contributed to the Plan, albeit in nonmonetary ways.

### 3.    *Essential to Plan*

MercyOne argues that the Bankruptcy Court erred in finding that the releases of the Remote Released Parties were essential to the reorganization plan. (Doc. 19, at 22–24). MercyOne argues that even if the Releases were essential to plan confirmation, there is no evidence that the Remote Released Parties were essential to the efficacy of those Releases.

The Bankruptcy Court found that "[t]he evidence and undisputed arguments also show the Releases were critical to achieving the near-unanimous consent (other than MercyOne) to the Plan and its confirmation." AA 477. The evidence included unrefuted testimony that the releases were an essential component of the compromise, which likely would not have been reached without their inclusion. *See* AA 428.

24

Here, undisputed evidence in the record shows the Released Parties considered the Release as essential to confirmation. Toney provided testimony, subject to cross-examination, that the releases were necessary to getting a Plan confirmed. AA 726. Based on his personal knowledge of the negotiations, Toney testified that "[i]t was made very clear during the negotiations that without those releases, there would not be a settlement . . . I actually verified it with a couple of the key stakeholders." *Id.* Toney testified that the representative for the Pension Committee, Paula Roby, also insisted on the inclusion of the Releases. AA 722.

Toney's testimony extended to the Remote Released Parties. In fact, Toney was explicitly asked about the Remote Released Parties during re-direct examination. Toney responded that it was necessary for the Remote Released Parties to be released as well. AA 730. Toney's testimony shows why that necessity is not "farfetched," as MercyOne suggests. (Doc. 19, at 22). According to Toney, the Key Parties would be negatively impacted if there was a cause or claim against one of the Remote Released Parties "due to the fact that there would be recourse back to the original," i.e., the Key Parties. AA 730. "Especially officers, managers, consultants, attorneys would have recourse back to the original." *Id.* Toney explained that many of the Remote Released Parties had engagement letters with the Key Parties that included indemnification agreements, so the Key Parties may be responsible for claims against the Remote Released Parties. AA 730–31. Last, Toney testified that the Debtors worked with MercyOne to narrow the scope of the Remote Released Parties, but the Debtors were not willing to narrow it down any further than what was ultimately included in the Plan. There is no evidence in the record that refutes Toney's testimony.

Thus, the Court agrees with the Bankruptcy Court that the record shows the Releases, including the releases of the Remote Released Parties, were essential to Plan

25

confirmation. The Court finds the third factor weighs in favor of upholding the non-debtor releases.

### 4. Support for Plan

The fourth factor is "the single most important factor" and considers the creditors'—and specifically the impacted class's—approval for the Plan. *Master Mortg.*, 168 B.R. at 938. The Bankruptcy Court found that "[a]ll of the Voting Classes voted overwhelmingly in favor of Confirmation of the Plan after information about the releases was widely distributed through the Solicitation Process." AA 478.

The record is clear that there was overwhelming support for the Plan amongst all voting classes. AA 051. Each Voting Class approved of the Plan at rates ranging between 88% and 100%. *Id.* The lowest approval rate came from Class 3, which represents the general unsecured claims. Still, 88% of Class 3 voted in favor of the Plan. No class rejected the Plan.

MercyOne argues the fourth factor does not weigh in favor of appellees because MercyOne and "multiple other creditors did not vote to accept the Plan," and overwhelming support of the Plan does not save the releases in light of *Purdue*. (Doc. 41, at 14). There may be several creditors who did not approve of the Plan, but that does not somehow cancel out that many creditors did approve of the Plan. The fourth factor considers whether the voting classes "overwhelmingly" voted for the Plan. Here, they did.

The Court also thinks it is relevant that the United States Trustee supported, or at least did not object to, the Plan. The United States Trustee's objective is to promote the integrity and efficiency of the bankruptcy system for all stakeholders. The United States Trustee who currently oversees bankruptcy proceedings in the Northern District of Iowa has held this position for years and has a well-earned reputation of carefully monitoring proceedings and raising objections and concerns whenever warranted. The Court has

26

confidence that if the United States Trustee did not object to the Plan, there was likely little basis to do so.[4]

The Court therefore agrees with the Bankruptcy Court that this factor "provides strong support for approval of the release language." AA 478.

### 5.  *Claim Payments*

The last factor considers "whether the plan provides a mechanism for payment of all, or substantially all, of the claims of the class affected by the injunction." *In re U.S. Fidelis, Inc.*, 481 B.R. 503, 520 (Bankr. E.D. Mo. 2012). Courts often find this factor is met when a plan provides for a distribution to impaired creditors affected by releases that is greater than the distribution such creditors would receive under a Chapter 7 liquidation. *See In re Zenith Electronics Corp.*, 241 B.R. 92, 111 (Bankr. Del. 1999) ("The evidence on valuation clearly establishes that the $50 million distribution under the Plan to the bondholders would not be available in liquidation . . .."); *In re Matter of Fansteel Foundry Corp.*, No. 16-01825-als11, 2018 WL 5472928, at *12 (Bankr. S.D. Iowa Oct. 26, 2018) ("The plan provides a mechanism that realizes recovery for creditors who would receive no distribution under [C]hapter [7].").  The Bankruptcy Court found the impaired creditors would receive more under this Plan than they would under a Chapter 7 liquidation plan, and therefore this factor weighed in favor of the releases.

The evidence here shows that if this bankruptcy proceeding were to be converted to a Chapter 7 liquidation, the unsecured creditor class would receive nothing. *See* AA 214; AA 376–77.  Indeed, if converted to a Chapter 7 liquidation, only the Bondholders and some secured claims would receive payment.  AA 214.  The Plan provides greater

---

[4] This case is a far cry from the facts of *Purdue Pharma*, where fewer than 20% of eligible creditors participated in a poll on the proposed plan, "thousands of opioid victims voted against" the plan, and the United States Trustee, "charged with promoting the integrity of the bankruptcy system for all stakeholders, joined in these objections." *Purdue Pharma*, 603 U.S. at 212–13.

recovery for the unsecured creditors than it would under a Chapter 7 liquidation, which Toney testified would be the likely alternative if the Plan was not accepted.  AA 376–77.

Thus, the Court agrees with the Bankruptcy Court that the fifth factor favors the releases.

### 6. Conclusion

Although the Court finds here that the Bankruptcy Court did not apply the *Master Mortgage* criteria as it relates to the first two factors without some factual error, the Court finds the Bankruptcy Court did not commit legal error in finding the releases of the Remote Released Parties permissible.  While the first two factors do not clearly support the Releases, the other factors do.  Of particular importance is the fourth and most important factor regarding support of the Plan.  Here, there was such overwhelming support for the Plan that the fourth factor weighs heavily, and nearly insurmountably, in favor of allowing the Releases.

Indeed, courts consider other things as well, like whether the Plan will lead to a truly unfair result.  *U.S. Fidelis*, 481 B.R. at 520 (finding that it would be a "truly unfair result" if an objection to releases in a plan was sustained because doing so would cause the plan to fall apart and the case would be dismissed or converted to a Chapter 7 case). Achieving the Plan here was unlikely at the outset, but through diligent work and compromise the stakeholders were able to come up with a plan that had near unanimous consent.  To sustain the objection and cause the Plan to fail when the Plan had garnered such significant support would be unfair.

### D. Business Judgment Rule

Last, appellee argues that the releases satisfy the business judgment rule.  (Doc. 36, at 33).  MercyOne, however, argues the releases "cannot be saved by conclusory invocations of 'business judgment'" when the releases otherwise fail the *Master Mortgage* criteria.  (Doc. 41, at 15).

28

Here, the Court has already found that the releases of the Remote Released Parties satisfy the *Master Mortgage* factors and are enforceable. The *Master Mortgage* factors are supported by evidence in the record. There may be situations in which a release is protected by the business judgment rule when the *Master Mortgage* factors otherwise fail, but the Court does not have occasion to review that here because the *Master Mortgage* factors are satisfied.

## V.     CONCLUSION

For these reasons, appellee's motion to dismiss for lack of standing is **granted**. (Doc. 33). Even if the Court did not grant appellee's motion to dismiss, the Court would still affirm the Bankruptcy Court.

**IT IS SO ORDERED** this 3rd day of March, 2025.

_____
C.J. Williams, Chief Judge
United States District Court
Northern District of Iowa

29

# UNITED STATES DISTRICT COURT
### for the

Northern   District of   Iowa

| | |
|---|---|
| Mercy Health Network, Inc., d/b/a MercyOne | ) |
| *Appellant* | ) |
| v. | ) |
| Mercy Hospital, Iowa City, Iowa; Mercy Services | ) |
| Iowa City, Inc.; and Mercy Iowa City ACO, LLC | ) |
| *Appellees* | ) |

Civil Action No.   1:24-cv-68-CJW-MAR

## JUDGMENT IN A CIVIL ACTION

The court has ordered that *(check one)*:

☐ the plaintiff *(name)* _____ recover from the
defendant *(name)* _____ the amount of
_____ dollars ($ _____ ), which includes prejudgment
interest at the rate of _____ %, plus post judgment interest at the rate of _____ % per annum, along with costs.

☐ the plaintiff recover nothing, the action be dismissed on the merits, and the defendant *(name)* _____
_____ recover costs from the plaintiff *(name)* _____

☒ other:   Appellee's motion to dismiss for lack of standing is granted. _____

This action was *(check one)*:

☐ tried by a jury with Judge _____ presiding, and the jury has
rendered a verdict.

☐ tried by Judge _____ without a jury and the above decision
was reached.

☒ decided by Chief Judge _____ C.J. Williams _____ on a motion to   dismiss.

Date: _____ March 3, 2025 _____          *PAUL DE YOUNG, CLERK OF COURT*

_____
*Signature of Clerk or Deputy Clerk*

**1.179** "**Professional Fee Claim Objection Deadline**" shall have the meaning set forth in Article IV.D hereof.

**1.180** "**Professional Fee Estimate**" means (a) with respect to any Professional, a good-faith estimate of such Professional's anticipated accrued, unpaid Professional Fee Claims as of the Effective Date to be provided by each Professional in writing to the Debtors prior to the commencement of the Confirmation Hearing, or in the absence of such a writing, to be prepared by the Debtors, and (b) collectively, the sum of all individual Professional Fee Estimates.

**1.181** "**Professional Fee Reserve**" means the reserve of Cash funded by the Debtors and maintained by the Liquidation Trust for the benefit of Holders of Allowed Professional Fee Claims in an amount equal to the Professional Fee Estimate. The Professional Fee Reserve need not be maintained by the Liquidation Trust in a segregated account.

**1.182** "**Proof of Claim**" means the proof of claim that must be Filed before the Bar Date, the Governmental Bar Date, or the Administrative Expense Claim Bar Date, as applicable, which term shall include a request for payment of an Administrative Expense Claim.

**1.183** "**Pro Rata**" means, at any time, the proportion that the Face Amount of a Claim in a particular Class bears to the aggregate Face Amount of all Claims (including Disputed Claims, but excluding Disallowed Claims) in such Class, unless the Plan provides otherwise.

**1.184** "**Real Property Interests**" means the Debtors' real property interests in (a) Mercy Office Building II and (b) the adjacent parking lots.

**1.185** "**Real Property Sale Proceeds**" means the proceeds from any sale of the Debtors' Real Property Interests.

**1.186** "**Receivership Action**" shall have the meaning set forth in Article III.B.3 hereof.

**1.187** "**Reinstated**" means the treatment provided for in Bankruptcy Code section 1124.

**1.188** "**Rejection Bar Date**" means the deadline to File a Proof of Claim for damages relating to the rejection of an Executory Contract or Unexpired Lease, which is the later of (a) 30 days after the effective date of rejection of any unexpired lease or executory contract of the Debtors as provided by an order of the Court or pursuant to a notice under procedures approved by the Court, (b) any date set by another order of the Court, or (c) the Bar Date or the Governmental Bar Date, whichever is applicable.

**1.189** "**Released Parties**" means, collectively, the following Entities, each in their capacity as such: (a) the Debtors; (b) the UCC and each of its members (only in their capacity as such); (c) the Pension Committee and each of its members (only in their capacity as such); (d) the Bondholder Representatives; (e) the Foundation; (f) the Sisters of Mercy; and (g) with respect to any such Entity, in each case in its capacity as such with respect to such Entity, such Entity's current and former directors, managers, officers, predecessors, successors, affiliates, principals, members, management companies, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, and other professionals and advisors; *provided, however*, that Released Parties shall not include former officers and directors of the Debtors but shall include

**App.0755**

any of the Debtors' directors and officers that served in such role at any time between the Petition Date and the Effective Date; *provided further* that Released Parties shall not include MercyOne.

1.190   **"Releasing Parties"** means the following Entities, each in their respective capacities as such: (a) each Holder of a Claim that (i) votes to accept the Plan or (ii) either (1) abstains from voting or (2) votes to reject the Plan and, in the case of either (1) or (2), does not opt out of the voluntary release by checking the opt-out box on the applicable Ballot, and returning it in accordance with the instructions set forth thereon, indicating that they are electing to opt out of granting the releases provided in the Plan; (b) each Holder of a Claim that is deemed to accept the Plan or is otherwise Unimpaired under the Plan and who does not opt out of the voluntary release by checking the opt out box on the applicable non-voting status notice form, and returning it in accordance with the instructions set forth thereon, indicating that they are not willing to grant the releases provided in the Plan; and (c) each Holder of a Claim that is deemed to reject the Plan or is otherwise Impaired under the Plan and who does not opt out of the voluntary release by checking the opt-out box on the applicable non-voting status notice form, and returning it in accordance with the instructions set forth thereon, indicating that they are not willing to grant the releases provided in the Plan.

1.191   **"Response Letter"** shall have the meaning set forth in Article III.B.3 hereof.

1.192   **"Review"** shall have the meaning set forth in Article III.C.5 hereof.

1.193   **"Sale"** means the Debtors' sale of substantially all assets to the University.

1.194   **"Sale Order"** means the *Order (I) Approving the Sale of Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, (II) Authorizing the Assumption and Assignment of Contracts and Leases, and (III) Granting Related Relief* [Docket No. 476], entered on the Docket by the Court on November 7, 2023.

1.195   **"Sale Proceeds"** means the proceeds of the Sale.

1.196   **"Scheduled"** means, with respect to any Claim, the status and amount, if any, of that Claim as set forth in the Schedules.

1.197   **"Schedules"** means the schedules of assets and liabilities and the statement of financial affairs Filed by the Debtors on August 21, 2023 and August 22, 2023 [Docket Nos. 135, 136, 137] and the amended schedules Filed by the Debtors on December 28, 2023 [Docket No. 606], as such schedules and statements have been or may be supplemented or amended from time to time in accordance with Bankruptcy Rule 1009 or any orders of the Court.

1.198   **"Second Interim Cash Collateral Order"** means the *Second Interim Order Granting Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Use of Cash Collateral and Granting Adequate Protection; (II) Scheduling a Final Hearing on the Use of Cash Collateral; and (III) Granting Related Relief* [Docket No. 475], entered on the Docket by the Court on November 7, 2023.

1.199   **"Secured Claim"** means a Claim that is secured by a Lien on property in which the Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable

and controversies resolved pursuant to the Combined Disclosure Statement and Plan or relating to the contractual, legal and subordination rights that a Holder of a Claim or Interest may have with respect to any Claim or Interest, or any Distribution to be made on account of such Claim or Interest.  The entry of the Confirmation Order shall constitute the Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable and reasonable.

The Debtors expressly reserve the right (with Court approval, following appropriate notice and opportunity for a hearing) to compromise and settle any and all Claims against it and claims that it may have against other Persons and Entities at any time up to and including the Effective Date.  After the Effective Date, such right shall pass to the Liquidation Trust and shall be governed by the terms of the Plan and the Liquidation Trust Agreement.

**B.       Binding Effect**

The Combined Disclosure Statement and Plan shall be binding upon and inure to the benefit of the Debtors, all present and former Holders of Claims and Interests, whether or not such Holders shall receive or retain any property or interest in property under the Combined Disclosure Statement and Plan, and their respective successors and assigns, including, but not limited to, the Liquidation Trust and all other parties-in-interest in the Chapter 11 Cases.

**C.       Discharge of the Debtors**

Pursuant to Bankruptcy Code section 1141(d)(3), Confirmation shall not discharge Claims against the Debtors; *provided, however*, no Holder of a Claim or Interest may, on account of such Claim or Interest, seek or receive any payment or other Distribution from, or seek recourse against, the Debtors, the Liquidation Trust, or its respective successors, assigns, and/or property, except as expressly provided in the Plan.

**D.       Releases**

**1.       Debtor Release**

**Effective as of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtors, their Estates, and the Debtors' current and former Affiliates, successor, and assigns, including any successor to the Debtors or any Estate representative appointed or selected pursuant to Bankruptcy Code section 1123(b)(3), including the Liquidation Trustee, shall be deemed to forever release, waive, and discharge each of the Released Parties from any claim, Claim, Cause of Action, obligation, suit, judgment, damages, debt, right, remedy, liability, action, proceeding, suit, account, controversy, agreement, promise, right to legal remedies, right to equitable remedies, or right to payment, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising in law, equity, or otherwise, for any act or omission in connection with, relating to, or in any manner arising in whole or in part, the Debtors, the Debtors' operations, the Chapter 11 Cases, the Sale, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan, the business or contractual**

120

**App.0847**

arrangements between any Debtor and any Released Party, the Series 2011 Bonds, the Series 2018 Bonds, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions, the Plan Support Agreement, or the Combined Disclosure Statement and Plan, and the administration, formulation, preparation, dissemination, solicitation, negotiation, consummation, and implementation of any of the foregoing or any contract, instrument, release, or other agreement, understanding, accord, course of dealing, or document created or entered into in connection with or evidencing any of the foregoing, whether or not accrued, arising or having occurred, liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity, mixed, or otherwise, that may be based in whole or part on any act, omission, transaction, agreement, understanding, course of dealing, event or other occurrence or omission taking place on or prior to the Effective Date.

2.      **Third-Party Releases**

Effective as of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Releasing Parties shall be deemed to, completely, conclusively, absolutely, unconditionally, irrevocably and forever release, waive, and discharge the Released Parties from any claim, Claim, Cause of Action, obligation, suit, judgment, damages, debt, right, remedy, liability, action, proceeding, suit, account, controversy, agreement, promise, right to legal remedies, right to equitable remedies, or right to payment, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising in law, equity, or otherwise, for any act or omission in connection with, relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' operations, the Chapter 11 Cases, the Sale, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan, the business or contractual arrangements between any Debtor and any Released Party, the Series 2011 Bonds, the Series 2018 Bonds, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions, the Plan Support Agreement, or the Combined Disclosure Statement and Plan, and the administration, formulation, preparation, dissemination, solicitation, negotiation, consummation, and implementation of any of the foregoing or any contract, instrument, release, or other agreement, understanding, accord, course of dealing, or document created or entered into in connection with or evidencing any of the foregoing, whether or not accrued, arising or having occurred, liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity, mixed, or otherwise, that may be based in whole or part on any act, omission, transaction, agreement, understanding, course of dealing, event or other occurrence or omission taking place on or prior to the Effective Date.

E.      **Exculpation and Limitation of Liability**

Except as otherwise specifically provided herein, the Exculpated Parties shall not have or incur, and are hereby released and exculpated from, any liability, whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed,

1   A    Again, I'm not an attorney, but if that's your

2   interpretation, I agree.

3   Q    Well, you're here to talk about confirmation, right,

4   Mr. Toney?

5   A    That's correct.

6   Q    And one of the things you talked about in your declaration

7   was that you believe this release is -- meets the standards

8   that the courts in the Eighth Circuit have applied and

9   satisfies those substantively.  Is that a fair summary?

10  A    That's -- that is correct.

11  Q    All right.  And so in able -- for you to be able to do

12  that, you feel you have an understanding of what this provides,

13  right?

14  A    Yes.

15  Q    And that's what it provides.  That list of some 18

16  categories, they're being released of any claim and cause of

17  action and suit and right and anything else that's listed here,

18  right?

19  A    My understanding.

20  Q    All right.  And the liquidation trustee is not going to be

21  able to pursue them for any claim, suit, right, cause of action

22  that's been released?

23  A    My understanding.

24  Q    All right.  And it could go to things that people today

25  don't even know about.  Right?

1  A    That's my understanding.

2  Q    And when you think of what might be a claim, this would --

3  and I know you're not -- you're not a lawyer.  Is that correct?

4  A    That is correct.

5  Q    All right.  And so you can't purport to say this meets the

6  legal standards that courts in the Eighth Circuit have

7  followed.  Is that fair?

8  A    Based on consultation with our counsel, that's what my

9  declaration was based on.

10  Q    Right.  But to the extent you're opining in your

11  declaration that it does meet the standards, you're doing that

12  because you've spoken with counsel who's told you that's their

13  interpretation.  Is that right?

14  A    I'm not opining on legal matters.  That's correct.

15  Q    All right.  But you understand that -- and let me just

16  give a series of potential causes of action we sometimes see

17  arising out of bankruptcy.  You understand that with regard to

18  that list of released parties that the claims released would

19  include professional negligence.  It would include breach of

20  fiduciary duty, breach of contract, preference and fraudulent

21  transfer claims, correct?

22  A    Correct.

23  Q    All right.  Let's go to your declaration.  Tell me when

24  you have it available.

25        THE COURT:  Exhibit 1.

 1              MR. GOROFF:  It's Docket -- Exhibit 3, I believe.

 2              THE COURT:  Oh, yeah.  I'm sorry.  Exhibit 3.  I'm

 3   sorry.

 4   BY MR. GOROFF:

 5   Q    And I'm going to want you to look at Paragraph 29.

 6   A    Page number, sir?

 7   Q    I'm sorry.  It's at Page Number 12.

 8   A    Yes.

 9   Q    Are you there?  All right.  One of the things you say is,

10   "It is my view", and then you -- I'm going to take you to the

11   second sentence, and you say, "The Debtor Release has been a

12   critical aspect of the Plan since its inception and, in

13   ultimately agreeing to the Debtor Release contained in the Plan

14   and through the Plan Settlement, the Debtors, the UCC, and the

15   Pension Committee considered the value of the potential claims

16   and causes of action [and] proposed to be released against the

17   benefits of the Plan, the Plan Settlement, and the likely

18   recoveries to unsecured creditors."  That's a fair read of what

19   you said in that second sentence, correct?

20   A    If I may, let me just read the first two.

21   Q    Please.  Take your time.

22   A    That is correct.

23   Q    And you mention the debtors, the UCC, and the pension

24   committee.  Were you personally involved in that evaluation?

25   A    We did not do an investigation of claims against any of

1  those parties.  We assessed it based upon their collaboration

2  and working with us to develop the plan and their contributions

3  in the case.

4  Q    When you say "we did not do an investigation", do you --

5  when -- do you mean to include the debtors, the UCC, and the

6  pension committee?

7  A    I would say we did not do an investigation as the

8  debtors' -- chief restructuring officer for the debtors.

9  Q    Okay.  Did anyone do such an investigation?

10 A    I'm not aware of any.

11 Q    So when you speak of your view that it -- that there was

12 an assessment of the value of claims versus potential recovery,

13 your assessment of the value of claims is not based on anyone's

14 actual investigation of these claims.  Is that fair?

15 A    My assessment's based on that there were no allegations or

16 apparent reasons for allegations against those parties.

17 Q    But like -- but for example, one of the categories of

18 parties that's being released are consultants in 1.189, and

19 that would include the debtors' consultants pre-bankruptcy,

20 correct?

21 A    1.189 in the plan, sir?

22 Q    Yes.

23 A    It would include the consultants.

24 Q    Did anyone evaluate potential causes of action against

25 consultants to the debtors which may have arisen pre-

1  bankruptcy?

2  A    I'm not aware that there was an investigation into them,

3  and most of the situations where there are engagements of

4  consultants and advisors, there's typically indemnification.

5  And --

6           UNIDENTIFIED:  (Indiscernible).

7           THE COURT:  Somebody objecting?  Or somebody just

8  came online with -- from the phone, it sounds like.

9           No objection.  All right.  Whoever just spoke, you

10  were very audible in the courtroom.  If you could mute your

11  phone, please.

12          Go ahead.

13          THE WITNESS:  Typically, there is indemnifications in

14  those provisions, and so from the debtors' perspective, anyone

15  that's going to sue the consultants, advisors, actuaries, those

16  type of things, they're going to come back ultimately to the

17  released parties, and they'll have the responsibility.

18  Q    But you -- as we sit here today, you didn't look at any

19  particular pre-bankruptcy consultant's agreement, correct?

20  A    Can you restate that?

21  Q    As we sit here today, you hadn't, in preparation for your

22  declaration and testimony that you've given through the

23  declaration, looked at any of the debtors' pre-bankruptcy

24  consultants to see what their -- the terms of their agreements

25  said?

1   A    I've relied on counsel to help me with that.

2   Q    Okay  And I have the same question as to professionals.

3   Do you have -- you understand that all pre-bankruptcy

4   professionals, if there's a claim against them, those are being

5   released?

6   A    Can you repeat that, please?

7   Q    Yes.  As to pre-bankruptcy professionals, you understand

8   that all of the debtors' pre-bankruptcy professionals, if there

9   is a claim against them, it is also being released?

10  A    That's my understanding, yes.

11  Q    And you -- can you tell me how many such professionals

12  there were?

13  A    No.

14  Q    Do you know if any of the professionals in the -- who are

15  serving the debtors in the bankruptcy also had been

16  professionals before?

17  A    There were.

18  Q    Who would they be?

19  A    ToneyKorf Partners was pre-bankruptcy.  H2C, the

20  investment banker, was pre-bankruptcy.

21  Q    Anyone else?

22  A    Not that I can readily say, but those are the two apparent

23  ones that come to mind.

24  Q    And were you part of the evaluation of potential claims

25  against professionals?

 1  A    As I said, we didn't do a discovery.  We did not do a

 2  review of any potential claims.  We just looked at were there

 3  any allegations.

 4  Q    But you understand you would have a conflict of interest

 5  in -- as ToneyKorf in opining that a release is valuable if the

 6  release encompasses possible claims against your firm.  Right?

 7            MR. SIMON:  Objection to the extent that's calling

 8  for a legal conclusion.

 9            THE COURT:  Again, I'll use the same guidance.  So I

10  understand he's not an attorney, but he can say what his

11  understanding is and we can take that for whatever weight it

12  is.

13            THE WITNESS:  Thank you, Your Honor.

14            I do understand that would be a release for the

15  firms, that there would be a potential conflict of interest.

16  Our engagement was limited in timetable and services rendered

17  before the bankruptcy.

18  BY MR. GOROFF:

19  Q    Was anything done by the people who did evaluate claims

20  against pre-bankruptcy parties to address possible conflicts of

21  interest?

22  A    My knowledge.

23  Q    And it is your knowledge that the professionals in this

24  bankruptcy including your firm have been able to submit

25  requests for payment of their work and have been paid for their

1  work as they've done so?

2  A    Correct.

3  Q    So they aren't -- and as we sit here today, do you know of

4  any professional that is sacrificing some of the payment they

5  would be owed in this bankruptcy as part of getting this plan

6  confirmed?

7  A    I can't answer that yet because we're all subject to the

8  final fee applications and reviewed by the stakeholders in the

9  case.

10  Q    But as we sit here today, has anyone said, you know what?

11  I'm going to be like the bondholders, and I'm going to kick in,

12  you know, 50,000 that was going to go to my firm, but let's

13  donate it to unsecured creditors instead.  No one's done that,

14  right?

15  A    Not to my knowledge.

16  Q    Okay.  And again, putting aside those professionals who

17  may also have continued on -- H2C and you -- your firm -- you

18  know, there's lots and lots of professionals over the years.

19  We have no idea who they are, right?

20  A    Can you repeat the question?

21  Q    The debtors alone had many professionals prior to

22  bankruptcy, and we have no idea who these firms would be,

23  correct, or individuals?

24  A    That's correct.

25  Q    All right.  And we have no idea what claims might have

 1  arisen had these actually been investigated.  Correct?

 2  A    That's correct.

 3  Q    We do know those claims are being released?

 4  A    That is correct.

 5  Q    Okay.  You have done this kind -- the kind of chief

 6  restructuring officer and related work for many years in

 7  bankruptcies, correct?

 8  A    Yes.

 9  Q    It's been a commonplace where you sort of turn over the

10  work to a liquidation trustee in your experience in

11  bankruptcies, right?

12  A    Yes.

13  Q    And it's been your understanding that liquidation trustees

14  often have as part of their mandate to investigate potential

15  claims and then to bring those claims if they believe those

16  will increase returns to creditors and others?

17  A    Yes.

18  Q    And in this case, that's being short-circuited, at least

19  as to the released claims, right?  The liquidation trustee is

20  not going to have that opportunity?

21            MR. SIMON:  Objection.  Mischaracterizes his

22  testimony.

23            THE WITNESS:  I think that --

24            THE COURT:  Hold on.  Hold on a second.  I've got an

25  objection.

 1  A    According to the plan, it is projected that they will not

 2  be paid in full.

 3  Q    And Ms. Perlman, as you understand it, was accurate in

 4  saying that unsecured creditors would share in 60 percent of

 5  what the liquidation trustee brings in, in those recovery,

 6  right?

 7  A    That is my recollection.  Correct.

 8  Q    And the release potentially limits those recoveries?

 9  A    Yes.

10  Q    And I -- you know, I know we've gone through consultants

11  and professionals, but the same is true as to the debtors'

12  pre-bankruptcy attorneys, pre-bankruptcy agents, pre-bankruptcy

13  members, so on and so on, right?  If there's claims against

14  them, it's your understanding that those weren't specifically

15  investigated, and they weren't specifically valued, but they

16  are being released?

17  A    That is my understanding.

18  Q    Okay.  And you cannot, as we sit here today, talk about

19  the -- like, the number -- the value of the claims that are

20  being released is X or Y because no one really has done that

21  valuation?

22  A    The debtor has not done any review of potential claims.

23  Q    But as far as you know, neither has the pension committee,

24  neither has the Foundation, neither have the Sisters of Mercy.

25  None of the people have done that?

 1    A    I'm not aware.

 2    Q    All right.  And you talk about in your declaration, at

 3    Paragraph 33, when you talk about the third-party releases,

 4    that there's an identity of interest between the debtors and

 5    the released parties.  What do you understand "identity" to

 6    mean?

 7         Strike that.  When you say "identity", what do you mean?

 8    A    That there is a relationship between the parties.

 9    Q    A relation -- just a relationship?  Any kind?

10    A    There's a business relationship.  There was negotiations

11    going on.  It's a legal term.  I can't give you the exact legal

12    definition of "identity".

13    Q    But I think we've established -- as we sit here today, you

14    don't know if every employee, for example, of -- in the history

15    of the debtors had an indemnification agreement?

16    A    That is correct.

17    Q    And yet every employee is being released?

18    A    That is correct.

19    Q    And you don't -- you can't tell me what -- how many of

20    those employees are claimants in this bankruptcy?

21    A    I do not have it readily available, no.

22    Q    But you know it's not everyone, right?  Every employee,

23    right?

24    A    I'm sorry?

25    Q    Is it your testimony that every single employee in the