Appeal No. 25-1654

_____

**United States Court of Appeals for the Eighth Circuit**

_____

Mercy Health Network, Inc.,
d/b/a MercyOne,

*Appellant,*

v.

Mercy Hospital, Iowa City, Iowa *et al.*,

*Debtors-Appellees,*

Dan Childers, Successor Liquidation Trustee of the
Mercy Hospital Liquidation Trust,

*Trustee-Appellee.*

_____

Appeal from the United States District Court for
the Northern District of Iowa, Case No. 24-cv-00068

_____

**Trustee-Appellee's Brief**

_____

Eric Lam
Joseph Porter
SIMMONS PERRINE MOYER BERGMAN PLC
115 3rd Street SE, Suite 1200
Cedar Rapids IA 52401-1266
Telephone: 319-366-7641
Facsimile: 319-366-1917
elam@simmonsperrine.com
jporter@spmblaw.com
ATTORNEYS FOR APPELLEE DAN CHILDERS, SUCCESSOR LIQUIDATION
TRUSTEE OF THE MERCY HOSPITAL LIQUIDATION TRUST

# SUMMARY OF THE CASE

Through tremendous efforts, the appellee-entities comprising Mercy Hospital ("Debtors") transformed a highly contentious bankruptcy proceeding into a nearly universally-approved Chapter 11 Bankruptcy Plan ("Plan"). This resolution was made possible by cooperation among the Debtors and the other "key players"—the Bondholder Representatives, the Pension Committee, the Unsecured Creditors' Committee, and two non-profits, the Mercy Hospital Foundation and the Sisters of Mercy. Recognizing these parties' contributions, the Plan included Debtor Releases granted by the Debtors to the Released Parties, comprising the key players and persons related to them, and Third-Party Releases consensually granted by Holders of Claims to the Released Parties.

MercyOne, the lone objecting party at the Plan confirmation hearing, contends the Releases made the Plan unconfirmable. But MercyOne opted out of the Third-Party Releases, so it lacks standing to appeal them. And it lacks standing to appeal the Debtor Releases, because MercyOne cannot show the Debtor Releases harmed it in any way. Regardless, the Releases were properly confirmed. The *Master Mortgage* standards weigh in favor of confirmation. The ruling of the District Court should be affirmed.

The Liquidation Trustee requests 10 minutes of oral argument due to the complexity of the factual record.

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a), Dan R. Childers, in his sole capacity as Successor Liquidation Trustee of the Mercy Hospital Liquidation Trust, states that there is no publicly held corporation that owns 10% or more of an interest in the Trust.

Pursuant to Federal Rule of Appellate Procedure 26.1(c), the Trustee provides the following corporate disclosure for the Debtors:

- Debtor Mercy Services Iowa City, Inc. is wholly owned by Debtor Mercy Hospital, Iowa City, Iowa.

- Debtor Mercy Iowa City ACO, LLC is wholly owned by Debtor Mercy Hospital, Iowa City, Iowa.

There is no publicly held corporation that owns 10% or more of Debtor Mercy Hospital, Iowa City, Iowa.

# TABLE OF CONTENTS

SUMMARY OF THE CASE ..........................................................................i

CORPORATE DISCLOSURE STATEMENT.............................................ii

TABLE OF AUTHORITIES ................................................................... v

STATEMENT OF ISSUES PRESENTED .................................................. 1

STATEMENT OF THE CASE ................................................................. 2

    I.   Hard-Fought Negotiations Among the Key Players Produced a Plan that Drew Only One Objection. ................................................... 2

    II.  Relevant Plan Provisions.................................................................. 6

        A.  The Debtors Narrowed the List of Related Parties. .......................... 6

        B.  The Debtor Releases Maximize Value to the Estates. ....................... 7

        C.  The Third-Party Releases Are Consensual Opt-Out Releases. ............ 8

        D.  The Liquidation Trust Will Pay Litigation Recoveries to Unsecured Creditors. ...................................................................... 9

    III. The Confirmation Hearing Established the Releases Are Proper. .......... 9

    IV. The Bankruptcy Court Confirmed the Plan. ....................................... 11

    V.  The District Court Affirmed the Bankruptcy Court.............................. 13

    VI. MercyOne Refuses Full Payment of Its Claim. ................................... 14

SUMMARY OF THE ARGUMENTS........................................................ 14

ARGUMENTS ..................................................................................... 17

    I.   MercyOne Lacks Standing to Object to the Third-Party Releases and the Debtor Releases Because It Is Not a Person Aggrieved. .......... 17

        A.  MercyOne Lacks Standing to Appeal the Third-Party Releases Since It Opted Out of Them. ........................................................... 18

        B.  MercyOne Lacks Standing to Appeal the Debtor Releases Because Its Putative Possibility of Injury Is Too Speculative to Satisfy the Person Aggrieved Standard. ........................................... 23

        C.  Impaired Creditors Do Not Automatically Have Appellate Standing....................................................................................... 26

        D.  The Oversight Committee's Conduct Does Not Create Standing. .... 29

    II.  Consensual Third-Party Releases Are Permissible After *Purdue*. .......... 30

    III. The Releases Meet the *Master Mortgage* Guidelines. ........................... 36

        A.  There Is an Identity of Interest Between the Debtors and the Released Parties. .......................................................................... 38

    B.   The Released Parties Substantially Contributed to the Plan. ............ 41

    C.   The Third-Party Releases Are Essential to the Plan Because the Key Creditors Would Not Have Supported the Plan Without Them. ............................................................................................. 42

    D.   There Is Overwhelming Support for the Plan. ................................. 43

    E.   The Plan Provides Distributions to Creditors Affected by the Third-Party Releases....................................................................... 43

IV. Consensual Third-Party Releases Are Confirmable Without Satisfying the *Master Mortgage* Guidelines. .......................................... 44

V.  The Debtor Releases Satisfy the Business Judgment Rule. .................. 45

CONCLUSION ........................................................................................ 50

# TABLE OF AUTHORITIES

## Cases

*Cogley v. Hy-Vee Food Stores, Inc.*, 171 N.W.2d 310 (Iowa 1965).....................49

*Harrington v. Purdue Pharma L.P.*, 603 U.S. 204 (2024) ............ 16, 31, 32, 37, 38

*In Matter of The Watch Ltd.*, 257 F. App'x 748 (5th Cir. 2007) (unpublished)......................................................................................27

*In re 710 Long Ridge Rd. Operating Co., II, LLC*, No. 13-13653 (DHS), 2014 WL 886433 (Bankr. D.N.J. Mar. 5, 2014) ....................................39

*In re AFY*, 734 F.3d 810 (8th Cir. 2013) .................................................22, 30

*In re Bay Circle Props., LLC*, 955 F.3d 874 (11th Cir. 2020)...........................22

*In re Blitz U.S.A., Inc.*, Case No. 11-13603 (PJW), 2014 WL 2582976 (Bankr. D. Del. Jan. 30, 2014) ....................................................................38

*In re Bos. Harbor Marina Co.*, 157 B.R. 726 (Bankr. D. Mass. 1993)...............22

*In re Cap. Contracting Co.*, 924 F.3d 890 (6th Cir. 2019) .................................21

*In re Citation Corp.*, 371 B.R. 518 (N.D. Ala. 2007) ...................................24, 28

*In re Conseco, Inc.*, 301 B.R. 525 (Bankr. N.D. Ill. 2003) .....................22, 44, 45

*In re DBSD N. Am., Inc.*, 634 F.3d 79 (2d Cir. 2011)......................................28

*In re Dynegy, Inc.*, 770 F.3d 1064 (2d Cir. 2014).............................................21

*In re Elecs. & Metals Indus., Inc.*, 153 B.R. 36 (Bankr. W.D. Tex. 1992) ...................................................................................................22

*In re Exide Holdings, Inc.*, No. 20-11157-CSS, 2021 WL 3145612 (D. Del. July 26, 2021) ...................................................................................48

*In re GOL Linhas Aereas Inteligentes S.A.*, No. 24-10118 (MG), 2025 WL 1466055 (Bankr. S.D.N.Y. May 22, 2025)......................................45

*In re GOL Linhas Aereas Inteligentes S.A.*, No. 25CV4610 (DLC), 2025 WL 1591830 (S.D.N.Y. June 5, 2025).....................................................45

*In re GT Automation Grp., Inc.*, 828 F.3d 602 (7th Cir. 2016).....................26, 27

*In re Harie Ford, Inc.*, 764 F.3d 1321 (11th Cir. 2014) ....................................30

*In re Hecker*, 496 B.R. 541 (B.A.P. 8th Cir. 2013).........................................25

*In re Hercules Offshore, Inc.*, 565 B.R. 732 (Bankr. D. Del 2016) .................47, 50

*In re Levitt*, 632 B.R. 527 530 (B.A.P. 8th Cir. 2021)................................19, 25

*In re LTV Steel Co., Inc.*, 560 F.3d 449 (6th Cir. 2009) ...............................26, 30

*In re Mallinckrodt PLC*, 639 B.R. 837 (Bankr. D. Del. 2022).....................21, 45

*In re Mercedes Homes, Inc.*, 431 B.R. 869 (Bankr. S.D. Fla. 2009)..............38, 41

*In re Mercy Hosp.*, No. 23-00623, 2024 WL 2890139 (Bankr. N.D. Iowa June 7, 2024).................................................2, 12, 13, 40, 41, 44, 46

*In re Merrifield*, 214 B.R. 362 (B.A.P. 8th Cir. 1997)................................19, 20

*In re Millennium Lab Holdings II, LLC*, 591 B.R. 559 (D. Del. 2018)...........36, 38

*In re Nangle*, 288 B.R. 213 (B.A.P. 8th Cir.), *aff'd*, 83 F. App'x 141 (8th Cir. 2003) ......................................................................................... 19

*In re O&S Trucking, Inc.,* 811 F.3d 1020 (8th Cir. 2016) ................................. 19

*In re P.R.T.C., Inc.*, 177 F.3d 774 (9th Cir. 1999) ....................................27, 28

*In re Papio Keno Club, Inc.*, 262 F.3d 725 (8th Cir. 2001) ..................... 36, 46, 50

*In re Peabody Energy Corp.*, 958 F.3d 717 8th Cir. 2020).................................. 36

*In re Peoples*, 764 F.3d 817 (8th Cir. 2014) .................................................. 18

*In re Produce Hawaii, Inc.*, 41 B.R. 301 (Bankr. D. Haw. 1984)....................... 22

*In re Quincy Med. Ctr., Inc.*, No. 11-16394-MSH, 2011 WL 5592907 (Bankr. D. Mass. Nov. 16, 2011) ........................................................... 47

*In re Robertshaw U S Holding, Corp.*, 662 B.R. 300 (Bankr. S.D. Tex. 2024) ...................................................................................................31, 33

*In re rue21, Inc.*, 575 B.R. 314 (Bankr. W.D. Pa. 2017).................................. 41

*In re Seaside Eng'g & Surveying, Inc.*, 780 F.3d 1070 (11th Cir. 2015) .... 38, 39, 41

*In re Simply Essentials, LLC*, 640 B.R. 922 (Bankr. N.D. Iowa 2022), *aff'd*, 78 F.4th 1006 (8th Cir. 2023) ............................................................ 47

*In re Smallhold, Inc.*, 2024 WL 4296938 (Bankr. D. De. Sept. 25, 2024) .................................................................................................33, 34

*In re Spansion, Inc.*, 426 B.R. 114 (Bankr. D. Del. 2010) ................................ 48

*In re Tonopah Solar Energy, LLC*, 657 B.R. 393 (D. Del. 2022) ....................... 21

*In re Trib. Co.*, 464 B.R. 126 (Bankr. D. Del.), *on reconsideration in part*, 464 B.R. 208 (Bankr. D. Del. 2011), *aff'd sub nom. In re Trib. Media Co.*, 587 B.R. 606 (D. Del. 2018), *aff'd sub nom. In re Trib. Co.*, 972 F.3d 228 (3d Cir. 2020), and *aff'd in part sub nom. In re Trib. Media Co.*, 587 B.R. 606 (D. Del. 2018), and *aff'd sub nom. In re Trib. Co.*, 972 F.3d 228 (3d Cir. 2020)............................................... 39

*In re Trism*, 282 B.R. 662 (B.A.P. 8th Cir. 2002)............................................. 46

*In re U.S. Fidelis, Inc.*, 481 B.R. 503 (Bankr. E.D. Mo. 2012) ........................ 44

*In re Union Fin. Servs. Grp., In.c*, 303 B.R. 390 (Bankr. E.D. Mo. 2003) ............................................................................................................... 43

*In re Wigley,* 557 B.R. 678 (B.A.P. 8th Cir. 2016), *appeal dismissed*, 886 F.3d 681 (8th Cir. 2018) ........................................................................ 46

*In re Wigley*, 886 F.3d 681 (8th Cir. 2018) ........................................ 18, 20, 21

*In re Woodberry*, 629 B.R. 239 (Bankr. E.D. Mich. 2021) ............................ 47

*In re Wool Growers Cent. Storage Co..*, 371 B.R. 768 (Bankr. N.D. Tex. 2007) ............................................................................................................... 22

*In re Zenith Elecs.*, 241 B.R. 92 (Bankr. D. Del. 1999).............................39, 43

*Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988).................. 22, 27, 28

*Matter of Fansteel Foundry Corp.*, No. 16-01825-ALS11, 2018 WL 5472928 (Bankr. S.D. Iowa Oct. 26, 2018) ............................................. 43

*Matter of Highland Cap. Mgmt., L.P.*, 74 F.4th 361 (5th Cir. 2023).................. 29

*Matter of Ultra Petroleum Corp.*, No. 21-20049, 2022 WL 989389 (5th Cir. Apr. 1, 2022) ..................................................................................... 21

*Oberbillig v. W. Grand Towers Condo. Ass'n*, 807 N.W.2d 143 (Iowa 2011) ............................................................................................................... 47

*Opportunity Fin., LLC v. Kelley*, 822 F.3d 451 (8th Cir. 2016) ... 15, 18, 23, 25, 29

*Patterson v. Mahwah Bergen Retail Grp., Inc.*, 636 B.R. 641 (E.D. Va. 2022) ............................................................................................................... 21

*State v. Williams*, 315 N.W.2d 45 (Iowa 1982) ............................................. 49

*Talarico v. Ultra Petroleum Corp.*, 2020 WL 8361996 (S.D. Tex. Dec. 29, 2020) ......................................................................................................... 21

*TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021) ......................................... 22

*Truck Ins. Exch. v. Kaiser Gypsum Co., Inc.*, 602 U.S. 268 (2024) ..................... 30

## Statutes

11 U.S.C. § 1101(2)(C) ................................................................................... 31

11 U.S.C. § 1109(b) ........................................................................................ 22

11 U.S.C. § 1123(b)(3)..................................................................................... 46

## Rules

Fed. R. Bankr. R. 2004..................................................................................... 29

# STATEMENT OF ISSUES PRESENTED

1.     Whether MercyOne lacks standing to appeal the Third-Party Releases because it opted out of those releases and is in no way affected by them.

- *In re Wigley*, 886 F.3d 681 (8th Cir. 2018)

2.     Whether MercyOne lacks standing to appeal the Debtor Releases when any possibility of injury or recovery is so remote that the "person aggrieved" standard is not met.

- *Opportunity Fin., LLC v. Kelley*, 822 F.3d 451 (8th Cir. 2016)

- *In re Citation Corp.*, 371 B.R. 518 (N.D. Ala. 2007)

3.     Whether the Bankruptcy Court's correctly found facts supporting its ruling that the Debtor Releases and Third-Party Releases satisfy the *Master Mortgage* factors.

- *In re Master Mortg. Inv. Fund, Inc.*, 168 B.R. 930 (Bankr. W.D. Mo. 1994)

4.     Whether the Bankruptcy Court appropriately approved the consensual Third-Party Releases.

- *In re Robertshaw US Holding, Corp.*, 662 B.R. 300 (Bankr. S.D. Tex. 2024)

- *In re GOL Linhas Aereas Inteligentes S.A.*, No. 24-10118 (MG), 2025 WL 1466055 (Bankr. S.D.N.Y. May 22, 2025)

# STATEMENT OF THE CASE

## I. Hard-Fought Negotiations Among the Key Players Produced a Plan that Drew Only One Objection.

The Debtors' Chapter 11 Plan was the "result of extensive compromise and settlement talks between the key parties" to the proceeding. *In re Mercy Hosp.*, No. 23-00623, 2024 WL 2890139, at *6 (Bankr. N.D. Iowa June 7, 2024) ("*Mercy*"). Though ending in peace, a virtually consensual plan was hardly in the offing at the beginning of the Debtors' cases in August 2023. As Bankruptcy Judge Collins put it, from the outset there was "bad blood" among some of the key constituents of creditors and the Debtors. App. 1122; Bankr. R. Doc. 1148 at 14:13.[1] These key constituents of creditors are the (1) Bondholder Representatives, which hold a $62,000,000.00 claim; (2) the Unsecured Creditors' Committee ("UCC"), which represents the Debtors' several hundred unsecured creditors holding around $38,000,000.00 of allowed claims; and (3) the Pension Committee, representing the Debtors' thousand-plus pensioners who hold an estimated $7,900,000.00 to $29,500,000.00 of allowed claims. App. 799; Bankr. R. Doc. 1050 at 80. Together, these creditors hold over ninety-nine percent of the claims allowed against the Debtors.

These key creditors made substantial concessions in arriving at the Plan. As the Debtors' Chief Restructuring Officer ("CRO") Mark Toney explained in

---

[1] "Bankr. R. Doc." denote citations to the Bankruptcy Court record. "Dist. R. Doc." denote citations to the District Court record.

his declaration supporting Plan confirmation, the Plan incorporated a Plan Settlement among the UCC, the Pension Committee, and the Bondholder Representatives. App. 1020; Bankr. R. Doc. 1052 at 9 (¶24). This settlement "was struck after months of good faith negotiations" and provided for, among other things, (1) "a $1,000,000 contribution by the Bondholder Representatives" to benefit the General Unsecured Claims and Pension Claims; (2) a $1,500,000 limit on the Bondholder Representatives' ability to recover a deficiency claim; (3) an allocation to the General Unsecured Claims and Pension Claims of 60% of the proceeds of recoveries made by the Liquidation Trustee; and (4) an advance distribution of more than $750,000 for the benefit of the Pension Claims. App. 1020-21; Bankr. R. Doc. 1052 at 9-10 (¶25).

The CRO's declaration further explained he believed the Plan Settlement was essential to achieving a confirmable Plan and to obtaining recoveries for unsecured claimants. He stated:

- Without the Plan Settlement, the Bondholder Representatives, UCC, and Pension Committee would not vote for the Plan. App. 1021; Bankr. R. Doc. 1052 at 10 (¶25).

- Absent settlement, likely recoveries for unsecured claimants like the UCC and Pension Committee would be "unavailable." *Id.*

- The Debtors may need to convert to Chapter 7, resulting in "lengthy and protracted litigation by a chapter 7 trustee regarding various potential

claims and causes of action sought to be resolved by the Plan Settlement, among others." *Id.* Even if successful, the litigation would "result in recoveries (if collected) to unsecured creditors that, at best, would represent a small fraction of what is available to such creditors under the Plan, all without the costs, delay, and attendant risks to such recoveries." *Id.*

Beyond the Bondholder Representatives, UCC, and Pension Committee, two non-creditor key players were closely involved with the Debtors, the Plan negotiations, and the pre-confirmation sale process in which Debtors sold nearly all their assets to the University of Iowa. First is the Sisters of Mercy of the America's, Inc. ("Sisters of Mercy"), who established Mercy Hospital in 1873. App. 904; Bankr. R. Doc. 1050 at 185. During the bankruptcy proceeding, they provided "material benefits" to the Debtors, as detailed in the CRO's declaration. App. 1026; Bankr. R. Doc. 1052 at 15. In particular, the Sisters of Mercy "dedicated significant time and attention to restructuring matters" and were "instrumental in negotiating, formulating, and implementing the sale and transactions contemplated by the Plan." App. 1026; Bankr. R. Doc. 1052 at 15.

The second additional key player is the Mercy Hospital Foundation (the "Foundation"). The Foundation is a non-profit organization, with Mercy Hospital as its sole member, whose purpose is to, among other things, support Mercy Hospital and the Sisters of Mercy by "providing financial and facility

assistance[.]" App. 762; Bankr. R. Doc. 1050 at 43. To that end, the Foundation solicited and received donations for the purpose of supporting Mercy Hospital. App. 762; Bankr. R. Doc. 1050 at 43. In the bankruptcy case, the Foundation entered into a settlement agreement with the Debtors to release $2.2 million of "unrestricted" funds to Mercy Hospital to cover operational expenses. App. 785; Bankr. R. Doc. 1050 at 66. Pursuant to the Plan, the Foundation was dissolved when the Plan became effective on June 24, 2024. App. 831; Bankr. R. Doc. 1050 at 112 (Art. IX(O)); App. 1451-53; Bankr. R. Doc. 1139 at 1-2.

In return for the key parties' contributions, and in order to "implement" the Plan Settlement, the Plan contains the Debtor Releases and Third-Party Releases. App. 1022; Bankr. R. Doc. 1052 at 11. These are "integral components" of its provisions, as Toney noted and as Judge Collins concluded in his ruling. *Mercy* at *1; App. 1022; Bankr. R. Doc. 1052 at 11 (¶27). They are discussed below.

Given the sacrifices by the key players, the Plan won overwhelming support from the Voting Classes, with approval ranging from 88% to 100% in number of votes and 91.7% to 100% in votes weighted by value of the voters' claims. App. 697; Bankr. R. Doc. 1037 at 7. When Judge Collins approved the Plan, there was only one pending objection—that of MercyOne. MercyOne was Mercy Hospital's former manager, whose approximate $31,000 claim constitutes around 0.02% of the total amount of allowed claims. App. 670-690;

Bankr. R. Doc. 1016; App. 731-38; Bankr. R. Doc. 1050 at 12-19 (summary of claims).

## II. Relevant Plan Provisions.

### A. The Debtors Narrowed the List of Related Parties.

MercyOne objected to the Plan because it felt the Plan's definition of "Released Parties" was overbroad. App. 675; Bankr. R. Doc. 1016 at 6. Taking that objection into account, the Debtors narrowed down the scope of the releases, but they did not eliminate the release for the Related Parties altogether. App. 1075; Bankr. R. Doc. 1053 at 27 (¶53). That is because winnowing the list even further would have opened "an opportunity to bring actions against the Related Parties, thereby undermining the effectiveness of the Plan's release provisions." App. 1075; Bankr. R. Doc. 1053 at 27 (¶53).

As confirmed, the Released Parties include each of the six key players as well as the following Related Parties. MercyOne objects to the Releases only because they release these Related Parties:

> (g) with respect to any such Entity [the Debtors, the UCC and its members solely in that capacity, the Pension Committee and its members solely in that capacity, the Bondholder Representatives, Mercy Foundation, and the Sisters of Mercy] in each case in its capacity as such with respect to such Entity, such Entity's current and former directors, managers, officers, predecessors, successors, affiliates, principals, members, management companies, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, and other professionals and advisors[.]

(the "Related Parties"). App. 755; Bankr. R. Doc. 1050 at 36 (Plan Art. II(A)(1.189)).

The Released Parties do not include the Debtors' former officers and directors who did not serve in their roles during the pendency of the Debtors' bankruptcy, nor does it include MercyOne. *Id.* Debtors believe they have $4,000,000 of avoidance actions (among other claims and lawsuit theories) against MercyOne.

**B. The Debtor Releases Maximize Value to the Estates.**

The Debtor Releases describe the claims, causes of action, and other rights the Debtors released against the Released Parties as of the June 24, 2024 Effective Date. App. 847-48; Bankr. R. Doc. 1050 at 128-29 (Art. XIV(D)(1)). Generally, under this provision the Debtors released the Released Parties for any claim arising out of "any act or omission" taken "in connection with" the Debtors, the transactions in the bankruptcy, and certain events pre-bankruptcy. *Id.* The Debtors' CRO concluded the Debtor Releases represented a reasoned application of the Debtors' business judgment. The UCC and the Pension Committee weighed the "value of the potential claims and causes of action proposed to be released against the benefits of the Plan, the Plan Settlement, and the likely recoveries to unsecured creditors[,]" and found the Plan provided more benefit to the Estates. App. 1023; Bankr. R. Doc. 1052 at 12 (¶29).

## C. The Third-Party Releases Are Consensual Opt-Out Releases.

The Third-Party Releases give Holders of a Claim the option of either (1) voting in favor of the Plan and granting the Third-Party Releases or (2) abstaining from voting or voting against the Plan and opting out of the Third-Party Releases. App. 756; Bankr. R. Doc. 1050 at 37 (Art. II(A)(1.190)). If a Holder of a Claim did not avail itself of the opportunity to opt out of the Third-Party Releases, the claimant granted the Third-Party Releases. *Id.*

The Plan ensured a Holder of a Claim could make an informed decision whether to accept the Third-Party Releases. General Unsecured Creditors, for instance, were provided a Solicitation Package comprising, among other things, the Combined Plan and Disclosure Statement and a ballot. App. 504; Bankr. R. Doc. 926 at 9 (¶17); App. 693; Bankr. R. Doc. 1037 at 3 (¶6). The ballot stated in bolded, all-caps text that the Plan contained Third-Party Releases and excerpted the relevant Release provisions across three pages of bold font. App. 573-76; Bankr. R. Doc. 926 at 78-81. Then, immediately before the opt-out box, the ballot clearly explained in capitalized text the effect of the Third-Party Releases if the claimant voted for the Plan, if the claimant voted against the Plan, or abstained from voting without opting out of the releases. App. 577; Bankr. R. Doc. 926 at 82. To opt out, the Holder of a Claim merely had to check a box on the form and then sign and return it with the pre-addressed envelope or submit an E-ballot through an online portal. App. 577-79; Bankr. R. Doc. 926 at 82-84.

"MercyOne voluntarily and unequivocally opted out of the Third-Party Releases[.]" *Mercy*, at *3.

### D. The Liquidation Trust Will Pay Litigation Recoveries to Unsecured Creditors.

The Plan funneled all un-released lawsuit claims and other assets into a Liquidation Trust. App. 750; Bankr. R. Doc. 1050 at 31 (Art. II(A)(1.125)); App. 832, 833; Bankr. R. Doc. 1050 at 113, 114 (Art. X(A), (C)). The Liquidation Trustee has the power to prosecute these litigation claims. App. 835-37; Bankr. R. Doc. 116-18 (Art. X(I)(1)). If a pursuit-worthy claim exists, and if the Trustee chooses to litigate it, and if he succeeds, and if he recovers from the defendant, and if the judgment survives appeal, then 60% of the Litigation Claims Recovery amount will be distributed by the Trustee to unsecured claimholders (such as MercyOne), App. 759; Bankr. R. Doc. 1050 at 40 (Art. II(A)(1.237)), and 40% will go to the Bondholders. App. 742; Bankr. R. Doc. 1050 at 23 (Art. II(A)(1.27)).

## III.   The Confirmation Hearing Established the Releases Are Proper.

At the confirmation hearing, Toney, the Debtors' CRO, submitted a declaration and provided testimony supporting the Debtor Releases and Third-Party Releases. Toney was well-positioned to provide this evidence. He has 37 years of experience in financial restructuring with a "significant emphasis" on the healthcare industry. App. 7; Bankr. R. Doc. 27 at 7 (¶13). Beginning in January 2023, he provided the Debtors with financial advisory services, and

became Mercy Hospital's CRO in April 2023, four months before the Debtors filed for bankruptcy. App. 7; Bankr. R. Doc. 27 at 7 (¶14). In this capacity, he was involved with the Debtors' pre-petition restructuring efforts. App. 7; Bankr. R. Doc. 27 at 7 (¶14). During the bankruptcy proceedings he continued to actively participate in the Debtors' negotiations with the key creditors noted above. App. 1020; Bankr. R. Doc. 1052 at 9 (¶24); App. 1240; Bankr. R. Doc. 1145 at 132:1-10. Thus, Toney's extensive involvement with the negotiations and other discussions with the key players gave him an intimate knowledge of the Debtors' business, the stakeholders' demands, and the viability of the Plan.

Backed by this extensive experience, Toney testified at the confirmation hearing that he relied on Debtors' counsel when assessing the claims and other matters related to the Releases. *E.g.*, App. 1138; Bankr. R. Doc. 1145 at 29:15-30:9. He also testified there had been "[v]ery" extensive negotiations among the Debtors, the UCC, the Pension Committee, and the Bondholders in which the stakeholders' "different interests" had to be "balance[d]" against each other to reach consensus on the Plan. App. 1166-68; Bankr. R. Doc. 1145 at 58:17-60:3. This collaboration was significant for the Releases, because these parties approved the Releases even though they would have received 40%–60% of the recoveries from any claims exempted from the Releases. *E.g.*, App. 1150; Bankr. R. Doc. 1145 at 42:3-9. So in "assess[ing]" the Releases, the Debtors relied on the key players' cooperative efforts and on the fact these parties, who were

incentivized to uncover claims subject to the Releases, did not allege any such claims existed. App. 1140; Bankr. R. Doc. 1145 at 32:1-2, 15-16; App. 1145; Bankr. R. Doc. 1145 at 37:1-3; App. 1148; Bankr. R. Doc. 1145 at 40:15-25. For example, the attorney for the Pension Committee represented she had "undertaken an investigation of potential causes of action" but nonetheless "insiste[d]" that the releases be included in the Plan. App. 1164; Bankr. R. Doc. 1145 at 56:14-57:23.

Further, Toney reasoned even if such causes of action existed, there are typically indemnification provisions in Related Persons' agreements with the Debtors that would "ultimately" bring liability back to the Debtors. App. 1141; Bankr. R. Doc. 1145 at 33:13-17. In addition, Toney drew on his 37 years of experience in financial restructuring to form the judgment that he would not "wast[e] the estate's money on pursuing" claims unsupported by any "allegations" or "assertions" of wrongdoing. App. 1153-54; Bankr. R. Doc. 1145 at 45:17-46:7. He did not see the "benefit" in that kind of pursuit. App. 1153-54; Bankr. R. Doc. 1145 at 45:17-46:7.

## IV. The Bankruptcy Court Confirmed the Plan.

On June 7, 2024, Judge Collins overruled MercyOne's objections to the Debtor Releases and the Third-Party Releases. The Bankruptcy Court found inclusion of the Releases in the Plan was an appropriate exercise of the Debtors' business judgment because the Releases were, as the Debtors' evidence showed,

"a product of good faith, arm's-length negotiations, and were a material and necessary precondition for the key parties in the case to support the Plan." *Mercy* at *7. Indeed, the "most persuasive evidence" to the Bankruptcy Court was that "[t]he key parties, particularly the Bondholders, also reiterated at the Confirmation Hearing that, but for the inclusion of the Releases, they would not have voted in support of the Plan." *Id.*; *see id.* (noting the "gravity of having a consensual Plan" despite the "palpable" "animosity between Debtors and the multiple constituent groups" early in the case). Because MercyOne "offered no evidence beyond conclusory allegations" that the releases exceeded the Debtors' business judgment, the Court denied and overruled MercyOne's objection. *Id.*

The Bankruptcy Court made two additional rulings on the Third-Party Releases. It first found MercyOne lacked standing to object to those releases. "MercyOne voluntarily and unequivocally opted out of the Third-Party Releases in the plan, meaning MercyOne is not bound by the provisions of the Plan that prevent a non-Debtor party like MercyOne from pursuing its own claims against the released parties." *Id.* at *3. Since MercyOne was not affected by the Third-Party Releases, it did not have standing to dispute them.

Then the Bankruptcy Court held even if MercyOne had standing, the Third-Party Releases would satisfy the *Master Mortgage* guidelines. *Id.* at *3-*7. In doing so, it made the following factual findings:

1) *Identity of interest*: "[T]he Court finds that there is an identity of interest between Debtors and the Released Parties. Particularly persuasive is

the fact that these releases were integral to the consesual [*sic*] nature of the Plan and necessary to avoid the prospect of immense and complex litigation absent the releases." *Id.* at *4.

2) *Substantial contribution*: "The evidence also showed that most parties receiving the benefit of the Debtor's release agreed to forego some right or possible right of recovery in exchange for the release. In doing so, these parties provided assurance that the Releases would both eliminate a risk of adverse result for the Debtor and allow the Debtor to avoid any further expense in pursuing those issues on which Debtor received concessions. Both of these elements provide substantial contribution to the estate." *Id.* at *5.

3) *Essential to the Plan*: "The evidence and undisputed arguments also show the Releases were critical to achieving the near-unanimous consent (other than MercyOne) to the Plan and its confirmation. Multiple major constituents, including most notably the Bondholders and the Pensioners, explicitly noted that their support of the Plan was dependent on Debtors' inclusion of the released parties." *Id.*

4) *Overwhelming support for the Plan*: "All of the Voting Classes voted overwhelmingly in favor of Confirmation of the Plan after information about the releases was widely distributed through the Solicitation Process." *Id.*

5) *Payment of claims*: "Finally, it is undisputed that the Plan here provides for distributions to parties affected by the releases." *Id.*

## V.    The District Court Affirmed the Bankruptcy Court.

The District Court affirmed the confirmation order. Granting the Liquidation Trustee's motion to dismiss, it held MercyOne lacked standing to appeal both the Third-Party Releases and the Debtor Releases. App. 1615-1643; Dist. R. Doc. 47. MercyOne's choice to opt out of the Third-Party Releases deprived it of standing to appeal them. App. 1624; Dist. R. Doc. 47 at 10. And MercyOne's inability to identify "a single claim" against the Related Parties that

the Liquidation Trustee could have, but for the Debtor Releases, leveraged to increase MercyOne's distributions under the Plan divested MercyOne of standing to appeal the Debtor Releases. App. 1624; Dist. R. Doc. 47 at 10. Alternatively and irrespective of MercyOne's lack of standing, the District Court found the Releases were consensual and that each of the *Master Mortgage* factors weighed in favor of the Third-Party Releases and the Debtor Releases. App. 1628-1642; Dist. R. Doc. 47 at 14-28.

## VI.  MercyOne Refuses Full Payment of Its Claim[2].

On May 5, 2025, the Liquidation Trustee tendered full payment of MercyOne's claim. Reply Supp. Appellee Mot. to Dismiss Ex. E; Bankr. R. Doc. 1919 at 1-2 (¶3). The offer was reasonable, since the amount expended in defending MercyOne's appeal easily outstrips the meager value of its claim. MercyOne rejected the tender. On June 16, 2025, the Liquidation Trustee moved the Bankruptcy Court to compel MercyOne to accept the payment. The Bankruptcy Court has not ruled on the motion as of July 30, 2025.

## SUMMARY OF THE ARGUMENTS

I.A. MercyOne lacks standing to appeal the Third-Party Releases. To have standing in this bankruptcy appeal, MercyOne must be a "person aggrieved" by

---

[2] By filing this Brief, Appellee does not waive and does not concede and instead does preserve and does reserve any and all right, theory, argument etc. with respect to the tender of full payment to MercyOne, and with respect to all claims, rights, remedies, etc. against MercyOne.

the Third-Party Releases, meaning it must be "directly and adversely" affected by the Third-Party Releases. *Opportunity Fin., LLC v. Kelley*, 822 F.3d 451, 458 (8th Cir. 2016). MercyOne is not directly and adversely affected by the Releases because it opted out of them, so it is as free to sue the Released Parties after the entry of the confirmation order, just like it was free to do before the confirmation order entered.

I.B. MercyOne also lacks standing to appeal the Debtor Releases because it is not "directly" affected by them. This is so because any connection between those releases and any possible increase in distribution for MercyOne if there were no Debtor Releases is not direct, and MercyOne has provided no evidence of this remote eventuality, *viz.* the only way MercyOne could be impacted by those releases is if a long chain of multiple uncertain events would occur without the Debtor Releases, beginning with MercyOne identifying a cause of action covered by the Debtor Releases and ending with the Liquidation Trustee collecting on a judgment from that action and making a *pro rata* distribution to MercyOne. That is, (i) lawsuits have to be filed, (ii) the plaintiff needs to win at trial, (iii) survive an appeal, (iv) then the plaintiff has to collect, (v) then the plaintiff needs to pay the fees and expenses associated with the trial and appeal, and then, and only then, (vi) will any net recovery be available for distribution to the general unsecured claim pool, in which MercyOne has approximately 0.2% interest. MercyOne has tendered no evidence of such a speculative

outcome, and in any event the possibility and potential of recovery to MercyOne is so remote and minute that any injury does not and cannot possibly satisfy the "person aggrieved" standard.

II. The Third-Party Releases are permissible after *Purdue Pharma*. *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204 (2024). First, *Purdue Pharma* expressly stated it does not bind plans like the one here, which are and have been effective and substantially consummated. *Id.* at 226. Second, *Purdue Pharma* is factually distinguishable from the Debtors' bankruptcies, because the record does not show any lawsuits filed against the Related Parties and because *Purdue Pharma* involved a magnitude of claim amounts not matched here. Finally, even if *Purdue Pharma* somehow does apply, third-party releases are still allowed so long as the releases were conspicuously disclosed to all creditors, and every creditor had the opportunity to opt out of the release.

III. The Releases meet the five *Master Mortgage* guidelines. *In re Master Mortg. Inv. Fund, Inc.*, 168 B.R. 930, 935 (Bankr. W.D. Mo. 1994). There is an "identity of interest" among the Released Parties and the Debtors because they all worked toward the common goal of Plan confirmation and because many Released Parties have indemnity rights against the Debtors. The Released Parties "substantially" contributed to the Plan in several ways, including making concessions and contributing sweat equity. The Releases are "essential" to the Plan because without the Releases the Plan would not have received almost-

unanimous support. Finally, the Plan made meaningful distributions to the creditors affected by the Releases.

IV. Consensual third-party releases, such as those in the Plan, are confirmable without engaging in the *Master Mortgage* analysis. That analysis was calibrated to check potential misuses of involuntary third-party releases. Because there are no non-consensual releases in the Plan, *Master Mortgage* need not be satisfied.

V. The Debtors' decision to include the Debtor Releases in the Plan is protected by the business judgment rule. MercyOne has not overcome the presumption the business judgment rule favors approval of the Debtors' decision; the Debtors drew on their extensive experience when including the Debtor Releases; the Debtor Releases were a crucial part of negotiations conducted at arm's length with the parties the Debtors were releasing; and the Debtors relied on counsel when placing the Debtor Releases in the Plan.

## ARGUMENTS

### I. MercyOne Lacks Standing to Object to the Third-Party Releases and the Debtor Releases Because It Is Not a Person Aggrieved.

MercyOne does not have standing to appeal the Third-Party Releases because it is not directly and adversely affected by them. The reason MercyOne is not directly and adversely affected by the Third-Party Releases is because MercyOne voluntarily opted out of them. MercyOne is also not directly and adversely affected by the Debtor Releases, because any alleged injury from them

is too speculative and far off. As a result, MercyOne has no financial stake in the Releases and MercyOne lacks standing to appeal. Regardless, MercyOne's rejection of the full payment of its claim shows its purported injury is an illusion anyway: MercyOne's real complaint is it was not released from the millions of dollars of claims the Debtors (and now the Appellee) have against it. Indeed, this appeal is merely an attempt to extract such a release from the Liquidation Trustee.

"Whether an appellant is a person aggrieved is generally a question of fact for the district court, but where the facts are undisputed, this court may treat the question as an issue of law." *Opportunity Fin.*, 822 F.3d at 457-58.

## A. MercyOne Lacks Standing to Appeal the Third-Party Releases Since It Opted Out of Them.

"[S]tanding in a bankruptcy appeal is narrower than Article III standing." *In re Wigley*, 886 F.3d 681, 684 (8th Cir. 2018) (citation omitted). In the context of a bankruptcy appeal, a party has standing to appeal an order of a bankruptcy court **only if** the party is a "person aggrieved" by the order. *In re Peoples*, 764 F.3d 817, 820 (8th Cir. 2014). A person is aggrieved by a bankruptcy court order if the person has a "financial stake" in the order such that "they were directly and adversely affected pecuniarily by" it. *Opportunity Fin.*, 822 F.3d at 458 (citation omitted). Stated otherwise, an "appellant is a party aggrieved 'if the bankruptcy court order diminishes the person's property, increases the person's

burdens, or impairs the person's rights.'" *Id.* (citing *In re Marlar*, 267 F.3d 749, 753 n.1 (8th Cir. 2001)).

This "essentially prudential limitation on standing" furthers the "interest in efficient judicial administration" of bankruptcy proceedings, which are "often administratively and procedurally unwieldly" and would, without the person aggrieved standard, be "prolonged by unnecessary appeals." *In re O&S Trucking, Inc.,* 811 F.3d 1020, 1023 (8th Cir. 2016) (citation omitted). Since appellate standing "is a question of fact[,]" the party seeking review must provide evidence probative of its financial harm. *In re Nangle*, 288 B.R. 213, 216 (B.A.P. 8th Cir.), *aff'd*, 83 F. App'x 141 (8th Cir. 2003). Thus, MercyOne bears the burden of producing evidence that confirmation caused it financial harm to the degree that MercyOne was "aggrieved" within the meaning of Eighth Circuit caselaw. *In re Levitt*, 632 B.R. 527, 530 (B.A.P. 8th Cir. 2021).

Decisions in the Eighth Circuit applying these standards have consistently held an appellant who would "gain nothing" from reversing the order on appeal lacks standing to prosecute the appeal. *In re Merrifield*, 214 B.R. 362, 366 (B.A.P. 8th Cir. 1997) ("If the transfer were avoided, [the debtor] would gain nothing. Returning the condominium unit to the estate might increase the amount received by [the debtor's] creditors, but it would not provide any benefit to her. Therefore, she is not a person aggrieved for purposes of appealing the order."). Similarly, appellants do not have standing where the appealed order does not

19

alter the "*status quo ante*" or merely "maintain[s] the previously existing state of affairs[.]" *In re Wigley*, 886 F.3d at 685.

Here, MercyOne does not satisfy the "aggrieved person" standard because even if this Court reverses the Bankruptcy Court's confirmation, MercyOne still would *not* release the Released Parties since MercyOne opted out of the Third-Party Release. Put simply, no matter if the confirmation order is affirmed or reversed, all of MercyOne's claims against the Released Parties will be and has been preserved. Just like the debtor in *Merrifield*, MercyOne would "gain nothing" by reversing the confirmation order, and reversal "would not provide any benefit" to MercyOne. *In re Merrifield*, 214 B.R. at 366. Similarly, just like *Wigley* in which "the order[] . . . maintained the previously existing state of affairs" such that "[w]hatever risk of liability and burden of litigation" the appellant "face[d] . . . pre-existed [the] bankruptcy proceeding," and so the Bankruptcy Court's confirmation order did "not increase [MercyOne's]'s burdens[.]" *In re Wigley*, 886 F.3d at 685. Whatever liability MercyOne faced pre-bankruptcy was <u>not</u> increased by the confirmation order; rather, the confirmation order merely maintained the "*status quo ante*[.]" *Id.*

The straightforward consequence of the Eighth Circuit's "person aggrieved" standard—that MercyOne lacks standing to appeal the Third-Party Releases—is bolstered by the uniform holding in other jurisdictions that a party opting out of a third-party release lacks standing to appeal the release since the

20

party is not adversely affected by it.[3] Indeed, MercyOne has not cited any decision supporting its position that it has standing to appeal the Third-Party Releases. And MercyOne's attempt to distinguish *Wigley* (on the theory that *Wigley* does not concern an impaired creditor) does not work. Appellant Br. 22. This is so because *Wigley* teaches no matter who the appellant is, the appellant lacks standing if the appealed order merely maintains the status quo. 886 F.3d at 685. Because MercyOne opted out of the Third-Party Releases, the status quo is preserved, *i.e.*, before entry of the Confirmation Order, MercyOne could have sued the Released Parties, and after the Confirmation Order, MercyOne also could have sued the Released Parties. In short, the Confirmation Order makes no difference to MercyOne. MercyOne has no standing to appeal.

Nor does MercyOne have standing to rectify perceived violations of the Bankruptcy Code, as if it were some kind of Code-enforcer. Appellant Br. 34; *In re Cap. Contracting Co.*, 924 F.3d 890, 898 (6th Cir. 2019) (reasoning that a bankruptcy appellant "may not assert merely the 'vindication of the rule of law' as its basis for harm without alleging an actual injury from the purported violation" (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 106 (1998));

---

[3] *Matter of Ultra Petroleum Corp.*, No. 21-20049, 2022 WL 989389, at *5 (5th Cir. Apr. 1, 2022); *In re Dynegy, Inc.*, 770 F.3d 1064, 1070 (2d Cir. 2014); *Patterson v. Mahwah Bergen Retail Grp., Inc.*, 636 B.R. 641, 664 (E.D. Va. 2022); *In re Tonopah Solar Energy, LLC*, 657 B.R. 393, 407 (D. Del. 2022); *In re Mallinckrodt PLC*, 639 B.R. 837, 877 (Bankr. D. Del. 2022); *Talarico v. Ultra Petroleum Corp.*, 2020 WL 8361996, at *3 (S.D. Tex. Dec. 29, 2020).

*see TransUnion LLC v. Ramirez*, 594 U.S. 413, 426 (2021) ("Article III standing requires a concrete injury even in the context of a statutory violation." (quoting *Spokeo, Inc. v. Robins*, 578 U. S. 330, 341 (2016)); *see also In re Bay Circle Props., LLC*, 955 F.3d 874, 879 (11th Cir. 2020) (holding that an appellant cannot attain person-aggrieved status "simply by virtue of attacking the inherent fairness of a bankruptcy proceeding").

Further, while MercyOne asserts "[m]ultiple courts hold" appellants similar to MercyOne have appellate standing, the assertion is untrue. Appellant Br. 32. None of MercyOne's cites found a party who opted out of a non-debtor release satisfies the "person aggrieved" test to appeal a plan confirmation order.[4] The cases allowing creditors to object during a bankruptcy proceeding implicate 11 U.S.C. section 1109, governing a the right of a "party in interest" to be heard in a case. 11 U.S.C. § 1109(b). But a party's section 1109 right of participation at the bankruptcy-court level is different from, and far broader than, a party's standing to appeal at the appellate level. *In re AFY*, 734 F.3d 810, 824 (8th Cir. 2013). In any event, section 1109 merely states "a creditor . . . may raise and

---

[4] *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 646 (2d Cir. 1988) (no third-party release, holding creditor had standing to appeal violations of his own rights); *In re Produce Hawaii, Inc.*, 41 B.R. 301, 303 (Bankr. D. Haw. 1984) (no third-party release, not an appeal); *In re Elecs. & Metals Indus., Inc.*, 153 B.R. 36, 37 (Bankr. W.D. Tex. 1992) (no third-party release, not an appeal); *In re Bos. Harbor Marina Co.*, 157 B.R. 726, 730 (Bankr. D. Mass. 1993) (not an appeal); *In re Wool Growers Cent. Storage Co..*, 371 B.R. 768, 779 (Bankr. N.D. Tex. 2007) (not an appeal); *In re Conseco, Inc.*, 301 B.R. 525, 527 (Bankr. N.D. Ill. 2003) (not an appeal).

may appear and be heard . . . ." 11 U.S.C. § 1109(b). MercyOne did appear and was heard by the Bankruptcy Court. Section 1109 was satisfied, and does not help MercyOne in this appeal.

### B. MercyOne Lacks Standing to Appeal the Debtor Releases Because Its Putative Possibility of Injury Is Too Speculative to Satisfy the Person Aggrieved Standard.

Though MercyOne may theorize it has standing to appeal the Debtor Releases as reducing its potential distribution from the Liquidation Trust, this theory is too circuitous and speculative to prevail. To have standing, an appellant must experience "'direct' pecuniary impact" from an order, mere "potential pecuniary harm" that "is several steps removed" will not do. *Opportunity Fin.*, 822 F.3d at 458. For example, in *Opportunity Finance* the Eighth Circuit held appellant-lenders were not directly pecuniarily impacted by a consolidation order even though the lenders argued that, due to the consolidation, the trustee would be more likely to obtain an increased recovery in avoidance actions he filed against the lenders. *Id.* The court found the lenders had no standing because, "[s]everal steps must occur before the Lenders suffer a pecuniary harm: [the trustee] must prevail in the avoidance actions, the Lenders must pay the judgment in full, and then they must file a valid proof of claim against the consolidated estate." *Id.* "This possibility of harm" did "not satisfy the persons aggrieved standard." *Id.*

Applying *Opportunity Finance*, MercyOne does not have standing to appeal the Debtor Releases. Though MercyOne may argue if the Debtors did not release the Related Parties, MercyOne could possibly receive a larger distribution from the Liquidation Trust than it would have if the Debtor Releases weren't in the Plan, any alleged harm to MercyOne is so many steps removed that MercyOne is not directly pecuniarily injured by the Debtor Releases. Specifically, before MercyOne could gain anything by excising the Related Persons from the Debtor Releases, at least four contingencies must occur:

First, MercyOne must identify a claim against the Related Persons subject to the Debtor Releases that would be prudent for the Liquidation Trustee to assert. Yet MercyOne offered no evidence of such a claim. And that destroys its standing. In *In re Citation Corp.*, for example, the district court held a creditor lacked standing to appeal a plan that included non-debtor releases of the debtor's secured lenders for a period between the debtor's first and second bankruptcies. 371 B.R. 518, 520-22, 525 (N.D. Ala. 2007). Although the creditor may have been impaired to the extent it had a claim against the secured lenders subject to the plan's releases, the court dismissed the creditor's appeal because it did "not identif[y] such a claim" and because "[s]peculative or hypothetical claims are insufficient to establish standing." *Id.* The same goes for MercyOne. Notably, Judge Collins asked MercyOne's counsel at the confirmation hearing whether he had "anything to suggest there's a claim against any of those people you're

talking about?" App. 1212; Bankr. R. Doc. 1145 at 104:6-8. He responded, "I don't have anything I could put, concrete, before you." App. 1212; Bankr. R. Doc. 1145 at 104:11-12. MercyOne has the burden of proving its own standing but as this exchange shows, it cannot and it did not. *In re Levitt*, 632 B.R. at 530.

Second, the Liquidation Trustee must actually litigate and prevail on that unknown claim. Third, the Liquidation Trustee must successfully collect on it. And fourth, the judgment must survive appeal. *Opportunity Finance* instructs this tenuous prospect of recovery is too many steps removed to meet the person aggrieved standard. 822 F.3d at 458. Accordingly, *Opportunity Finance* bars MercyOne from appealing the Debtor Releases, because MercyOne has produced no evidence to satisfy the burden imposed on it to prove standing.

MercyOne attempts to distinguish *Opportunity Finance* by noting the case does not involve an impaired creditor. Appellant Br. 21-22. Though true, the rationale from *Opportunity Finance* nonetheless applies to any party, including an impaired creditor, where its standing is predicated on a highly contingent "possibility of harm," as MercyOne's is. 822 F.3d at 458; *see In re Hecker*, 496 B.R. 541, 551 (B.A.P. 8th Cir. 2013) (applying person aggrieved standard to appellee in capacity as unsecured creditor).

MercyOne also makes several arguments going to the merits of the Releases in criticizing the District Court's standing analysis. Appellant Br. 23-

26. But apart from being unpersuasive, the Releases' merits have nothing to do with whether MercyOne has standing to appeal them.

In short, MercyOne's alleged harm of receiving a diminished distribution as a result of the Debtor Releases is too remote to support appellate standing. Even if MercyOne's argument that the Debtor Releases diminished dividend distribution were theoretically correct, if carried to its conclusion, any release will likely diminish distributions. As such, the mere effect of distribution diminution cannot possibly sustain MercyOne's arguments.

## C. Impaired Creditors Do Not Automatically Have Appellate Standing.

MercyOne's contention that impaired creditors always have appellate standing is wrong. Appellant Br. 17. As the Sixth Circuit explained, "[s]imply holding a claim of any type against the estate does not automatically confer appellate standing under the 'person aggrieved' doctrine." *In re LTV Steel Co., Inc.*, 560 F.3d 449, 455 (6th Cir. 2009) (citing *Trailer Source,* 555 F.3d 250 (Rogers, J., dissenting) (collecting cases)). Consequently, even creditors must show they were adversely affected by an order to appeal it. *Id.*

For example, the Seventh Circuit dismissed for lack of standing an impaired creditor's appeal of an order distributing estate assets to lawyers of the bankruptcy estate. *In re GT Automation Grp., Inc.*, 828 F.3d 602, 604 (7th Cir. 2016). The lawyers argued the creditor lacked standing since, even if the challenged payments had not been made, the creditor provided no evidence it

would have received a distribution on its claim, given the value of senior claims the estate would need to pay first. *Id.* at 605. Much like MercyOne here, the creditor nonetheless urged it was "theoretically possible" it would "benefit" if the order were reversed. *Id.* Rejecting that speculation, the Seventh Circuit held "[w]ithout a doubt" the creditor lacked standing not merely under the person aggrieved standard, but also under Article III. *Id.*; *see In Matter of The Watch Ltd.*, 257 F. App'x 748, 750 (5th Cir. 2007) (unpublished) (dismissing case on mootness grounds yet finding it "unlikely" that the impaired creditor was a person aggrieved "because whether [the creditor] will recover on his $1,829.61 unsecured claim is highly speculative, to say the least.").

MercyOne's argument therefore contravenes both the "person aggrieved" standard and Article III. But rejecting that argument does not strike a split with the Second and Ninth Circuits as MercyOne suggests, because MercyOne misapplies those Circuits' standing doctrines.

The Second and Ninth Circuits "general[ly]" find "creditors have standing to appeal orders of the bankruptcy court *disposing of property of the estate* because such orders directly affect the creditors' ability to receive payment of their claims." *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 642 (2d Cir. 1988) (emphasis added); *In re P.R.T.C., Inc.*, 177 F.3d 774, 778 (9th Cir. 1999) (similar). But that general statement is premised on the appellant being able to identify the estate property that was distributed under the appealed-from order. Typically, this is

easy to do. In *In re P.R.T.C.*, for instance, a creditor had standing to appeal a settlement order where the order transferred the estate's right to sue various defendants to one of those defendants. 177 F.3d at 778. And in *In re DBSD N. Am., Inc.*, the fight was over a "gift" of shares and warrants the appellant claimed violated the absolute priority rule. 634 F.3d 79, 87 (2d Cir. 2011).

By contrast, MercyOne has not identified *any* claim against the Related Parties that the Debtor Releases purportedly let go. Unlike the *P.R.T.C.* and *DBSD* appellants who identified the property transferred by the appealed-from order, MercyOne only offers speculation on this front, not evidence. *E.g.*, Appellant Br. at 20 (speculating released claims "almost certainly" existed). Because MercyOne's "almost certainly" speculation pointed to nothing, MercyOne did not meet the minimal threshold showing there was a release of Estate claims, the Second and Ninth Circuits' standing doctrines, being predicated on the disposition of estate assets, are inapplicable. Even if (but not conceding) the Second and Ninth Circuits' standing doctrines somehow apply in this Court, those doctrines do not confer standing on MercyOne.

Moreover, if MercyOne tries to argue it has standing because it would benefit under an "alternative plan[]" that has no Releases, the same problem arises. *Kane*, 843 F.2d at 641. MercyOne would again need to prove that claims against those parties in fact exist, which it cannot do and did not do. *In re Citation Corp.*, 371 B.R. at 522 ("Speculative or hypothetical claims are insufficient to

establish standing."). Even if it could, any value added to the Liquidation Trust through reducing the claims to judgment is so rife with contingency that the "person aggrieved" standard cannot be met. *Matter of Highland Cap. Mgmt., L.P.*, 74 F.4th 361, 367, 367 n.23 (5th Cir. 2023) (holding that an appellant's litigation-based theory of standing failed where "no less than seven different 'ifs' must come to pass," ranging from the claims being filed to the dispositive decisions being upheld on appeal, before the appellant would be injured).

### D. The Oversight Committee's Conduct Does Not Create Standing.

MercyOne also urges it has standing because the Trust Oversight Committee issued Bankruptcy Rule 2004 production and deposition requests that caused MercyOne to expend resources in complying with the discovery requests. *See* Fed. R. Bankr. R. 2004. The Eighth Circuit, however, has already unequivocally rejected MercyOne's argument: "a bankruptcy court order allowing litigation to proceed against an adversary defendant does not make that defendant a party aggrieved." *Opportunity Fin.*, 822 F.3d at 458.

More fully, the reason litigation does not turn an appellant into a person aggrieved is "litigation causes only *indirect* harm to that party." *Opportunity Fin.*, 822 F.2d at 459. This harm is equally indirect no matter whether the plaintiff is properly authorized to sue or not. As the Eleventh Circuit held in *In re Harie Ford, Inc.*, the defendant there lacked standing to appeal an allegedly erroneously entered plan-confirmation order that enabled a liquidating agent to sue the

defendant on over a dozen causes of action since the harms from that order were indirect. *In re Harie Ford, Inc.*, 764 F.3d 1321, 1326 (11th Cir. 2014); *In re LTV Steel Co., Inc.*, 560 F.3d at 456 ("[W]e are aware of no court that has held that the burden of defending a lawsuit, however onerous or unpleasant, is the sort of direct and immediate harm that makes a party 'aggrieved' so as to confer standing in a bankruptcy appeal."). The outcome should be no different here.

Further, MercyOne's reliance on *Truck Insurance Exchange* is misplaced. *Truck Ins. Exch. v. Kaiser Gypsum Co., Inc.*, 602 U.S. 268, 277 (2024). That opinion addressed a party-in-interest's ability to appear and be heard before a bankruptcy court in a Chapter 11 case pursuant to Bankruptcy Code section 1109. *Id.* (discussing 11 U.S.C. § 1109). But as noted above, the section 1109 right of participation is much more permissive than the "person aggrieved" standard, and MercyOne cannot satisfy that standard. *In re AFY*, 734 F.3d at 824. MercyOne's argument essentially urges *Truck Insurance* sub silentio overruled an entire line of decades-long appellate standing caselaw. Nothing in *Truck Insurance* came close to supporting that proposition, nor did MercyOne cite to any caselaw so holding.

## II. Consensual Third-Party Releases Are Permissible After *Purdue*.

MercyOne contends *Purdue Pharma* means the third-party release at section XIV(D)(2) of the Plan was invalid. *See* Appellant Br. 48-56. Such a contention is without merit, for at least four reasons. First, the plan in *Purdue*

*Pharma* was stayed pending appeal, *viz.* Justice Gorsuch specifically held "***this case involves only a stayed reorganization plan***, [and] ***we do not address whether our reading of the bankruptcy code would justify unwinding reorganization plans that have already become effective and been substantially consummated***." 603 U.S. at 226 (emphasis added). The Plan in this appeal was not stayed, *see* App. 1543; Dist. R. Doc. 32 (District Court denying MercyOne's Motion for Stay Pending Appeal); App. 1431; Bankr. R. Doc. 1137 (Bankruptcy Court also denying MercyOne's Motion for Stay), and indeed the Liquidation Trust has already commenced distribution, App. 1542; Bankr. R. Doc. 1258 at 3 (¶9), and the Debtors have filed a Notice of Consummation.[5] App. 1451; Bankr. R. Doc. 1139. Since *Purdue Pharma* did "not address . . . reorganization plans that have become effective and been substantially consummated," and since the Court's "words must be read literally," *In re Robertshaw US Holding, Corp.*, 662 B.R. 300, 323 (Bankr. S.D. Tex. 2024) (Lopez, J.), MercyOne's reliance on *Purdue Pharma* is misplaced. Simply put, *Purdue Pharma* does not control this appeal.

Second, in *Purdue Pharma* "a growing number of suits" were already pending and filed by various claimants and plaintiffs (including Canadian

---

[5] MercyOne's contention that the Plan is not substantially consummated because "creditors remain unpaid" is dead wrong. Appellant Br. 52. Substantial consummation merely requires the "commencement" of distributions, and distributions have begun here. ***11 U.S.C. § 1101(2)(C)***; App. 1542; Bankr. R. Doc. 1258 at 3 (¶9). Moreover, the Bankruptcy Court found the Plan was substantially consummated on the date it became effective. App. 1313; Bankr. R. Doc. 1114 at 47 (¶56).

creditors) against the non-bankruptcy filing released entities. 603 U.S. at 209. In the appeal at bar, the record does not reveal even one lawsuit filed against any of the Released Parties. The significance of pending lawsuits was one of the driving impetuses that led to the *Purdue Pharma* ruling: Justice Gorsuch observed "[n]o one has directed us to a statute or case suggesting American courts in the past enjoyed the power in bankruptcy to discharge *claims brought* by nondebtors against other nondebtors." *Id*. at 224 (emphasis added). The absence of even one lawsuit *brought* by anyone against the Released Parties distinguishes the appeal at bar from *Purdue Pharma*.

Third, the parties sought to be released by the *Purdue Pharma* plan had withdrawn $11 billion from the company, *id*. at 211, yet they were offering to repay only $4.325 + $1.675 billion (total approximately $6 billion). *Id*. at 211-12. In the appeal at bar, nothing in the record came anywhere close to the enormity and magnitude of the amounts involved in *Purdue Pharma.*

Fourth, even if (but not conceding) *Purdue Pharma* somehow does apply to this appeal and is otherwise not distinguishable, at least two post-*Purdue Pharma* decisions *did* approve third-party releases, so long as the releases were conspicuously disclosed to all creditors, and every creditor had the opportunity to opt out of the release. Specifically, Judge Lopez approved third-party releases in *Robertshaw,* which involved a ballot that displayed this language:

> **If you submit your Ballot without this box checked, or if you do not submit your Ballot by the Voting Deadline, you will be**

> **deemed to consent to the releases contained in Article X.C of the Plan to the fullest extent permitted by applicable law.**

662 BR. at 323. Similar to Judge Collins' reliance on the testimony of the CRO Mark Toney in the appeal at bar, Judge Lopez relied on a declaration that the release "is an integral part of the Plan and was a condition of the settlements set forth therein," *id.,* and the release was a "core" consideration among the parties supporting confirmation. *Id*. Further,

> There is no evidence in the record to refute these findings. Thus, the third-party releases are consensual and narrowly tailored. The UCC—an active participant in these cases with a fiduciary duty to all unsecured creditors—doesn't oppose the opt-out for the releases.

*Id*.[6] The *Robertshaw* court therefore overruled the United Trustee's objection,[7] and confirmed the plan. *Id*. at 323-25. And in *In re Smallhold, Inc.*, 665 B.R. 704 (Bankr. D. De. 2024) (Goldblatt, J.), the Court held a vote in favor of or against the plan "coupled with conspicuous notice of the opt-out mechanism, suffices as consent to the third-party releases." *Id.* at 723. Indeed, the *Smallhold* plan language is similar to the language in the plan a bar, *viz.* the *Smallhold* plan provided the following notice and choices (in bold type):

> all persons (i) who voted to accept this Plan . . . and (ii) who voted to reject this Plan but did not affirmatively mark the box on the

---

[6] Similar to the Committee's posture in *Robertshaw*, the Unsecured Creditors' Committee also supported confirmation of the Debtors' plan, *viz.* the Committee urged "the committee is here to endorse, support, advocate for this Court to confirm this plan today." App. 1201; Bankr. R. Doc. 1145 at 93:13-14.

[7] Notably, the United States Trustee in the appeal at bar did *not* object to confirmation.

> ballot to opt out of granting the releases . . . shall . . . be deemed to forever release … the Released Parties.

*Id.* at 726. The ballot (with respect to Class 3 comprising the general unsecured claimants of which MercyOne is one) tendered by the Debtors in this Appeal to the various creditors/voters provided:

### <u>OPTIONAL OPT-OUT ELECTION</u>

If you vote to accept the Plan, you shall be deemed to have consented to the Third-Party Release . . . .

IF YOU VOTE TO ACCEPT THE PLAN, YOU SHALL BE DEEMED TO HAVE CONSENTED TO THE THIRD-PARTY RELEASE IN ARTICLE XIV.D.2 . . . AND YOU CANNOT OPT OUT OF THE THIRD-PARTY RELEASE. IF YOU . . . VOTE TO REJECT . . . AND . . . DO NOT CHECK THE BOX BELOW, YOU SHALL BE DEEMED TO HAVE CONSENTED TO THE THIRD-PARTY RELEASE . . . .

The Holder of the Class 3 General Unsecured Claims . . . elects to:

☐ Opt Out of the Third-Party Release

App. 577; Bankr. R. Doc. 926 at 82. In the section entitled "Voting," Item 3 directed the voters' attention to "Important Information Regarding the Releases . . . and Optional Opt-Out Election." App. 573; Bankr. R. Doc. 926 at 78. Indeed, *four pages* of bold-faced discussion were offered regarding the releases and injunctions. App. 573-76; Bankr. R. Doc. 926 at 78-81. Simply put, the Class 3 creditors were given conspicuous notice of the Third-Party Releases, and they could opt out of the Third-Party Release by voting to reject the plan or abstaining from voting and checking the opt-out box (and MercyOne did so).

Such a voting choice therefore meets the *Purdue Pharma* standard, *viz.* the key is if a creditor was "not given the opportunity to vote," then the creditor "cannot be said to have consented to the releases." *In re Smallhold*, 665 B.R. at 716. The mechanism in the Debtors' Plan at bar easily meets the *Purdue Pharma* standard.

In sum, *Purdue Pharma* does not apply to the appeal at bar; *Purdue Pharma* is distinguishable; and even if *Purdue Pharma* does apply and is not distinguishable, caselaw analyzing *Purdue Pharma* approved third-party releases that are similar to the third-party releases involved in the appeal at bar. MercyOne's arguments to the contrary should be rejected.

Finally, MercyOne complains the scope of the Releases included many individuals, such as officers, advisors, etc. But the broad scope of such Releases is routine. For example, the definition of "Released Parties" in *Robershaw* included:

> such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), interest holders, predecessors, successors, and assigns, subsidiaries, affiliates, managed accounts or funds, and each of their respective current and former equity holders, officers, directors, managers, principals, shareholders, members, management companies, fund advisors, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such collectively.

*In re Robertshaw U S Holding, Corp.*, Case #24-90052, Dkt. #857 at 24-25 (Bankr.

S.D. Tex. July 13, 2024).[8] The release in the appeal at bar extends to almost the same person/entities as did the *Robershaw* release. *See* App. 755-56; Bankr. R. Doc. 1050 at 36 (Art.II(A)(1.189)). It is not exceedingly broad.

## III.  The Releases Meet the *Master Mortgage* Guidelines.

"[A]s the second court of appellate review," this Court "conduct[s] an independent review of the bankruptcy court's judgment applying" a de novo standard to legal determinations and a clear error standard to factual findings. *In re Peabody Energy Corp.*, 958 F.3d 717, 721 (8th Cir. 2020). For a bankruptcy court's finding to be clearly erroneous, the "decision must strike [the Court] as more than just maybe or probably wrong; it must strike [the Court] as wrong with the force of a five-week-old, unrefrigerated dead fish." *In re Papio Keno Club, Inc.*, 262 F.3d 725, 729 (8th Cir. 2001) (citation omitted).

The Bankruptcy Court's factual findings that the Releases satisfy the *Master Mortgage* guidelines do not strike one "as wrong with the force of a five-week-old, unrefrigerated dead fish." *In re Papio*, 262 F.3d at 729 (cleaned up). Accordingly, these findings are not clearly erroneous and should not be overturned on appeal. *Id.*; *In re Millennium Lab Holdings II, LLC*, 591 B.R. 559, 586 (D. Del. 2018) (applying the "clearly erroneous" standard to the *Master*

---

[8] Because the *Robertshaw* plan is not available on Westlaw, it is included in the appendix, and the cite for the quoted provision is App. 1481-82.

*Mortgage* guidelines).[9]

*Master Mortgage* set out five non-exclusive factors bankruptcy courts often balance when considering whether to confirm a plan with third-party releases:

> (1) There is an identity of interest between the debtor and the third party, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete assets of the estate.

> (2) The non-debtor has contributed substantial assets to the reorganization.

> (3) The injunction is essential to reorganization. Without the [injunction], there is little likelihood of success.

> (4) A substantial majority of the creditors agree to such injunction, specifically, the impacted class, or classes, has "overwhelmingly" voted to accept the proposed plan treatment.

> (5) The plan provides a mechanism for the payment of all, or substantially all, of the claims of the class or classes affected by the injunction.

*Master Mortg.*, 168 B.R. at 935 (footnotes omitted). The "single most important factor" is "creditor approval of the injunction." *Id*. at 938.

These five factors demand a fact- and equity-specific analysis, with outcomes turning on the nature of each case. *Id.* Third-party releases can be appropriate even if all the factors are not met. *Id.* at 935. Fundamentally, the

---

[9] The *Millennium Lab* decision was affirmed on appeal, but the appellate opinion was abrogated by *Purdue Pharma* because it involved nonconsensual releases. *Purdue Pharma,* 603 U.S. at 214 n.1. The reason the decision is still persuasive here is because *Purdue Pharma* expressly limited its holding to nonconsensual third-party releases, unlike the consensual releases in the Plan. *Purdue Pharma*, 603 U.S. at 226.

factors function as "guideposts" that are "helpful" in guiding bankruptcy courts' discretion in determining whether third-party releases are warranted. *In re Millennium Lab Holdings II, LLC*, 591 B.R. at 584; *Master Mortg.*, 168 B.R. at 937 (concluding that the "power" to enforce third-party releases is "discretionary"). The Liquidation Trustee submits the Bankruptcy Court correctly in applied the "guideposts" in approving the Releases here.

## A. There Is an Identity of Interest Between the Debtors and the Released Parties.

Identity of interest is a "flexibl[e]" concept that encompasses a variety of scenarios. *In re Seaside Eng'g & Surveying, Inc.*, 780 F.3d 1070, 1080 (11th Cir. 2015).[10] For instance, courts have found an identity of interests between debtors and releasees where the debtors and releasees "share the common goal of confirming" a plan or are instrumental in in formulating the plan. *In re Trib. Co.*, 464 B.R. 126, 187 (Bankr. D. Del.), *on reconsideration in part*, 464 B.R. 208 (Bankr. D. Del. 2011), *aff'd sub nom. In re Trib. Media Co.*, 587 B.R. 606 (D. Del.

---

[10] *See, e.g.*, *In re Blitz U.S.A., Inc.*, Case No. 11-13603 (PJW), 2014 WL 2582976, at *6 (Bankr. D. Del. Jan. 30, 2014) (finding an identity of interest between the debtor and several other parties due to, among other things, indemnification obligations and shared insurance proceeds); *In re Mercedes Homes, Inc.*, 431 B.R. 869, 879-80 (Bankr. S.D. Fla. 2009) (finding identity of interest where debtors were required to indemnify released parties, the officers and directors, against claims or causes of action).

Like *Millennium Lab*, the *Seaside* opinion was abrogated by *Purdue Pharma*, *see Purdue*, 603 U.S. at 214 n.1, but because the Plan contains consensual releases, *Seaside*'s application of the third-party release factors is still persuasive authority. *Id.* at 226 (limiting holding to nonconsensual releases).

2018), *aff'd sub nom. In re Trib. Co.*, 972 F.3d 228 (3d Cir. 2020), and *aff'd in part sub nom. In re Trib. Media Co.*, 587 B.R. 606 (D. Del. 2018), and *aff'd sub nom. In re Trib. Co.*, 972 F.3d 228 (3d Cir. 2020) (finding debtors and releasees "share the common goal" of confirming a plan dependent on settlement of complex multi-party litigation resulted in an "identity of interest"); *In re Zenith Elecs.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999) (finding an identity of interest with debtor where certain released parties who "were instrumental in formulating the Plan" shared the goal of "seeing that the Plan succeed and the company reorganize"); *In re 710 Long Ridge Rd. Operating Co., II, LLC*, No. 13-13653 (DHS), 2014 WL 886433, at *15 (Bankr. D.N.J. Mar. 5, 2014) (finding identity of interest where both debtor and non-debtor released parties shared a common goal of "confirming [a plan] and implementing the transactions contemplated thereunder"). Courts have also concluded this factor is met where third-party releases would stave off costly litigation that would drain the estate's assets. *In re Seaside*, 780 F.3d at 1079-80 (finding identity of interest between debtor and released parties, who were debtor's key employees, where debtor would deplete its assets in defending released parties against litigation).

Here, the Bankruptcy Court did not commit clear error in holding there is an identity of interest between the Debtors and the Released Parties. The Bankruptcy Court found it significant the releases were "integral" to a consensual Plan and "necessary to avoid the prospect of immense and complex

litigation absent the releases." *Mercy*, at *4. This finding is easily supported by Toney's declaration that states, among other things, all of the Released Parties "share the common goal with the Debtors of confirming the Plan," because "the Released Parties and their efforts were integral to the overall success of the Debtors' sale and restructuring efforts during the Chapter 11 Cases including, monetary support as well as time, energy, resources, and support in coordinating complex and time-consuming efforts in furtherance of the Chapter 11 Cases." App. 1024-25; Bankr. R. Doc. 1052 at 13-14 (¶¶33-34). Toney also explained the Releases avoided complex litigation that would have arisen if the case were converted to Chapter 7 due to the key players voting against a non-Release plan. The identity of interest is further established because several Released Parties have indemnity rights against the Debtors. App. 844-45; Bankr. R. Doc. 1050 at 125 (Art. XII(C)). MercyOne offered no evidence to the contrary.

While MercyOne objects the "Liquidation Trustee has no legitimate interest in avoiding litigation," Appellant Br. 40, this is simply irrelevant because the Liquidation Trustee (1) is not a Released Party and (2) did not even come into existence until the Plan was confirmed. Moreover, MercyOne faults Toney for not being able to cite a specific indemnification agreement in his testimony, Appellant Br. 42, but his 37 years of experience taught him that such agreements are common, so he did not need to waste Estate resources tracking them down.

App. 1141; Bankr. R. Doc. 1145 at 33:2-5. Thus, the Bankruptcy Court did not clearly err when it found there was an identity of interest.

## B. The Released Parties Substantially Contributed to the Plan.

The Released Parties also substantially contributed to the Plan, as evidenced by Toney's declaration and related testimony. App. 1025-26; Bankr. R. Doc. 1052 at 14-15 (¶35). As detailed there, these contributions included, among other things, giving up portions of their recoveries for the benefit of unsecured creditors, providing funding for the Plan (including the Foundation's contribution of significant unrestricted funds), expending unusual levels of critical sweat equity to make the sale to the University of Iowa possible, and negotiating, formulating, and implementing the liquidation provisions of the Plan. *Id.* The Bankruptcy Court has "discretion to determine whether the nature and size of the consideration rises to the level of a 'substantial' contribution." *In re rue21, Inc.*, 575 B.R. 314, 326 (Bankr. W.D. Pa. 2017). Given the evidence at the hearing, the Bankruptcy Court did not abuse its discretion in finding the Released Parties made a substantial contribution by "provid[ing] assurance that the Releases would both eliminate a risk of adverse result for the Debtor and allow the Debtor to avoid any further expense in pursuing those issues on which Debtor received concessions." *Mercy* at \*5; *see In re Seaside Eng'g & Surveying, Inc.*, 780 F.3d at 1080 (finding substantial contribution where key employees provided labor and services); *Mercedes Homes, Inc.*, 431 B.R. at 881 (finding

debtors' officers' and directors' expertise and knowledge, which would be used to work for reorganized debtors, constituted a substantial contribution).

### C. The Third-Party Releases Are Essential to the Plan Because the Key Creditors Would Not Have Supported the Plan Without Them.

The Third-Party Releases were also essential to the Plan. Toney testified at the confirmation hearing that the key constituents would not have agreed to the Plan "without those releases." App. 1169; Bankr. R. Doc. 1145 at 61:7-16 ("Q. As part of the concessions reached, were releases important to the parties? A. Yes. Q. Were they necessary? A. Yes. Q. How do you know? A. It was made very clear during the negotiations that without those releases, there would not be a settlement. And before signing my declaration, I actually verified it with a couple of the key stakeholders."); App. 1021-22; Bankr. R. Doc. 1052 at 10-11 (¶¶25, 27). Additionally, Toney understood the Pension Committee's lawyer insisted on the releases. App. 1165; Bankr. R. Doc. 1145 at 57:11-13. MercyOne provided no counterevidence.

Although MercyOne appears to not understand why the key players insisted on releases for the Released Parties, Appellant Br. 46, the simple fact is they unequivocally did. MercyOne also returns to its complaints about indemnification agreements, but the relevant point is that, regardless of those agreements, the Plan could not have been confirmed without the Releases. App. 1021-22; Bankr. R. Doc. 1052 at 10-11 (¶¶25, 27). Accordingly, the Bankruptcy Court did not clearly err in finding the releases were essential to the Plan. *E.g.,*

*Matter of Fansteel Foundry Corp.*, No. 16-01825-ALS11, 2018 WL 5472928, at *12 (Bankr. S.D. Iowa Oct. 26, 2018) (holding non-debtor releases were essential because "[t]he plan cannot move forward if the release and exculpation are not permitted"); *In re Union Fin. Servs. Grp., In.c*, 303 B.R. 390, 428 (Bankr. E.D. Mo. 2003) ("Where the success of the reorganization is premised in substantial part on such releases, and failure to obtain releases means the loss of a critical financial contribution to the debtor's plan that is necessary to the plan's feasibility, such releases should be granted.").

### D. There Is Overwhelming Support for the Plan.

Support for the Plan is "the single most important factor" in assessing whether non-debtor releases are appropriate. *Master Mortgage*, 168 B.R. at 938. This factor is satisfied here. Calculated by number, the Voting Classes supported the Plan at a rate of 88%-100%. App. at 799; Bankr. R. Doc. 1050 at 80. Calculated by value, the Voting Classes supported the Plan at a rate of 91.7%-100%. *Id*. The Bankruptcy Court did not clearly err in finding these acceptances constituted overwhelming support for the Plan.

### E. The Plan Provides Distributions to Creditors Affected by the Third-Party Releases.

The payment-to-creditors factor is met when creditors affected by third-party releases receive a greater distribution than they would have in a Chapter 7 liquidation. *See In re Zenith*, 241 B.R. at 111; *Matter of Fansteel Foundry Corp.*, 2018 WL 5472928, at *12 (approving third-party release because, among other things,

"[t]he plan provides a mechanism that realizes recovery for creditors who would receive no distribution" otherwise); *In re U.S. Fidelis, Inc.*, 481 B.R. 503, 520 (Bankr. E.D. Mo. 2012) (finding fifth factor satisfied where there was a return to creditors). The Plan here provides greater recovery to the general unsecured claimants and the pensioners than a Chapter 7 liquidation; indeed, in a Chapter 7 liquidation the secured creditors would receive all the proceeds of a liquidation sale, and the unsecured creditors and pensioners would get nothing. App. 859; Bankr. R. Doc. 1050 at 140; App. 1020-21; Bankr. R. Doc. 1052 at 9-10 (¶25). The Plan also provides meaningful recovery for every class of creditor. App. 799; Bankr. R. Doc. 1050 at 80. Thus, the Bankruptcy Court's finding that this factor is satisfied because the Plan "provides for distributions to parties affected by the releases" is not clearly erroneous. *Mercy* at *5.

Therefore, the Bankruptcy Court correctly found each of the five *Master Mortgage* factors favors the Releases. As a result, the Releases are properly included in the Plan.

## IV. Consensual Third-Party Releases Are Confirmable Without Satisfying the *Master Mortgage* Guidelines.

A court can confirm consensual third-party releases without weighing the *Master Mortgage* factors. *Master Mortgage* elaborated its list of five considerations in light of the potential "knotty problems" with *non*-consensual releases. *Master Mortg.*, 168 B.R. at 934. These problems do not occur with consensual releases. *In re Conseco, Inc.*, 301 B.R. 525, 527 (Bankr. N.D. Ill. 2003) (reasoning that a

release that was not compulsory did not "require justification by special circumstances" like those in *Master Mortgage*); *id.* (citing *In re Dow Corning Corp.*, 280 F.3d 648, 657 (6th Cir.2002) for the need for special circumstances for a third-party release). As noted above, opt-out releases like those in the Plan are consensual and are not barred by *Purdue*. *In re GOL Linhas Aereas Inteligentes S.A.*, No. 24-10118 (MG), 2025 WL 1466055, at \*19 (Bankr. S.D.N.Y. May 22, 2025) ("In short, *Purdue* narrowly, surgically eliminated nonconsensual releases from non-asbestos chapter 11 plans, and should not be read to significantly curtail the scope of bankruptcy courts' powers under section 1123(b)(6)."); *id.* at \*24-\*25 (affirming plan with third-party opt-out releases since such releases are consensual); *see In re GOL Linhas Aereas Inteligentes S.A.*, No. 25CV4610 (DLC), 2025 WL 1591830, at \*6 (S.D.N.Y. June 5, 2025) (refusing to stay third-party releases upon appeal from plan confirmation in *In re GOL*). Because the Third-Party Releases are consensual, they should be approved even apart from the *Master Mortgage* analysis. *In re GOL Linhas Aereas Inteligentes S.A.*, No. 24-10118 (MG), 2025 WL 1466055, at \*19 (affirming third-party releases without *Master-Mortgage* like discussion); *In re Conseco, Inc.*, 301 at 527 (same); *In re Mallinckrodt PLC*, 639 B.R. at 877-881 (same).

## V.     The Debtor Releases Satisfy the Business Judgment Rule.

A release from a debtor is governed by and specifically allowed by §1123(b)(*3*) *viz.* a plan "may . . .  provide for . . . the settlement or adjustment of

any claim . . . belonging to the Debtor or to the estate." 11 U.S.C. § 1123(b)(3). A §1123(b)(3) settlement proposal is approved if it meets the usual "settlement approval" criteria. *E.g.*, *In re Wigley,* 557 B.R. 678, 685 (B.A.P. 8th Cir. 2016), *appeal dismissed*, 886 F.3d 681 (8th Cir. 2018). In that light, a decision to approve or disapprove a settlement is reviewed using the "abuse of discretion" standard. *In re Trism*, 282 B.R. 662, 666 (B.A.P. 8th Cir. 2002), *viz.* a discretionary ruling may be reversed only if the trial court made an erroneous finding of fact or applied the wrong legal standard. *Id.* In the appeal at bar, all parties agreed the business judgment rule is to be employed, informed by the five criteria enumerated in *Master Mortgage*. *See Mercy,* at *4 ("Debtors and MercyOne agree that the factors set forth in . . . *Master Mortgage* . . . are applicable here to assist the Court as it considers the validity of the Debtors Releases"); App. 1219; Bankr. R. Doc. 1145 at 111:20-21 (MercyOne "do[es] agree that business judgment is informed by those five criteria."). There is therefore no dispute regarding the legal standard.

As to fact findings, they may be reversed only if the Bankruptcy Court's findings were "more than just may be or probably wrong; it must . . . strike us as wrong with the force of a five-week old, unrefrigerated dead fish." *In re Papio*, 262 F.3d at 729 (citation omitted). The Liquidation Trustee submits the Bankruptcy Court's fact findings easily meet this standard, and certainly are far from the smell of a "a five-week old, unrefrigerated dead fish." Specifically,

"[t]he heart of the business judgment rule is judicial deference to business decisions by corporate directors." *Oberbillig v. W. Grand Towers Condo. Ass'n*, 807 N.W.2d 143, 154 (Iowa 2011) (cleaned up). The "rule applies when directors act in good faith in making a business decision, when the decision is reasonably prudent, and when the directors believe it to be in the corporate interest[.]" *Id.* (cleaned up). "[T]here is no reason why a debtor in its reasonable business judgment should not be permitted, as part of its own plan, to propose to release whomever it chooses." *In re Quincy Med. Ctr., Inc.*, No. 11-16394-MSH, 2011 WL 5592907, at *2 (Bankr. D. Mass. Nov. 16, 2011). In making this decision, the debtor's business judgment is accorded considerable deference. *In re Simply Essentials, LLC*, 640 B.R. 922, 931 (Bankr. N.D. Iowa 2022), *aff'd*, 78 F.4th 1006 (8th Cir. 2023). To challenge the debtor's decision, the objecting party must "establish that the course of action chosen by the fiduciary was outside the parameters of what a rational and reasonably informed businessperson might select." *In re Woodberry*, 629 B.R. 239, 243 (Bankr. E.D. Mich. 2021); *see In re Hercules Offshore, Inc.*, 565 B.R. 732, 757 (Bankr. D. Del 2016) (explaining that a business judgment must be upheld "unless it cannot be attributed to any rational purpose" (citation omitted)). MercyOne has not done so and cannot do so here. This is so because MercyOne's objections to the Debtor Releases fail for at least four reasons.

*First*, the Debtor Releases do not violate any statute or Supreme Court

decision. Appellant Br. 57. *Second*, MercyOne cannot overcome the business judgment presumption in favor of the Debtors because there is no evidence the Debtors acted beyond the bounds of reason in including the Debtor Releases in the Plan. As rehearsed above, the key constituents insisted the Plan contain such releases. While MercyOne attempts to invade the Debtors' business judgment by implying they should have conducted an extensive and costly investigation into every possible claim, the Debtors' CRO explained in his experience he believed such an investigation would not be "prudent" and would "wast[e] the estate's resources" because there had been no "allegations" of wrongdoing worth looking into, despite working closely with the parties who would benefit by investigating and prosecuting such claims. App. 1153; Bankr. R. Doc. 1145 at 45:17-46:7. This is exactly the kind of experience-based judgment the rule was meant to protect. *See In re Exide Holdings, Inc.*, No. 20-11157-CSS, 2021 WL 3145612, at *14 (D. Del. July 26, 2021) (agreeing that debtor releases are "appropriate where a debtor concludes in its business judgment that any claims it might have against third parties are only marginally viable and unlikely to have significant value"). *Third*, the Debtors' management drew upon their experiences, and the Released Parties were the key players who were "actively involved" in formulating and negotiating the Plan. *See In re Spansion, Inc.*, 426 B.R. 114, 143 (Bankr. D. Del. 2010) ("The Debtor Releasees were actively involved in negotiating and formulating the Plan. It is a valid exercise of the

Debtors' business judgment to include a settlement of any claims it might own against such parties as a discretionary provision of the plan."). The Plan was the "result of extensive negotiations and arm's length bargaining" among these key players. *In re Abeinsa Holding, Inc.*, 562 B.R. at 284-85 (finding the debtors' releases were protected by the business judgment rule where, among other things, the Plan was the product of extensive, arm's-length negotiations). For this reason too, Judge Collins's approval of the Debtors' decision to include the releases in the Plan was not clearly erroneous. *Fourth*, the Debtors also relied on their professionals in evaluating whether to accept the Debtor Releases. *E.g.*, App. 1137; Bankr. R. Doc. 1145 at 29:15-30:9. The Debtors were entitled to rely on counsel[11] in conducting this evaluation, and their independent decisions

_____

[11] Counsel for the Pensioners' Committee reported to Judge Collins, "I undertook investigation of sort of globally who we were looking at and were there potential causes of action against them," and it was "absolutely right" that "I'd spend more time and energy doing it than I'd be able to get something out of it." App. 1208; Bankr. R. Doc. 1145 at (100:2-5, 101:6-15). Under Iowa law, such a "professional statement" has the effect of an affidavit, *viz.* a professional statement "means a statement of fact presented to the court by an attorney in connection with a matter then before such court, verified in effect by the oath of such attorney, and designed or calculated to aid or influence the court in the determination of a given cause or issue." *Cogley v. Hy-Vee Food Stores, Inc.*, 171 N.W.2d 310, 313 (Iowa 1965). Bearing in mind such a statement enjoys the status of an affidavit, the attorney is subject to cross examination. *State v. Williams*, 315 N.W.2d 45, 53 (Iowa 1982). In *Williams*, counsel for the appellant did not object to the professional statement, nor did counsel avail the opportunity to cross-examine. *Id.* The Iowa Supreme Court therefore held admission of the statement was not error. *Id.* To the extent MercyOne complains there is no "evidence" of investigation, the complaint should be rejected, because as in *Williams*, MercyOne did not avail itself of the opportunity to cross-

made upon that reliance are protected by the business judgment rule. *In re Hercules Offshore, Inc.*, 565 B.R. at 757.

Therefore, even if (but not conceding) the record at the confirmation hearing might arguably be imperfect, Judge Collins' finding that the Debtors properly exercised their business judgment when including the Debtor Releases in the Plan is not wrong "with the force of a five-week old, unrefrigerated dead fish." *In re Papio*, 262 F.3d at 729. The confirmation order should be affirmed.

## CONCLUSION

The Liquidating Trustee respectfully requests this Court affirm the Bankruptcy Court's overruling of MercyOne's objection, affirm the confirmation of the Plan, affirm the District Court's dismissal of MercyOne's appeal and the District Court's affirmance of the Bankruptcy Court's Confirmation Order, and grant such further relief as may be just and proper.

---

examine, nor did MercyOne object to the professional statement from the Pensioners' Committee's counsel.

Dated: August 9, 2025

/s/ Joseph J. Porter
Eric W. Lam, AT0004416
Joseph J. Porter, AT0014454
SIMMONS PERRINE MOYER BERGMAN PLC
115 Third Street SE, Suite 1200
Cedar Rapids, IA 52401
Tel: 319-366-7641; Fax: 319-366-1917
elam@simmonsperrine.com
jporter@spmblaw.com
ATTORNEYS FOR DAN R. CHILDERS, IN HIS SOLE
CAPACITY AS TRUSTEE OF MERCY HOSPITAL
LIQUIDATION TRUST

## CERTIFICATE OF SERVICE

I hereby certify that on August 9, 2025, I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ Joseph J. Porter

## CERTIFICATE OF COMPLIANCE

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in Microsoft Word using a proportionally spaced typeface—Calisto MT 14 point.

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B), which permits up to 13,000 words. As determined by the word count feature of Microsoft Word, this brief contains 12,854 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with Eighth Circuit Local Rule 28A(h) because it is a single, PDF document printed directly from Microsoft Word's word-processing system. The brief was scanned for viruses and found to be virus free, and the brief may be searched and copied.

/s/ Joseph J. Porter