No. 25-1654

IN THE UNITED STATES COURT OF APPEALS FOR THE
EIGHTH CIRCUIT

MERCY HEALTH NETWORK, INC. d/b/a MERCYONE,
Appellant,

v.

MERCY HOSPITAL, IOWA CITY, IOWA, *et al.*,
Appellees

DAN CHILDERS, SUCCESSOR LIQUIDATION TRUSTEE OF THE MERCY
HOSPITAL LIQUIDATION TRUST,
Trustee-Appellee
_____

On Appeal from the United States District Court
for the Northern District of Iowa, Cedar Rapids Division
_____

**REPLY BRIEF OF APPELLANT**
_____

David B. Goroff
Nora J. McGuffey
**FOLEY & LARDNER LLP**
321 N. Clark Street, Suite 3000
Chicago, IL 60654
(312) 832-4500
dgoroff@foley.com
nora.mcguffey@foley.com

*Counsel for Appellant Mercy Health*
*Network, Inc. d/b/a MercyOne*


*Oral Argument Requested*

4932-9396-2085.2

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................... iv

INTRODUCTION ...............................................................................1

ARGUMENT .....................................................................................2

    A.    The Liquidation Trustee Misstates Key Facts. ......................................2

        1.    The Remote Released Parties Contributed Nothing To The Plan Or Bankruptcy.................................................2

        2.    The Liquidation Trustee Misleads Regarding The Scope Of The Remote Releases.................................................3

        3.    The Liquidation Trustee Argues Both That MercyOne Stands To Be Paid Both Nothing And Everything.....................4

        4.    The Liquidation Trustee Misleadingly Suggests Unsecured Creditors Have Received Payment. .........................4

        5.    The Pension Committee Spent 1.6 Hours Investigating............4

        6.    That Debtors Originally Included Even More Categories Of Remote Released Parties Does Not Justify The Remainder. ....................................................................5

        7.    The Liquidation Trustee Blames Others For Not Doing Debtors' Investigative Work For Him.........................................6

        8.    The Liquidation Trustee Admits That Forfeited Claims Likely Had Value. ...............................................................7

    B.    The Liquidation Trustee Cannot Refute That The Remote Releases Are Contrary To *Master Mortgage*.........................................7

        1.    Identity of Interest.......................................................9

        2.    Substantial Contribution. ..........................................10

        3.    Essential to Reorganization.......................................11

        4.    Creditor Support For The Plan..................................11

4932-9396-2085.2

        5.      Mechanism For Payment Of All Claims. ...................................12

  C.     The Third-Party Releases Lack The Necessary Consent. ...................13

  D.     MercyOne Has Standing To Appeal Both Releases. ...........................17

        1.      MercyOne Has Standing As An Impaired Creditor. .................17

        2.      MercyOne Independently Has Standing Due To Harm Caused By The OC's Rule 2004 Process. .................................25

        3.      The Liquidation Trustee's Illusory "Offer" To Pay MercyOne's Claim Does Not Impact Standing. .......................26

  E.     The Business Judgment Rule Does Not Apply Where Debtors Did Not Investigate Claims Released By The Remote Releases. .......27

CONCLUSION ....................................................................................................28

CERTIFICATION OF COMPLIANCE ..................................................................30

CERTIFICATE OF SERVICE ..............................................................................30

4932-9396-2085.2

# TABLE OF AUTHORITIES

## Cases

*Harrington v. Purdue Pharma L.P.*,
603 U.S. 204 (2024)..........................................................................2, 13, 16

*In re AFY*,
734 F.3d 810 (8th Cir. 2013)..........................................................................22

*In re Citation Corp.*,
371 B.R. 518 (N.D. Ala. 2007)........................................................................20

*In re DBSD N. Am., Inc.*,
634 F.3d 79 (2d Cir. 2011)..............................................................................17

*In re Dean Hardwoods, Inc.*,
431 B.R. 387 (Bankr. E.D.N.C. 2010)............................................................14

*In re Dynegy*,
770 F.3d 1064 (2d Cir. 2014)..........................................................................23

*In re e2 Commc'ns, Inc.*,
320 B.R. 849 (Bankr. N.D. Tex. 2004)............................................................18

*In re GT Automation Group, Inc.*,
828 F.3d 602 (7th Cir. 2016)...........................................................................20

*In re Haire Ford*,
764 F.3d 1321 (11th Cir. 2014)........................................................................25

*In re Heatron*,
34 B.R. 526 (Bankr. W.D. Mo. 1983)..............................................................14

*In re Hecker*,
496 B.R. 541 (B.A.P. 8th Cir. 2013)................................................................20

*In re Highland Cap. Mgmt., L.P.*,
74 F.4th 361 (5th Cir. 2023)............................................................................23

*In re Jorgensen*,
66 B.R. 104 (B.A.P. 9th Cir. 1988)..................................................................14

iv

*In re Levitt*,
632 B.R. 527 (B.A.P. 8th Cir. 2021) ............................................................23

*In re LTV Steel Co.*,
560 F.3d 449 (6th Cir. 2009) ........................................................................19

*In re Mallinckrodt*,
639 B.R. 837 (Bankr. D. Del. 2022) ............................................................16

*In re Master Mortgage Inv. Fund*,
168 B.R. 930 (Bankr. W.D. Mo. 1994) ............................................... 7, 8, 10

*In re Merrifield*,
214 B.R. 362 (B.A.P. 8th Cir. 1997) ............................................................21

*In re Millennium Lab Holdings II, LLC*,
591 B.R. 559 (D. Del. 2018) .........................................................................13

*In re Olsen*,
861 F.2d 188 (8th Cir. 1988) ........................................................................14

*In re P.R.T.C., Inc.*,
177 F.3d 774 (9th Cir. 1999) ........................................................................18

*In re Riverbend Leasing, LLC*,
458 B.R. 520 (Bankr. S.D. Iowa 2011) .........................................................12

*In re Robertshaw U.S. Holding Corp.*,
662 B.R. 300 (Bankr. S. D. Tex. 2024) .........................................................16

*In re Smallhold*,
665 B.R. 704 (Bankr. D. Del. 2024) ...................................................... 15, 16

*In re The Watch Ltd.*,
257 F. App'x 748 (5th Cir. 2007) ..................................................................20

*In re Tonopah Solar Energy, LLC*,
657 B.R. 393 (D. Del. 2022) .........................................................................24

*In re U.S. Fidelis, Inc.*,
481 B.R. 503 (Bankr. E.D. Mo. 2012) ..........................................................10

v

*In re Wigley*,
    886 F.3d 681 (8th Cir. 2018)..........................................................................22

*Jones v. Harrell*,
    858 F.2d 667 (11th Cir. 1988).....................................................................18

*Kane v. Johns-Manville Corp.*,
    843 F.2d 636 (2d Cir. 1988)................................................................. 18, 19

*Matter of Fansteel Foundry Corp*,
    2018 WL 5472928 (Bankr. S.D. Iowa, Oct. 26, 2018)..................................10

*Newspaper & Mail Deliverers' Union of New York & Vicinity v. Imperial News Co.*,
    1991 WL 243458 (S.D.N.Y. Nov. 12, 1991) ...............................................21

*Opportunity Finance, LLC v. Kelley*,
    822 F.3d 451 (8th Cir. 2016).........................................................................22

*Talarico v. Ultra Petroleum Corp.*,
    2020 WL 8361996 (S.D. Tex. Dec. 29, 2020) ..............................................23

*Talarico v. Ultra Petroleum Corp.*,
    2022 WL 989389 (5th Cir., Apr. 1, 2022)......................................................23

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021)......................................................................................17

## Statutes

11 U.S.C. §1101(2)(c) ....................................................................................14

11 U.S.C. §1123(a)(4) ....................................................................................26

## Rules

Fed. R. App. P. 27(d)(2) ..................................................................................5

4932-9396-2085.2

# **INTRODUCTION**

The Liquidation Trustee[1] cannot overcome the multiple reasons why the Remote Releases are unenforceable and cause the Plan to fail, and why MercyOne has standing to challenge confirmation both as an impaired creditor and otherwise. The Liquidation Trustee misstates critical facts in arguing otherwise.

Despite efforts to obscure this fact, the Liquidation Trustee cannot avoid that the Remote Released Parties—the thousands of persons and entities in the 108 categories of the Remote Releases—provided *nothing* to support the Plan. None participated in the Plan's drafting or negotiation. None provided sweat equity. None contributed a penny. Yet, all are receiving complete, gratuitous releases.

To suggest otherwise, the Liquidation Trustee always refers to the "Released Parties." Yet this term includes the six "Key Players" in the bankruptcy, including the Debtors, UCC, Bondholders Representatives, Pension Committee, Sisters of Mercy and Mercy Hospital Foundation. These six entities <u>did</u> contribute to Debtors' reorganization, and MercyOne does not object to these six being released. When the Liquidation Trustee speaks to the *Master Mortgage* factors of identity of interest, substantial contribution, and essential to reorganization, he addresses only what

---

[1]This Reply uses terms defined in MercyOne's Opening Brief ("<u>OB</u>"). "Bankr.R._Doc._" are citations to the Bankruptcy Court record and "Dist.R._Doc._" are to the District Court record.

these six Key Players provided, disregarding that no Remote Released Party contributed anything.

Because the Plan cannot satisfy any *Master Mortgage* factor regarding the Remote Releases, neither Remote Release can stand, and the Plan fails.

The Third-Party Releases independently fail because the Plan makes them enforceable against those who did not vote or return their ballot. Yet this is not affirmative consent, which authority following *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204 (2024) ("*Purdue*"), requires.

MercyOne has standing to challenge the Remote Releases because it is an impaired creditor. This status, alone, confers standing to challenge confirmation of a Plan that provides it with less than it might otherwise have received. Separately, MercyOne suffered pecuniary harm by having to participate in Rule 2004 discovery pursued by the OC, who lacked authority in so acting. The OC has now compounded this harm by suing MercyOne.

## ARGUMENT

### A. The Liquidation Trustee Misstates Key Facts.

#### 1. The Remote Released Parties Contributed Nothing To The Plan Or Bankruptcy.

Throughout his brief, the Liquidation Trustee refuses to focus on the Remote Released Parties, the issue in this Appeal, and instead refers to "Released Parties" as a whole, which includes the six Key Players. This lets him falsely suggest that the

4932-9396-2085.2

thousands of Remote Released Parties made "integral" contributions (TAB, 5),[2] when they contributed nothing to the Plan or Bankruptcy. Indeed, the identity of most is unknown.

Thus, the Liquidation Trustee spends the initial pages of his brief describing how the Plan was the result of compromise among the Key Players. (TAB, 2-5). This is irrelevant. MercyOne does not challenge the release of the six Key Players.

This Appeal solely concerns the Releases' inclusion of 18 categories of parties for each of the six Key Players—so 108 additional categories of parties— who, under the Plan, are receiving full releases of all claims despite making no contribution. Debtors' CRO admitted that one category alone—Debtors' employees—includes thousands of persons. (App.1151-52 & 1156-57, Bankr.R._Doc._1145, at 43:17-44:16, 48:19-49:9). The other 107 categories include thousands more. The Remote Releases extend back in time without limit.

## 2. The Liquidation Trustee Misleads Regarding The Scope Of The Remote Releases.

The Liquidation Trustee states that the Third-Party Releases "give Holders of a claim the option of either 1) voting in favor of the Plan and granting the Third-Party Releases or 2) abstaining from voting or voting against the Plan and opting out of the Third-Party Releases." (TAB, 8). This falsely implies that those who abstain

---

[2]Trustee's Appellee's Brief referenced herein as "TAB."

or who vote against the Plan are not subject to these Releases. Rather, under the Plan, "Released Parties" subject to the Releases include those who 1) "abstain[] from voting" and 2) who vote to reject the Plan but do not check the ballot box to opt out of the releases. (App.0756, Bankr.R._Doc._1050, at Art.II.A.1.190(a)).

### 3. The Liquidation Trustee Argues Both That MercyOne Stands To Be Paid Both Nothing And Everything.

The Liquidation Trustee takes contrary positions regarding whether MercyOne's class stands to receive payment. Having told this Court in May that MercyOne's appeal should be dismissed because it would be paid in full, he now argues in his Statement of Issues that MercyOne's possibility of recovery is "so remote" that MercyOne should be found to lack standing to contest Plan confirmation. (TAB, 1).

### 4. The Liquidation Trustee Misleadingly Suggests Unsecured Creditors Have Received Payment.

The Liquidation Trustee inaccurately states he has made "meaningful distributions to the creditors affected by the Releases." (TAB, 17). Rather, he has made no distributions to unsecured creditors (or most claimants), who plainly are "affected by the Releases."

### 5. The Pension Committee Spent 1.6 Hours Investigating.

The Liquidation Trustee falsely claims the UCC and Pension Committee "weighed the 'value of the potential claims and causes of action proposed to be released against the benefits of the Plan, the Plan Settlement and the likely recoveries

to unsecured creditors' and found the Plan provided more benefit to the Estates."

(TAB, 7). Despite their attorney's argument to the Bankruptcy Court (TAB, 11, 49,

n.11), the Pension Committee did no investigation. The Liquidation Trustee cites

that attorney's assertion otherwise (TAB, 49, n.11), but disregards MercyOne's

evidence demonstrating this was inaccurate, as the Pension Committee's fee

applications show it spent only 1.6 hours investigating potential causes of action.

(OB, 26, n.15).[3] Separately, no evidence showed the UCC spent any time.

6.   **That Debtors Originally Included Even More Categories Of Remote Released Parties Does Not Justify The Remainder.**

The Liquidation Trustee acknowledges that Debtors had the ability to fix the

Releases during the Bankruptcy after MercyOne objected. (TAB, 6). Instead, they

made a purely performative tweak, narrowing the categories of Remote Released

Parties from 25 to 18 for each Key Player, thus reducing the total categories of

Remote Released Parties from 150 to 108.  (TAB, 6).  This leaves unchanged that no

one in the 108 remaining categories contributed anything (monetarily or otherwise)

to the Plan or Bankruptcy.

The Liquidation Trustee acknowledges that Debtors elected to maintain the

Remote Releases in the Plan even after MercyOne complained of their overbreadth,

---

[3] Nor did that attorney provide "testimony," as the Liquidation Trustee asserts. For there to be a "professional statement," Iowa law requires the attorney to "pledge the honor of [her] profession and [her] personal integrity," which she did not. *See State v. Williams*, 315 N.E.3d 45, 53 (Iowa 1982).

although his explanation is nonsensical. He argues that "winnowing the list even further would have opened 'an opportunity to bring actions against Related Parties, thereby undermining the effectiveness of the Plan's Release provisions,'" (TAB, 6), which is to say that if the Remote Releases did not release all claims against the Remote Released Parties, these parties could have been sued. This truism sidesteps the fact that such wholesale releases did not benefit creditors, but instead likely forfeited hundreds of preferences, fraudulent transfer and other avoidance actions, which could have generated revenue to pay unsecured creditors. It ignores that the Liquidation Trustee controls which actions to bring post-bankruptcy. Nothing requires him to sue any Remote Released Party if he believes this is impractical or uneconomical. Yet even before the Liquidation Trust was formed, through the Remote Releases, the Plan stripped him of any ability to pursue such claims, despite giving him a $1 million litigation war chest.

### 7. The Liquidation Trustee Blames Others For Not Doing Debtors' Investigative Work For Him.

The Liquidation Trustee states that Debtors relied on the Key Players to identify claims because they were incentivized to do so. (TAB, 10-11). This forgets that was Debtors' job, as Debtors decided to include the Remote Releases *in their Plan*. It ignores that the Liquidation Trustee is Debtors' successor, not the Key Players'. It disregards that Debtors employed the CRO and a nationally-recognized restructuring firm, McDermott, Will and Emery. It also ignores that the Liquidation

6

Trustee was obligated to consider all claimants' interests. The notion that Debtors' CRO expected a religious order, the Sisters of Mercy, or the Hospital's Foundation to do his investigative work defies logic and, unsurprisingly, lacks any record support.

### 8. <u>The Liquidation Trustee Admits That Forfeited Claims Likely Had Value.</u>

The Liquidation Trustee argues that the Remote Releases are the result of significant compromise, because the Key Players stood to recover 40-60% of whatever value was sacrificed. (TAB, 9-10). The corollary is that unsecured creditors stood to receive 40-60% of what was forfeited, showing this ill-considered sacrifice likely harmed their prospects.

### B. <u>The Liquidation Trustee Cannot Refute That The Remote Releases Are Contrary To *Master Mortgage*.</u>

The Liquidation Trustee acknowledges that the five-part *Master Mortgage* test should apply to the Remote Debtor Release but misstates law and fact in analyzing each. (TAB, 37). While he argues in one place that this standard does not apply to consensual releases (TAB, 44), elsewhere he admits it does. (TAB, 12). The latter is correct because, as shown below, the Third-Party Releases are non-consensual.

*First*, the Liquidation Trustee ignores the dictum of *In re Master Mortgage Inv. Fund*, 168 B.R. 930 (Bankr. W.D. Mo. 1994), that non-debtor releases are to be a "rare thing" that should only be approved where there are "exceptional

circumstances." *Id*. at 937. The Remote Releases are anything but—they release thousands of persons and entities across 108 categories, unbounded in time. They are a giveaway to untold thousands more reminiscent of confetti being strewn at a parade than a justifiable release.

*Second*, the Liquidation Trustee ignores that Debtors bore the burden of demonstrating that the Remote Releases satisfied these factors but produced no supporting evidence. (OB, 36).

*Third*, the Liquidation Trustee suggests that *Master Mortgage* involves factual determinations. This is incorrect but, irrespective, unhelpful to him. Whether each of the five criteria is satisfied is a legal determination which, to be sure, is influenced by facts specific to each Remote Release. Here, however, the facts demonstrate the need for reversal, including: a) Debtors did no investigation of the Remote Releases; b) Debtors' CRO agreed he did not know the identity of the vast majority of Remote Released Parties; c) the Remote Releases extend to thousands of persons and entities across 108 categories; and d) no Remote Released Party contributed anything, monetarily or otherwise.

*Fourth*, and most importantly, while the Liquidation Trustee argues that all five factors are satisfied regarding these Remote Releases, none are.

4932-9396-2085.2

1. **Identity of Interest.**

The Liquidation Trustee falsely argues there is an identity of interest between Debtors and the "Released Parties" because "they all worked toward the common goal of plan confirmation." (TAB, 16; *see also* TAB, 12-13, 16, 38-41). This is an example of where the Liquidation Trustee lumps the Remote Released Parties together with the Key Players to create a misimpression. There may be an identity of interest between Debtors and the six Key Players, but not with the Remote Released Parties. Again, no Remote Released Party contributed anything. Contrary to the Liquidation Trustee's argument, the Remote Released Parties did not "share the common goal of confirming the Plan." (TAB, 38). They were uninvolved in the "settlement of complex multi-party litigation." (TAB, 39).

Releases were not necessary to "stave off costly litigation" with the Remote Released Parties. (TAB, 39). The Liquidation Trustee did not need to sue if he thought doing so was uneconomical. Absent the Remote Releases, he could have brought claims that created possibilities for greater recoveries for the Debtors' estates, and thus, for unsecured creditors. Yet, they now stand to receive nothing.

The Liquidation Trustee asserts it is "simply irrelevant" that he has no legitimate reason for avoiding litigation against the Remote Released Parties because his position only came into existence after the Plan was confirmed. (TAB, 40). That makes no sense.

4932-9396-2085.2

## 2. **Substantial Contribution.**

Here, too, the Liquidation Trustee attempts to create a misimpression, falsely asserting that "Released Parties" contributed sweat equity and made concessions. (TAB, 41; *see also* TAB, 13,16, 41-42). No Remote Released Party provided any sweat equity, made any concession or provided any consideration.

The Liquidation Trustee argues he has discretion to determine whether a contribution rises to the level of being "substantial." This ignores that no Remote Released Party made <u>any</u> contribution. None did anything that called for the exercise of discretion.

The Liquidation Trustee ignores that in cases where courts in this Circuit have upheld a non-debtor release under *Master Mortgage*, the released party provided necessary funding or other consideration for the plan. *See, e.g., Master Mortgage*, 168 B.R. at 937 (Skopbank assigned participation interests and released collateral interests which enabled a distribution to plan classes); *Matter of Fansteel Foundry Corp*, 2018 WL 5472928, at \*\*11-12 (Bankr. S.D. Iowa, Oct. 26, 2018) (cited TAB, 43-44) (released party provided "the only funding available to propose a viable plan."); *In re U.S. Fidelis, Inc*., 481 B.R. 503 (Bankr. E.D. Mo. 2012) (cited TAB, 44) (release enabled substantial distribution to consumers). The Remote Released parties provided nothing.

4932-9396-2085.2

### 3.     __Essential to Reorganization.__

The Liquidation Trustee premises his argument that the Remote Releases were "essential" on the false assumption that the Key Players would not have voted for the Plan unless these were included. (TAB, 13, 42-43). At the Confirmation Hearing, the CRO only opined that the Bondholders might not have voted for the Plan. Yet, the Bondholders themselves, despite being present, never said this was true, but instead sat mute. No evidence showed that the UCC, Pension Committee, Sisters of Mercy or Foundation would have walked away, and the Liquidation Trustee provides no credible reason why any Key Player would have.

Here, too, the Liquidation Trustee takes two irreconcilable positions, claiming that the Remote Releases were essential to reorganization (TAB, 13, 37, 42-43), yet asserting that it is "only . . . speculation" whether any claim existed against any of the thousands of Remote Released Parties. (TAB, 28).

### 4.     __Creditor Support For The Plan.__

The Liquidation Trustee notes that all voting classes supported the Plan (TAB, 43), but ignores that many who received ballots never returned them, abstained from voting for the Plan, or voted for the Plan but did not check the box objecting to the Third-Party Release. The Plan improperly treated everything as a consent to the Releases except where a claimant both voted against the Plan and checked a box objecting to the Third-Party Release. *Master Mortgage* did not consider what

constitutes "consent" for purposes of Third-Party Releases, but after *Purdue*, this plainly requires affirmative consent. *See infra*.

5.    **Mechanism For Payment Of All Claims.**

The Plan provides no mechanism to ensure payment of unsecured creditors' claims. To suggest otherwise, here, too, the Liquidation Trustee bends the truth, stating falsely that there have been "meaningful distributions to *the creditors affected by the Releases*." (TAB, 17; *see also* TAB, 43-44) (emphasis added). Instead, unsecured creditors in general and MercyOne's impaired class in particular have received nothing. The Liquidation Trustee admits on Page 1 that the prospect of payment is remote at best. (TAB, 1). Thus, while he argues this factor is met when creditors receive a greater distribution than in a Chapter 7 liquidation (TAB, 43), that standard fails here, where impaired creditors likely will receive no distribution.

The Liquidation Trustee repeatedly quips that the Releases do not strike one as wrong with the force of a five-week-old dead fish. (TAB, 36, 46, 50). Fish or not, because the Remote Releases fail each factor, they are dead on arrival, making the Plan unconfirmable. This requires reversal of the Confirmation Order and the District Court's affirmance of same. Notably, the Liquidation Trustee ignores *In re Riverbend Leasing, LLC*, 458 B.R. 520 (Bankr. S.D. Iowa 2011), which denied confirmation where a non-debtor release lumped those who made important contributions to reorganizations with others who did not and failed to substantiate

and made generalized comments about released parties' involvement. This case presents like circumstances supporting the same result.[4]

## C.    The Third-Party Releases Lack The Necessary Consent.

The Liquidation Trustee argues that the Third-Party Releases cannot be reviewed because the Plan has become effective and been substantially consummated in hopes to short-circuit any consideration of the merits of whether the Remote Releases violate *Purdue* because they lack the consent of all affected parties. (TAB, 31). That misreads *Purdue*, which states that the Supreme Court *took no position* on the decision's application in such circumstances. *Purdue*, 603 U.S. at 226. Here, *Purdue*'s holding is best served if it applies even if the Plan were substantially consummated, because MercyOne timely sought stays in both lower courts, which were denied based on each court's erroneous belief that MercyOne's position lacked merit. Because this was error, the fact that this resulted in the Plan moving forward provides no legitimate basis for letting the overbroad and unjustifiable Remote Releases remain enforceable, especially when they can be readily excised. As few lower courts would approve a third-party release if they believed their ruling was unlikely to succeed on the merits, and if the failure to grant

---

[4] The Liquidation Trustee relies on *In re Millennium Lab Holdings II, LLC*, 591 B.R. 559, 569, 585-86 (D. Del. 2018). There, the equity holders receiving the challenged release contributed $325 million, which was the "centerpiece" of the Plan. Here, no Remote Released Party contributed a penny.

a stay alone precluded review, many offending releases would remain enforceable, undermining *Purdue*.

Irrespective, the Plan has not been substantially consummated under Eighth Circuit standards. Unsecured creditors have received no distribution, although MercyOne understands that a small number of administrative or secured creditors may have received one. Therefore, payment has not commenced to substantially all creditors. Thus, in *In re Heatron*, 34 B.R. 526, 529 (Bankr. W.D. Mo. 1983), the court found a plan had been substantially consummated for purposes of 11 U.S.C. §1101(2)(c) where, *inter alia*, 53% of creditors received distributions. This Court read *Heatron* favorably in *In re Olsen,* 861 F.2d 188, 190 (8th Cir. 1988) (finding plan was not substantially consummated on other grounds). So have other courts. *See In re Jorgensen*, 66 B.R. 104 (B.A.P. 9th Cir. 1988) ("The word 'substantial' suggests more than halfway, more than a mere preponderance.") (citing *Heatron*); *In re Dean Hardwoods, Inc.*, 431 B.R. 387, 391 (Bankr. E.D.N.C. 2010) (requiring distribution to commence to substantially all creditors) (cited OB, 52). The Liquidation Trustee ignores this Circuit's authority, instead citing other courts that read §1101(2)(c) differently.

Regarding substance, the Liquidation Trustee cannot overcome that all affected creditors have not consented to the Remote Releases, as *Purdue* requires. The Plan treated those who did not return a ballot or did so but did not check the box

14

regarding the Third-Party Release as agreeing to the Releases. It therefore relies on implied and not actual consent, as required. Moreover, it does not allow for a party to oppose the Plan while agreeing to the Releases, or to agree to the Plan but not the Releases, or to agree to the Releases except for the Remote Release portion, as MercyOne would. Therefore, the Third-Party Release fails under *Purdue*.

The Liquidation Trustee dwells on the fact that, in *Purdue*, claims already had been brought by non-debtors against non-debtors (TAB, 32), but the ruling is not so limited. To excuse the consent unless a suit between nondebtors already existed would make enforceability turn on the vagaries of other nondebtors and mean unwilling claimants could have overreaching releases thrust upon them.

Similarly, that the released parties in *Purdue* had withdrawn substantial amounts from the company also is peripheral to the holding. (TAB, 32). The ruling requires consent irrespective of the circumstances giving rise to the particular third-party release.[5]

The Liquidation Trustee agrees with MercyOne that *In re Smallhold*, 665 B.R. 704 (Bankr. D. Del. 2024), is the leading decision concerning what consent is necessary post-*Purdue* (TAB, 33-35) but distorts what *Smallhold* holds. The court

---

[5] The Liquidation Trustee claims it is "notable" that the U.S. Trustee did not object to confirmation. Yet the Plan was confirmed before *Purdue* issued. As noted in the Opening Brief, since then, the U.S. Trustee's office has objected consistently nationwide to plan releases relying on implied consent. (OB, 34 & n.17 (presenting examples).

4932-9396-2085.2

there held that a contract model should apply and that this requires affirmative consent. *Id*. at 708-10. It held that the traditional opt-out model would not suffice, because it assumes those that do not respond agree to releases, when *Purdue* requires a manifestation of consent. It held that "[a]s a general proposition, creditors must affirmatively express consent to the release in order to be bound by it." *Id*. at 717. It noted, "the creditor's silence in the face of a plan and form of ballot can no longer be sufficient." *Id*. at 720. In *Smallhold*, unlike here, the plan did not deem failure to return a ballot as consent. *Id*. at 710. Significantly, the court took issue with *In re Robertshaw U.S. Holding Corp*., 662 B.R. 300 (Bankr. S. D. Tex. 2024),[6] *id*. at 721-22 & n.53, which the Liquidation Trustee emphasizes. (TAB, 31, 33). The court also noted that *Purdue*'s reasoning overrules other Delaware Bankruptcy Court decisions the Liquidation Trustee relies upon, including *In re Mallinckrodt*, 639 B.R. 837 (Bankr. D. Del. 2022) (cited TAB, 21, 45). *See Smallhold*, 665 B.R. at 718-19 (citing *Purdue,* 665 B.R. at 719).

---

[6] The Liquidation Trustee notes that *Robertshaw* had a similarly expansive list of released parties. (TAB, 35-36). That, of course, only applied to the debtor, while here the same 18 categories of Remote Released Parties additionally apply to five other entities. Irrespective, the point is immaterial. Under *Purdue*, parties may affirmatively agree on broad release terms. Here, the Debtors Release is imposed on those who voted against the Plan, while, as noted, the Third-Party Release binds many besides those who voted for the Plan, including those who did not vote at all.

4932-9396-2085.2

**D. MercyOne Has Standing To Appeal Both Releases.**

    **1. MercyOne Has Standing As An Impaired Creditor.**

The Liquidation Trustee urges this Court to create a circuit split with the Second and Ninth Circuits, which each hold that being an impaired creditor suffices to create standing to challenge plan confirmation. The holding of *In re DBSD N. Am., Inc.*, 634 F.3d 79, 89 (2d Cir. 2011), directly pertains to the circumstances here and holds: the standing inquiry"[*has*] *never demanded more to accord a creditor standing than that it has a valid and impaired claim.*"[7] Because the status of being an impaired creditor suffices to establish standing, the Liquidation Trustee's argument that "several steps" would have to occur before MercyOne had standing (TAB, 23-25), *which is based on decisions not involving impaired creditors*, fails.

In *DBSD*, the Second Circuit held that an unsecured creditor whose claim was valued at $2 million for voting purposes had standing to appeal confirmation of a plan that stood to pay that creditor less than half and separately had standing to challenge the transfer of property to debtors' shareholder as a gift that should have

---

[7] Citing Supreme Court authority concerning standing for the separate purposes of a class action, the Liquidation Trustee notes that Article III requires a concrete injury for standing. (TAB, 21-22) (citing *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021)). That creates no standing problem for MercyOne, as *DBSD* grounded its holding in Article III. *DBSD*, 634 F.3d at 88-90. The Liquidation Trustee notes that merely challenging the inherent fairness of a bankruptcy cannot satisfy the "aggrieved standard." (TAB, 22). Yet MercyOne makes no generalized fairness challenge but instead attacks specific plan provisions forfeiting claims belonging to Debtors' estate.

been available to pay unsecured creditors.[8] The Court rejected arguments that the creditor lacked standing because its claim was "out of the money" or "under water." So here, MercyOne has standing to challenge the Plan where it stands to receive less than the value of its claim. Indeed, the Liquidation Trustee advises that MercyOne's impaired class likely will receive nothing. (TAB, 1). As in *DBSD*, here, MercyOne has a financial stake in challenging the Remote Releases, which transfer away property belonging to the estate which otherwise could have been available to pay its claim and those of other unsecured creditors. (TAB, 18).

The Liquidation Trustee even acknowledges that "[t]he Second and Ninth Circuits 'general[ly]' find 'creditors have standing to appeal orders of the bankruptcy court *disposing of property of the estate* because such orders directly affect the creditors' ability to receive payment of their claims.'" (TAB, 27) (quoting *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 642 (2d Cir. 1988) (emphasis original), and citing *In re P.R.T.C., Inc.,* 177 F.3d 774, 778 (9th Cir. 1999), as "similar."). Yet this is true here. Courts hold that a plan's release of claims constitutes a transfer of property of the estate. *See In re e2 Commc'ns, Inc.*, 320 B.R. 849, 855 (Bankr. N.D. Tex. 2004) (so holding); *Jones v. Harrell*, 858 F.2d 667 (11th Cir. 1988) (post-petition release of pre-petition claim was avoidable transfer of estate property).

---

[8] The Liquidation Trustee focuses solely on *DBSD*'s second basis for standing and ignores the first. (TAB, 28).

*Kane* also holds that a creditor whose economic interests are directly impaired by a plan has standing because that plan gives him "less than what he might have received." 843 F.2d at 642. So here, had the claims against Remote Released Parties been preserved, the Plan may have distributed more to MercyOne than it stands to receive.[9]

In asking this Court to disregard this authority, the Liquidation Trustee relies on cases cited by the District Court which MercyOne already distinguished in its Opening Brief but ignores MercyOne's analysis. Thus, the Liquidation Trustee cites *In re LTV Steel Co*., 560 F.3d 449, 455 (6th Cir. 2009), as holding that "simply holding a claim of any type against the estate does not automatically confer appellate standing under the 'person aggrieved doctrine.'" (cleaned up). But MercyOne does not base standing on having a claim "of any type." MercyOne has standing *because it has an impaired claim*. Moreover, as noted in MercyOne's Opening Brief, *LTV* did not involve claims of impaired unsecured creditors who were challenging plan provisions that diminished recovery prospects, but instead held an *administrative claimant* lacked standing to challenge an order which would not impact that administrative claim. (OB, 17, n.9).

---

[9] To establish standing, all MercyOne needed to show is that the Plan gives it less than what it might have received. It need not describe "an alternative plan." (TAB, 28).

The Liquidation Trustee erroneously claims that *In re Hecker*, 496 B.R. 541, 550-51 (B.A.P. 8th Cir. 2013) (cited TAB, 25; OB, 27-28), concerned standing of an unsecured creditor. It instead concerned a secured creditor with a lien, GMAC, but posited that even if GMAC were an unsecured creditor, it and the estate would not benefit from voiding separate liens of judgment creditors.

Contrary to the Liquidation Trustee's assertion, *In re Citation Corp.*, 371 B.R. 518 (N.D. Ala. 2007) (cited TAB, 24, 28; OB, 27), a claimholder was found to not be aggrieved because it retained a potentially allowed unsecured claim and stood to be fully paid under the plan. MercyOne's impaired class has no such prospects.

The Liquidation Trustee cites two additional cases that fare no better. The first, *In re GT Automation Group, Inc.*, 828 F.3d 602, 605 (7th Cir. 2016) (TAB, 26-27), concerned a Chapter 7 liquidation in which an unsecured creditor failed to assert standing to challenge the grant of a law firm's fee application and failed to dispute (thus admitting) the law firm's argument that it had no possibility to recover anything on its unsecured claim. In this Chapter 11 bankruptcy, MercyOne has vigorously argued its bases for appellate standing in the District Court and now this Court.

The other, *In re The Watch Ltd.*, 257 F. App'x 748 (5th Cir. 2007) (TAB, 27), concerned the sale of a debtor's assets to the highest bidder at an auction, not plan confirmation. The appellant, an equity holder with a small additional unsecured claim, did not object to that sale at the bankruptcy court's hearing. Because he had

not obtained a stay, the District Court on first tier appeal found his appeal moot. The Fifth Circuit agreed, noting, therefore, it did not need to reach standing and did not do so, but observed that the possibility that appellant would be paid on his unsecured claim was speculative.

Contrary to the Liquidation Trustee (TAB, 20), MercyOne <u>would</u> gain from the Court's reversal of the lower courts' approval of the Remote Releases, because the Liquidation Trustee could then pursue recoveries from potentially thousands of additional parties to benefit MercyOne and other impaired claimants. By contrast, *In re Merrifield*, 214 B.R. 362, 365-66 (B.A.P. 8th Cir. 1997) (cited TAB, 20), held that a chapter 13 debtor lacked standing to avoid a prepetition fraudulent transfer and therefore to appeal the bankruptcy court's decision, where Congress vested such powers in a trustee and the bankruptcy court judgment "had no negative effect on the on the debtor's pecuniary interests" because debtor would gain nothing by avoiding the transfer.

Courts hold that the nature of reorganization plans gives impaired creditors a basis for appellate standing that other interested parties lack. *See Newspaper & Mail Deliverers' Union of New York & Vicinity v. Imperial News Co.*, 1991 WL 243458, at *2 (S.D.N.Y. Nov. 12, 1991) ("Creditors are always affected pecuniarily by reorganization plans because these plans allocate estate assets among creditor groups and determines the extent to which each creditor is to be paid. For this reason, the

21

creditor differs from other parties not permitted to challenge orders affecting the estate.").

Nonetheless, the Liquidation Trustee principally relies on *Opportunity Finance, LLC v. Kelley*, 822 F.3d 451 (8th Cir. 2016), to contest MercyOne's standing. Yet *Opportunity Finance* did not involve the standing of an impaired creditor like MercyOne. It held that a debtors' *lender*, which filed no proof of claim, lacked standing. The lender sought to challenge the estates' substantive consolidation, not plan confirmation. The lender complained that substantive consolidation might cause it to lose affirmative defenses in third-party litigation. The case did not concern an estate's forfeiture of claims that would have existed for the benefit of all estate creditors.

The other Circuit authority the Liquidation Trustee cites is likewise inapposite. *In re Wigley*, 886 F.3d 681 (8th Cir. 2018) (cited TAB, 18-21; OB, 21-22), held that a debtor's wife, not an impaired creditor, could not challenge the bankruptcy court's rejection of her settlement of claims against because that ruling simply restored pre-existing claims.

In *In re AFY*, 734 F.3d 810 (8th Cir. 2013) (cited TAB, 22, 30; OB, 27), this Court held that, under the "shareholder standing rule," shareholders with only a derivative interest lacked standing to appeal a bankruptcy court decision.

4932-9396-2085.2

In *In re Levitt*, 632 B.R. 527 (B.A.P. 8th Cir. 2021) (cited TAB, 25), the court held that because *chapter 7 debtors* were divested of all rights in nonexempt property through the creation of the bankruptcy estate, they lacked standing to appeal bankruptcy court orders granting a trustee's fee application and denying their motion to remove the trustee because neither impacted their discharge

The Liquidation Trustee also relies on a Fifth Circuit case—*In re Highland Cap. Mgmt., L.P.,* 74 F.4th 361, 367 (5th Cir. 2023) (cited TAB, 29)—which, too, is inapposite. *Highland* held that a creditor lacked standing to appeal a denial of its objection to professional fees where its claim previously was disallowed.

Because it is adversely affected by the confirmed Plan, MercyOne may challenge its terms, making the Liquidating Trustee's cases (TAB, 21, n.3), inapposite.[10] In *Talarico v. Ultra Petroleum Corp.,* 2020 WL 8361996, at *3 (S.D. Tex. Dec. 29, 2020), *aff'd*, 2022 WL 989389 (5th Cir., Apr. 1, 2022), the court found that by opting out of releases, appellant lost standing to challenge them. Importantly, however, that appellant had participated in devising the plan and had no possibility of recovery. *In re Dynegy*, 770 F.3d 1064, 1069-71 (2d Cir. 2014), did not concern the validity of a third-party release, but instead a bankruptcy court's refusal to permit

---

[10] As noted in the Opening Brief (OB, 31-32), one case, *Patterson v. Mahwah Bergen Retail Group, Inc*., 636 B.R. 641 (E.D. Va. 2022), supports MercyOne by holding that silence cannot constitute consent to a release, a holding the Liquidation Trustee ignores.

4932-9396-2085.2

a named plaintiff to pursue a class action, where that plaintiff preserved his individual claims. *In re Tonopah Solar Energy*, *LLC,* 657 B.R. 393, 406-407 (D. Del. 2022), distinguished between impaired creditors (like MercyOne), which have appellate standing and unimpaired creditors, who must show other grounds, and emphasized that unsecured creditors stood to be fully paid.

The Liquidation Trustee erroneously argues that "MercyOne has not identified any claim against the Related Parties that the Debtor Releases purportedly let go." (TAB, 28).[11] To the contrary, the Remote Releases release each Remote Released Party from *every* claim. MercyOne's Opening Brief quotes Plan Art. XIV.D.1-2, which makes clear that each releases each Remote Released Party "**from any claim, Claim, Cause of Action, . . . suit, judgment, damages, . . . right, liability, action, proceeding, suit, . . . controversy," or right to legal, equitable or other remedy, whether known or unknown.**" (App.0847-48, Bankr.R._Doc._1050, at Art.XIV.D.1-2) (emphasis original).

While both lower courts asked MercyOne to identify what specific claims were forfeited by a release, no authority requires this, certainly of an impaired creditor, and the Liquidation Trustee identifies none.

---

[11] The Liquidation Trustee renames the "Remote Released Parties" as "Related Parties" even though it includes outside advisors, consultants and professionals.

## 2. MercyOne Independently Has Standing Due To Harm Caused By The OC's Rule 2004 Process.

The Liquidation Trustee cannot deny that since January 2025, MercyOne has been put through an expensive, onerous Rule 2004 discovery process by the OC. Because the OC, like the Liquidation Trustee, was appointed under an invalid plan, it lacks authority to pursue this discovery. That MercyOne is being put to significant burden and financial expense by an entity that lacks valid authority, independently supports its standing. The Liquidation Trustee responds by noting that *Opportunity Finance* holds that allowing litigation to proceed does not make a defendant a party aggrieved. The Liquidation Trustee ignores the two reasons MercyOne presented in its Opening Brief showing why this argument fails. *First*, Rule 2004 is not a litigation process, nor an adversary proceeding. MercyOne's complaint was that it was facing the kind of deposition and written discovery it would face if the OC already had sued, when it had not. More importantly, this holding of *Opportunity Finance* refers to litigation's customary risks and burdens.[12] MercyOne does not complain about these but rather the OC's lack of authority to pursue any matter against it.

The OC has now engaged in further ultra vires conduct by suing MercyOne.[13]

_____

[12] The same reason distinguishes *In re Haire Ford*, 764 F.3d 1321 (11th Cir. 2014) (order subjecting party to litigation creates only indirect harm to interest of avoiding liability).

[13] *See* Bankr.R._Doc._2038.

4932-9396-2085.2

### 3. The Liquidation Trustee's Illusory "Offer" To Pay MercyOne's Claim Does Not Impact Standing.

As MercyOne noted in its opposition to the Liquidation Trustee's motion to pay its claim,[14] the Liquidation Trustee's purported "offer" was illusory, because he retained a full reservation of rights to claw it back, which he ignores. *Indeed, the Liquidation Trustee includes the same reservation of rights in its brief.* (TAB, 14, n.2). Thus, irrespective of whether MercyOne accepted payment or had payment forced on it, the Liquidation Trustee demonstrates his intent to unwind this and take the money back once this appeal ends. The Liquidation Trustee also ignores that he continues to object to MercyOne's claim. He ignores and thus concedes the many cases MercyOne cited demonstrate that this offer violated 11 U.S.C. §1123(a)(4) and, if accepted, would have exposed MercyOne to challenges from fellow class members who received little or no payment. (*See* OB, 11, 15-16, 28-29).

The Liquidation Trustee suggests that MercyOne's real gripe is that it is being sued. (TAB, 18). It is, of course, possible for MercyOne to have two gripes—its status as a defendant and the Plan's forfeiture of possible avenues for paying impaired creditors like itself. Here, both "gripes" stem from common concerns— that the Plan, by being tainted by the Remote Releases, is presently unenforceable

---

[14]MercyOne's Opposition to Appellee's Motion to Dismiss Appeal, May 27, 2025, at 6, EntryID 5520463.

and that the Liquidation Trustee, by being created by that tainted Plan, lacks authority to act.

**E.     The Business Judgment Rule Does Not Apply Where Debtors Did Not Investigate Claims Released By The Remote Releases.**

The business judgment rule cannot save the Remote Releases. The Liquidation Trustee inaccurately asserts that the CRO, Debtors' lone confirmation witness, "concluded the Debtor Releases represented a reasoned application of the Debtors' business judgment." (TAB, 7, 45-50). Rather, the CRO exercised no business judgment: he admitted he did no investigation into what possible claims Debtors had against any of the Remote Released Parties, including avoidance actions. (App.1138, 1139-41, 11144-46, 1150-51, Bankr.R._Doc._1145, at 30:15-22, 31:23-32:10, 32:24-33:4, 36:24-37:3, 38:25-39:2, 42:18-43:1). He could not identify any Remote Released Party who contributed anything toward the Plan or bankruptcy. (App.1163, Bankr.R._Doc._55:21-25).

The Liquidation Trustee notes the CRO had 37 years of experience, focusing on the healthcare industry. (TAB, 9). This makes his failure to investigate and lack of curiosity regarding the nature of the released claims even more indefensible. He also asserts that the CRO relied on counsel regarding the Releases (TAB, 10, 17, 49), but Debtors produced no evidence that their counsel did anything to assess claims being released.

4932-9396-2085.2

The CRO testified that "several Released Parties ha[d] indemnity rights against the Debtors." (TAB, 40). He identified none. Irrespective, if several Remote Released Parties were covered by an indemnification agreement, the answer would have been to not sue these several parties, not to release thousands of unrelated parties from all claims.

While the Liquidation Trustee notes the Bankruptcy Court emphasized the CRO's representation that the Bondholders would not have supported the Plan without the Releases, the Bondholders never said their support depended on the Remote Releases and submitted no evidence supporting this. Had they done so they would have been subject to cross-examination. The CRO's affidavit in support of Debtors' First Day Motions identified the Bondholders as one of four causes of Debtors' demise and they otherwise plainly faced litigation. (App.0001, Bankr.R._Doc.__27, at 22-26). It is folly to think the Bondholders would have sacrificed their own release, unless, by way of example, the Plan also released the Foundation's landscaper (a "professional").

## CONCLUSION

This Court should reverse the lower courts' respective orders confirming the Plan and upholding this order.

4932-9396-2085.2

Dated: September 3, 2025

Respectfully submitted,

_/s/ David B. Goroff_

David B. Goroff
Nora J. McGuffey
**FOLEY & LARDNER LLP**
321 N. Clark Street, Suite 3000
Chicago, IL 60654
Tel: (312) 832-4500
Fax: (312) 832-4700
dgoroff@foley.com
nora.mcguffey@foley.com

4932-9396-2085.2

## CERTIFICATION OF COMPLIANCE

This Reply Brief complies with the typeface requirements of Fed.R.App.32(a)(5) and the type-style requirements of Fed.R.App.P.32(a)(6) because it has been prepared in Microsoft Word using a proportionally spaced typeface—Times New Roman 14 point. This Reply Brief is within the type-volume limitation of Fed.R.App.P. 28 which permits up to one-half the length of the Opening Brief—i.e., 6,500 words. As determined by the Word Count feature of Microsoft Word, the Opening Brief contains 6,466 words, excluding the parts of this Brief exempted under the Federal Appellate Rules and Local Rules.

<i>/s/ David B. Goroff</i>
David B. Goroff

## CERTIFICATE OF SERVICE

I hereby certify that on September 3, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

<i>/s/ David B. Goroff</i>
David B. Goroff

4932-9396-2085.2